1    UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF LOUISIANA

3

4    MCARTHUR GRIFFIN

5        Plaintiff

6            CIVIL ACTION NO: 3:20-92-BAJ-EWD

7    VERSUS

8

9    REC MARINE LOGISTICS, LLC, ET AL

10        Defendant

11

12

13

14        Deposition of GULF OFFSHORE LOGISTICS

15    through corporate representative, BRIAN HARRIS, taken

16    on Wednesday, May 12, 2021, commencing at 10:09 in

17    the office of REC Marine Logistics, 4535 Highway 308,

18    Raceland, Louisiana 70394.

19

20

21

22

23

24

25

**Page 2**

1    APPEARANCES:
2    MORROW & SHEPPARD
     5151 San Felipe, Suite 100
3    Houston, Texas 77056
     Phone: (713) 489-1206
4    Email: dsheppard@morrowsheppard.com
        BY: DANIEL E. SHEPPARD, ESQUIRE
5        Attorney for: McArthur Griffin
6
7    PUSATERI, BARRIOS, GUILLOT AND GREENBAUM, LLC
     1100 Poydras Street, Suite 2250
8    New Orleans, Louisiana 70163
     Phone: (504) 620-2500
9    Fax: (504) 620-2510
     Email: kyle.khoury@pjgglaw.com
10        BY: KYLE A. KHOURY, ESQUIRE
         Attorney for: REC Marine Logistics
11
12
13   LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD
     601 Poydras Street, Suite 2775
14   New Orleans, Louisiana 70130
     Phone: (504) 568-1990
15   Email: lscott@lawla.com
        BY: LORIN R. SCOTT, ESQUIRE
16       Attorney for British Marine
17
18
19
20   REPORTED BY:
21   Belinda D. Vigueira
     Certified Court Reporter
22
23
24
25

**Page 3**

1                I N D E X

2    Title            1
     Appearances          2
3    Stipulation        4
     Examination by Mr. Sheppard      5
4    Examination by Mr. Khoury      141
     Examination by Mr. Sheppard     159
5    Witness' certificate     169
     Reporter's certificate      170
6
7            EXHIBIT INDEX
8    Exhibit 1   Notice of Deposition         7
9    Exhibit 2   JSA Review         20
10   Exhibit 3   GOL JSA worksheet        24
11   Exhibit 4   Daily Boat Log       26
12   Exhibit 5   GOL Evaluation form        35
13   Exhibit 6   GOL Evaluation form        36
14   Exhibit 7   GOL Fax 9/22/15        38
15   Exhibit 8   JNB Pre-Employment Application   39
16   Exhibit 9   REC Application for Employment   41
17   Exhibit 10  Declaration of William Badeaux    51
18   Exhibit 11  Handwritten statement 5/13/18    69
19   Exhibit 12  Personal Incident/Illness Report  72
20   Exhibit 13  Page from HSE manual       81
21   Exhibit 14  GOL Training Matrix      106
22   Exhibit 15  Cell Phone Use Policy      139
23   Exhibit 16  Handwritten Statement by Griffin  148
24   Exhibit 17  Handwritten note of Harris     153
25   Exhibit 18  Handwritten note of Harris     167

**Page 4**

1        S T I P U L A T I O N

2

3        It is stipulated and agreed by and between

4    counsel that the deposition of Brian Harris is hereby

5    being taken under Article 1421, et seq, Louisiana

6    code of Civil Procedure for all purposes in

7    accordance with law;

8        That the formalities of filing, and

9    certification are hereby waived;

10       That the formalities of reading and signing

11   are specifically not waived;

12       That all objections, except those as to the

13   form of the question and/or responsiveness of the

14   answer, are hereby reserved until such time as this

15   deposition or any part thereof may be used in

16   evidence.

17   * * * * * * * *

18       BELINDA D. VIGUEIRA, Certified Court

19   Reporter, in and for the State of Louisiana,

20   officiated in administering the oath to the witness.

21

22

23

24

25

EXHIBIT

12

Page 5

| | | |
|---|---|---|
| 10:01:07 | 1 | VIDEOGRAPHER: |
| 10:09:17 | 2 | We're on the record to begin the video |
| 10:09:31 | 3 | recorded deposition of REC Marine Logistics, |
| 10:09:36 | 4 | LLC with Brian Harris representative. Taken |
| 10:09:41 | 5 | in the matter of McArthur Griffin versus REC |
| 10:09:45 | 6 | Marine Logistics, LLC, et al. Today's date |
| 10:09:47 | 7 | is May 12, 2021 and the time is, |
| 10:09:50 | 8 | approximately, 10:10 A.M. This case is filed |
| 10:09:53 | 9 | in United States District Court for the |
| 10:09:55 | 10 | Middle District of Louisiana under docket |
| 10:09:58 | 11 | number 3:20-92-BAJ-EWD. This deposition is |
| 10:10:06 | 12 | being held at 4535 Highway 308, Raceland, |
| 10:10:12 | 13 | Louisiana. The court reporter is Belinda |
| 10:10:14 | 14 | Vigueira. I'm Shawn Royston. We are both |
| 10:10:17 | 15 | representatives of Torres Reporting and |
| 10:10:19 | 16 | Associates. Can all counsel present please |
| 10:10:22 | 17 | state your name and firm affiliation for the |
| 10:10:23 | 18 | record. |
| 10:10:25 | 19 | MR. SHEPPARD: |
| 10:10:25 | 20 | Daniel Sheppard for the plaintiff. |
| 10:10:27 | 21 | Morrow and Sheppard, LLP. |
| 10:10:28 | 22 | MR. KHOURY: |
| 10:10:28 | 23 | Kyle Khoury with Pusateri, Johnston, |
| 10:10:31 | 24 | Guillot, Greenbaum for REC Marine Logistics, |
| 10:10:35 | 25 | LLC. |

Page 6

| | | |
|---|---|---|
| 10:10:36 | 1 | MS. SCOTT: |
| 10:10:39 | 2 | Lorin Scott for Lugenbuhl, Wheaton, Peck |
| 10:10:37 | 3 | for British Marine. |
| 10:10:42 | 4 | VIDEOGRAPHER: |
| 10:10:42 | 5 | Would the court reporter please swear in |
| 10:10:42 | 6 | the witness. |
| 10:10:42 | 7 | * * * |
| 10:10:42 | 8 | BRIAN HARRIS, AFTER FIRST BEING DULY SWORN |
| 10:10:42 | 9 | IN THE ABOVE-ENTITLED MATTER, DID TESTIFY ON HIS OATH |
| 10:10:42 | 10 | AS FOLLOWS: |
| 10:10:42 | 11 | * * * |
| 10:10:42 | 12 | EXAMINATION |
| 10:10:55 | 13 | BY MR. SHEPPARD: |
| 10:10:55 | 14 | Q Good morning. |
| 10:10:56 | 15 | A Good morning. |
| 10:10:57 | 16 | Q Can you state your name for the record, sir? |
| 10:10:59 | 17 | A Brian Harris. |
| 10:11:00 | 18 | Q Mr. Harris, I see some documents in front of |
| 10:11:06 | 19 | you. Are those the depo notices or are they something |
| 10:11:07 | 20 | else? |
| 10:11:08 | 21 | A No. Depo notices. |
| 10:11:10 | 22 | Q Okay. Is there one for REC Marine? |
| 10:11:13 | 23 | A Yes. |
| 10:11:14 | 24 | Q May I take a look at it, sir? |
| 10:11:16 | 25 | A Exhibit-A. |

Page 7

| | | |
|---|---|---|
| 10:11:19 | 1 | MR. KHOURY: |
| 10:11:21 | 2 | You don't have to show him the one with |
| 10:11:21 | 3 | your notes. Those are based on our |
| 10:11:23 | 4 | conversations, but if you have a blank one. |
| 10:11:25 | 5 | MR. SHEPPARD: |
| 10:11:25 | 6 | No, that's fine. I have one here. Mark |
| 10:11:34 | 7 | this as Exhibit 1. It's going to be the |
| 10:11:39 | 8 | deposition notice for today. |
| 10:11:45 | 9 | BY MR. SHEPPARD: |
| 10:11:46 | 10 | Q And are you here to give testimony on the |
| 10:11:52 | 11 | topics contained in the deposition notice? |
| 10:11:54 | 12 | A Yes. |
| 10:11:55 | 13 | Q Any there any topics that you aren't here to |
| 10:11:57 | 14 | give testimony on? |
| 10:11:58 | 15 | A No. |
| 10:12:00 | 16 | MR. KHOURY: |
| 10:12:00 | 17 | I think we just noted that we have some |
| 10:12:02 | 18 | objections to some of the topics, but other |
| 10:12:04 | 19 | than that. |
| 10:12:05 | 20 | BY MR. SHEPPARD: |
| 10:12:06 | 21 | Q Okay. Mr. Harris, have you given a |
| 10:12:08 | 22 | deposition before? |
| 10:12:09 | 23 | A No. |
| 10:12:10 | 24 | Q Okay. So, I'll go over a couple things that |
| 10:12:12 | 25 | help make it go a little bit more smoothly. Lots of |

Page 8

| | | |
|---|---|---|
| 10:12:18 | 1 | questions and, you know, it's not like a typical |
| 10:12:24 | 2 | conversation where you're gonna know where I'm going, |
| 10:12:25 | 3 | so you may want to answer; so if you let me finish the |
| 10:12:26 | 4 | question, go all the way through. Take a step. Let |
| 10:12:32 | 5 | Mr. Khoury object or Ms. Smith. |
| 10:12:33 | 6 | MS. SCOTT: |
| 10:12:33 | 7 | Scott. |
| 10:12:33 | 8 | BY MR. SHEPPARD: |
| 10:12:33 | 9 | Q Scott. Sorry. Ms. Scott object is well. |
| 10:12:38 | 10 | And that will give us a nice clean record. The court |
| 10:12:41 | 11 | reporter there is typing everything up and when we |
| 10:12:44 | 12 | start talking over each other it gets really hard for |
| 10:12:46 | 13 | her and makes it hard to understand what's being |
| 10:12:49 | 14 | written down. |
| 10:12:50 | 15 | A Okay. |
| 10:12:50 | 16 | Q Okay? If you don't understand a question, |
| 10:12:52 | 17 | just let me know. Um, you know, we'll try to figure |
| 10:12:55 | 18 | how to work it how so we both know what I'm asking, |
| 10:12:58 | 19 | and you know what you're answering. Is that fair? |
| 10:13:00 | 20 | A Yep. |
| 10:13:01 | 21 | Q If you don't understand a word that I'm |
| 10:13:02 | 22 | using, let me know. We'll try to figure it out and, |
| 10:13:05 | 23 | you know, get it so that you know all the words that |
| 10:13:08 | 24 | I'm using in every sentence. Is that fair? |
| 10:13:11 | 25 | A Yes. |

| | | |
|---|---|---|
| 10:13:11 | 1 | Q   Is there anything else that I can do to make |
| 10:13:14 | 2 | this deposition more fair to you? |
| 10:13:17 | 3 | A   I'm good. |
| 10:13:19 | 4 | Q   Okay.  And if you want to take a break at |
| 10:13:23 | 5 | anytime, just let me know and we can do it. |
| 10:13:26 | 6 | A   Okay. |
| 10:13:28 | 7 | Q   Are you on any sort of medication that would |
| 10:13:31 | 8 | make it difficult for you to testify here today? |
| 10:13:33 | 9 | A   No. |
| 10:13:34 | 10 | Q   Do you understand that you're giving |
| 10:13:34 | 11 | testimony under oath? |
| 10:13:38 | 12 | A   Yes. |
| 10:13:39 | 13 | Q   Okay.  And that's going to be binding on REC |
| 10:13:40 | 14 | Marine? |
| 10:13:41 | 15 | A   Yes. |
| 10:13:42 | 16 | Q   Okay.  Uh, again -- not again, but without |
| 10:13:45 | 17 | discussing or disclosing the content of any |
| 10:13:48 | 18 | conversations, have you had the opportunity to speak |
| 10:13:50 | 19 | with your lawyers today? |
| 10:13:51 | 20 | A   Yes. |
| 10:13:52 | 21 | Q   Have you spoke with them just today or more |
| 10:13:54 | 22 | than -- on other occasions? |
| 10:13:55 | 23 | A   Other occasions, also. |
| 10:13:57 | 24 | Q   Okay.  Um, when did you start speaking with |
| 10:14:01 | 25 | your lawyers today? |

| | | |
|---|---|---|
| 10:14:03 | 1 | A   Today?  9:30. |
| 10:14:04 | 2 | Q   Okay.  And kind of cheating here because |
| 10:14:08 | 3 | there's a visitor's log.  You met with Mr. Khoury |
| 10:14:12 | 4 | yesterday around 1:00? |
| 10:14:13 | 5 | A   Yeah. |
| 10:14:14 | 6 | Q   And about when did that conversation end? |
| 10:14:17 | 7 | A   Um, 2:30. |
| 10:14:18 | 8 | Q   Okay.  In preparation of this deposition here |
| 10:14:22 | 9 | today did you review any documents? |
| 10:14:25 | 10 | A   Yes. |
| 10:14:25 | 11 | Q   What documents did you review? |
| 10:14:27 | 12 | A   Um, incident report, logs, the exhibits here, |
| 10:14:36 | 13 | um, anything related to this, I guess. |
| 10:14:45 | 14 | Q   So, you reviewed the incident report for the |
| 10:14:47 | 15 | April 25th incident, and, also, the incident report |
| 10:14:50 | 16 | that was made for the subsequent incident? |
| 10:14:53 | 17 | A   Yes. |
| 10:14:53 | 18 | Q   Okay.  Did you review the statement that was |
| 10:14:57 | 19 | recorded by the folks over at Drew Aucoin's outfit? |
| 10:15:03 | 20 | A   I did not. |
| 10:15:04 | 21 | Q   Okay.  Did you review the written statements |
| 10:15:07 | 22 | that you made? |
| 10:15:08 | 23 | A   Yes. |
| 10:15:09 | 24 | Q   Did you review the written statements that |
| 10:15:10 | 25 | Mr. McArthur made? |

| | | |
|---|---|---|
| 10:15:12 | 1 | A   No. |
| 10:15:12 | 2 | Q   Okay. |
| 10:15:12 | 3 | A   Other than what he put on the incident |
| 10:15:15 | 4 | report. |
| 10:15:16 | 5 | Q   Okay.  Did you review -- you said you |
| 10:15:18 | 6 | reviewed the deck logs? |
| 10:15:21 | 7 | A   Yes. |
| 10:15:23 | 8 | Q   Was it -- was it all the deck logs or a |
| 10:15:25 | 9 | specific smattering? |
| 10:15:27 | 10 | A   No.  Yeah, just nothing specific, just kind |
| 10:15:30 | 11 | of glanced through them. |
| 10:15:32 | 12 | Q   Okay.  And then did you review any portions |
| 10:15:34 | 13 | of the safety manual, SMS manual? |
| 10:15:37 | 14 | A   Yes. |
| 10:15:38 | 15 | Q   What portions of that did you review? |
| 10:15:40 | 16 | A   Uh, personnel transfers. |
| 10:15:45 | 17 | Q   Anything else you can think of? |
| 10:15:46 | 18 | A   No. |
| 10:15:47 | 19 | MR. KHOURY: |
| 10:15:49 | 20 | We did talk about the two statements, |
| 10:15:51 | 21 | the handwritten statements that |
| 10:15:52 | 22 | Mr. Griffin -- he reviewed the two statements |
| 10:15:56 | 23 | Mr. Griffin wrote. |
| 10:15:59 | 24 | MR. SHEPPARD: |
| 10:15:59 | 25 | Okay. |

| | | |
|---|---|---|
| 10:16:00 | 1 | MR. KHOURY: |
| 10:16:01 | 2 | Yeah.  These and then his, um -- these |
| 10:16:07 | 3 | as well.  I think you have these. |
| 10:16:13 | 4 | MR. SHEPPARD: |
| 10:16:14 | 5 | These are contained in the first seven |
| 10:16:15 | 6 | pages of the document production as well. |
| 10:16:16 | 7 | A   Well, that's what I meant when I said we |
| 10:16:17 | 8 | reviewed -- other than the incident report, you know. |
| 10:16:18 | 9 | That's a part of that, so, yes, I did review his |
| 10:16:22 | 10 | statements as a part of that report. |
| 10:16:23 | 11 | BY MR. SHEPPARD: |
| 10:16:23 | 12 | Q   Okay.  Understood.  Okay.  Could you, uh -- |
| 10:16:30 | 13 | what do you do for a living? |
| 10:16:35 | 14 | A   HSE manager. |
| 10:16:37 | 15 | Q   Okay.  For which company? |
| 10:16:38 | 16 | A   REC Marine Logistics. |
| 10:16:43 | 17 | Q   Do you provide the, uh -- |
| 10:16:48 | 18 | Do you serve as the HSE manager for any of |
| 10:16:52 | 19 | the other defendants named in this lawsuit, GOL, OTS? |
| 10:16:55 | 20 | A   No. |
| 10:16:55 | 21 | Q   Okay.  When did you become the HSE manager of |
| 10:16:59 | 22 | REC? |
| 10:16:59 | 23 | A   Um, I guess it was around May 2016 when REC |
| 10:17:06 | 24 | merged with my previous company that I worked for, |
| 10:17:11 | 25 | Gulf Offshore Logistics. |

Page 13

10:17:15  1        COURT REPORTER:
10:17:15  2            Who's that?
10:17:15  3        THE WITNESS:
10:17:15  4            Gulf Offshore Logistics.
10:17:15  5    BY MR. SHEPPARD:
10:17:15  6        Q   Okay.  So, around May 2016 is when the two
10:17:21  7    companies just merged and became one?
10:17:24  8        A   Correct.  They merged, become one.  They
10:17:30  9    formed GOL, LLC and Gulf Offshore Logistics went away.
10:17:38 10        Q   Okay.  I have a question about that.  The --
10:17:47 11    did GOL exist before 2016?
10:17:53 12        A   No.
10:17:53 13        Q   Okay.  I just notice on the safety manual it
10:17:55 14    says GOL.
10:17:56 15        A   So, Gulf Offshore Logistics was known as GOL
10:17:59 16    for short, but it wasn't an actual --
10:18:01 17            You know, it wasn't GOL, LLC.
10:18:03 18        Q   Got ya.
10:18:04 19        A   So when they merged Gulf Offshore Logistics
10:18:07 20    had majority of the big contracts and things like
10:18:10 21    that, and everybody knew GOL already.  Knew the name
10:18:13 22    GOL, so they decided to create GOL, LLC just because
10:18:18 23    of the well-known name and Gulf Offshore Logistics
10:18:22 24    went away.  REC became the operating company for --
10:18:28 25        COURT REPORTER:

Page 14

10:18:28  1            What became the operating company?
10:18:28  2        A   REC Marine Logistics became the operating
10:18:28  3    company for GOL, LLC.
10:18:30  4    BY MR. SHEPPARD:
10:18:30  5        Q   Got ya.  And we'll run through a few just to
10:18:33  6    make it easier when we're speaking, so we know what
10:18:37  7    we're talking about since we've got a lot of acronyms
10:18:40  8    and very similar situated companies.  REC Marine
10:18:45  9    Logistics, LLC, I'll either probably call REC or REC
10:18:47 10    Marine; is that fair?
10:18:48 11        A   That's fair.
10:18:48 12        Q   Okay.  Gulf Offshore Logistics, LLC I'll
10:18:52 13    probably call Gulf Offshore.
10:18:53 14        A   Okay.
10:18:54 15        Q   And GOL, LLC I'll call GOL.
10:18:57 16        A   Okay.
10:18:58 17        Q   Offshore Transport Services I'll probably
10:19:00 18    just call OTS.
10:19:03 19        A   Okay.
10:19:03 20        Q   Are those fair?  You're gonna know what I
10:19:06 21    mean when I say all that, right?
10:19:08 22        A   I'll do the best I can.
10:19:09 23        Q   Okay.  So, as HSE manager, what are your
10:19:13 24    responsibilities to REC Marine?
10:19:15 25        A   I ensure all HSE requirements are met and

Page 15

10:19:19  1    that REC Marine Logistics stays in compliance with
10:19:25  2    everything regulatory.
10:19:29  3        Q   Like --
10:19:29  4        A   Coast Guard.
10:19:30  5        Q   Coast Guard, OSHA, whatever it may be.
10:19:32  6        A   Yeah.
10:19:39  7        Q   Were you responsible for developing or
10:19:43  8    updating the safety manual for REC?
10:19:46  9        A   No.
10:19:46 10        Q   My general understanding, let me know if I'm
10:19:49 11    wrong, is REC at some point had its own safety manual
10:19:53 12    but when it merged with Gulf Offshore Logistics, at
10:19:57 13    that point they had pulled in the manual for Gulf
10:20:02 14    Offshore Logistics and that became REC's manual; is
10:20:06 15    that fair?
10:20:07 16        A   Correct.
10:20:11 17        Q   Were there any changes made to the GOL manual
10:20:14 18    once it started getting used by REC?
10:20:18 19        A   No.
10:20:18 20        Q   Okay.  Do you have any idea when that manual
10:20:22 21    was first created?
10:20:24 22        A   I don't know.  I can tell you when Gulf
10:20:29 23    Offshore Logistics was established was around 2003.
10:20:32 24    So I'd imagine it was somewhere in that timeframe.
10:20:36 25        Q   Okay.  And, like I said, received updates

Page 16

10:20:39  1    every few years.
10:20:40  2        A   Oh, yeah.
10:20:41  3        Q   When was the last time it was updated, if you
10:20:44  4    know?
10:20:44  5        A   I do not know.
10:20:47  6        Q   I think in the manual itself it lists, kind
10:20:50  7    of, dates where certain materials were created.  Is
10:20:54  8    that something that we can rely on?
10:20:56  9        A   Yes.
10:20:57 10        Q   If it says June 2010, we know that that was
10:20:59 11    created on that particular month?
10:21:01 12        A   Yes.
10:21:07 13        Q   Did you have an opportunity to review the
10:21:09 14    statement of William Badeaux?
10:21:13 15        A   I did not.
10:21:14 16        Q   Okay.
10:21:14 17        COURT REPORTER:
10:21:14 18            I'm sorry.  That was the statement of
10:21:14 19    who?
10:21:17 20        MR. SHEPPARD:
10:21:17 21            William Badeaux, B-A-D-E-A-U-X.
10:21:20 22        BY MR. SHEPPARD:
10:21:23 23        Q   Did you watch any of the surveillance of
10:21:24 24    Mr. Griffin?
10:21:25 25        A   No.

Page 17

| | | |
|---|---|---|
| 10:21:26 | 1 | Q  Okay.  Did you speak, aside from your |
| 10:21:29 | 2 | lawyers, did you speak to anyone about this |
| 10:21:31 | 3 | deposition? |
| 10:21:32 | 4 | A  Um, maybe a couple people in the office, but |
| 10:21:38 | 5 | not in detail. |
| 10:21:39 | 6 | Q  Okay.  Did you give a -- did you give a call |
| 10:21:46 | 7 | to Captain Hauglund? |
| 10:21:47 | 8 | A  I did not. |
| 10:21:48 | 9 | Q  Am I saying his name right? |
| 10:21:50 | 10 | A  Yes. |
| 10:21:50 | 11 | Q  Okay.  Um, what about Captain Winhauer? |
| 10:21:56 | 12 | A  No. |
| 10:21:57 | 13 | Q  Did you speak with Casey Curule? |
| 10:22:00 | 14 | A  Just to be clear, you're talking about |
| 10:22:02 | 15 | this deposition, right. |
| 10:22:03 | 16 | Q  About this deposition or the, um, yeah, just |
| 10:22:06 | 17 | this deposition for now. |
| 10:22:08 | 18 | A  No. |
| 10:22:08 | 19 | Q  And what about Blaine Russell? |
| 10:22:08 | 20 | A  Um, I did talk to Blaine. |
| 10:22:12 | 21 | Q  Okay.  What did you and Blaine discuss? |
| 10:22:15 | 22 | A  Not much in detail, just what was going on |
| 10:22:17 | 23 | today.  I report everything to Blaine and my everyday |
| 10:22:19 | 24 | tasks get reported to Blaine, so just let him know |
| 10:22:22 | 25 | what was going on, what we were doing today and that's |

Page 18

| | | |
|---|---|---|
| 10:22:26 | 1 | really as far as we got. |
| 10:22:28 | 2 | Q  Okay.  Just want to put you on some |
| 10:22:30 | 3 | housekeeping issues.  Is the GOL Health Safety |
| 10:22:34 | 4 | Environmental manual, the, um, only manual used by REC |
| 10:22:40 | 5 | for health and safety? |
| 10:22:44 | 6 | A  Um, well, there's -- you talking about the |
| 10:22:46 | 7 | HSE manual, the operations manual, it's all one |
| 10:22:51 | 8 | package, ISM manual.  I don't know if that's what you |
| 10:22:55 | 9 | talking about, but those are other ones. |
| 10:22:59 | 10 | Q  Okay.  So there's -- |
| 10:23:02 | 11 | A  It's all part of the SMS manual. |
| 10:23:03 | 12 | Q  So, the manual like this. |
| 10:23:08 | 13 | A  Yes.  Yes, that's the only one that REC uses. |
| 10:23:10 | 14 | Q  I'm sorry if we covered this before.  Was |
| 10:23:14 | 15 | this manual in effect at the time of the incident |
| 10:23:14 | 16 | Mr. Griffin alleges happened? |
| 10:23:46 | 17 | A  Yes. |
| 10:23:47 | 18 | Q  Around May of 2018? |
| 10:23:47 | 19 | A  Yes. |
| 10:23:49 | 20 | Q  When we go through this deposition I'm going |
| 10:23:50 | 21 | to refer to the incident as the incident Mr. McArthur |
| 10:23:51 | 22 | Griffin alleges happened around May of 2018.  The one |
| 10:23:56 | 23 | that followed when he hit the fire rack? |
| 10:24:00 | 24 | A  Okay. |
| 10:24:03 | 25 | Q  Just so we understand each other when I say |

Page 19

| | | |
|---|---|---|
| 10:24:06 | 1 | "incident", that's kind of what I'm referring to? |
| 10:24:09 | 2 | A  Okay. |
| 10:24:12 | 3 | Q  Are there any policies in the GOL HSE manual |
| 10:24:20 | 4 | that do not apply to REC? |
| 10:24:23 | 5 | A  No. |
| 10:24:29 | 6 | Q  And the rules and policies associated with |
| 10:24:31 | 7 | the completion of incident reports and JSAs, those are |
| 10:24:36 | 8 | found in the manual, correct? |
| 10:24:38 | 9 | A  Yes. |
| 10:24:38 | 10 | Q  And those are the rules that apply for REC |
| 10:24:41 | 11 | employees? |
| 10:24:42 | 12 | A  Yes. |
| 10:24:47 | 13 | Q  Do you know whether or not Mr. Griffin was |
| 10:24:50 | 14 | provided with a personal copy of the HSE manual? |
| 10:24:58 | 15 | A  I don't know about a personal copy.  They are |
| 10:25:01 | 16 | provided on every vessel. |
| 10:25:03 | 17 | Q  Where do they stay at on the vessel? |
| 10:25:05 | 18 | A  On the bridge. |
| 10:25:06 | 19 | Q  Is it one copy; more than one copy? |
| 10:25:10 | 20 | A  One copy. |
| 10:25:25 | 21 | Q  Show you some things that were provided to |
| 10:25:27 | 22 | us.  This is the JSAs which is REC 1077 through 1083. |
| 10:25:37 | 23 | Sorry.  I'm not trying to trick you there. |
| 10:25:38 | 24 | I'm going to put one of these on before I forget. |
| 10:25:47 | 25 | MR. SHEPPARD: |

Page 20

| | | |
|---|---|---|
| 10:25:47 | 1 | I've marked the JSA reviews as |
| 10:25:50 | 2 | Exhibit -- Exhibit 2 to your deposition. |
| 10:25:55 | 3 | BY MR. SHEPPARD: |
| 10:25:56 | 4 | Q  Are these the -- is this the JSA form that |
| 10:26:01 | 5 | the captain or that -- that REC has people complete |
| 10:26:07 | 6 | when there's a JSA? |
| 10:26:08 | 7 | A  No.  The JSAs are more detailed than this. |
| 10:26:12 | 8 | This is just a sign-on sheet.  Um, I believe at the |
| 10:26:17 | 9 | time Captain Mike had created this.  This is not an |
| 10:26:21 | 10 | official REC form. |
| 10:26:23 | 11 | Q  Okay.  When -- so when -- is this -- is it |
| 10:26:27 | 12 | your understanding that this form is saying that this |
| 10:26:30 | 13 | is the topic of a JSA that was completed on this |
| 10:26:35 | 14 | specific date and these are the people that were |
| 10:26:37 | 15 | there? |
| 10:26:38 | 16 | A  That's correct. |
| 10:26:38 | 17 | Q  The form that REC actually requires its |
| 10:26:44 | 18 | captains to use is a bit more detailed than this, |
| 10:26:47 | 19 | right? |
| 10:26:48 | 20 | A  Yes. |
| 10:26:48 | 21 | Q  It outlines the topics that are discussed, |
| 10:26:51 | 22 | that goes into depth into what's being spoken about, |
| 10:26:57 | 23 | right? |
| 10:26:57 | 24 | A  Um-hum. |
| 10:26:59 | 25 | Q  So, in the review of the documents that were |

| | | |
|---|---|---|
| 10:27:03 | 1 | on the vessel, did you see that more thorough JSA |
| 10:27:07 | 2 | completed? |
| 10:27:12 | 3 | A  Um, I don't remember seeing that, the |
| 10:27:17 | 4 | detailed ones.  What this sign-on sheet does is |
| 10:27:21 | 5 | Captain Mike would review them and then he would have |
| 10:27:24 | 6 | them sign this instead of signing that actual JSA |
| 10:27:27 | 7 | form.  He just thought it was easier to do it this |
| 10:27:30 | 8 | way, to have them sign this acknowledging that they |
| 10:27:33 | 9 | reviewed it. |
| 10:27:35 | 10 | Q  Were the JSA forms thrown out after -- |
| 10:27:38 | 11 | A  They're kept on the vessel for, I believe, at |
| 10:27:41 | 12 | least three years.  I think. |
| 10:27:44 | 13 | Q  Okay.  Do you know whether or not the JSA |
| 10:27:55 | 14 | forms that correspond to this signature sheet exists? |
| 10:27:59 | 15 | A  I don't know if it exists. |
| 10:28:05 | 16 | Q  How often are JSAs supposed to be completed? |
| 10:28:09 | 17 | A  For every job. |
| 10:28:10 | 18 | Q  Okay.  So -- |
| 10:28:11 | 19 | A  Every critical job. |
| 10:28:12 | 20 | Q  Okay.  Would that include a basket transfer? |
| 10:28:15 | 21 | A  Yes. |
| 10:28:21 | 22 | Q  So, there should be a signature page here for |
| 10:28:24 | 23 | the basket transfer and there should also be a JSA |
| 10:28:30 | 24 | form included in the, uh -- that are somewhere on the |
| 10:28:34 | 25 | vessel, right? |

| | | |
|---|---|---|
| 10:28:36 | 1 | A  I mean, it could -- it could be that it was |
| 10:28:38 | 2 | discussed during a cargo operation as well. |
| 10:28:41 | 3 | Q  Okay. |
| 10:28:42 | 4 | A  Without seeing that detailed JSA I don't know |
| 10:28:45 | 5 | how it was written.  But looking at this I see he's |
| 10:28:50 | 6 | got cargo listed a few times.  It could have fit under |
| 10:28:54 | 7 | there as well. |
| 10:28:55 | 8 | Q  Okay. |
| 10:28:57 | 9 | MR. KHOURY: |
| 10:28:57 | 10 | And are you referring to a certain date? |
| 10:28:59 | 11 | MR. SHEPPARD: |
| 10:28:59 | 12 | Sure. |
| 10:28:59 | 13 | BY MR. SHEPPARD: |
| 10:29:00 | 14 | Q  If you look at REC 1080 and then REC 1081. |
| 10:29:05 | 15 | It shows that there were some -- there were some JSAs |
| 10:29:12 | 16 | on 4/19, 4/20, then jumps to 4/27, 4/28.  And then on |
| 10:29:21 | 17 | page 1081 it jumps to 5/10, and then it looks like 5/8 |
| 10:29:28 | 18 | is towards the end of one of the columns, then it |
| 10:29:31 | 19 | jumps to 5/16, 5/17.  Do you see that? |
| 10:29:36 | 20 | A  Um-hum. |
| 10:29:37 | 21 | Q  Would it be fair to say if there's not a |
| 10:29:40 | 22 | signature page for JSAs between the 28th and the 10th |
| 10:29:44 | 23 | that there was no JSA during that time period? |
| 10:29:47 | 24 | MR. KHOURY: |
| 10:29:48 | 25 | Object to the form. |

| | | |
|---|---|---|
| 10:29:50 | 1 | A  No. |
| 10:29:52 | 2 | BY MR. SHEPPARD: |
| 10:29:51 | 3 | Q  Okay.  Is it fair to say that looking at this |
| 10:29:55 | 4 | there is no evidence of there being a JSA during that |
| 10:29:58 | 5 | time period of April 28th to May 10th? |
| 10:30:03 | 6 | A  According to this -- |
| 10:30:04 | 7 | Q  Okay. |
| 10:30:04 | 8 | A  -- yes. |
| 10:30:07 | 9 | Q  All JSAs are required to be documented? |
| 10:30:10 | 10 | A  Yes. |
| 10:30:10 | 11 | Q  So it's not documented here, then that would |
| 10:30:13 | 12 | be something that wasn't done properly, correct? |
| 10:30:15 | 13 | MR. KHOURY: |
| 10:30:16 | 14 | Object. |
| 10:30:16 | 15 | A  It would be on the vessel. |
| 10:30:17 | 16 | BY MR. SHEPPARD: |
| 10:30:22 | 17 | Q  Have you seen any JSAs other than the ones I |
| 10:30:25 | 18 | put in front of you? |
| 10:30:27 | 19 | A  No. |
| 10:30:38 | 20 | Q  Did REC authorize Captain Hauglund to develop |
| 10:30:44 | 21 | this JSA review signature form? |
| 10:30:48 | 22 | A  No. |
| 10:30:49 | 23 | Q  Did REC know that he was using this signature |
| 10:30:51 | 24 | form? |
| 10:30:53 | 25 | A  No. |

| | | |
|---|---|---|
| 10:30:53 | 1 | MR. SHEPPARD: |
| 10:32:14 | 2 | For the record I'm going to hand the |
| 10:32:14 | 3 | witness REC 554 and 555. |
| 10:32:30 | 4 | BY MR. SHEPPARD: |
| 10:32:31 | 5 | Q  I'll ask you one question first.  Do these -- |
| 10:32:32 | 6 | it's just the JSA form.  Do those -- I mean, I'll add |
| 10:32:44 | 7 | this in a second.  I'm not sure which one belongs. |
| 10:32:47 | 8 | Do those two forms go together?  Like, do you |
| 10:32:50 | 9 | do the JSA form with that second form?  Does that form |
| 10:32:55 | 10 | the entire JSA. |
| 10:32:57 | 11 | A  No. |
| 10:32:57 | 12 | Q  Is it just that first one? |
| 10:32:59 | 13 | A  This is the JSA. |
| 10:33:00 | 14 | Q  Okay. |
| 10:33:00 | 15 | A  And this is, actually, not the right |
| 10:33:03 | 16 | revision. |
| 10:33:05 | 17 | Q  Okay.  When was this form revised? |
| 10:33:08 | 18 | A  I don't know. |
| 10:33:13 | 19 | Q  Okay. |
| 10:33:13 | 20 | MR. SHEPPARD: |
| 10:33:13 | 21 | I'm going to mark it as Exhibit 3. |
| 10:33:15 | 22 | BY MR. SHEPPARD: |
| 10:33:15 | 23 | Q  I don't have the -- this is the one in the |
| 10:33:17 | 24 | manual that was provided. |
| 10:33:19 | 25 | A  I mean, it's pretty much the same.  It's |

## Page 25

10:33:20 1 just, you know, it says REC Marine Logistics instead
10:33:24 2 of Gulf Offshore Logistics.
10:33:30 3     Q   Label that as Exhibit 3, which is REC 554.
10:33:32 4 Is that the -- is that, essentially, the JSA form
10:33:40 5 that the REC employees are supposed to complete minus
10:33:43 6 the change in the name at the top?
10:33:45 7     A   Yes.
10:34:08 8     Q   And I have the section for the participants
10:34:11 9 names to be listed at the bottom.
10:34:13 10     A   Yes.
10:34:14 11     Q   Is there any reason to have this JSA review
10:34:18 12 form and this, the official JSA form?
10:34:24 13     A   A lot of times they'll review the same JSA
10:34:27 14 for the same job; and so, maybe, Captain Mike thought
10:34:33 15 it was easier to just document it here.  This should
10:34:36 16 be attached to that if that's the way they were going
10:34:38 17 to do it.
10:34:43 18     Q   Okay.
10:34:44 19     A   I don't know if there's another copy attached
10:34:46 20 to that on the boat.
10:34:47 21     Q   Okay.  When we requested copies of JSAs and
10:35:00 22 things like that, I imagine someone went out to the
10:35:04 23 boat and pulled those records, correct?
10:35:06 24     A   This is what came in.
10:35:07 25     Q   Do you know who went and pulled those records

## Page 26

10:35:09 1 from the boat?
10:35:10 2     A   I don't -- I don't know who.
10:35:12 3     Q   Okay.
10:35:12 4     A   They could have been just mailed in from the
10:35:14 5 boat.  I think that's actually what it was.
10:35:17 6     Q   Okay.
10:35:18 7     A   The crew mailed it in.
10:35:25 8     Q   Actually, just dropped it in the post and it
10:35:28 9 got delivered here or?
10:35:29 10     A   They put it in a mailbag with crew changes,
10:35:31 11 and they just stuck it in that folder.
10:35:35 12     Q   Got ya.  I'm going to hand to you what I'm
10:36:53 13 going to mark as Exhibit 4.  These are the daily boat
10:36:58 14 logs for between April 19 and May 20th.  They are REC
10:37:15 15 26 through 84.  Take a look at those and let me know
10:37:22 16 if those are the deck logs for that time period?
10:37:27 17     A   Yes.
10:37:28 18     Q   Okay.
10:37:29 19         MR. SHEPPARD:
10:37:29 20             And copies if you want it.
10:37:32 21         MR. KHOURY:
10:37:32 22             Thanks.
10:37:38 23         MR. SHEPPARD:
10:37:38 24             Copy of that, too.
            25

## Page 27

10:37:45 1 BY MR. SHEPPARD:
10:37:45 2     Q   Okay.  I'd like to go through some of these
10:37:47 3 so that I can understand kind of the shorthand.  You
10:37:50 4 can help explain it to us.  First page, SB.  Does that
10:37:55 5 mean stand by?
10:37:58 6     A   Um, yes.
10:38:00 7     Q   Okay.  When it says from WNT to WNT, what
10:38:04 8 does -- what do you understand that to mean?
10:38:08 9     A   Right here?  This actual time or...
10:38:10 10     Q   Well, it says, from if standing by or idle
10:38:14 11 show location WNT, WNT.  I was wondering what that
10:38:19 12 means, if you know.
10:38:21 13     A   Well, that may be just where it shows who
10:38:24 14 they're working for.
10:38:30 15     Q   Okay.
10:38:30 16     A   Um, and it may be that they're listing the
10:38:35 17 dock that they're at.
10:38:36 18     Q   Okay.
10:38:36 19     A   The WNT dock.
10:38:40 20     Q   WNT's a dock?
10:38:43 21     A   They have -- they operate out of a certain
10:38:44 22 dock.
10:38:45 23     Q   Okay.  If you could turn to REC 32.
10:39:07 24     A   Okay.
10:39:09 25     Q   Are you able to -- also, says standby or SB

## Page 28

10:39:12 1 in this one it looks like.  Do you see that in the
10:39:14 2 "commodity hauled or purpose of trip".  Does that look
10:39:18 3 like SB?
10:39:20 4     A   Okay.
10:39:21 5     Q   Does that -- is that -- is that what it looks
10:39:23 6 like to you as well?
10:39:24 7     A   Yes.
10:39:25 8     Q   Okay.  When it says from and to it looks like
10:39:28 9 it's WNT again.  Then it has a slash.  Are you able to
10:39:33 10 make out what that is or do you have any idea?
10:39:36 11     A   Not on this one.
10:39:37 12         MR. KHOURY:
10:39:37 13             I think I know.  It's ICY, I think.
10:39:39 14     BY MR. SHEPPARD:
10:39:39 15     Q   Okay.  Do you know what ICY is?
10:39:42 16     A   Intracoastal City.
10:39:44 17     Q   Okay.  Is that where a dock is?
10:39:46 18     A   Yes.
10:39:46 19     Q   A dock for WNT?
10:39:48 20     A   Yes.
10:39:49 21     Q   Okay.  Could you turn to REC 71 for me?
10:40:45 22     A   Yes.
10:40:45 23     Q   Okay.  There's a few more acronyms here.  It
10:40:52 24 looks like we're in that commodity hauled section.
10:40:56 25 The second line it has E/R.  Does that mean en route?

10:41:02  1      A   Yes.
10:41:02  2      Q   What does B/L mean?
10:41:06  3      A   Back load.
10:41:06  4      Q   Does that mean they're loading up cargo from
10:41:09  5  the dock or something like that?
10:41:10  6      A   Yes.
10:41:14  7      Q   Now, if we go down to -- okay.  It looks
10:41:59  8  like -- um, I'm trying to find the --
10:42:04  9          There's one a little bit further down that
10:42:05 10  says E/R plus O/L, 3 pass plus cargo.  What does that
10:42:12 11  mean?
10:42:15 12      A   O/L is offload.  Three passengers and cargo.
10:42:20 13      Q   And do you know what LBJ is?
10:42:24 14      A   Where do you see that?
10:42:25 15      Q   It's one of the -- the -- it's in the from
10:42:29 16  and to sec- -- like we can go to the first one.
10:42:34 17      A   I would think it would be lift boat.
10:42:35 18  Whatever J is, I'm not real sure.  It's the location
10:42:41 19  that they're at.
10:42:42 20      Q   Okay.  Because a lot of the locations have,
10:42:49 21  like, a, you know, a Ship Shoal or something like that
10:42:52 22  and then they'll name a location within there, and
10:42:56 23  then they give you the -- designates it even further?
10:43:00 24      A   It could.
10:43:05 25      Q   So, if there was a -- would it make sense for

10:43:07  1  that to be Ship Shoal LBJ if all of that kind of -- if
10:43:12  2  that's one of the places?
10:43:15  3      A   Um, yeah, I mean, if that's where they were
10:43:18  4  working in Ship Shoal Field.
10:43:24  5      Q   Okay.  Because I'll represent to you that
10:43:31  6  Mr. Griffin in the recorded statement, I don't know if
10:43:34  7  you listened to it, it says that the incident happened
10:43:38  8  Ship Shoal 114 LBJ.  Would that be consistent with the
10:43:44  9  LBJ's that are here on the log?  Is that the same
10:43:47 10  place?
10:43:48 11      A   I'm not familiar with LBJ.
10:43:51 12      Q   Okay.  You understand that Mr. Griffin is
10:44:17 13  claiming that he was injured when a personnel basket
10:44:22 14  hit him while he was working, offloading some
10:44:26 15  passengers?
10:44:27 16      A   I'm aware.
10:44:29 17      Q   And when you're doing these offloads of
10:44:31 18  passengers, you see, you know, O/L 2 pass.  Are you
10:44:36 19  offloading them using a personnel basket?
10:44:42 20      A   It depends.  They can do swing rope.  Where
10:44:45 21  are you referencing?
10:44:47 22      Q   Um, if we go to -- it looks like there's a --
10:44:50 23  there's -- we'll just go to the fourth one down on
10:44:57 24  this one where they first talk about it.  They do en
10:45:01 25  route plus offload two pass.  It looks like it's at LB

10:45:05  1  Grand Isle.  Um, just using that as an example.  Are
10:45:09  2  they offloading using a crane and a personnel basket
10:45:13  3  or a rope swing?
10:45:17  4      A   It doesn't specify, so I'm unsure.
10:45:23  5      Q   So, looking at the document you can't tell
10:45:25  6  one way or another unless it says rope swing or
10:45:28  7  personnel basket, right?
10:45:30  8      A   I mean, yeah.  You can't distinguish the two
10:45:35  9  unless it's more specific.
10:45:40 10      Q   Okay.  Did you know -- and I'll move onto a
10:45:50 11  different thing.
10:45:51 12      A   Okay.
10:45:51 13      Q   Did you know McArthur Griffin?
10:45:54 14      A   No, not personally.
10:45:56 15      Q   Um, can you remind me when you started
10:46:00 16  working for the company?
10:46:02 17      A   For REC?
10:46:04 18      Q   For -- I know some of the companies are --
10:46:09 19      A   Before the merge?
10:46:10 20      Q   Little gropings.  There's -- what is it
10:46:13 21  called?  JNB.  Then there's Gulf Offshore, there's REC
10:46:19 22  Marine.  I know there's a few companies.  Did you work
10:46:22 23  for --
10:46:22 24      A   I worked for JNB Operating.  Started in
10:46:25 25  December 2012.

10:46:27  1      Q   Okay.
10:46:29  2      A   JNB operating was the operating company for
10:46:32  3  Gulf Offshore Logistics.
10:46:34  4      Q   Okay.  And, then you went to Gulf Offshore
10:46:39  5  Logistics and then to REC Marine?
10:46:41  6      A   No, I never worked for Gulf Offshore
10:46:43  7  Logistics.
10:46:43  8      Q   Okay.
10:46:43  9      A   Gulf Offshore Logistics was just a brokered
10:46:47 10  company.  They had the contracts.
10:46:50 11          MR. KHOURY:
10:46:51 12          JNB was to Gulf Offshore Logistics what
10:46:55 13      REC Marine now is to GOL.
10:46:56 14          THE WITNESS:
10:46:56 15          Correct.
10:46:56 16          MR. KHOURY:
10:46:56 17          It's the operating arm of the company
10:46:59 18      that runs all the boats; is that fair?
10:47:02 19          THE WITNESS:
10:47:02 20          Yes.
10:47:02 21          MR. KHOURY:
10:47:03 22          Just to help you.
10:47:04 23          MR. SHEPPARD:
10:47:04 24          It's been a while since my SATs, so.
10:47:10 25          It's an analogy test.

## Page 33

10:47:12 1 BY MR. SHEPPARD:

10:47:13 2 Q So, went from JNB to REC Marine?

10:47:16 3 A Correct.

10:47:21 4 Q I saw in Mr. Griffin's personnel file that he

10:47:24 5 had an employment agreement with JNB, and then he went

10:47:31 6 to Gulf Offshore, then he went to REC Marine. Is that

10:47:34 7 your understanding of his progression with the

10:47:36 8 companies?

10:47:36 9 A He would have never gone to Gulf Offshore

10:47:39 10 Logistics. Um, I understand that he did go from JNB

10:47:42 11 Operating to REC Marine.

10:47:45 12 COURT REPORTER:

10:47:45 13 To what?

10:47:45 14 THE WITNESS:

10:47:45 15 REC Marine Logistics.

10:47:48 16 A Um, I want to say sometime in 2016.

10:47:51 17 BY MR. SHEPPARD:

10:48:38 18 Q Would he have received paychecks from Gulf

10:48:42 19 Offshore Logistics?

10:48:43 20 A No.

10:48:45 21 Q I'm trying to think where I saw it. Oh,

10:48:47 22 okay. It's because of the logo.

10:49:01 23 When Mr. Griffin was hired by JNB,

10:49:07 24 presumably, he had to pass some sort of physical,

10:49:10 25 right?

## Page 34

10:49:11 1 A Um, the -- he was given an application for

10:49:17 2 REC --

10:49:19 3 Q Um-hum.

10:49:19 4 A -- with the merge of the two companies.

10:49:22 5 Q Okay.

10:49:23 6 A And --

10:49:23 7 MR. KHOURY:

10:49:23 8 I think he's talking about when he was

10:49:25 9 with JNB.

10:49:26 10 BY MR. SHEPPARD:

10:49:26 11 Q Right. So I'm sort of circling back.

10:49:29 12 A Oh, I'm sorry. Yes, JNB he did a physical.

10:49:32 13 Q And, um, he did the -- he did the same thing.

10:49:37 14 So let me ask the question again since we had that

10:49:41 15 kind of weird break. When Mr. Griffin was hired by

10:49:44 16 JNB he had to pass a physical, correct?

10:49:46 17 A Correct.

10:49:47 18 Q And then when he was hired by REC did he have

10:49:51 19 to pass another physical?

10:49:53 20 A No.

10:49:54 21 Q Okay. When you pass a physical that means

10:49:57 22 you're fit for duty?

10:49:59 23 A Yes.

10:50:06 24 Q Looking through Mr. Griffin's personnel file,

10:50:08 25 did you have an opportunity to do that before your

## Page 35

10:50:11 1 deposition?

10:50:11 2 A Yes.

10:50:12 3 Q Did you see that he was evaluated in 2012?

10:50:16 4 A Um, yeah. I didn't look at it in detail.

10:50:19 5 Q Okay. I can show it to you. This is going

10:50:36 6 to be REC 917.

10:50:39 7 MR. SHEPPARD:

10:50:39 8 Mark that as Exhibit 5. It's the --

10:51:00 9 it's the evaluation form.

10:51:00 10 BY MR. SHEPPARD:

10:51:00 11 Q Okay. And if you look through it there's

10:51:04 12 boxes that are checked going down the page. It says

10:51:09 13 that Mr. Griffin is a safe worker, right?

10:51:12 14 A Yes.

10:51:12 15 Q It says he doesn't need to be reminded about

10:51:15 16 safety, right?

10:51:16 17 A Yes.

10:51:36 18 Q And can you -- let me show this first.

10:52:04 19 On that same exhibit, could you read the

10:52:10 20 written portion under, "Please suggest improvements or

10:52:12 21 make notes here"?

10:52:17 22 A Oh, "Make notes here? McArthur Griffin is

10:52:20 23 good on the boat. He does his job well. Does not

10:52:22 24 have to be told what to do."

10:52:29 25 Q The form also says that Mr. Griffin has a

## Page 36

10:52:41 1 positive attitude, right? It's on the -- the fourth

10:52:49 2 from the bottom?

10:52:49 3 A Yes, it's checked.

10:52:50 4 Q And it also, it's checked where it says, does

10:52:55 5 the employee work well with others, and it says "yes".

10:52:59 6 Does the employee help others with their assignments

10:53:01 7 and it says "yes"?

10:53:02 8 A Yes.

10:53:03 9 Q Do you think the employee's a valuable part

10:53:06 10 of the crew, and it says "yes"?

10:53:08 11 A Yes.

10:53:11 12 Q It says that the employee works in a safe

10:53:13 13 manner at the top, correct?

10:53:15 14 A Yes.

10:53:16 15 Q And that when safety is discussed that

10:53:19 16 Mr. Griffin's response is positive, correct?

10:53:23 17 A Yes.

10:53:27 18 Q And then, also, says that the company was

10:53:31 19 satisfied with McArthur's performance, correct? Or at

10:53:37 20 least that's what Butch Martin had put on the review?

10:53:44 21 A Yes.

10:53:47 22 Q I'll hand you -- hand you Exhibit 6 which is

10:54:01 23 the review conducted in 2013.

10:54:05 24 MR. SHEPPARD:

10:54:05 25 You want to see? And for the record

| | | |
|---|---|---|
| 10:54:13 | 1 | that's REC 920. |
| 10:54:15 | 2 | BY MR. SHEPPARD: |
| 10:54:17 | 3 | Q  If we went through this form as well, we're |
| 10:54:19 | 4 | going to see pretty much all the same things except |
| 10:54:23 | 5 | for no notes on the right side, correct? |
| 10:54:26 | 6 | A  Yes. |
| 10:54:26 | 7 | Q  He's a safe worker; he doesn't have to be |
| 10:54:32 | 8 | reminded of safety; his response is positive when |
| 10:54:35 | 9 | safety is discussed; they've never witnessed unsafe |
| 10:54:39 | 10 | acts by McArthur, correct? |
| 10:54:42 | 11 | A  Correct. |
| 10:54:45 | 12 | Q  And that was, actually, true on the first one |
| 10:54:47 | 13 | as well, right? |
| 10:54:49 | 14 | A  Correct. |
| 10:54:52 | 15 | Q  And this one it says that he has a positive |
| 10:54:54 | 16 | attitude, works well with others, helps others with |
| 10:54:57 | 17 | their assignment and is a valuable part of crew, |
| 10:55:01 | 18 | correct? |
| 10:55:02 | 19 | A  Correct. |
| 10:55:20 | 20 | Q  I didn't see any other reviews after that. |
| 10:55:22 | 21 | Is there a reason why there aren't any other |
| 10:55:25 | 22 | performance reviews? |
| 10:55:26 | 23 | A  No. |
| 10:55:27 | 24 | Q  Are they supposed to be -- are you supposed |
| 10:55:29 | 25 | to have annual performance reviews or does the company |

| | | |
|---|---|---|
| 10:55:32 | 1 | stop after a while. |
| 10:55:33 | 2 | A  As-needed. |
| 10:55:34 | 3 | Q  Mark this Exhibit 7 which is a -- it's REC |
| 10:55:47 | 4 | 923. It's a fax cover page. Could you read, uh -- |
| 10:56:28 | 5 | I guess a question first. It says this is |
| 10:56:31 | 6 | from Alex. Is that Alex Griffin? |
| 10:56:34 | 7 | A  Yes. |
| 10:56:35 | 8 | Q  What was Alex Griffin? |
| 10:56:37 | 9 | A  Personnel manager. |
| 10:56:38 | 10 | Q  He's no longer with the company, right? |
| 10:56:40 | 11 | A  No. |
| 10:56:43 | 12 | Q  Did he leave sometime in 2017; does that |
| 10:56:45 | 13 | sound right? |
| 10:56:47 | 14 | A  Sounds about right. |
| 10:56:48 | 15 | Q  Um, at the end of this, uh, this fax it says |
| 10:56:53 | 16 | that he, McArthur, is a good employee. Correct? |
| 10:56:58 | 17 | A  Yes. |
| 10:57:07 | 18 | Q  In reviewing Mr. Griffin's personnel file did |
| 10:57:12 | 19 | you ever once see any reprimands or demerits or |
| 10:57:20 | 20 | anything like that? |
| 10:57:21 | 21 | A  No. |
| 10:57:28 | 22 | Q  Nothing saying that Mr. Griffin was unsafe? |
| 10:57:31 | 23 | A  No. |
| 10:57:34 | 24 | Q  Nothing saying that he had problems with |
| 10:57:36 | 25 | other employees? |

| | | |
|---|---|---|
| 10:57:38 | 1 | A  No. |
| 10:57:38 | 2 | Q  Okay. JNB, and REC, they didn't take an |
| 10:57:48 | 3 | issue with Mr. Griffin's criminal history, did they? |
| 10:57:53 | 4 | MR. KHOURY: |
| 10:57:53 | 5 | Object to form. |
| 10:57:57 | 6 | A  I'm sorry? |
| 10:57:57 | 7 | MR. KHOURY: |
| 10:57:58 | 8 | I was just making an objection on the |
| 10:58:00 | 9 | record. |
| 10:58:02 | 10 | BY MR. SHEPPARD: |
| 10:58:03 | 11 | Q  You're still allowed to answer. |
| 10:58:04 | 12 | A  Oh. Can you repeat the question? |
| 10:58:07 | 13 | Q  Of course. Did you -- kind of back it up a |
| 10:58:14 | 14 | little bit. Did you review Mr. Griffin's employment |
| 10:58:17 | 15 | application? |
| 10:58:18 | 16 | A  I did. |
| 10:58:18 | 17 | Q  Did you note that he listed prior convictions |
| 10:58:26 | 18 | on that application form? |
| 10:58:28 | 19 | A  No. Which application form? |
| 10:58:38 | 20 | Q  Sure. So I hand you what I'll mark as REC 8. |
| 10:59:16 | 21 | It's REC 871 through 875, and it is the employment |
| 10:59:27 | 22 | application for JNB Operating. |
| 11:00:02 | 23 | About midway on the first page it says, "Have |
| 11:00:06 | 24 | you ever been convicted of a felony? Yes." Do you |
| 11:00:09 | 25 | see that? |

| | | |
|---|---|---|
| 11:00:10 | 1 | A  Yes. |
| 11:00:11 | 2 | Q  And Mr. Griffin acknowledges that he was |
| 11:00:15 | 3 | convicted of DWI and aggravated battery. Do you see |
| 11:00:20 | 4 | that? |
| 11:00:20 | 5 | A  Yes. |
| 11:00:22 | 6 | Q  This was disclosed to JNB Operating and the |
| 11:00:26 | 7 | company still hired him, correct? |
| 11:00:28 | 8 | A  I'm not -- I can't answer for JNB. I |
| 11:00:32 | 9 | don't -- |
| 11:00:33 | 10 | Q  Okay. |
| 11:00:33 | 11 | A  I don't know of any personnel manager's |
| 11:00:36 | 12 | decision. |
| 11:00:38 | 13 | Q  Well, you understand that he worked for JNB |
| 11:00:40 | 14 | correct? |
| 11:00:40 | 15 | A  Yeah, he did work for JNB at one time. |
| 11:00:42 | 16 | Q  Okay. So, this was the application that he |
| 11:00:44 | 17 | filled out for JNB, correct? |
| 11:00:46 | 18 | A  Correct. |
| 11:00:47 | 19 | Q  And he lists on the application that he was |
| 11:00:48 | 20 | convicted of DWI and aggravated battery, correct? |
| 11:00:53 | 21 | A  Correct. |
| 11:00:53 | 22 | Q  And JNB hired him, correct? |
| 11:00:55 | 23 | A  Correct. |
| 11:01:33 | 24 | Q  Was the -- did REC have access to the JNB |
| 11:01:40 | 25 | application? Is it all kind of in one personnel file? |

Page 41

| | | |
|---|---|---|
| 11:01:44 | 1 | A  Yes. |
| 11:01:44 | 2 | Q  Okay.  And it's something that REC would have |
| 11:01:54 | 3 | been able to look at whenever they were hiring |
| 11:01:56 | 4 | Mr. Griffin? |
| 11:01:58 | 5 | A  Yes. |
| 11:02:03 | 6 | Q  On -- this is going to be -- this is REC 864 |
| 11:02:06 | 7 | through 866.  Make this Exhibit 9 to your deposition. |
| 11:03:02 | 8 | If you turn to the second page it says that |
| 11:03:06 | 9 | Mr. Griffin indicates that he was convicted of |
| 11:03:12 | 10 | fighting about four years ago.  Do you see that? |
| 11:03:15 | 11 | A  Yes. |
| 11:03:15 | 12 | Q  Okay.  So even though you're aware that |
| 11:03:16 | 13 | Mr. Griffin was convicted of fighting, REC Marine |
| 11:03:22 | 14 | still hired him, correct? |
| 11:03:23 | 15 | A  Correct. |
| 11:03:23 | 16 | Q  Okay.  That wasn't something that |
| 11:03:24 | 17 | disqualified him for the job, was it? |
| 11:03:27 | 18 | A  No. |
| 11:03:27 | 19 | Q  Okay.  Does DUI disqualify people for a job |
| 11:03:32 | 20 | at REC Marine? |
| 11:03:34 | 21 | A  No. |
| 11:03:34 | 22 | Q  Does aggravated battery disqualify people for |
| 11:03:37 | 23 | a job at REC Marine? |
| 11:03:39 | 24 | MR. KHOURY: |
| 11:03:40 | 25 | Object to form. |

Page 42

| | | |
|---|---|---|
| 11:03:42 | 1 | A  I can't answer that. |
| 11:03:44 | 2 | BY MR. SHEPPARD: |
| 11:03:47 | 3 | Q  Okay.  In reviewing Mr. Griffin's personnel |
| 11:03:56 | 4 | file, were there -- is there any documentation |
| 11:03:58 | 5 | whatsoever that would indicate there was a warning |
| 11:04:02 | 6 | issued to him about being violent towards another |
| 11:04:05 | 7 | employee or anyone? |
| 11:04:07 | 8 | A  I didn't see anything. |
| 11:04:08 | 9 | Q  Is there any -- any documentation showing |
| 11:04:12 | 10 | that he was -- that he had issues with alcohol |
| 11:04:16 | 11 | intoxication during his employment with JNB or REC? |
| 11:04:21 | 12 | A  No. |
| 11:04:35 | 13 | Q  Would you agree that all warnings, whether |
| 11:04:37 | 14 | they are verbal or whether they are written, they need |
| 11:04:41 | 15 | to be written down and documented? |
| 11:04:43 | 16 | A  Yes. |
| 11:04:46 | 17 | Q  So is it fair to say that if there is |
| 11:04:49 | 18 | nothing, no verbal warning or no written warning |
| 11:04:53 | 19 | documented that there is no evidence that Mr. Griffin |
| 11:04:58 | 20 | was ever reprimanded for any reason? |
| 11:05:00 | 21 | MR. KHOURY: |
| 11:05:02 | 22 | Object to form. |
| 11:05:03 | 23 | A  I'm not going to answer. |
| 11:05:04 | 24 | BY MR. SHEPPARD: |
| 11:05:05 | 25 | Q  You can answer.  He's just making a legal |

Page 43

| | | |
|---|---|---|
| 11:05:07 | 1 | objection. |
| 11:05:08 | 2 | MR. KHOURY: |
| 11:05:08 | 3 | Yeah, you need to answer if you know. |
| 11:05:09 | 4 | A  I mean, I don't know. |
| 11:05:11 | 5 | BY MR. SHEPPARD: |
| 11:05:12 | 6 | Q  Did you at any point since this incident, |
| 11:05:17 | 7 | have you talked to anyone about whether or not |
| 11:05:21 | 8 | McArthur had been reprimanded for any reason? |
| 11:05:26 | 9 | A  I don't know. |
| 11:05:27 | 10 | Q  You don't know if you have or? |
| 11:05:28 | 11 | A  No, I don't know that he's ever been written |
| 11:05:32 | 12 | up for anything. |
| 11:05:37 | 13 | Q  What is REC's understanding of the |
| 11:05:40 | 14 | allegations that Mr. Griffin is making concerning the |
| 11:05:43 | 15 | incident? |
| 11:05:46 | 16 | A  Um, well, it's two different allegations |
| 11:05:50 | 17 | here.  Wait.  I'm sorry.  Can you re -- rephrase that. |
| 11:05:53 | 18 | Q  Sure.  Again, when I talk about the incident |
| 11:05:55 | 19 | I'm talking about the subsequent one involving the |
| 11:05:57 | 20 | basket transfer. |
| 11:05:59 | 21 | A  Okay. |
| 11:05:59 | 22 | Q  What is REC's understanding of the incident |
| 11:06:01 | 23 | Mr. Griffin contends took place around May 2018 |
| 11:06:06 | 24 | involving a basket transfer? |
| 11:06:08 | 25 | A  For that, what we understand is he was |

Page 44

| | | |
|---|---|---|
| 11:06:10 | 1 | smashed between a cargo box and a personnel transfer. |
| 11:06:15 | 2 | We tried to verify that with the captain and he |
| 11:06:18 | 3 | couldn't give us any kind of statement.  Didn't recall |
| 11:06:23 | 4 | it happening.  So we had no way to verify it ever |
| 11:06:26 | 5 | happening. |
| 11:06:27 | 6 | Q  No way to verify it.  Did you speak with any |
| 11:06:29 | 7 | of the crew members? |
| 11:06:30 | 8 | A  Um, I talked to McArthur Griffin.  Um, other |
| 11:06:33 | 9 | than that, no, I did not. |
| 11:06:35 | 10 | Q  Okay.  Um, REC was aware that a kind of |
| 11:06:44 | 11 | insurance adjuster named Drew Aucoin had sent somebody |
| 11:06:48 | 12 | out to get a verbal statement from Mr. Griffin, right? |
| 11:06:51 | 13 | A  Yes. |
| 11:06:52 | 14 | Q  Do you recall about when that statement was |
| 11:06:54 | 15 | taken? |
| 11:06:54 | 16 | A  I don't know. |
| 11:06:54 | 17 | Q  June or July of 2018 sound fair? |
| 11:06:58 | 18 | A  I don't know.  I don't know when that |
| 11:07:00 | 19 | happened. |
| 11:07:01 | 20 | Q  Okay.  I'll represent to you that I believe |
| 11:07:02 | 21 | it's around that time.  I can take a listen during a |
| 11:07:05 | 22 | break and make sure of the right date.  I'll do that |
| 11:07:07 | 23 | now.  Say the date right. |
| 11:07:28 | 24 | RECORDING PLAYED:  Today's date is |
| 11:07:28 | 25 | July the 5th, 2018.  It's about -- |

| | | |
|---|---|---|
| 11:07:33 | 1 | BY MR. SHEPPARD: |
| 11:07:34 | 2 | Q   Okay.  I'll represent to you that that was |
| 11:07:36 | 3 | part of the recording that we just heard that was |
| 11:07:40 | 4 | taken by one of Mr. Aucoin's associates.  So that it |
| 11:07:46 | 5 | happened -- I think that was July 2018.  Is that what |
| 11:07:49 | 6 | you heard as well? |
| 11:07:51 | 7 | A   Yes. |
| 11:07:52 | 8 | Q   Okay.  Um, at any point since this incident |
| 11:07:58 | 9 | have you listened to that recording? |
| 11:07:59 | 10 | A   No. |
| 11:08:00 | 11 | Q   I'll represent to you that it says that |
| 11:08:02 | 12 | William Badeaux witnessed the incident.  Would that |
| 11:08:06 | 13 | have been information that you would have wanted to |
| 11:08:08 | 14 | know to investigate this incident? |
| 11:08:10 | 15 | A   Yes. |
| 11:08:11 | 16 | Q   Would you have sought out Mr. Badeaux and |
| 11:08:13 | 17 | spoken to him? |
| 11:08:14 | 18 | A   I would have tried. |
| 11:08:15 | 19 | Q   Are you aware that he has, uh, he has made a |
| 11:08:19 | 20 | statement in this case under penalty of perjury? |
| 11:08:22 | 21 | A   I am now. |
| 11:08:24 | 22 | Q   And that wasn't shown to you before your |
| 11:08:26 | 23 | deposition here today? |
| 11:08:27 | 24 | A   No.  William Badeaux, I believe looking at |
| 11:08:32 | 25 | the payroll records quit sometime around June 14th was |

| | | |
|---|---|---|
| 11:08:38 | 1 | his last day he worked.  June 14, 2018. |
| 11:08:42 | 2 | Q   Okay.  So you looked at his payroll records? |
| 11:08:50 | 3 | A   I didn't look at his payroll records.  I |
| 11:08:52 | 4 | looked at his time on and off, I guess. |
| 11:08:55 | 5 | Q   Okay.  On what date was the separation?  Do |
| 11:09:12 | 6 | you know? |
| 11:09:13 | 7 | A   I don't know the separation date was.  I saw |
| 11:09:15 | 8 | the last day worked was June 14, 2018. |
| 11:09:17 | 9 | Q   Okay.  Inside of Mr. Badeaux's personnel file |
| 11:09:28 | 10 | was his address and phone number, correct? |
| 11:09:30 | 11 | A   I didn't look in his personnel file. |
| 11:09:33 | 12 | Q   Do you know whether or not anyone tried to |
| 11:09:34 | 13 | contact Mr. Badeaux to see what happened?  To confirm |
| 11:09:40 | 14 | or anything regarding Mr. Griffin's claims about being |
| 11:09:44 | 15 | hit by a personnel basket and being tossed into a |
| 11:09:47 | 16 | Conex box? |
| 11:09:49 | 17 | A   I don't know of anybody trying to contact |
| 11:09:51 | 18 | him. |
| 11:09:52 | 19 | Q   Aside from speaking to Captain Haughlund was |
| 11:09:55 | 20 | there any other investigation done to determine what |
| 11:09:59 | 21 | may have happened? |
| 11:10:00 | 22 | A   Besides speaking with Captain Hauglund, no. |
| 11:10:05 | 23 | The -- that particular incident was never verbally |
| 11:10:09 | 24 | reported to the office.  Um, that was found out later. |
| 11:10:14 | 25 | Q   Okay.  One way or another does REC know |

| | | |
|---|---|---|
| 11:10:38 | 1 | whether or not there was a JSA or a safety meeting |
| 11:10:42 | 2 | before the basket transfer? |
| 11:10:47 | 3 | A   We don't. |
| 11:10:47 | 4 | MR. KHOURY: |
| 11:10:48 | 5 | I'm going to object to the form. |
| 11:10:49 | 6 | There's no -- the plaintiff can't testify |
| 11:10:51 | 7 | what date it was, so I don't think the |
| 11:10:53 | 8 | witness can testify if there was a JSA on a |
| 11:10:57 | 9 | date that is uncertain. |
| 11:10:57 | 10 | BY MR. SHEPPARD: |
| 11:10:59 | 11 | Q   Sure.  You're aware that Mr. Griffin says |
| 11:11:01 | 12 | that, at least in this oral deposition, he says it |
| 11:11:06 | 13 | happened a few days after the initial incident. |
| 11:11:08 | 14 | A   I did see that. |
| 11:11:11 | 15 | Q   So, let's look at that signature form again |
| 11:11:14 | 16 | if you can pull it up. |
| 11:11:17 | 17 | A   Which one?  The logs. |
| 11:11:20 | 18 | Q   Yes. |
| 11:11:20 | 19 | A   The JSAs or the logs? |
| 11:11:22 | 20 | Q   Uh-huh. |
| 11:11:23 | 21 | A   Which one? |
| 11:11:24 | 22 | Q   The JSAs. |
| 11:11:29 | 23 | A   This here? |
| 11:11:30 | 24 | Q   Yes, sir. |
| 11:11:32 | 25 | A   Okay. |

| | | |
|---|---|---|
| 11:12:33 | 1 | Q   If we are taking this log as true and the |
| 11:12:38 | 2 | dates reflected on this log are the dates where JSAs |
| 11:12:43 | 3 | took place there are no JSAs between April 29 and |
| 11:12:48 | 4 | May 9th, correct?  That period of time there are no |
| 11:12:56 | 5 | JSAs? |
| 11:12:56 | 6 | A   Um, April 29th? |
| 11:12:58 | 7 | Q   Beginning April 29th there are no JSAs and we |
| 11:13:02 | 8 | don't see another JSA until May 10th; is that fair? |
| 11:13:10 | 9 | A   It's -- this is not an official form, |
| 11:13:12 | 10 | official document for us, so I don't think that's |
| 11:13:15 | 11 | fair.  I would go by the logs. |
| 11:13:17 | 12 | Q   Okay.  Have you produced any logs in this |
| 11:13:21 | 13 | case?  Any JSA logs? |
| 11:13:25 | 14 | A   JSA logs?  This is it.  This is all we have. |
| 11:13:27 | 15 | Q   Right.  So, if we're going off what you have |
| 11:13:29 | 16 | there are no JSAs that have been documented starting |
| 11:13:33 | 17 | April 29 until May 10; is that correct? |
| 11:13:37 | 18 | A   No JSAs -- |
| 11:13:38 | 19 | MR. KHOURY: |
| 11:13:38 | 20 | Object to the form. |
| 11:13:39 | 21 | BY MR. SHEPPARD: |
| 11:13:41 | 22 | Q   Is that correct? |
| 11:13:43 | 23 | A   No JSAs documented.  That's correct during |
| 11:13:48 | 24 | that time. |
| 11:13:48 | 25 | Q   And the reason you document these JSAs is so |

| | | |
|---|---|---|
| 11:13:51 | 1 | you can go back and say, hey, we had a JSAs on this |
| 11:13:54 | 2 | day, correct? |
| 11:13:55 | 3 | A That's not the reason. You do a JSA to |
| 11:14:01 | 4 | prevent something from happening. |
| 11:14:03 | 5 | Q Okay. And what we can tell by looking at |
| 11:14:05 | 6 | this is we have no evidence that a JSA was done to |
| 11:14:10 | 7 | prevent something from happening like an injury |
| 11:14:12 | 8 | involving a basket transfer, correct? |
| 11:14:15 | 9 | A Correct. |
| 11:14:16 | 10 | MR. KHOURY: |
| 11:14:16 | 11 | But I think he testified that there may |
| 11:14:18 | 12 | be some on the boat that are not here. |
| 11:14:22 | 13 | THE WITNESS: |
| 11:14:22 | 14 | Correct. |
| 11:14:22 | 15 | BY MR. SHEPPARD: |
| 11:14:22 | 16 | Q If those were on the boat, will you |
| 11:14:24 | 17 | immediately produce them so we can look at them? |
| 11:14:26 | 18 | A If they're on the boat, sure. |
| 11:14:28 | 19 | Q Is there a reason why those wouldn't have |
| 11:14:30 | 20 | been produced to us earlier? |
| 11:14:32 | 21 | A No reason. |
| 11:14:46 | 22 | Q Is there a way to determine who actually went |
| 11:14:50 | 23 | through the records aboard the M/V DUSTIN DANOS to see |
| 11:14:57 | 24 | what was there and what wasn't? |
| 11:15:02 | 25 | A I can't recall who I talked to. |

| | | |
|---|---|---|
| 11:15:05 | 1 | Q Was there an email that anyone sent out |
| 11:15:09 | 2 | saying, you know, Mark, please grab these documents? |
| 11:15:12 | 3 | A It was a phone call. |
| 11:15:13 | 4 | Q Do you know when the phone call was made? |
| 11:15:15 | 5 | A I don't. |
| 11:15:24 | 6 | Q Where are those records kept on the boat? |
| 11:15:27 | 7 | A I'm not sure. |
| 11:15:27 | 8 | Q They're not -- |
| 11:15:27 | 9 | A Usually, in a file somewhere. I do know that |
| 11:15:32 | 10 | when the request was made to gather these documents |
| 11:15:37 | 11 | none of these guys were on the boat any more. They're |
| 11:15:41 | 12 | no longer employed, so it could be the current crew |
| 11:15:44 | 13 | could not find them, so I don't know. |
| 11:15:46 | 14 | Q Okay. Is there a -- a specified designated |
| 11:15:51 | 15 | place where these materials are generally kept in the |
| 11:15:56 | 16 | normal course of business? |
| 11:15:57 | 17 | A There should be. There should be. But it |
| 11:15:59 | 18 | could have been archived and stored somewhere on the |
| 11:16:02 | 19 | boat that they just don't know because they were new |
| 11:16:05 | 20 | to the vessel. |
| 11:16:07 | 21 | Q There's an area on the boat for archives? |
| 11:16:09 | 22 | A Typically, yes. |
| 11:16:11 | 23 | Q Is there an area where that usually is? |
| 11:16:13 | 24 | A Could be. I don't know for sure, but it |
| 11:16:14 | 25 | should be in there, yes. |

| | | |
|---|---|---|
| 11:16:16 | 1 | Q Okay. Do you know if the M/V DUSTIN DANOS |
| 11:16:22 | 2 | has an archive area? |
| 11:16:24 | 3 | A I don't know. |
| 11:16:44 | 4 | Q Okay. Is it your understanding based on |
| 11:16:47 | 5 | Mr. Griffin's allegations that the basket transfer |
| 11:16:52 | 6 | took place shortly after he came on duty? |
| 11:16:58 | 7 | A Never heard that before. |
| 11:17:00 | 8 | Q Okay. |
| 11:17:00 | 9 | COURT REPORTER: |
| 11:17:00 | 10 | I'm sorry. The answer was what? |
| 11:17:00 | 11 | THE WITNESS: |
| 11:17:00 | 12 | Never heard that before. |
| 11:17:00 | 13 | BY MR. SHEPPARD: |
| 11:17:08 | 14 | Q I don't know if you've been shown this |
| 11:18:06 | 15 | before. Have you take a look at it. I'm going to |
| 11:18:09 | 16 | mark it as Exhibit 10. If you could take a moment and |
| 11:18:13 | 17 | review this. It is a statement of William Badeaux. |
| 11:18:27 | 18 | MR. KHOURY: |
| 11:18:28 | 19 | Do you plan to ask him questions about |
| 11:18:29 | 20 | the statement? This is not covered in the |
| 11:18:31 | 21 | topics. |
| 11:18:33 | 22 | MR. SHEPPARD: |
| 11:18:35 | 23 | It's gonna be information involving the |
| 11:18:35 | 24 | incident. I think something he should have |
| 11:18:38 | 25 | been made aware of prior to the deposition. |

| | | |
|---|---|---|
| 11:18:41 | 1 | MR. KHOURY: |
| 11:18:41 | 2 | Well, I disagree with that |
| 11:18:43 | 3 | characterization, but if you're going to ask |
| 11:18:49 | 4 | him questions about this statement, it's not |
| 11:18:52 | 5 | part of the depo, so we're not going to do |
| 11:18:54 | 6 | that. |
| 11:19:31 | 7 | MR. SHEPPARD: |
| 11:19:32 | 8 | And any information/facts known or |
| 11:19:34 | 9 | reasonably believed to be known by |
| 11:19:36 | 10 | defendants... Wayne Badeaux. That's |
| 11:19:39 | 11 | information about Wayne Badeaux. |
| 11:19:41 | 12 | MR. KHOURY: |
| 11:19:42 | 13 | I'm sorry. Say that again. |
| 11:19:43 | 14 | MR. SHEPPARD: |
| 11:19:43 | 15 | Topic Number 27. Any information/facts |
| 11:19:47 | 16 | known or reasonably believed to be known by |
| 11:19:50 | 17 | Wayne Badeaux. |
| 11:19:52 | 18 | MR. KHOURY: |
| 11:19:52 | 19 | Yeah, but if you're asking him about |
| 11:19:54 | 20 | this statement; and actually we object to |
| 11:19:57 | 21 | that. The company is not going to testify as |
| 11:19:59 | 22 | to personalized knowledge of the 11 |
| 11:20:03 | 23 | individuals listed on Number 27. Not the |
| 11:20:07 | 24 | proper basis of a corporate deposition. He |
| 11:20:09 | 25 | can testify as to what the company knows. |

## Page 53

| | | |
|---|---|---|
| 11:20:11 | 1 | He's not going to testify as to what another |
| 11:20:13 | 2 | person knows about their individual capacity. |
| 11:20:19 | 3 | MR. SHEPPARD: |
| 11:20:19 | 4 | You can object to it, still answer the |
| 11:20:21 | 5 | question. |
| 11:20:22 | 6 | MR. KHOURY: |
| 11:20:22 | 7 | No, I'm telling you, you can ask them, |
| 11:20:24 | 8 | he's not going to answer them. |
| 11:20:25 | 9 | MR. SHEPPARD: |
| 11:20:26 | 10 | You can instruct him not to answer if |
| 11:20:28 | 11 | you think that's appropriate. |
| 11:20:28 | 12 | MR. KHOURY: |
| 11:20:28 | 13 | I will. You don't have to answer any |
| 11:20:32 | 14 | questions about what someone else knows. You |
| 11:20:34 | 15 | can testify as to what REC Marine as a |
| 11:20:37 | 16 | corporation knows. Other than that you don't |
| 11:20:40 | 17 | have to testify as to personalized knowledge |
| 11:20:42 | 18 | that someone else has. |
| 11:20:48 | 19 | BY MR. SHEPPARD: |
| 11:20:48 | 20 | Q You never took the time to speak with William |
| 11:20:55 | 21 | Badeaux? The company never did, correct? |
| 11:20:57 | 22 | MR. KHOURY: |
| 11:20:57 | 23 | Object to the form. |
| 11:21:00 | 24 | A No. |
| | 25 | |

## Page 54

| | | |
|---|---|---|
| 11:21:00 | 1 | BY MR. SHEPPARD: |
| 11:21:00 | 2 | Q Okay. If the company had spoken to |
| 11:21:03 | 3 | Mr. Badeaux they could have learned about the |
| 11:21:05 | 4 | information contained in William Badeaux's |
| 11:21:08 | 5 | declaration, right? |
| 11:21:10 | 6 | MR. KHOURY: |
| 11:21:10 | 7 | Object to form. I don't think he could |
| 11:21:12 | 8 | have learned that as the declaration wasn't |
| 11:21:15 | 9 | taken or provided until a week ago, so |
| 11:21:18 | 10 | obviously not. |
| 11:21:19 | 11 | MR. SHEPPARD: |
| 11:21:19 | 12 | Not what my question is. |
| 11:21:20 | 13 | MR. KHOURY: |
| 11:21:21 | 14 | It was what your question was. |
| 11:21:22 | 15 | MR. SHEPPARD: |
| 11:21:23 | 16 | No, my question was... |
| 11:21:23 | 17 | BY MR. SHEPPARD: |
| 11:21:23 | 18 | Q If REC Marine had taken the time to speak |
| 11:21:26 | 19 | with Mr. Badeaux it, too, could have learned about the |
| 11:21:29 | 20 | information contained in this declaration, correct? |
| 11:21:31 | 21 | MR. KHOURY: |
| 11:21:32 | 22 | Object to the form. |
| 11:21:33 | 23 | A I'm going to take the advice and I'm not |
| 11:21:35 | 24 | going to answer these questions. |
| | 25 | |

## Page 55

| | | |
|---|---|---|
| 11:21:37 | 1 | BY MR. SHEPPARD: |
| 11:21:37 | 2 | Q He's just objecting to the form. |
| 11:21:39 | 3 | A I'm not going to answer. |
| 11:21:40 | 4 | MR. KHOURY: |
| 11:21:41 | 5 | I'm objecting, so let me be clear about |
| 11:21:42 | 6 | what I'm objecting to. He's not going to be |
| 11:21:45 | 7 | able to tell you hypothetically what he could |
| 11:21:48 | 8 | have learned from William Badeaux. |
| 11:21:51 | 9 | BY MR. SHEPPARD: |
| 11:21:51 | 10 | Q Is there anything that -- is there anything |
| 11:21:53 | 11 | that stopped REC Marine from calling William Badeaux |
| 11:21:57 | 12 | and asking him if there was a basket transfer where |
| 11:22:01 | 13 | McArthur Griffin was injured? |
| 11:22:03 | 14 | A Well, for one we don't believe it even |
| 11:22:05 | 15 | happened because the captain couldn't verify that it |
| 11:22:08 | 16 | happened. |
| 11:22:08 | 17 | MR. SHEPPARD: |
| 11:22:08 | 18 | Object as nonresponsive. |
| 11:22:09 | 19 | BY MR. SHEPPARD: |
| 11:22:10 | 20 | Q Sir, is there anything that prevented REC |
| 11:22:11 | 21 | Marine from calling Mr. Badeaux and asking him if he |
| 11:22:17 | 22 | witnessed an incident where McArthur Griffin was |
| 11:22:20 | 23 | injured during a basket transfer. |
| 11:22:22 | 24 | A It could have been that he was no longer |
| 11:22:25 | 25 | employed because he quit on June 14th. |

## Page 56

| | | |
|---|---|---|
| 11:22:26 | 1 | Q Okay. Is there anything that would have |
| 11:22:29 | 2 | prevented the company from looking at the personnel |
| 11:22:31 | 3 | file, looking at the phone number that William Badeaux |
| 11:22:35 | 4 | had put down on his application, and given him a call? |
| 11:22:40 | 5 | A No. |
| 11:22:41 | 6 | Q Is there anything that would have prevented |
| 11:22:42 | 7 | the company from sending a letter to Mr. Badeaux's |
| 11:22:45 | 8 | last known address? |
| 11:22:47 | 9 | A I mean, I can't answer the what ifs. I don't |
| 11:22:49 | 10 | know that answer, so I'm not gonna -- |
| 11:22:52 | 11 | Q So you're not going to answer the question? |
| 11:22:54 | 12 | A No. |
| 11:22:54 | 13 | Q Is there anything that would have prevented |
| 11:22:56 | 14 | the company from going to Mr. Badeaux's house and |
| 11:22:59 | 15 | speaking with him? |
| 11:23:00 | 16 | A That would be intrusive. |
| 11:23:01 | 17 | Q Would there have been anything that stopped |
| 11:23:02 | 18 | the company from sending an insurance adjuster to |
| 11:23:05 | 19 | Mr. Badeaux's house like they did to McArthur Griffin? |
| 11:23:09 | 20 | A No. |
| 11:23:09 | 21 | Q Okay. Just so I'm clear, the company's |
| 11:23:19 | 22 | position is despite there being a sworn declaration |
| 11:23:22 | 23 | from a witness the company's position is that the |
| 11:23:24 | 24 | incident never took place; is that correct? |
| 11:23:26 | 25 | A That's correct. This incident was not |

| | |
|---|---|
| 11:23:35 | 1 |

reported to us verbally. It was discovered in the

mail that they sent in from the boat on June 29th;

somewhere in that area. That's how we found out about

it.

Q   Okay.

A   I talked to McArthur Griffin numerous times

from when the first incident when he was carrying the

starter and backed into a firehose rack, May 5th.

Somewhere in there. I talked to him numerous times.

If believe they might have called June 20th. After

reading my statement, that's the date I put on there,

June 20th. He called to report that his shoulder was

still hurting from the starter incident. There was

never a mention anything about getting smashed between

a cargo box. We did get him off the boat to get

further evaluated by an orthopedic doctor. There was

never a mention about any of that stuff. It was

discovered by the incident report that came in the

mail on June 29th.

MR. SHEPPARD:

Object to the nonresponsive portions.

BY MR. SHEPPARD:

Q   Did, uh -- you heard -- or is it your

understanding that Mr. Griffin had claimed he reported

this to Captain Hauglund?

A   I don't -- I didn't know that, that he said

that.

Q   In reading the declaration of William

Badeaux, do you see that it indicates that William

Badeaux reported to Captain Hauglund, too?

A   I can't take this into consideration.

Q   Okay. So, the company's position is they're

not going to take the statement of witnesses into

consideration. Is that a fair statement?

A   We were never able to take our own

statements.

Q   Is there anything preventing the company from

speaking to Mr. Badeaux and taking statements from

him?

A   No.

Q   Company's choosing not to, correct?

MR. KHOURY:

Object to the form.

BY MR. SHEPPARD:

Q   You can still answer.

A   I'm good.

Q   You can still answer.

A   I don't need to answer.

Q   Please answer the question.

A   I don't need to answer.

Q   Sir, you have to answer the question.

MR. KHOURY:

What -- what are you asking him? I

think you've asked him like five times if

there's anything prevents the company from

talking to William Badeaux. I think he said

"no", in four or five different ways. I'm

not sure what you want more from him.

MR. SHEPPARD:

He's just claimed that he hasn't been

able to go get a statement from Mr. Badeaux

and then I asked the follow up question to

that because he's making a new claim now.

MR. KHOURY:

What's the new claim?

MR. SHEPPARD:

His new claim was that he hasn't had an

opportunity. The company hasn't had an

opportunity to take a statement from

Mr. Badeaux.

MR. KHOURY:

Okay.

MR. SHEPPARD:

And then my question was: What is --

like, the company has chosen not to do that.

Tell me, because those two things are

inconsistent and that's the question we have

on the table.

MR. KHOURY:

I don't think it's inconsistent. I

think he's told you multiple times that they

couldn't speak to William Badeaux.

MR. SHEPPARD:

Well, he just said that he has not had

the opportunity to take the statement; he

has.

MS. SCOTT:

I think that misstates the testimony. I

think he simply said that he hadn't.

MR. SHEPPARD:

Okay. I'll make sure I clear it up.

BY MR. SHEPPARD:

Q   Is it your position that the company just

hasn't taken a statement from Mr. Badeaux?

A   Yes.

Q   You understand that Mr. Griffin alleges that

there are a few people being transferred off the boat

on the date of the incident, correct?

A   I don't know anything about that incident.

Of what was going on, I'm talking about. I'm unaware

| | | |
|---|---|---|
| 11:27:23 | 1 | of anything that he might have said about that. |
| 11:27:25 | 2 | Q   I'll represent to you that he's alleged that |
| 11:27:27 | 3 | there was a few people being transferred off the M/V |
| 11:27:31 | 4 | DUSTIN DANOS when he was being -- prior to his injury. |
| 11:27:40 | 5 | Um, his testimony was that they were being transferred |
| 11:27:44 | 6 | by a crane.  That's not something that's unusual; that |
| 11:27:48 | 7 | happens out in the -- |
| 11:27:52 | 8 | A   A basket transfer? |
| 11:27:54 | 9 | Q   Yeah. |
| 11:27:54 | 10 | A   Uh-huh. |
| 11:27:55 | 11 | Q   Would it be strange for three or four people |
| 11:27:59 | 12 | to be transferred in kind of a single, uh, single |
| 11:28:05 | 13 | time? |
| 11:28:06 | 14 | A   It's not unusual. |
| 11:28:16 | 15 | Q   I'll represent to you that Mr. Griffin and |
| 11:28:20 | 16 | Mr. Badeaux stated that Captain Hauglund was on the |
| 11:28:25 | 17 | phone at the time of the incident.  Should captains be |
| 11:28:27 | 18 | on the phone when a personnel basket transfer |
| 11:28:30 | 19 | operation is taking place? |
| 11:28:31 | 20 | A   No. |
| 11:28:32 | 21 | MR. KHOURY: |
| 11:28:32 | 22 | Object to the form. |
| 11:28:36 | 23 | BY MR. SHEPPARD: |
| 11:28:37 | 24 | Q   I'll represent to you that Mr. Badeaux stated |
| 11:28:40 | 25 | that Captain Hauglund stepped away from the vessel's |

| | | |
|---|---|---|
| 11:28:44 | 1 | controls when the basket transfer was ongoing.  Is |
| 11:28:47 | 2 | that something that captains should do? |
| 11:28:50 | 3 | A   No. |
| 11:28:50 | 4 | MR. KHOURY: |
| 11:28:50 | 5 | Object to the form. |
| 11:28:51 | 6 | BY MR. SHEPPARD: |
| 11:28:52 | 7 | Q   I'll represent to you that Mr. Badeaux stated |
| 11:28:53 | 8 | that the controls for M/V DUSTIN DANOS were engaged |
| 11:28:58 | 9 | and the vessel was being propelled forward while the |
| 11:29:00 | 10 | basket transfer was ongoing.  Is that something that |
| 11:29:02 | 11 | captains should do? |
| 11:29:03 | 12 | MR. KHOURY: |
| 11:29:04 | 13 | Object to the form. |
| 11:29:04 | 14 | MS. SCOTT: |
| 11:29:04 | 15 | Object to form. |
| 11:29:06 | 16 | A   I mean, that depends on the weather.  It |
| 11:29:08 | 17 | depends on the situation.  I don't know if it should |
| 11:29:10 | 18 | be going forward or backward. |
| 11:29:11 | 19 | BY MR. SHEPPARD: |
| 11:29:12 | 20 | Q   Okay.  If the vessel's controls are engaged |
| 11:29:15 | 21 | and the vessel is moving forward and the captain has |
| 11:29:18 | 22 | stepped away from the controls, is that something that |
| 11:29:21 | 23 | is particularly unsafe? |
| 11:29:22 | 24 | MR. KHOURY: |
| 11:29:22 | 25 | Object to the form. |

| | | |
|---|---|---|
| 11:29:23 | 1 | MS. SCOTT: |
| 11:29:23 | 2 | Object to the form. |
| 11:29:24 | 3 | A   Yeah, it can be unsafe. |
| 11:29:25 | 4 | BY MR. SHEPPARD: |
| 11:29:26 | 5 | Q   And if you kind of compound that on top of |
| 11:29:28 | 6 | one another, being on the phone, stepping away from |
| 11:29:31 | 7 | controls while the vessel is being propelled forward, |
| 11:29:35 | 8 | is that very unsafe? |
| 11:29:36 | 9 | MR. KHOURY: |
| 11:29:36 | 10 | Object to the form. |
| 11:29:37 | 11 | MS. SCOTT: |
| 11:29:37 | 12 | Object to the form. |
| 11:29:39 | 13 | A   If someone were to do that, sure. |
| 11:29:41 | 14 | BY MR. SHEPPARD: |
| 11:29:42 | 15 | Q   If Captain Hauglund had admitted to doing all |
| 11:29:45 | 16 | those things, would he have had some sort of |
| 11:29:46 | 17 | disciplinary action? |
| 11:29:48 | 18 | A   Anyone would, yes. |
| 11:29:49 | 19 | Q   Would it be possible termination? |
| 11:29:51 | 20 | A   Sure. |
| 11:29:57 | 21 | Q   Could that be the reason Mr. Hauglund didn't |
| 11:30:00 | 22 | report it to anyone? |
| 11:30:01 | 23 | MR. KHOURY: |
| 11:30:02 | 24 | Object to the form. |
| 11:30:02 | 25 | MS. SCOTT: |

| | | |
|---|---|---|
| 11:30:03 | 1 | Object to form. |
| 11:30:03 | 2 | MR. KHOURY: |
| 11:30:04 | 3 | Speculative. |
| 11:30:05 | 4 | A   Neither did McArthur Griffin. |
| 11:30:06 | 5 | BY MR. SHEPPARD: |
| 11:30:07 | 6 | Q   Are you aware that he testified that he |
| 11:30:09 | 7 | reported it to Captain Hauglund? |
| 11:30:11 | 8 | A   No, because I didn't see that. |
| 11:30:13 | 9 | Q   Okay. are you aware that Mr. Badeaux has |
| 11:30:17 | 10 | represented in his declaration that he and McArthur |
| 11:30:19 | 11 | Griffin reported this incident to Captain Hauglund |
| 11:30:23 | 12 | right after it happened? |
| 11:30:24 | 13 | MR. KHOURY: |
| 11:30:25 | 14 | I'm sorry.  He's not going to testify as |
| 11:30:27 | 15 | to what's in Mr. Badeaux's statement that you |
| 11:30:30 | 16 | drafted. |
| 11:30:30 | 17 | BY MR. SHEPPARD: |
| 11:30:32 | 18 | Q   Okay.  Are you going to follow your -- |
| 11:30:35 | 19 | A   The only thing I've seen from Mr. Badeaux is |
| 11:30:38 | 20 | this right here, so I know nothing about Mr. Badeaux. |
| 11:30:40 | 21 | Captain Mike did call on June 20 to report that |
| 11:30:43 | 22 | McArthur Griffin was still sore from the starter |
| 11:30:46 | 23 | incident.  So, there was opportunity to report this |
| 11:30:52 | 24 | smashed-by-a-box incident if it only happened a few |
| 11:30:56 | 25 | days later.  I mean, that's almost two months later. |

Page 65

| | | |
|---|---|---|
| 11:30:59 | 1 | It was never reported until June 20th, but that was |
| 11:31:02 | 2 | not about the smashed between the cargo box and the |
| 11:31:04 | 3 | personnel transfer basket. |
| 11:31:08 | 4 | MR. SHEPPARD: |
| 11:31:09 | 5 | Object to the nonresponsive portions. |
| 11:31:15 | 6 | BY MR. SHEPPARD: |
| 11:31:16 | 7 | Q If two -- if two separate employees reported |
| 11:31:21 | 8 | an incident to a captain and the captain doesn't fill |
| 11:31:24 | 9 | out a report, is he, um, doing his -- handling his job |
| 11:31:29 | 10 | duties properly? |
| 11:31:30 | 11 | MS. SCOTT: |
| 11:31:31 | 12 | Object to form. |
| 11:31:33 | 13 | A That's situational. |
| 11:31:34 | 14 | BY MR. SHEPPARD: |
| 11:31:35 | 15 | Q Aren't all incidents supposed to be reported? |
| 11:31:39 | 16 | A Pick up the phone and call. |
| 11:31:41 | 17 | Q Okay. |
| 11:31:41 | 18 | A We'll determine if it needs to be documented |
| 11:31:43 | 19 | or not. |
| 11:31:43 | 20 | Q So the manual that you guys have says that |
| 11:31:48 | 21 | not all incidents need to be documented on a paper |
| 11:31:52 | 22 | form? |
| 11:31:53 | 23 | A All incidents, big or small, need to be |
| 11:31:55 | 24 | reported verbally. |
| 11:31:56 | 25 | MS. SCOTT: |

Page 66

| | | |
|---|---|---|
| 11:31:56 | 1 | Objection. |
| 11:31:58 | 2 | A What happens after that, is situational. |
| 11:31:59 | 3 | BY MR. SHEPPARD: |
| 11:32:00 | 4 | Q Okay. I understand the company's contention |
| 11:32:21 | 5 | is that the incident didn't happen, but for purposes |
| 11:32:24 | 6 | of this question, assume it does. Assume it did. Is |
| 11:32:29 | 7 | REC taking a position that Mr. Griffin contributed to |
| 11:32:32 | 8 | the incident in any way? |
| 11:32:35 | 9 | A This smashed by box? |
| 11:32:37 | 10 | Q Yes, sir. |
| 11:32:40 | 11 | A Well, typically, you know a lot of times you |
| 11:32:44 | 12 | could put yourself in a pinch point. You can put |
| 11:32:47 | 13 | yourself in the wrong spot in order for that to |
| 11:32:50 | 14 | happen. It could be a crane operator made an error. |
| 11:32:52 | 15 | So I think that's where we would stand on that. |
| 11:32:56 | 16 | Q Okay. Does the company have any -- have they |
| 11:33:00 | 17 | made a determination whether or not Mr. Griffin was in |
| 11:33:03 | 18 | a pinch point? |
| 11:33:04 | 19 | A We don't know. |
| 11:33:05 | 20 | Q Okay. |
| 11:33:05 | 21 | A We couldn't verify that this incident |
| 11:33:07 | 22 | happened, so. |
| 11:33:07 | 23 | Q And just for the purposes of these, let's |
| 11:33:09 | 24 | just kind of assume they do, so that -- I'm just |
| 11:33:11 | 25 | trying to understand, kind of, what kind of defenses |

Page 67

| | | |
|---|---|---|
| 11:33:13 | 1 | might come up. Is there any evidence that the company |
| 11:33:18 | 2 | has that there is something that the crane operator |
| 11:33:22 | 3 | did wrong? |
| 11:33:23 | 4 | A No evidence. |
| 11:33:25 | 5 | Q Was there -- I think we covered pinch point, |
| 11:33:29 | 6 | crane operator. Was there anything else? |
| 11:33:34 | 7 | A I mean, all that's assumptions. That's, you |
| 11:33:37 | 8 | know, we have no evidence that anything ever happened, |
| 11:33:39 | 9 | so it would be hard to jump to any kind of conclusion |
| 11:33:42 | 10 | of what could have gone wrong. |
| 11:33:44 | 11 | Q Except the evidence that you do have is the |
| 11:33:46 | 12 | statement of Mr. Griffin and now the statement of |
| 11:33:48 | 13 | Mr. Badeaux, correct? |
| 11:33:49 | 14 | A I don't have -- |
| 11:33:50 | 15 | MR. KHOURY: |
| 11:33:50 | 16 | The company has not reviewed the |
| 11:33:51 | 17 | statement of Mr. Badeaux and doesn't have and |
| 11:33:55 | 18 | hasn't reviewed Mr. Griffin's testimony from |
| 11:33:58 | 19 | his deposition a week ago, so. |
| 11:34:00 | 20 | BY MR. SHEPPARD: |
| 11:34:01 | 21 | Q The company has had the opportunity for a few |
| 11:34:03 | 22 | years to review the recording that was taken by Drew |
| 11:34:09 | 23 | Aucoin's associate, correct? |
| 11:34:11 | 24 | A I have not reviewed it. |
| 11:34:12 | 25 | Q The company has had several years -- I'm |

Page 68

| | | |
|---|---|---|
| 11:34:14 | 1 | sorry. Strike that. |
| 11:34:16 | 2 | The REC Marine has had, approximately, two |
| 11:34:22 | 3 | and a half years to review the recorded statement |
| 11:34:25 | 4 | taken by Drew Aucoin's associate, correct? |
| 11:34:29 | 5 | MR. KHOURY: |
| 11:34:30 | 6 | Object to form. |
| 11:34:31 | 7 | A I didn't even know that was out there, so. |
| 11:34:33 | 8 | BY MR. SHEPPARD: |
| 11:34:35 | 9 | Q Okay. |
| 11:34:37 | 10 | A So I couldn't review something that I didn't |
| 11:34:38 | 11 | know was out there. |
| 11:34:40 | 12 | Q Okay. Was the company ever able to review |
| 11:34:43 | 13 | it? |
| 11:34:43 | 14 | A No. |
| 11:34:45 | 15 | Q When was that statement provided to the |
| 11:34:47 | 16 | company? |
| 11:34:48 | 17 | A It never was. |
| 11:34:49 | 18 | Q How did the company get that statement and |
| 11:34:50 | 19 | then -- I'm talking about the recording, the audio. |
| 11:34:54 | 20 | A I never got that statement. |
| 11:34:55 | 21 | Q How did the company then produce those |
| 11:34:58 | 22 | documents -- that recording in discovery? |
| 11:35:00 | 23 | MR. KHOURY: |
| 11:35:01 | 24 | Counsel produced it from the adjuster. |
| 11:35:05 | 25 | BY MR. SHEPPARD: |

## Page 69

11:35:09  1   Q   Okay. Um, I want to make sure I understand
11:35:30  2   this right. Are the basket transfers typically done
11:35:33  3   on back deck?
11:35:35  4   A   I mean, if they're being lowered, they'd be
11:35:37  5   lowered onto the back deck.
11:35:43  6   Q   Are you aware that Mr. Griffin wrote a
11:35:49  7   statement at some point saying that he was moved to
11:35:52  8   nights so he wouldn't have to go on the back deck.
11:35:57  9   A   I know he made some sort of statement, and I
11:36:01  10  don't remember seeing anything about specifically
11:36:03  11  working nights.
11:36:06  12  Q   Okay. REC 3. Do you see where -- let me
11:37:11  13  know if I read this correctly. "I told Captain Mike
11:37:14  14  about it and he wanted me to work only nights so I
11:37:17  15  wouldn't have much work on the back deck." Did I read
11:37:20  16  that correctly?
11:37:24  17  A   Yes.
11:37:33  18  Q   Is that sort of a change into like a light
11:37:36  19  duty atmosphere or anything like that if you're not
11:37:39  20  having to work the back deck?
11:37:41  21  A   It could be that they did that out of
11:37:44  22  precaution knowing that he was going to the doctor the
11:37:46  23  very next day. I see that it's dated 5/13.
11:37:50  24  Q   Um-hum.
11:37:50  25  A   So, this is due to the starter incident when

## Page 70

11:37:54  1   he wanted to get his shoulder looked at. We got him
11:37:57  2   off the boat and we got him to OMS to get checked on
11:38:01  3   5/14 and he went straight back to the boat to finish
11:38:04  4   his hitch.
11:38:05  5   Q   Can you --
11:38:05  6   A   He never mentioned anything about getting
11:38:08  7   smashed between a box.
11:38:09  8   Q   Can you point out in this statement where it
11:38:11  9   says starter incident or anything like that?
11:38:14  10  A   No, but it was attached to the incident
11:38:16  11  report that was done. These were sent in together. I
11:38:24  12  believe one other statement that was sent in.
11:38:34  13  Q   I'll represent to you that it came behind
11:38:36  14  the, uh, June -- the June 20 report.
11:38:47  15  A   How would that be possible?
11:38:48  16      MR. KHOURY:
11:38:48  17          Object to form. Yeah, I --
11:38:49  18  A   It's 5/13/18 and you got 5/14/18 right here
11:38:53  19  saying, "I McArthur Griffin was seen by the doctor on
11:38:57  20  5/14/18 and I feel good to go back to work."
11:39:01  21      BY MR. SHEPPARD:
11:39:01  22  Q   Okay. So, when the company was producing
11:39:04  23  these documents contained in their forms, do they
11:39:07  24  start moving things around, shuffling paper? I'm
11:39:10  25  trying to understand why --

## Page 71

11:39:11  1       MR. KHOURY:
11:39:12  2           Object to form. You don't need to
11:39:13  3   answer that.
11:39:13  4       MR. SHEPPARD:
11:39:14  5           I'm trying to explain why so he
11:39:15  6   understands the question.
11:39:16  7       MR. KHOURY:
11:39:16  8           We produced them in the order that the
11:39:19  9   request asked for them, that's why they're in
11:39:22  10  a certain order. We order them in accordance
11:39:24  11  with what you asked, Request for Production
11:39:28  12  whatever number it would be; so that's why
11:39:31  13  they're ordered in some certain way.
11:39:35  14      MR. SHEPPARD:
11:39:35  15          Okay.
11:39:35  16      MR. KHOURY:
11:39:35  17          Don't imply that REC Marine misordered
11:39:40  18  some documents. They're in response to your
11:39:42  19  requests.
11:39:42  20      BY MR. SHEPPARD:
11:39:44  21  Q   Okay. I'm looking at these documents here.
11:39:46  22  When this statement was -- when this incident report
11:39:50  23  dated May 5th was sent in, is it just sent in as two
11:39:59  24  pieces of paper, you staple it? How is it done?
11:40:03  25  A   How was this sent in?

## Page 72

11:40:04  1   Q   Do you staple the statements that are
11:40:05  2   handwritten to the report or what do you do?
11:40:07  3   A   Staple maybe. Uh, paper clip. Maybe
11:40:10  4   nothing. I don't know.
11:40:12  5       MR. KHOURY:
11:40:13  6           Can we maybe mark as exhibit what we're
11:40:15  7   talking about now because we're talking
11:40:17  8   about --
11:40:19  9       MR. SHEPPARD:
11:40:19  10          Sure. I am talking about --
11:40:20  11      BY MR. SHEPPARD:
11:40:20  12  Q   Which one did I hand you, sir?
11:40:22  13      MR. KHOURY:
11:40:23  14          You handed him a statement from
11:40:24  15  McArthur -- yeah, from McArthur Griffin dated
11:40:29  16  May 13.
11:40:30  17      MR. SHEPPARD:
11:40:31  18          Sure. I will hand you one and two. So,
11:40:35  19  we also have here -- I'll make this
11:40:39  20  Exhibit 12.
11:40:49  21      BY MR. SHEPPARD:
11:40:50  22  Q   So, REC 1 and 2.
11:41:00  23  A   So, is this the same? You're putting this
11:41:03  24  together now?
11:41:03  25  Q   That's a separate exhibit. REC 1 and 2 is

11:41:06  1    one exhibit.  REC 3 is a separate one.
11:41:12  2         MR. KHOURY:
11:41:12  3              Let me see the two he just handed you.
11:41:20  4         REC 1 and 2.  I'm sorry.  What are you
11:41:20  5    talking about?
11:41:20  6         MR. SHEPPARD:
11:41:20  7              The Bates number.
11:41:23  8         MR. KHOURY:
11:41:23  9              Oh, REC 1 and 2.  Got ya.  So, REC
11:41:26 10    Number 1 is Exhibit 12.  Are you going to
11:41:29 11    make this one --
11:41:32 12         MR. SHEPPARD:
11:41:32 13              Together.
11:41:32 14         MR. KHOURY:
11:41:32 15              Two accident reports?
11:41:34 16         MR. SHEPPARD:
11:41:35 17              Yes.
11:41:36 18    BY MR. SHEPPARD:
11:41:36 19         Q    The reason I'm asking you is I see that this
11:41:51 20    statement, REC 3, if you look at the top right corner,
11:41:54 21    there are dots that look likes holes for staples.  Do
11:42:01 22    you see that?
11:42:02 23         A    Sure.
11:42:02 24         And then on REC 2 which is the statement
11:42:05 25    from, um, it's dated June 20, 2018 has holes in the

11:42:11  1    corner of that one as well.  Do you see that?
11:42:14  2         A    Sure.
11:42:14  3         Q    Do you see any holes in the corner of REC 1?
11:42:17  4         A    No, but, I mean, they could be a different
11:42:20  5    copy or it could be that something with the scanner.
11:42:24  6    I don't know for sure that that's staples.
11:42:28  7         Q    You're just guessing at that last part that
11:42:30  8    this might have been a different document or scanned
11:42:33  9    funny?
11:42:33 10         A    Not a different document, but it could be --
11:42:34 11    I mean, yeah it could be a scanned copy of it that was
11:42:37 12    stapled later or something.
11:42:48 13         Q    Also, could be that -- strike that.
11:43:08 14              Well, I guess I do have a question to you.
11:43:10 15    You kind of indicated that you thought that the
11:43:13 16    handwritten statement was attached to the first
11:43:18 17    incident report.  Do you recall that?
11:43:23 18         A    Yeah.
11:43:27 19         Q    When these incident reports are send in, are
11:43:31 20    they sent in by email usually, computer, anything like
11:43:36 21    that?  Do they scan it in and send it?
11:43:39 22         A    Not at this time.  They didn't have email.
11:43:42 23         Q    How did they get it to you?
11:43:44 24         A    Through the mail.  Crew change mail.  These
11:43:50 25    reports came in at separate times.

11:43:52  1         Q    Okay.  So, they weren't attached -- I'm
11:43:54  2    asking about the first incident report.
11:43:57  3         A    The first incident report came first.  This
11:43:59  4    one was later.
11:44:01  5         Q    Okay.  Do you know one way or another whether
11:44:04  6    or not the written statement was with the first --
11:44:08  7    was, actually, sent along with the first report?
11:44:12  8         A    I don't remember.
11:44:13  9         Q    Okay.  Would you agree with me that the --
11:44:35 10    the captain plays a key role in the safe use of the
11:44:41 11    personnel basket?
11:44:42 12         A    Yes.
11:44:43 13         MS. SCOTT:
11:44:43 14              Object to the form.
11:44:43 15    BY MR. SHEPPARD:
11:44:44 16         Q    Would you agree with me that the captain must
11:44:47 17    properly position the boat, make sure the deck area is
11:44:51 18    clear before the personnel basket procedure takes
11:44:53 19    place?
11:44:54 20         A    Yes.
11:45:11 21         Q    Does the company have any evidence to refute
11:45:14 22    the claim that Mr. Hauglund was on his phone during
11:45:19 23    the basket transfer procedure that Mr. Griffin claims
11:45:25 24    he was injured as a result of?
11:45:27 25         A    There is no evidence.  We were never able to

11:45:30  1    verify that that incident happened so we don't even
11:45:33  2    know the date that McArthur said it happened.
11:45:37  3         Q    So there's nothing that you can do to refute
11:45:39  4    that, right?
11:45:39  5         A    To refute?
11:45:40  6         Q    The claim that Mr. --
11:45:41  7         A    No.
11:45:42  8         Q    That Captain Hauglund was on the phone?
11:45:44  9         A    No.
11:45:48 10         Q    Company has no evidence to refute the claim
11:45:52 11    that Captain Hauglund had stepped away from the
11:45:57 12    controls during the basket transfer that Mr. Griffin
11:46:01 13    claims caused his injuries?
11:46:03 14         MR. KHOURY:
11:46:06 15              Objection to form.
11:46:06 16         A    No evidence that that happened.
11:46:07 17         COURT REPORTER:
11:46:07 18              I'm sorry.  I didn't hear the answer.
11:46:07 19         THE WITNESS:
11:46:07 20              No evidence that that happened.
11:46:07 21    BY MR. SHEPPARD:
11:46:08 22         Q    Do you have any evidence to refute the claim?
11:46:10 23         A    No.
11:46:10 24         Q    Do you have -- does the company have any
11:46:19 25    evidence to refute the claim that while the vessel was

| | | |
|---|---|---|
| 11:46:22 | 1 | being propelled forward during a basket transfer, |
| 11:46:26 | 2 | personnel basket transfer, the captain had stepped |
| 11:46:29 | 3 | away from the controls that were engaged? |
| 11:46:32 | 4 | MR. KHOURY: |
| 11:46:32 | 5 | Well, object to the form. You mean, |
| 11:46:35 | 6 | other than the fact that the captain said it |
| 11:46:37 | 7 | didn't happen? |
| 11:46:39 | 8 | MR. SHEPPARD: |
| 11:46:40 | 9 | If he's saying that, that's fine. I'm |
| 11:46:41 | 10 | asking what the evidence is. |
| 11:46:43 | 11 | MR. KHOURY: |
| 11:46:44 | 12 | If he's saying -- said multiple times |
| 11:46:46 | 13 | that the captain said an incident didn't |
| 11:46:48 | 14 | happen, and then you wouldn't be -- what |
| 11:46:50 | 15 | would you offer to rebut that a condition as |
| 11:46:55 | 16 | part of that happened or didn't happen? |
| 11:46:58 | 17 | MR. SHEPPARD: |
| 11:46:59 | 18 | Kyle, I'm asking him a question. I feel |
| 11:47:00 | 19 | like we're getting close to coaching because |
| 11:47:04 | 20 | you're giving him -- |
| 11:47:05 | 21 | MR. KHOURY: |
| 11:47:05 | 22 | No, I think you're trying to trick him |
| 11:47:07 | 23 | into answering. |
| 11:47:08 | 24 | MR. SHEPPARD: |
| 11:47:09 | 25 | I'm not. |

| | | |
|---|---|---|
| 11:47:09 | 1 | MR. KHOURY: |
| 11:47:09 | 2 | You are. You're trying to trick him |
| 11:47:10 | 3 | into answering the question that they have |
| 11:47:11 | 4 | something, evidence to rebut, when he's |
| 11:47:15 | 5 | already said the captain said it didn't |
| 11:47:17 | 6 | happen. |
| 11:47:17 | 7 | MR. SHEPPARD: |
| 11:47:17 | 8 | All right. So you -- |
| 11:47:17 | 9 | MR. KHOURY: |
| 11:47:17 | 10 | An accident didn't happen. |
| 11:47:19 | 11 | MR. SHEPPARD: |
| 11:47:19 | 12 | You're now telling him how to answer the |
| 11:47:21 | 13 | question? |
| 11:47:21 | 14 | MR. KHOURY: |
| 11:47:22 | 15 | No, I'm not. |
| 11:47:22 | 16 | MR. SHEPPARD: |
| 11:47:22 | 17 | I would ask you not to do that going |
| 11:47:24 | 18 | forward. |
| 11:47:24 | 19 | MR. KHOURY: |
| 11:47:25 | 20 | I'm going to make my objection, and if |
| 11:47:25 | 21 | you have a problem with it, do what you need |
| 11:47:28 | 22 | to do. |
| 11:47:28 | 23 | MR. SHEPPARD: |
| 11:47:29 | 24 | The rules say don't make speaking |
| 11:47:30 | 25 | objections. |

| | | |
|---|---|---|
| 11:47:31 | 1 | MR. KHOURY: |
| 11:47:31 | 2 | I'm going to make the objection that I |
| 11:47:33 | 3 | made and I stand by it. |
| 11:47:34 | 4 | MR. SHEPPARD: |
| 11:47:34 | 5 | Okay. I'd ask that you don't make any |
| 11:47:38 | 6 | more speaking objections. |
| 11:47:40 | 7 | BY MR. SHEPPARD: |
| 11:47:43 | 8 | Q Aside from claims made by Captain Hauglund |
| 11:47:49 | 9 | that the incident didn't take place, does the company |
| 11:47:54 | 10 | have any other evidence to support its position that |
| 11:47:59 | 11 | Captain Hauglund, uh -- strike that. |
| 11:48:05 | 12 | Aside from statements made by Captain |
| 11:48:09 | 13 | Hauglund, does the -- can the company bring forth any |
| 11:48:13 | 14 | other evidence to refute the claims or the statements |
| 11:48:18 | 15 | made in this case that Captain Hauglund stepped away |
| 11:48:24 | 16 | from the controls that were engaged while the vessel |
| 11:48:27 | 17 | was being propelled forward during a basket transfer |
| 11:48:31 | 18 | that was taking place that caused Mr. Griffin to |
| 11:48:35 | 19 | suffer injuries? |
| 11:48:37 | 20 | A We have no -- |
| 11:48:37 | 21 | MR. KHOURY: |
| 11:48:38 | 22 | Objection to form. You're asking him -- |
| 11:48:40 | 23 | A We have no way to verify that. |
| 11:48:42 | 24 | BY MR. SHEPPARD: |
| 11:48:43 | 25 | Q Okay. I'm asking for -- if there's other |

| | | |
|---|---|---|
| 11:48:45 | 1 | evidence out there. That's a fair question. |
| 11:48:47 | 2 | MR. KHOURY: |
| 11:48:48 | 3 | You're asking him to answer an |
| 11:48:49 | 4 | impossible question. |
| 11:48:50 | 5 | MR. SHEPPARD: |
| 11:48:50 | 6 | I'm not. |
| 11:48:51 | 7 | MR. KHOURY: |
| 11:48:51 | 8 | You are. |
| 11:48:54 | 9 | MR. SHEPPARD: |
| 11:48:54 | 10 | I'm asking for the evidence that's out |
| 11:48:55 | 11 | there. It's a fair question. |
| 11:48:57 | 12 | BY MR. SHEPPARD: |
| 11:49:07 | 13 | Q Is it true that it's always best to use the |
| 11:49:09 | 14 | buddy system no matter what the task? |
| 11:49:12 | 15 | A Sure. |
| 11:49:13 | 16 | Q What does that mean? |
| 11:49:14 | 17 | A Well, as far as the buddy system, in this |
| 11:49:17 | 18 | case, these boats, they only have two-man crews. So |
| 11:49:20 | 19 | you're going to have a deckhand, and you're gonna have |
| 11:49:21 | 20 | a captain on watch. I mean, the buddy system in which |
| 11:49:26 | 21 | way? Two people on deck? Is that what you're talking |
| 11:49:29 | 22 | about or? |
| 11:49:30 | 23 | Q Asking for what you understand it to mean. |
| 11:49:33 | 24 | It comes from REC's manual. I can show it to you. |
| 11:49:36 | 25 | The second sentence is where the phrase comes from. |

| | |
|---|---|
| 11:50:50 | 1 | MR. KHOURY: |
| 11:50:50 | 2 | What section of the manual are you |
| 11:50:51 | 3 | pointing to? |
| 11:50:53 | 4 | MR. SHEPPARD: |
| 11:50:53 | 5 | It is General Rules. |
| 11:50:57 | 6 | MR. KHOURY: |
| 11:50:57 | 7 | Okay. |
| 11:50:57 | 8 | BY MR. SHEPPARD: |
| 11:50:59 | 9 | Q   I may have covered it up with that sticker, |
| 11:51:01 | 10 | but on 109, the following page it says General Rules |
| 11:51:06 | 11 | at the bottom.  Sir, it says, in the General Rules |
| 11:51:41 | 12 | section, Section M, working alone, Paragraph 1 in the |
| 11:51:47 | 13 | second sentence, "It's always best to use the buddy |
| 11:51:50 | 14 | system no matter what the task."  Did I read that |
| 11:51:54 | 15 | correctly? |
| 11:51:54 | 16 | A   Yeah.  But, I mean, this applies to more or |
| 11:51:57 | 17 | less working in confined space areas or working |
| 11:52:05 | 18 | somewhere other than a deck. |
| 11:52:08 | 19 | Q   Okay. |
| 11:52:08 | 20 | MR. KHOURY: |
| 11:52:08 | 21 | I just want to note an objection that |
| 11:52:11 | 22 | you didn't finish the sentence. |
| 11:52:12 | 23 | MR. SHEPPARD: |
| 11:52:13 | 24 | I was going piece by piece. |
| 11:52:15 | 25 | MR. KHOURY: |

| | |
|---|---|
| 11:52:16 | 1 | Okay. |
| 11:52:16 | 2 | BY MR. SHEPPARD: |
| 11:52:16 | 3 | Q   The following sentence, or the other portion |
| 11:52:18 | 4 | of the sentence says, "However when it's infeasible to |
| 11:52:21 | 5 | use the buddy system spacial care must be taken when |
| 11:52:25 | 6 | planning a task that requires an employee to work |
| 11:52:29 | 7 | alone."  Did I read that correctly? |
| 11:52:29 | 8 | A   Yes. |
| 11:52:30 | 9 | Q   Is a basket transfer procedure one of those |
| 11:52:35 | 10 | tasks that are infeasible to use the buddy system? |
| 11:52:42 | 11 | A   Not necessarily, no. |
| 11:52:44 | 12 | Q   Okay.  When there is a basket transfer |
| 11:52:48 | 13 | operation taking place you should have at least the |
| 11:52:51 | 14 | captain and a deckhand kind of working together, |
| 11:52:53 | 15 | right? |
| 11:52:54 | 16 | A   And a crane operator. |
| 11:52:55 | 17 | Q   And the crane operator; all three? |
| 11:52:58 | 18 | A   Correct. |
| 11:53:16 | 19 | Q   Would you agree that when employees are |
| 11:53:18 | 20 | working alone to perform a task, the risk associated |
| 11:53:22 | 21 | with the task can be greatly increased? |
| 11:53:24 | 22 | A   Sure. |
| 11:53:36 | 23 | Q   And if Mr. Griffin and these statements are |
| 11:53:43 | 24 | accurate and the captain had stepped away from the |
| 11:53:45 | 25 | controls and was on the phone while the basket |

| | |
|---|---|
| 11:53:47 | 1 | transfer operation was taking place, is that the buddy |
| 11:53:51 | 2 | system? |
| 11:53:52 | 3 | MR. KHOURY: |
| 11:53:52 | 4 | What statement are you referring to as |
| 11:53:54 | 5 | being accurate? |
| 11:53:55 | 6 | MR. SHEPPARD: |
| 11:53:56 | 7 | If it's true that -- I won't ask with |
| 11:53:59 | 8 | the statement then. |
| 11:54:00 | 9 | BY MR. SHEPPARD: |
| 11:54:00 | 10 | Q   If it's true that Captain Hauglund stepped |
| 11:54:03 | 11 | away from the controls while they were engaged and the |
| 11:54:06 | 12 | vessel, M/V DUSTIN DANOS, was propelled forward and |
| 11:54:11 | 13 | making a phone call, is that buddy system broken? |
| 11:54:14 | 14 | A   I have no way of verifying any of that. |
| 11:54:17 | 15 | Q   I'm asking you, if those things happened, if |
| 11:54:20 | 16 | Captain Hauglund steps away from the controls, the |
| 11:54:23 | 17 | vessel is propelling forward, and Captain Hauglund is |
| 11:54:27 | 18 | taking a phone call, is the buddy system during a |
| 11:54:30 | 19 | basket -- personnel basket transfer operation broken? |
| 11:54:33 | 20 | MS. SCOTT: |
| 11:54:33 | 21 | Object to form. |
| 11:54:35 | 22 | A   I don't think the buddy system was intended |
| 11:54:38 | 23 | for that operation. |
| 11:54:39 | 24 | BY MR. SHEPPARD: |
| 11:54:59 | 25 | Q   Can basket transfer operations be dangerous? |

| | |
|---|---|
| 11:55:06 | 1 | A   Yes. |
| 11:55:08 | 2 | Q   But that's a common thing that the offshore |
| 11:55:11 | 3 | workers encounter, right? |
| 11:55:12 | 4 | MS. SCOTT: |
| 11:55:13 | 5 | Object to the form. |
| 11:55:16 | 6 | A   Yes. |
| 11:55:16 | 7 | BY MR. SHEPPARD: |
| 11:55:17 | 8 | Q   And I think you may have testified to this |
| 11:55:20 | 9 | earlier.  I'm sorry if I'm retreading the ground.  You |
| 11:55:24 | 10 | know, it's a basket transfer operation is the type of |
| 11:55:28 | 11 | job you would want to do a JSA for, right? |
| 11:55:32 | 12 | A   Yes. |
| 11:55:32 | 13 | Q   Um, I think I had shown you the JSA form that |
| 11:55:37 | 14 | I found in the manual has three columns, correct? |
| 11:55:50 | 15 | A   The JSA form? |
| 11:55:51 | 16 | Q   Yes, sir. |
| 11:55:51 | 17 | A   There's more -- oh, yeah, three going down? |
| 11:55:56 | 18 | Q   Yes, sir.  When you do a JSA you need to list |
| 11:56:01 | 19 | the job steps, correct? |
| 11:56:02 | 20 | A   Yes. |
| 11:56:02 | 21 | Q   You need to list the corresponding hazards, |
| 11:56:05 | 22 | correct? |
| 11:56:06 | 23 | A   Yes. |
| 11:56:06 | 24 | Q   And you need to list the safe procedures for |
| 11:56:08 | 25 | each step, correct? |

| | | |
|---|---|---|
| 11:56:10 | 1 | A Yes. |
| 11:56:11 | 2 | Q Have you ever had to complete a JSA for a |
| 11:56:14 | 3 | basket transfer operation before? |
| 11:56:17 | 4 | A No. |
| 11:56:18 | 5 | Q Have you ever seen one? |
| 11:56:19 | 6 | A Yes. |
| 11:56:19 | 7 | Q Are you familiar with the job steps involved |
| 11:56:23 | 8 | in a basket transfer operation? |
| 11:56:26 | 9 | A I'm not very familiar. I'm not a mariner, so |
| 11:56:28 | 10 | I don't know. I'm not an expert on it. I know that |
| 11:56:32 | 11 | the conditions can be different so the JSAs may be |
| 11:56:35 | 12 | different every time. |
| 11:56:36 | 13 | Q Okay. So for example, if there's choppy seas |
| 11:56:42 | 14 | or, you know, something different with how the |
| 11:56:47 | 15 | operation is going to have to take place, you might |
| 11:56:50 | 16 | change a few things here or there; is that fair? |
| 11:56:55 | 17 | A Yes. |
| 11:56:55 | 18 | Q Do you have any idea -- and if you don't |
| 11:56:58 | 19 | know, that's fine. Do you have any idea what the -- |
| 11:57:00 | 20 | what some of the job steps are? |
| 11:57:06 | 21 | A I wouldn't feel comfortable answering that. |
| 11:57:08 | 22 | I just don't know -- |
| 11:57:09 | 23 | Q It's okay. |
| 11:57:09 | 24 | A -- the right way to do it. |
| 11:57:11 | 25 | Q Understood. Is there somebody at the company |

| | | |
|---|---|---|
| 11:57:13 | 1 | that could speak to that a little better? |
| 11:57:16 | 2 | A Uh, a captain. |
| 11:57:17 | 3 | Q Okay. And maybe deckhands? |
| 11:57:20 | 4 | A Yes. |
| 11:57:24 | 5 | Q Do you know what any of the corresponding |
| 11:57:27 | 6 | hazards are? You're not comfortable diving into that? |
| 11:57:31 | 7 | A Some of the things you want to consider, of |
| 11:57:32 | 8 | course, is do you have a clear deck; maintain |
| 11:57:35 | 9 | communications with all parties involved. And beyond |
| 11:57:40 | 10 | that, you know, I don't know. It just depends on the |
| 11:57:44 | 11 | situation. You have to just consider all the |
| 11:57:45 | 12 | variables, be aware of your surroundings. So, it's |
| 11:57:51 | 13 | variable. |
| 11:57:51 | 14 | Q Okay. And when you say "clear deck" you |
| 11:57:53 | 15 | don't mean everything off the deck, you just mean -- |
| 11:57:56 | 16 | A Clear landing area. |
| 11:57:58 | 17 | Q -- a clear area. |
| 11:57:58 | 18 | A Yeah. Sure. |
| 11:57:58 | 19 | Q Otherwise these transfers would take a long |
| 11:58:01 | 20 | time I would imagine. |
| 11:58:06 | 21 | Do you have any familiarity with the, um, |
| 11:58:12 | 22 | with the safe procedures for each step? |
| 11:58:15 | 23 | A Not without reading it out the manual. |
| 11:58:18 | 24 | Q Okay. I think we'll touch on some of those. |
| 11:58:41 | 25 | Okay. And just to kind of talk through what |

| | | |
|---|---|---|
| 11:58:45 | 1 | kind of goes into each column and the general way that |
| 11:58:47 | 2 | we find in the manual. The left column the sequence |
| 11:58:53 | 3 | of basic job steps, those are steps that are listed in |
| 11:58:56 | 4 | order in which they occur, correct? |
| 11:58:59 | 5 | A Typically. |
| 11:58:59 | 6 | Q And in the middle column the corresponding |
| 11:59:02 | 7 | hazards are identified for each job step? |
| 11:59:05 | 8 | A Correct. |
| 11:59:05 | 9 | Q And in the right column you list the |
| 11:59:09 | 10 | recommended safe job procedures that should be |
| 11:59:11 | 11 | followed to guard against these hazards in order to |
| 11:59:15 | 12 | prevent potential hazards, correct? |
| 11:59:17 | 13 | A Correct. |
| 11:59:19 | 14 | Q Is there a corporate directive of any kind |
| 11:59:24 | 15 | that all incidents, once you find out about them, need |
| 11:59:32 | 16 | to be investigated? |
| 11:59:33 | 17 | A To a certain extent. All incidents are to be |
| 11:59:38 | 18 | reported no matter how big or small. |
| 11:59:42 | 19 | Q Um, for the basket transfer incident that |
| 11:59:47 | 20 | Mr. Griffin alleges took place, aside from talking to |
| 11:59:52 | 21 | the captain and having an insurance adjuster talk to |
| 11:59:56 | 22 | Mr. Griffin, was there any other investigation done? |
| 11:59:59 | 23 | A Yeah. We talked to captain, uh -- the |
| 12:00:01 | 24 | captain and he couldn't verify that it happened so |
| 12:00:04 | 25 | that's as far as it got. |

| | | |
|---|---|---|
| 12:00:06 | 1 | Q Okay. Were there any discussions internally |
| 12:00:13 | 2 | with anyone else besides the captain about the alleged |
| 12:00:17 | 3 | incident or anything like that? |
| 12:00:18 | 4 | A No. We were more focused on the starter |
| 12:00:21 | 5 | incident and that treatment. |
| 12:00:22 | 6 | Q Okay. We may have gone over this. When -- |
| 12:00:41 | 7 | when the person from Mr. Aucoin's outfit came out and |
| 12:00:49 | 8 | took a statement, REC didn't do anything with that |
| 12:00:49 | 9 | information, correct? |
| 12:00:50 | 10 | MS. SCOTT: |
| 12:00:50 | 11 | Object to the form. |
| 12:00:54 | 12 | A Correct. |
| 12:00:54 | 13 | BY MR. SHEPPARD: |
| 12:00:56 | 14 | Q Aside from -- there was another captain on |
| 12:00:59 | 15 | the vessel as well. Did the company try to speak to |
| 12:01:03 | 16 | him? |
| 12:01:03 | 17 | A Not that I'm aware of. |
| 12:01:05 | 18 | Q Okay. I think that was Captain Winhauer or |
| 12:01:07 | 19 | Winhauer (different pronunciation)? |
| 12:01:08 | 20 | A Correct, yeah. He would have been sleeping |
| 12:01:12 | 21 | at the time. |
| 12:01:51 | 22 | MR. SHEPPARD: |
| 12:01:51 | 23 | Can we take a quick break? |
| 12:01:53 | 24 | VIDEOGRAPHER: |
| 12:01:53 | 25 | We're going to go off the record. The |

## Page 89

```
12:01:54   1         time is 12:02 P.M.
12:01:56   2              (OFF THE RECORD)
12:01:56   3         VIDEOGRAPHER:
12:12:51   4             We're going back on the record.  The
12:12:55   5       time is 12:13 P.M.
12:12:57   6    BY MR. SHEPPARD:
12:13:25   7       Q   REC kind of valued the work that Mr. Griffin
12:13:30   8    did for them, right?
12:13:31   9       A   Yes.
12:13:31  10       Q   He did his work well?
12:13:33  11       A   Yes.
12:13:35  12       Q   Did it without complaint or protest?
12:13:39  13       A   Yes.
12:13:43  14       Q   Fair to say that he was a good worker when he
12:13:46  15    worked for REC?
12:13:46  16       A   Yes.
12:13:59  17       Q   What do you -- what's your understanding of,
12:14:01  18    if you know, of the, uh -- the injuries Mr. Griffin
12:14:10  19    claims he sustained as a result of the incident?
12:14:15  20       A   It was a tear in his rotator cuff related to
12:14:18  21    the -- him picking up a starter and backing into a
12:14:22  22    fire rack, hose rack, and he went into surgery for
12:14:27  23    that.  He was repaired, treated, and he was released
12:14:32  24    to MMI.
12:14:33  25       Q   Okay.  Are you aware Mr. Griffin claimed neck
```

## Page 90

```
12:14:51   1    injuries and back injuries as well from the -- when I
12:14:54   2    say incident, again, I'm talking about the basket
12:14:56   3    transfer incident he claims that took place.
12:14:58   4       A   I'm aware that, yes, he's claiming that now.
12:15:02   5       Q   Okay.  And you're aware that he's also
12:15:04   6    claiming that the rotator cuff injury was a result of
12:15:08   7    the basket transfer operation, correct?
12:15:11   8       A   I'm not aware of that.
12:15:12   9         MR. KHOURY:
12:15:13  10             Object to form.
12:15:25  11    BY MR. SHEPPARD:
12:15:27  12       Q   Okay.  If Mr. Griffin was just as fit as he
12:15:32  13    was before these incidents, would REC hire him back?
12:15:37  14       A   Yes.
12:15:45  15       Q   Um, it's been claimed in this case that
12:15:52  16    Mr. Griffin had some, maybe, had some preexisting neck
12:15:55  17    and back injuries.  Are you aware of that?
12:16:01  18       A   Um, no, I'm not aware of specifically what
12:16:05  19    was injured previous to this, right?
12:16:12  20       Q   Correct.
12:16:14  21       A   Okay.
12:16:14  22       Q   If Mr. Griffin did have neck and back
12:16:16  23    injuries that predated him being hired for REC back in
12:16:22  24    2014, would you still hire him?
12:16:27  25         MS. SCOTT:
```

## Page 91

```
12:16:28   1             Object to the form.
12:16:28   2         MR. KHOURY:
12:16:29   3             Object to the form.
12:16:30   4       A   That depends on the outcome of his physical.
12:16:32   5    BY MR. SHEPPARD:
12:16:33   6       Q   Okay.  And if he had the same outcome for his
12:16:36   7    physical and worked for four years, you know, knowing
12:16:42   8    all that, would -- kind of having that foreknowledge,
12:16:44   9    would REC still hire Mr. Griffin if he had neck and
12:16:48  10    back injuries prior to his employment?
12:16:51  11         MR. KHOURY:
12:16:51  12             Object to the form.
12:16:52  13         MS. SCOTT:
12:16:52  14             Object to the form.
12:16:54  15       A   If he passed his physical, yes, we would hire
12:16:57  16    him.
12:16:57  17    BY MR. SHEPPARD:
12:16:58  18       Q   Did Mr. Griffin pass his physical in 2014?
12:17:02  19         MR. KHOURY:
12:17:02  20             You mean 2012?
12:17:03  21    BY MR. SHEPPARD:
12:17:05  22       Q   Did Mr. Griffin pass his physical in 2012?
12:17:09  23       A   Yes.
12:17:09  24       Q   Okay.  In 2014 when the -- when JNB and REC
12:17:15  25    merged was there -- describe that process from like
```

## Page 92

```
12:17:19   1    the employee standpoint.  Did they go and reinterview
12:17:23   2    for their positions?
12:17:24   3       A   It would have been 2016.
12:17:26   4       Q   Sorry.
12:17:27   5       A   But the whole fleet, everybody, all the
12:17:31   6    mariners had to fill out another application.  They
12:17:36   7    were just transferred over on the same vessel that
12:17:40   8    they were previously working on but they were
12:17:42   9    transferred over to REC Marine instead of, I guess it
12:17:45  10    was JNB.  They did not undergo a brand new physical.
12:17:51  11    The old JNB physicals were adopted, I guess.
12:17:55  12       Q   Okay.  So, when REC made the decision to hire
12:18:00  13    Mr. Griffin on in 2016, right?
12:18:04  14       A   Yes.
12:18:04  15       Q   They opted to rely, kind of, solely on that
12:18:09  16    2012 physical; is that fair?
12:18:11  17         MR. KHOURY:
12:18:12  18             Object to the form.
12:18:12  19         MS. SCOTT:
12:18:12  20             Object to the form.
12:18:13  21       A   Correct.  I don't know exactly what the
12:18:15  22    agreements that they had for that merger, but that was
12:18:19  23    part of it, that those physicals and everything would
12:18:22  24    be adopted.
          25
```

12:18:23  1   BY MR. SHEPPARD:
12:18:23  2     Q   Okay.  REC Marine didn't have any desire to
12:18:30  3   have their former JNB employees undergo any additional
12:18:37  4   physicals; is that fair?
12:18:40  5        MS. SCOTT:
12:18:40  6            Object to the form.
12:18:42  7     A   I would assume that REC would have been
12:18:45  8   advised of how they needed to do that.
12:18:49  9   BY MR. SHEPPARD:
12:18:49 10     Q   Advised by who?
12:18:50 11     A   I don't know.  Maybe by the attorneys
12:18:52 12   involved with the merger.
12:18:55 13     Q   Okay.  If Mr. Griffin had, when he was coming
12:19:13 14   on to work for REC had mentioned that he had some back
12:19:18 15   injuries or neck injuries in the past, what, if
12:19:21 16   anything, would REC had wanted to do?
12:19:25 17     A   It would have been possible to have him
12:19:27 18   undergo another physical.
12:19:50 19     Q   But REC didn't have the requirement that the
12:19:54 20   JNB employees undergo a physical at all, correct?
12:19:59 21     A   Not for the merger.
12:20:11 22     Q   Fair to say JNB chose to rely on all the
12:20:14 23   prior physicals for the JNB employees that were
12:20:18 24   transitioned into REC?
12:20:20 25        MR. KHOURY:

12:20:20  1            Object to form.
12:20:21  2     A   That REC relied on the JNB physicals?
12:20:24  3   BY MR. SHEPPARD:
12:20:25  4     Q   Yes, sir.
12:20:25  5     A   Yeah, that'd be fair to say that.
12:20:26  6     Q   Okay.  Is there anything else that they --
12:20:27  7   when this transfer happened, and the applications were
12:20:33  8   completed, did REC even review the applications?
12:20:38  9     A   Yes.
12:20:39 10     Q   Each one?
12:20:40 11     A   Yes.
12:20:40 12     Q   Okay.  What did they look for?
12:20:44 13     A   Um, I mean, that was needed to be done for
12:20:47 14   payroll purposes, probably, mainly; but they looked
12:20:50 15   for job history, I guess, how long they were employed
12:20:55 16   with JNB.  Just the usual evaluations that you would
12:20:59 17   do to hire someone.
12:21:00 18     Q   Okay.  Is there anyone else you can think of
12:21:02 19   that they looked at aside from, you know, I guess some
12:21:05 20   identifying information to find out where they need to
12:21:08 21   send paychecks and the work history.
12:21:10 22     A   Yeah, they looked at that type of stuff.  You
12:21:12 23   know, for insurance purposes, also.  Another reason
12:21:14 24   why these applications needed to be done.  There was a
12:21:17 25   new insurance plan offered to these people; so, I

12:21:21  1   can't think of anything other than that.
12:21:24  2     Q   Okay.
12:21:24  3     A   That would be reviewed.
12:21:27  4     Q   Did the -- did REC go through the JNB
12:21:33  5   personnel files and look at those as well or they
12:21:37  6   just, did they not?
12:21:39  7     A   Um, I don't know that anybody did.
12:21:43  8     Q   Okay.
12:21:46  9     A   It would have been the personnel department.
12:21:48 10   I don't know if they did.
12:21:50 11     Q   Okay.  Is there anyone that would know?
12:21:56 12     A   Personnel.
12:21:56 13     Q   Okay.  So, is it the same people that were
12:21:58 14   manning the personnel office back in 2016 still here?
12:22:05 15     A   No.
12:22:06 16     Q   Okay.  I guess, maybe, no one who has the
12:22:14 17   institutional knowledge of what materials were
12:22:16 18   reviewed, if the personnel files were reviewed?
12:22:20 19     A   No, it would be the person that was running
12:22:22 20   personnel at that time.
12:22:48 21     Q   Were these workers hired or were they just
12:22:50 22   kind of transferred?  Do you understand?
12:22:54 23     A   Wouldn't it be kind of the same thing?
12:22:56 24     Q   I don't know.  It's, like, if you worked for
12:22:58 25   McDonald's and then try to get a job with Burger King.

12:23:01  1     A   It's a little bit different.  They didn't
12:23:03  2   merge.
12:23:04  3     Q   Right.  So the --
12:23:04  4     A   I think it would be more of a transfer.
12:23:20  5     Q   Do you know if anyone who worked for JNB
12:23:25  6   didn't come on to work for REC?
12:23:27  7     A   I don't know of anyone specifically.
12:23:29  8     Q   Okay.  Is there anyone that would know that
12:23:31  9   one way or another?
12:23:34 10     A   Not that I can think of.
12:23:55 11     Q   Is there -- did you see any documents in
12:23:59 12   Mr. Griffin's personnel file where he complains of
12:24:04 13   neck pain or back pain preventing him from doing his
12:24:08 14   job?
12:24:08 15     A   I didn't see anything in there.
12:24:27 16     Q   Is it fair that, you know, work offshore can
12:24:31 17   be dangerous and sometimes people do get hurt?
12:24:35 18     A   Yes.
12:24:35 19     Q   Could be bumps and bruises or could be
12:24:37 20   something more severe?
12:24:39 21     A   Yes.
12:24:40 22     Q   Um, sometimes people hurt their backs?
12:24:45 23     A   Yes.
12:24:45 24        MR. KHOURY:
12:24:45 25            Object to the form.

| | |
|---|---|
| 12:24:46 | 1 | BY MR. SHEPPARD: |

12:24:46  1   BY MR. SHEPPARD:
12:24:46  2       Q   Sometimes people hurt their necks?
12:24:48  3       A   They can.
12:24:49  4       Q   Okay.  Do you terminate them or do you keep
12:24:52  5   them on or how does that work?
12:24:53  6       A   Make sure that they get treated.
12:24:56  7       Q   Okay.  And after they get treated if they've
12:24:58  8   recovered?
12:24:59  9       A   They return to work.
12:25:01 10       Q   They return to work.  If an employee comes in
12:25:04 11   and, you know, is able to work, is having no issues,
12:25:11 12   is there any reason that the company would terminate
12:25:15 13   them for later having some pain or some neck pain or
12:25:18 14   some back pain?
12:25:19 15       MS. SCOTT:
12:25:20 16           Objection to form.
12:25:20 17       MR. KHOURY:
12:25:21 18           Objection.
12:25:21 19       A   No.
12:25:21 20   BY MR. SHEPPARD:
12:25:23 21       Q   Does REC have a manning policy?
12:26:00 22       A   A manning policy?  We follow Coast Guard
12:26:03 23   regulations as far as that goes.
12:26:05 24       Q   Okay.  Is it the same or different than
12:26:08 25   crewing?

12:26:09  1       A   It's a little bit different.
12:26:11  2       Q   Okay.  Can you explain the differences?
12:26:13  3       A   Well, Manning is what Coast Guard puts out as
12:26:17  4   their requirements, what would be appropriate to man a
12:26:21  5   certain vessel, you need this amount of people.  You
12:26:23  6   need this many captains; this many deckhands.  Crewing
12:26:27  7   would be you assign -- you can assign more, you know,
12:26:31  8   depending on the job scope.  If they needed extra help
12:26:35  9   you can give them more people.
12:26:36 10       Q   Okay.  I guess the Coast Guard and the
12:26:42 11   company, they have these requirements to protect
12:26:48 12   people from getting hurt and prevents accidents from
12:26:52 13   happening, right?
12:26:53 14       A   The Coast Guard puts the manning requirements
12:26:56 15   at the bare minimum.
12:26:58 16       Q   Does REC do the bare minimum or they try to
12:27:00 17   do more?
12:27:02 18       A   REC does the norm.
12:27:03 19       Q   What's the norm?  What do you mean?
12:27:04 20       A   REC meets Coast Guard expectation.
12:27:07 21       Q   Does REC try to exceed the minimum or does
12:27:09 22   it --
12:27:10 23       A   It depends on the job scope.
12:27:11 24       Q   Okay.  Is there a reason why REC couldn't
12:27:29 25   have, you know, a third or fourth deckhand on vessels

12:27:33  1   like the DUSTIN DANOS?
12:27:36  2       A   Um, it just it's not needed.  A lot of that
12:27:41  3   depends on what the customer is willing to pay for as
12:27:44  4   well.
12:27:45  5       Q   Okay.  So, just kind of sometimes comes down
12:27:49  6   to the scope and the amount of money that people are
12:27:51  7   willing to pay with how many people you can put on the
12:27:54  8   vessel?
12:27:55  9       A   I mean, it could -- it could be but it's more
12:27:56 10   of the job scope than anything; is it necessary to add
12:27:59 11   that extra man.
12:28:00 12       Q   Okay.  Are you the person that sets the
12:28:13 13   safety policies for REC?
12:28:14 14       A   No.
12:28:15 15       Q   Who does that?
12:28:17 16       A   Uh, the VP of HSE.
12:28:20 17       Q   Who's that?
12:28:20 18       A   Artie Angeron.
12:28:22 19       COURT REPORTER:
12:28:22 20           Say it again.
12:28:22 21       THE WITNESS:
12:28:22 22           Artie Angeron.  A-N-G-E-R-O-N.
12:28:26 23   BY MR. SHEPPARD:
12:28:29 24       Q   If new safety procedures are developed how
12:28:35 25   are they communicated to the folks for REC?

12:28:39  1       A   They'll be shared in a like safety alert is
12:28:42  2   what we call it and sent out to the fleet.
12:28:45  3       Q   Okay.  Electronically or physical copies.
12:28:48  4       A   Both, depending on what system they have.
12:28:51  5       Q   So, some of these vessels they have the
12:28:54  6   capability of, you know, email and things like that,
12:28:57  7   and some don't?
12:28:59  8       A   Correct.
12:29:00  9       Q   At the time of the incident did DUSTIN DANOS
12:29:04 10   have capabilities for email?
12:29:07 11       A   No.
12:29:07 12       Q   Okay.  Does it now?
12:29:08 13       A   Yes.
12:29:08 14       Q   Okay.  Is that a fleet-wide change y'all are
12:29:14 15   trying to make?  Just upgrading?
12:29:14 16       A   Yeah.  Trying to go electronically for
12:29:17 17   everything.
12:29:17 18       Q   Okay.  Does the, um -- and I don't know this
12:29:20 19   one way or the other.  Is dynamic positioning
12:29:27 20   something that you can retrofit to a vessel or is it
12:29:29 21   kind of stuck with the time it was made?
12:29:32 22       A   Yeah, you're stuck with -- I mean, you can
12:29:33 23   retrofit it but it would be too costly, so you got
12:29:37 24   what you got, you know, if that's how it was built.
12:29:43 25       Q   I'd like to talk a little about

12:29:45 1   responsibilities of captains. Let me know if this is
12:29:49 2   true. The captain is the general manager of the
12:29:51 3   vessel in tow in which he or she is assigned and their
12:29:55 4   responsibilities include, but are not limited to,
12:29:59 5   safety, welfare, productivity and professionalism of
12:30:03 6   their crew, and the safety, maintenance, cleanliness
12:30:07 7   and performance standard of the equipment in tow.
12:30:11 8       A   That's correct.
12:30:14 9       Q   Um, is it true that the -- it's the -- the
12:30:21 10  captains are the supervisors for the deckhands and the
12:30:25 11  engine folks, right?
12:30:27 12      A   Correct.
12:31:40 13      Q   The incident reports that we looked at
12:31:42 14  previously, those are meant to be completed by
12:31:46 15  supervisors, captains, right?
12:31:48 16      A   Yes.
12:31:49 17      Q   Not Mr. Griffin.
12:31:51 18      A   Correct.
12:31:52 19      Q   His only responsibility is to report the
12:31:54 20  incident to the supervisor, correct?
12:31:57 21      A   Correct.
12:31:57 22      Q   Okay. The captain's responsibility is to
12:32:08 23  communicate the incident to the shoreside folks,
12:32:12 24  right?
12:32:13 25      A   Right.

12:32:14 1       Q   Would he communicate it to you or someone
12:32:16 2   else?
12:32:16 3       A   It could have been someone else, but in this
12:32:19 4   situation it would have been me.
12:32:21 5       Q   Okay. If a person is injured and claims that
12:32:30 6   they're injured. You know, they injure their shoulder
12:32:33 7   pretty seriously due to a basket transfer operation,
12:32:36 8   is that something where you require a physical report
12:32:40 9   to be generated?
12:32:41 10      A   Yes.
12:32:50 11      Q   So, if the incident was reported to Captain
12:52:53 12  Hauglund and McArthur Griffin's versions of events
12:32:56 13  were true, it would have been Captain Hauglund's
12:32:59 14  responsibility to complete the incident form when he
12:33:02 15  first learned of the incident, correct?
12:33:04 16          MR. KHOURY:
12:33:04 17              Object to the form.
12:33:06 18      A   Uh, yes.
12:33:06 19  BY MR. SHEPPARD:
12:33:14 20      Q   What sort of medical treatment has or was
12:33:18 21  there available onboard the M/V DUSTIN DANOS around
12:33:23 22  May of 2018?
12:33:25 23      A   The only thing that's available on the vessel
12:33:28 24  itself is everybody's first aid trained. There's a
12:33:30 25  first aid kit onboard. Otherwise, everything else is

12:33:35 1   shoreside.
12:33:40 2       Q   So that, certainly, nothing on the vessel
12:33:42 3   that could be used to repair a torn rotator cuff,
12:33:46 4   right?
12:33:46 5       A   No.
12:33:52 6       Q   When there is a -- would you consider a torn
12:33:56 7   rotator cuff to be an emergency injury?
12:33:59 8           MS. SCOTT:
12:33:59 9               Object to the form.
12:34:01 10      A   Um, it depends. I mean, what's -- like, an
12:34:04 11  emergency where you got to get 'em off the boat
12:34:08 12  immediately? I don't know if you can know that right
12:34:10 13  away.
12:34:10 14  BY MR. SHEPPARD:
12:34:11 15      Q   I'll show you the -- I'll show you page 167.
12:36:53 16  It's a incident report. I don't know why it's not
12:37:00 17  showing up on there. Oh, I don't have it here. I
12:37:02 18  wanted to let you see it first. I'm just going to ask
12:37:04 19  him a couple questions about it. You can read as much
12:37:08 20  of this as you want. I'm trying to understand what
12:37:10 21  a -- when there's an emergency injury. It's just a
12:37:16 22  term that's used in here. You can zoom in. Do
12:37:21 23  whatever you need to.
12:37:56 24      A   Okay.
12:37:57 25      Q   So, towards the top of -- I'll take that

12:38:01 1   back. So it's not in your shot. If you need it for
12:38:03 2   any reason, let me know. There's a part in here on
12:38:14 3   REC 167 where -- where it says it's the emergency
12:38:38 4   response procedures for personal injury or illness and
12:38:44 5   it says that the responsibility of the vessel captain
12:38:47 6   or wheelhouse person on watch is responsible for
12:38:51 7   evaluating the degree of emergency and insuring that
12:38:56 8   appropriate action is taken. What does that mean?
12:39:02 9       A   It's exactly what it means. Means you
12:39:05 10  evaluate the severity of it. Is it an emergency that
12:39:09 11  needs attention right away. If it does, you take care
12:39:11 12  of what you can on the boat and then you make your
12:39:14 13  notifications to the office or the platform or
12:39:20 14  wherever it needs to go. You make your Coast Guard
12:39:23 15  notifications. In this situation the, uh -- it was
12:39:27 16  not an emergency based off of he hurt his shoulder
12:39:32 17  carrying a starter and backed into the firehose rack.
12:39:36 18  They called and reported it and he said that he was
12:39:40 19  good to go until, uh -- good to continue working until
12:39:45 20  whatever date it was, the 13th, and that's when he was
12:39:48 21  initially seen by a doctor.
12:39:51 22      Q   Okay.
12:39:55 23          MR. SHEPPARD:
12:39:55 24              Object to, "in this case it wasn't an
12:39:59 25      emergency" forward as nonresponsive.

| | |
|---|---|
| 12:40:02 | 1 |

BY MR. SHEPPARD:

12:40:12 2     Q  Aside from the JSAs that we discussed before,

12:40:15 3 are there any other types of weekly, monthly, daily

12:40:21 4 safety training or anything like that?

12:40:22 5     A  There's weekly safety meetings. There's

12:40:24 6 weekly drills.

12:40:28 7     Q  Okay.

12:40:29 8     A  As far as meetings, I mean there's also

12:40:31 9 weekly vessel safety checklists that they do to check

12:40:36 10 the maintenance and things like that.

12:40:38 11     Q  Okay. For the safety drills, and the -- and

12:40:43 12 other sort of safety training, is that documented

12:40:46 13 somewhere?

12:40:46 14     A  Yes.

12:40:47 15     Q  Okay. So if that were to -- if that were to

12:40:49 16 exist, is that put in someone's file or where is that

12:40:54 17 kept.

12:40:54 18     A  Yes, it would be in a file.

12:40:56 19     Q  Where would that file be?

12:40:58 20     A  Should be here at the office.

12:41:00 21     Q  If Mr. Griffin was part of any sort of weekly

12:41:04 22 training or weekly safety meetings or monthly

12:41:06 23 training, or monthly safety meetings, that's going to

12:41:09 24 be documented in a file here somewhere, right?

12:41:11 25     A  And there's a copy kept on the boat and

12:41:12 1 there's a copy sent here as well.

12:41:14 2     Q  So, there's a copy here in the office we're

12:41:17 3 sitting in here today?

12:41:19 4     A  There should be.

12:41:20 5     Q  How long does the company hold onto those

12:41:22 6 records for?

12:41:23 7     A  I'd have to look at the records retention. I

12:41:25 8 believe those are five years.

12:42:13 9     Q  Does REC follow the -- this is REC 596. Does

12:42:18 10 it follow the calendar, sort of established, for the

12:42:25 11 training matrix?

12:42:29 12     A  Yes.

12:42:45 13     Q  There is a bunch of things listed there that

12:42:48 14 are supposed to be done annually. Do you see that?

12:42:54 15     A  Yes.

12:42:56 16     Q  Where -- is that documented anywhere in

12:42:58 17 someone's personnel file or is there any documentation

12:43:02 18 anywhere that shows that that safety training is done

12:43:04 19 on an annual basis?

12:43:06 20     A  Yeah, it should be documented on a checklist.

12:43:08 21 The GOL orientation and annual refresher training.

12:43:13 22 That's the form it would be documented on.

12:43:15 23     Q  Where is that form kept for each employee?

12:43:19 24     A  In the office.

12:43:24 25     Q  Does it have a similar five year retention

12:43:27 1 policy?

12:43:28 2     A  Yes.

12:43:40 3     Q  So in the checklist is it just something that

12:43:43 4 says "we went over this" or is it something where

12:43:45 5 employees are signing it? Can you describe?

12:43:48 6     A  Yeah, the employees -- each vessel has all

12:43:51 7 these topics in a binder and, annually, when that time

12:43:56 8 is due they go over each topic, review it, and initial

12:44:01 9 that it's been completed and then sign off when the

12:44:05 10 whole thing's done.

12:44:06 11     Q  And is that the same for the weekly,

12:44:08 12 quarterly and three year and four year deadlines as

12:44:16 13 well?

12:44:17 14     A  Um, yeah. The weeklies and the quarterlies,

12:44:20 15 that's on a different form; but they're all

12:44:23 16 documented.

12:44:24 17     Q  Those are kept here in the office?

12:44:26 18     A  Yes.

12:44:46 19     Q  I'm going to pivot and talk about some of the

12:44:49 20 -- talk about Mr. Griffin's maintenance. Maintenance

12:44:56 21 and cure. Um, when was the maintenance and cure

12:44:59 22 suspended?

12:45:03 23     A  Uh, some time around May or June of 2019

12:45:06 24 after he was released to MMI.

12:45:09 25     Q  Okay. Has the company spoken to any of

12:45:14 1 Mr. Griffin's current treaters, current treating

12:45:18 2 physicians?

12:45:19 3     A  Not that I'm aware of.

12:45:21 4     Q  Is the company aware of any surgeries or

12:45:24 5 future medical treatment that Mr. Griffin has been

12:45:26 6 recommended by his treating physicians?

12:45:32 7     A  I'm not aware of any.

12:45:33 8     Q  Is the company aware of any additional

12:45:36 9 medical treatment that Mr. Griffin -- has been

12:45:38 10 recommended by Mr. Griffin from a life care planner?

12:45:43 11     A  No.

12:45:43 12     Q  Okay. If Mr. Griffin was being recommended

12:45:46 13 additional treatment from other treating physicians is

12:45:50 14 that something that the company, REC Marine, would

12:45:56 15 take into consideration in determining whether or not

12:45:58 16 to turn maintenance and cure back on for him?

12:46:02 17     MR. KHOURY:

12:46:03 18     Object to form.

12:46:03 19     MS. SCOTT:

12:46:04 20     Object to form.

12:46:04 21     A  It would be taken into consideration, um, but

12:46:06 22 we would talk to -- we'd get legal advice on that.

12:46:09 23 BY MR. SHEPPARD:

12:46:09 24     Q  Okay. And that's something -- again, don't

12:46:11 25 want to get into conversations you may have had with

12:46:14  1    your lawyer but since the company isn't even aware
12:46:17  2    that treating physicians and life care planners have
12:46:20  3    recommended additional treatment in the future for
12:46:23  4    Mr. Griffin, it stands to reason that the company
12:46:25  5    hasn't had any discussions whatsoever about whether or
12:46:28  6    not maintenance and cure should be turned back on.
12:46:33  7         MS. SCOTT:
12:46:34  8              Object to form.
12:46:34  9         MR. KHOURY:
12:46:34 10              Object to form.
12:46:34 11    A   Yeah, I'm not aware of any of that.
12:46:37 12    BY MR. SHEPPARD:
12:46:38 13    Q   And there's been no evaluation one way or
12:46:40 14    another since the maintenance and cure was originally
12:46:44 15    suspended by the company in 2019, correct?
12:46:45 16         MR. KHOURY:
12:46:46 17              Object to form.
12:46:46 18         MS. SCOTT:
12:46:47 19              Object to form.
12:46:48 20    A   Evaluation of?
12:46:49 21    BY MR. SHEPPARD:
12:46:51 22    Q   Sure.  Thanks for helping me out a little
12:46:52 23    bit.
12:46:54 24    A   There's been no additional evaluation by the
12:46:59 25    company in regards to whether or not maintenance and

12:47:02  1    cure should be turned back on since it was suspended
12:47:06  2    in 2019; is that correct?
12:47:09  3         MS. SCOTT:
12:47:09  4              Object to form.
12:47:10  5    A   There's been no evaluation.
12:47:12  6    BY MR. SHEPPARD:
12:47:53  7    Q   Are you familiar with the Gulf Coast Surgical
12:47:58  8    Center?
12:47:58  9    A   Yes.
12:48:01 10    Q   It's where Dr. Brett Casey works, right?
12:48:04 11    A   I would assume that's where he performs
12:48:07 12    surgeries.
12:48:07 13    Q   Okay.  Is the Gulf Coast Surgery Center --
12:48:12 14    sorry.  Is the Gulf Coast Surgical Center one of the
12:48:18 15    facilities that REC sends employees to when they're
12:48:22 16    injured?
12:48:23 17    A   Um, not the surgical center.
12:48:25 18    Q   Okay.  Is doctor -- is Dr. Brett Casey one of
12:48:32 19    the doctors that REC sends employees to when they have
12:48:37 20    injuries?
12:48:37 21    A   Yes.
12:48:38 22    Q   Okay.  Does the company have a kind of
12:48:41 23    preferred doctors that they use that they send
12:48:44 24    employees to when they're injured?
12:48:46 25         MR. KHOURY:

12:48:46  1              Object to form.
12:48:49  2    A   Whoever is available.
12:48:50  3         COURT REPORTER:
12:48:50  4              Whoever's what?
12:48:50  5         THE WITNESS:
12:48:50  6              Whoever is available.
12:48:50  7    BY MR. SHEPPARD:
12:48:51  8    Q   Kind of run down a list to see who's
12:48:53  9    available or how does that work?
12:48:55 10    A   Yeah, first available.
12:48:58 11    Q   Does the company have a list of doctors that
12:49:02 12    it calls to see who's available?
12:49:05 13    A   No.  We call 'em through the regular
12:49:07 14    scheduling receptionist.
12:49:10 15    Q   Okay.  Does the company call certain
12:49:12 16    facilities?
12:49:14 17    A   Gulf Coast, uh, Orthopedics.
12:49:17 18    Q   Okay.  Um, does the company maintain a list
12:49:20 19    of facilities that they can work their way through
12:49:23 20    when sending an employee to a facility for treatment?
12:49:27 21    A   No.  We always just -- we make these
12:49:29 22    appointments based on referrals from wherever the
12:49:32 23    initial visit was.
12:49:34 24    Q   Okay.  So, the -- if the initial visit to one
12:49:40 25    place -- I guess, what I'm getting at -- I'll just

12:49:43  1    come out with it.  Does the company have a list of
12:49:46  2    preferred facilities or doctors that it sends
12:49:48  3    employees to when they are injured?
12:49:52  4    A   Gulf Coast Orthopedics is pretty much who we
12:49:55  5    use.  They're local.  They're right there.
12:49:57  6    Q   Okay.  Is there anyone else that the company
12:49:59  7    uses that they send their employees to when they're
12:50:02  8    injured?
12:50:04  9    A   Not on a regular basis, no.
12:50:08 10    Q   Does the company allow the employee to chose
12:50:11 11    where they want to go get treated?
12:50:13 12    A   No.  Let me rephrase that.  If they're
12:50:15 13    needing orthopedic care, that's where we would go,
12:50:18 14    otherwise there -- there are other clinics that we
12:50:22 15    use.
12:50:22 16    Q   Okay.  If a -- if a, kind of get back to that
12:50:26 17    in a second.  Kind of start with the first part.  If
12:50:29 18    an employee requires orthopedic care, do they --
12:50:36 19    sorry.  Strike that.
12:51:01 20         When an employee requires orthopedic care does
12:51:05 21    the company just send them to Gulf Coast Surgical
12:51:08 22    Center, Gulf Coast Orthopedics or do they let the
12:51:12 23    employee choose where they want to go?
12:51:15 24    A   We would offer Gulf Coast.  If they would
12:51:17 25    like to choose somewhere else, that's their choice.

## Page 113

12:51:20  1     Q   For other -- when a person is -- if they are
12:51:24  2  injured with some other type of injury, does the
12:51:26  3  company have preferred facilities that they send
12:51:29  4  employees to?
12:51:31  5     A   We trust Gulf Coast with their care, every
12:51:33  6  one of those doctors.  It would be no different than
12:51:36  7  choosing someone for yourself or for your kids.  If
12:51:39  8  you trust a doctor then that's who you go to.  We have
12:51:42  9  a good relationship with them.  They've always done a
12:51:44  10  good job for our employees.
12:51:47  11     Q   Okay.  What sort of relationship does the
12:51:49  12  company have with Gulf Coast Orthopedics?
12:51:51  13     A   A business relationship.  Just, I mean, they
12:51:54  14  treat our employees when we need them to.
12:51:58  15     Q   My understanding is that, you let me know if
12:52:02  16  I'm wrong with this, but Mr. Aucoin, you know, he
12:52:06  17  talks to the folks that provide treatment with REC
12:52:11  18  employees and tries to get them come down on their
12:52:14  19  bill a little bit, and he gets some money given to him
12:52:17  20  for what he saves the company.  Is that accurate?
12:52:18  21     MS. SCOTT:
12:52:18  22        Objection.
12:52:18  23     MR. KHOURY:
12:52:19  24        Yeah.  Totally outside the deposition
12:52:20  25  notice.

## Page 114

12:52:22  1     MR. SHEPPARD:
12:52:22  2        Okay.  If you know personally.
12:52:23  3     MR. KHOURY:
12:52:24  4        No, don't answer personally.
12:52:25  5     MR. SHEPPARD:
12:52:26  6        The depo notice calls for the --
12:52:27  7  BY MR. SHEPPARD:
12:52:28  8     Q   Are we very clear this is a question just for
12:52:31  9  you and not for the company, as it does say will be
12:52:32  10  deposed in his individual capacity.  So, this is not
12:52:36  11  for the company but just for you, so we're real clear
12:52:39  12  about that.
12:52:40  13     Do you have any knowledge whatsoever
12:52:42  14  personally concerning the relationship between
12:52:50  15  Mr. Aucoin's company and whether or not they try to
12:52:57  16  reduce medical expenses for REC by negotiating
12:53:03  17  reductions with medical providers that REC employees
12:53:07  18  treat with.
12:53:08  19     MS. SCOTT:
12:53:08  20        Object to form.
12:53:09  21     MR. KHOURY:
12:53:09  22        First of all, I'm going to state the
12:53:11  23  objection because this is a corporate
12:53:13  24  deposition.  He's not here to testify in his
12:53:15  25  personal capacity, and the corporation's

## Page 115

12:53:21  1  knowledge of what an adjuster does is not a
12:53:24  2  proper topic of this corporate deposition.
12:53:28  3     MR. SHEPPARD:
12:53:28  4        I noticed the deposition -- I've noticed
12:53:31  5  the deposition with saying that the witness
12:53:34  6  will be deposed in their individual capacity.
12:53:37  7     MR. KHOURY:
12:53:38  8        Well, he's not here to testify in his
12:53:39  9  individual capacity.  It's a corporate
12:53:42  10  deposition notice.
12:53:42  11     MR. SHEPPARD:
12:53:43  12        It wasn't objected to and we've been
12:53:44  13  doing this for a few hours.
12:53:45  14     MR. KHOURY:
12:53:45  15        I'm objecting to it now.
12:53:46  16     MR. SHEPPARD:
12:53:47  17        It needs to be done before the
12:53:48  18  deposition starts?
12:53:49  19     MR. KHOURY:
12:53:50  20        I'm objecting to it now.  He's here to
12:53:51  21  testify on behalf of the company, not on his
12:53:55  22  own behalf.
12:53:56  23     MR. SHEPPARD:
12:53:56  24        Even though it's on the notice and it
12:53:57  25  wasn't objected to before the deposition

## Page 116

12:54:00  1  began?
12:54:00  2     MR. KHOURY:
12:54:00  3        Correct.
12:54:00  4     MR. SHEPPARD:
12:54:00  5        You're going to instruct him not to
12:54:01  6  answer any questions?
12:54:02  7     MR. KHOURY:
12:54:03  8        Correct.
12:54:03  9  BY MR. SHEPPARD:
12:54:03  10     Q   Are you going to follow your attorney's
12:54:05  11  instructions and not answer any questions in your
12:54:08  12  individual capacity?
12:54:09  13     A   Yes.
12:54:09  14     MS. SCOTT:
12:54:09  15        Let me clarify before going forward to
12:54:19  16  the extent he's testified in his individual
12:54:23  17  capacity in the past.
12:54:25  18     MR. SHEPPARD:
12:54:25  19        I don't know if he has.  He's answered
12:54:26  20  the questions and there's been no objection
12:54:27  21  to it.
12:54:28  22     MS. SCOTT:
12:54:29  23        I want to make clear that's a rule going
12:54:31  24  forward.
12:54:31  25     MR. KHOURY:

| | | |
|---|---|---|
| 12:54:32 | 1 | Yeah, I mean, I think he has testified |
| 12:54:34 | 2 | as to things that he knows on behalf of the |
| 12:54:37 | 3 | company. He is the agency manager so I'm |
| 12:54:42 | 4 | allowing some leeway as far as, you know, the |
| 12:54:46 | 5 | person at the company with knowledge about |
| 12:54:49 | 6 | certain things will be him, and that's why |
| 12:54:51 | 7 | he's here. But the company is not going to |
| 12:54:55 | 8 | testify as to what an adjuster does and what |
| 12:55:01 | 9 | they negotiate with a medical provider |
| 12:55:03 | 10 | because that's not a topic of a corporate |
| 12:55:06 | 11 | deposition and it's not a topic that's listed |
| 12:55:09 | 12 | in this notice. |
| 12:55:10 | 13 | MR. SHEPPARD: |
| 12:55:10 | 14 | Just to be clear, the notice says in the |
| 12:55:13 | 15 | last sentence on the first page, "the witness |
| 12:55:14 | 16 | may be questioned in their individual |
| 12:55:16 | 17 | capacity." Also represent, I'm fairly |
| 12:55:18 | 18 | certain there's at least a few cases in the |
| 12:55:23 | 19 | Fifth Circuit that have stated that as long |
| 12:55:25 | 20 | as you are compartmentalizing the corporate |
| 12:55:28 | 21 | rep portions from the individual portions, |
| 12:55:34 | 22 | you can do both. |
| 12:55:35 | 23 | MR. KHOURY: |
| 12:55:36 | 24 | If you would like to at a subsequent |
| 12:55:37 | 25 | time take his deposition in his personal |

| | | |
|---|---|---|
| 12:55:39 | 1 | capacity to ask what he knows about an |
| 12:55:41 | 2 | adjuster and what he does to negotiate bills, |
| 12:55:44 | 3 | then you can do that, but as far as this |
| 12:55:47 | 4 | deposition goes, the witness is not going to |
| 12:55:50 | 5 | answer a question about a topic that is not |
| 12:55:53 | 6 | listed in the corporate deposition notice. |
| 12:55:57 | 7 | MR. SHEPPARD: |
| 12:55:57 | 8 | And, again, he was designated that he |
| 12:55:59 | 9 | would testify. That we may ask questions in |
| 12:56:02 | 10 | his individual capacity. To the extent that |
| 12:56:04 | 11 | he's not going to answer the questions and |
| 12:56:06 | 12 | require us to come back to Louisiana and |
| 12:56:08 | 13 | incur additional costs when we can ask the |
| 12:56:11 | 14 | questions here and now today, we're reserving |
| 12:56:13 | 15 | our rights to make a motion with the Court. |
| 12:56:16 | 16 | MR. KHOURY: |
| 12:56:16 | 17 | That's fine, but also note that when you |
| 12:56:19 | 18 | want to construe this notice as allowing him |
| 12:56:23 | 19 | to testify in his personal capacity is one |
| 12:56:25 | 20 | thing, but there are topics listed in the |
| 12:56:28 | 21 | corporate deposition notice, one of those |
| 12:56:31 | 22 | topics is not what an adjuster does to |
| 12:56:34 | 23 | negotiate rates with different medical |
| 12:56:36 | 24 | providers. |
| 12:56:37 | 25 | MR. SHEPPARD: |

| | | |
|---|---|---|
| 12:56:38 | 1 | And I've asked him that question in his |
| 12:56:40 | 2 | personal capacity. You've instructed not to |
| 12:56:42 | 3 | answer. He said that he won't answer. He's |
| 12:56:44 | 4 | taking your objection. I'll move on. |
| 12:56:48 | 5 | MR. KHOURY: |
| 12:56:48 | 6 | Correct, because it's not in the notice. |
| 12:56:51 | 7 | I'm maintaining both objections. I'm |
| 12:56:52 | 8 | maintaining an objection to him testifying in |
| 12:56:55 | 9 | his personal capacity at a corporate |
| 12:56:58 | 10 | deposition. Also, maintaining the objection |
| 12:57:00 | 11 | that the topic about which you're asking him, |
| 12:57:03 | 12 | whether it's on behalf of company or his |
| 12:57:06 | 13 | personal, as far as his personal knowledge, |
| 12:57:08 | 14 | is not a topic that was listed on his notice. |
| 12:57:18 | 15 | MR. SHEPPARD: |
| 12:57:19 | 16 | Understand your objection. Again, it's |
| 12:57:20 | 17 | on the notice. It says he can be questioned |
| 12:57:23 | 18 | in his individual capacity. This was not |
| 12:57:26 | 19 | objected to before the deposition started. |
| 12:57:28 | 20 | It was only objected to when asked the |
| 12:57:32 | 21 | question. You know, this is something that |
| 12:57:34 | 22 | is permitted and to the extent that we're |
| 12:57:36 | 23 | going to have to come back down to ask these |
| 12:57:39 | 24 | questions at a future date when they could be |
| 12:57:41 | 25 | asked today with little or no cost, we |

| | | |
|---|---|---|
| 12:57:43 | 1 | reserve our right to seek costs. |
| 12:57:47 | 2 | BY MR. SHEPPARD: |
| 12:58:15 | 3 | Q Okay. Represent to you that Mr. Griffin's |
| 12:58:22 | 4 | physicians have recommended additional treatment. At |
| 12:58:26 | 5 | this time REC is not going to pay for that additional |
| 12:58:29 | 6 | treatment, correct? |
| 12:58:29 | 7 | MS. SCOTT: |
| 12:58:30 | 8 | Object to the form. |
| 12:58:31 | 9 | A I'm unaware of any request. |
| 12:58:33 | 10 | BY MR. SHEPPARD: |
| 12:58:34 | 11 | Q If Mr. Griffin has been recommended for |
| 12:58:36 | 12 | additional treatment is REC going to pay for that |
| 12:58:41 | 13 | additional treatment? |
| 12:58:43 | 14 | MR. KHOURY: |
| 12:58:43 | 15 | Object to form. |
| 12:58:44 | 16 | MS. SCOTT: |
| 12:58:45 | 17 | Object to the form. |
| 12:58:45 | 18 | A It will have to be evaluated. |
| 12:58:46 | 19 | BY MR. SHEPPARD: |
| 12:58:47 | 20 | Q At this time has the company made a |
| 12:58:49 | 21 | determination whether or not they're going to pay for |
| 12:58:49 | 22 | the additional treatment that's been recommended to |
| 12:58:53 | 23 | Mr. Griffin? |
| 12:58:53 | 24 | MR. KHOURY: |
| 12:58:53 | 25 | To what? |

| | | |
|---|---|---|
| 12:58:53 | 1 | MR. SHEPPARD: |
| 12:58:53 | 2 | That has been recommended for Mr. |
| 12:58:53 | 3 | Griffin. |
| 12:58:54 | 4 | MS. SCOTT: |
| 12:58:54 | 5 | Object to the form. |
| 12:58:55 | 6 | A   I haven't seen any recommendations. |
| 12:58:56 | 7 | BY MR. SHEPPARD: |
| 12:58:59 | 8 | Q   Okay.  Let's talk a little bit about some of |
| 12:59:29 | 9 | the defendants in this case.  So, specifically, Gulf |
| 12:59:35 | 10 | Offshore, OTS, GOL.  And REC. |
| 12:59:45 | 11 | Can we go off for just a second? |
| 13:01:36 | 12 | VIDEOGRAPHER: |
| 13:01:36 | 13 | We're going to go off the record.  The |
| 13:01:38 | 14 | time is 1:00 P.M. |
| 13:01:39 | 15 | (OFF THE RECORD) |
| 13:01:39 | 16 | VIDEOGRAPHER: |
| 13:01:39 | 17 | We're going back on the record.  The |
| 13:01:39 | 18 | time is 1:01 P.M. |
| 13:01:43 | 19 | MR. SHEPPARD: |
| 13:01:43 | 20 | Um, just for the record we had |
| 13:01:46 | 21 | conversation with Mr. Khoury for the purposes |
| 13:01:50 | 22 | of depo topic 40, the relationship between |
| 13:01:57 | 23 | REC Marine Logistics, GOL LLC, and Gulf |
| 13:02:01 | 24 | Offshore LLC and Offshore Transport Services |
| 13:02:04 | 25 | LLC, the roles of those companies and the |

| | | |
|---|---|---|
| 13:02:06 | 1 | relationship between those companies and |
| 13:02:08 | 2 | plaintiff.  The witness is going to be acting |
| 13:02:11 | 3 | as a corporate representative for all four of |
| 13:02:14 | 4 | those defendants on that one topic in this |
| 13:02:16 | 5 | deposition. |
| 13:02:19 | 6 | BY MR. SHEPPARD: |
| 13:02:25 | 7 | Q   All right.  My understanding, and let me know |
| 13:02:30 | 8 | if I have this -- if I have this right -- is that |
| 13:02:36 | 9 | years and years ago that you had JNB and they provided |
| 13:02:42 | 10 | the operational support onboard vessels that were |
| 13:02:50 | 11 | actually -- I'm just gonna -- actually, I'll just -- |
| 13:02:50 | 12 | could you -- could you -- I'll just strike that. |
| 13:02:55 | 13 | Could you explain the relationship between |
| 13:02:58 | 14 | JNB and Offshore -- and Gulf Offshore Logistics? |
| 13:03:07 | 15 | A   So, JNB operating was the operating company |
| 13:03:15 | 16 | for Gulf Offshore Logistics.  Um, Gulf Offshore |
| 13:03:21 | 17 | Logistics was the company -- they were a brokered |
| 13:03:25 | 18 | company and they had all the contracts.  You know, |
| 13:03:29 | 19 | like all these contracts with the companies we were |
| 13:03:32 | 20 | working -- or that JNB was working for, they got paid |
| 13:03:36 | 21 | through Gulf Offshore Logistics, so they had had the |
| 13:03:39 | 22 | contracts.  And JNB was the operating company.  They |
| 13:03:42 | 23 | did all the hiring.  They had the employees.  Um, it's |
| 13:03:49 | 24 | set up pretty much the exact same way GOL and REC |
| 13:03:53 | 25 | Marine is set up now.  That was kind of how that |

| | | |
|---|---|---|
| 13:03:57 | 1 | relationship was. |
| 13:03:58 | 2 | Q   Okay.  So, if I understand this correctly, |
| 13:04:04 | 3 | Gulf Offshore enters into a contract with some company |
| 13:04:09 | 4 | that wants to use Gulf Offshore's vessel; is that |
| 13:04:13 | 5 | correct? |
| 13:04:14 | 6 | A   It wouldn't be Gulf Offshore's vessel but |
| 13:04:17 | 7 | they would be marketing a vessel for that customer. |
| 13:04:20 | 8 | That vessel that they would be marketing was operated |
| 13:04:30 | 9 | by JNB. |
| 13:04:32 | 10 | Q   Okay.  And, let me make sure -- I'm going to |
| 13:04:35 | 11 | use an analogy.  See if I have this in my head right. |
| 13:04:39 | 12 | Gulf Offshore is the listing agent for a house that's |
| 13:04:45 | 13 | for sale.  Then you have some other company who owns |
| 13:04:50 | 14 | the house and JNB is the people that puts the |
| 13:04:57 | 15 | furnishing in the house.  Is that kind of what we're |
| 13:05:00 | 16 | talking about here? |
| 13:05:01 | 17 | A   Yes. |
| 13:05:02 | 18 | Q   The, uh -- okay.  And then when -- when |
| 13:05:11 | 19 | Mr. Griffin started working for these, um, Gulf |
| 13:05:17 | 20 | Offshore Logistics, GOL.  I'm sorry.  When Mr. Griffin |
| 13:05:23 | 21 | started working for JNB and REC are those -- were |
| 13:05:30 | 22 | those companies under the same sort of umbrella?  Were |
| 13:05:33 | 23 | they related? |
| 13:05:35 | 24 | A   They were not related. |
| 13:05:37 | 25 | Q   So, back when Mr. Griffin worked for JNB and |

| | | |
|---|---|---|
| 13:05:43 | 1 | you had Gulf Offshore as the brokering company, how |
| 13:05:51 | 2 | were they not connected to one another? |
| 13:05:53 | 3 | A   How is what not connected. |
| 13:05:55 | 4 | Q   Those two companies? |
| 13:05:56 | 5 | A   JNB and Gulf Offshore? |
| 13:05:58 | 6 | Q   Yeah. |
| 13:06:00 | 7 | A   Connected in which way. |
| 13:06:02 | 8 | Q   So, did the -- I guess -- JNB, the B is for |
| 13:06:06 | 9 | Broussard?  Right?  I'm trying -- guessing.  I'm |
| 13:06:09 | 10 | assuming it's initials of someone? |
| 13:06:11 | 11 | A   Yeah, I'm assuming that as well.  I don't |
| 13:06:15 | 12 | know for sure. |
| 13:06:16 | 13 | Q   Um, when you have -- did the folks that ran |
| 13:06:22 | 14 | JNB also run Gulf Offshore? |
| 13:06:27 | 15 | A   Um, I don't know what the partnership was at |
| 13:06:31 | 16 | that time. |
| 13:06:33 | 17 | Q   Okay. |
| 13:06:33 | 18 | A   But the Gulf Offshore secured the jobs.  JNB |
| 13:06:38 | 19 | operated those boats for those jobs.  Gulf Offshore |
| 13:06:43 | 20 | didn't have any employees.  They didn't own any boats. |
| 13:06:46 | 21 | They just got the contract. |
| 13:06:48 | 22 | Q   Okay.  It's a symbiotic relationship.  Then |
| 13:06:52 | 23 | They're not against one another.  They're working |
| 13:06:55 | 24 | together.  One of them is getting the contract for |
| 13:06:58 | 25 | somebody to charter the vessels, take the money, and |

Page 125

| | |
|---|---|
| 13:07:01 1 | then that company takes the money and gives it to JNB |
| 13:07:05 2 | or whatever it needs to go. |
| 13:07:08 3 | A   Yes. |
| 13:07:15 4 | Q   Would Gulf Offshore have been responsible for |
| 13:07:20 5 | training or crewing or doing anything? |
| 13:07:22 6 | A   No. |
| 13:07:23 7 | Q   Okay.  I know you said that Gulf Offshore had |
| 13:07:27 8 | no employees but I would imagine the company had to |
| 13:07:30 9 | have somebody doing something to get the money from |
| 13:07:33 10 | point A to point B. |
| 13:07:34 11 | A   I meant mariners. |
| 13:07:36 12 | Q   Okay.  Is it essentially just accounting |
| 13:07:45 13 | people or, you know, the office staff?  You just don't |
| 13:07:49 14 | have anyone working offshore there? |
| 13:07:50 15 | A   Support staff, yeah. |
| 13:07:52 16 | Q   And then flash forward a few years, I believe |
| 13:07:57 17 | in April of 2016 JNB merges with REC Marine? |
| 13:08:06 18 | A   Correct. |
| 13:08:07 19 | Q   Okay.  JNB goes away. |
| 13:08:09 20 | A   Correct. |
| 13:08:11 21 | Q   You know REC just takes over from JNB? |
| 13:08:14 22 | A   Correct. |
| 13:08:15 23 | Q   And the employees that were JNB are moved on |
| 13:08:19 24 | to the payroll for REC? |
| 13:08:22 25 | A   Correct. |

Page 126

| | |
|---|---|
| 13:08:23 1 | Q   Okay.  And REC relies on, you know, all the |
| 13:08:29 2 | materials from JNB when they're making the decision, I |
| 13:08:35 3 | guess, whether to keep people on, right? |
| 13:08:38 4 | A   Um-hum. |
| 13:08:38 5 | Q   Is that a yes? |
| 13:08:39 6 | A   Yes. |
| 13:08:40 7 | Q   That's one of those first things we talked |
| 13:08:42 8 | about. |
| 13:08:44 9 | A   Yeah.  Essentially, JNB and REC, they were |
| 13:08:48 10 | competitors before.  They did the same thing.  They |
| 13:08:51 11 | were competitors.  Then they came together and created |
| 13:08:55 12 | a new company. |
| 13:08:57 13 | Q   Where the REC name -- |
| 13:08:59 14 | A   Created a new brokering company -- I'm sorry. |
| 13:09:04 15 | Q   Sometimes these large oil and gas companies |
| 13:09:06 16 | they'll buyout one and put it under a different name. |
| 13:09:09 17 | That might be kind of what we're talking about. |
| 13:09:14 18 | Um, so, then at that time when Gulf Offshore |
| 13:09:22 19 | took over all the JNB stuff, a new company was created |
| 13:09:29 20 | to be the new Gulf Offshore and that was called GOL? |
| 13:09:34 21 | A   Correct. |
| 13:09:35 22 | MR. KHOURY: |
| 13:09:35 23 | You mean when REC Marine took over the |
| 13:09:37 24 | JNB stuff? |
| 13:09:39 25 | MR. SHEPPARD: |

Page 127

| | |
|---|---|
| 13:09:39 1 | Yeah. |
| 13:09:39 2 | BY MR. SHEPPARD: |
| 13:09:39 3 | Q   When REC Marine took over -- |
| 13:09:41 4 | Um, when REC marine and JNB merged, Gulf |
| 13:09:47 5 | Offshore went away and in its place came GOL. |
| 13:09:51 6 | A   The Gulf Offshore and then REC took over all |
| 13:09:54 7 | of JNB's operating, and JNB went away. |
| 13:10:00 8 | Q   Right.  That as well. |
| 13:10:01 9 | A   Yeah.  So Gulf Offshore and JNB went away. |
| 13:10:07 10 | Q   Okay. |
| 13:10:07 11 | MR. KHOURY: |
| 13:10:07 12 | And the merged companies formed GOL LLC |
| 13:10:12 13 | to be the broker. |
| 13:10:15 14 | THE WITNESS: |
| 13:10:15 15 | To be the broker, correct. |
| 13:10:17 16 | BY MR. SHEPPARD: |
| 13:10:18 17 | Q   And is GOL performing the same duties now and |
| 13:10:26 18 | at the time of the incident that Gulf Offshore was |
| 13:10:31 19 | performing prior to its dissolution? |
| 13:10:35 20 | A   Yes. |
| 13:10:36 21 | Q   Okay.  I'm just trying to understand this. |
| 13:11:37 22 | We have some -- some records out there that have a |
| 13:11:42 23 | logo that says GOL and underneath it says Gulf |
| 13:11:47 24 | Offshore Logistics.  We have other logos that say GOL, |
| 13:11:49 25 | LLC, with no Gulf Offshore Logistics below it.  And |

Page 128

| | |
|---|---|
| 13:11:56 1 | specifically on the Health Safety and Environmental |
| 13:12:00 2 | Manual it says GOL, LLC, but it doesn't have that Gulf |
| 13:12:06 3 | Offshore Logistics below it.  The manual also has |
| 13:12:13 4 | revision dates going back to 2012.  So I'm kind of |
| 13:12:18 5 | confused as to the inception of GOL, LLC.  Was this in |
| 13:12:24 6 | 2016 or in 2012? |
| 13:12:27 7 | A   2016. |
| 13:12:28 8 | Q   Okay. |
| 13:12:30 9 | A   GOL, LLC adopted the Gulf Offshore Logistics |
| 13:12:35 10 | Manual as their own because that's the manual that was |
| 13:12:38 11 | being audited for -- by all these customers that, you |
| 13:12:42 12 | know, did auditing that REC Marine was working for. |
| 13:12:48 13 | They recognized the GOL manual.  It was approved, so, |
| 13:12:52 14 | it was adopted. |
| 13:12:54 15 | Q   Okay.  And the GO- -- so this -- now I'm |
| 13:12:59 16 | gettin' -- |
| 13:12:59 17 | A   The logo was also changed.  They took off the |
| 13:13:03 18 | Gulf Offshore Logistics on the logo. |
| 13:13:06 19 | Q   Right.  So, this -- this logo on this -- on |
| 13:13:09 20 | the safety manual for -- that's used by REC, this is a |
| 13:13:15 21 | GOL safety manual? |
| 13:13:18 22 | A   I guess essentially it's GOL's it says GOL |
| 13:13:22 23 | but it's REC's manual.  You know, REC Marine Logistics |
| 13:13:28 24 | is the operating company so that's the manual that REC |
| 13:13:31 25 | follows. |

13:13:32 1    Q   But this is -- it's got -- it's got GOL's
13:13:37 2    name all over it.  Are they the ones -- they're the
13:13:41 3    ones that authored it, right?
13:13:43 4    A   What?
13:13:44 5    Q   That authored it?
13:13:45 6    A   Yes.
13:13:46 7    Q   And they're the ones that said this is the
13:13:47 8    policy -- these are the policies and procedures that
13:13:49 9    you need to follow, right?
13:13:52 10   A   Right.  So essentially it's both.  It's both.
13:13:54 11   I mean, they share it.
13:13:56 12   Q   Okay.  So, both REC Marine and GOL, you know,
13:14:01 13   this is their -- the shared Health Safety
13:14:04 14   Environmental manual that they put together and kind
13:14:10 15   of order employees to follow, right?
13:14:13 16   A   Right.
13:14:14 17   Q   Okay.  And in this case I think earlier we
13:14:25 18   had talked about JNB, Gulf Offshore, and an unknown
13:14:34 19   company that owned the boat back in -- my
13:14:39 20   understanding is that, um, OTS is, or at least at the
13:14:45 21   time of the incident, was the owner of DUSTIN DANOS.
13:14:49 22   Does that sound right?
13:14:52 23   A   Yes.
13:14:53 24   Q   And I might just go into some of the OTS
13:14:58 25   stuff while we're here.  Just ownership things.  You

13:15:02 1    can testify to that as corporate rep for OTS in this
13:15:06 2    deposition?
13:15:07 3        MR. KHOURY:
13:15:08 4           Yes.
13:15:08 5    BY MR. SHEPPARD:
13:15:10 6    Q   Um, are you familiar with the requirement of
13:15:37 7    owners of vessels to ensure that the vessels are
13:15:40 8    seaworthy?
13:15:43 9    A   Yes.
13:15:45 10   Q   So in that case this would apply to OTS.
13:15:50 11   They had a duty to make sure that the vessel was
13:15:53 12   seaworthy, right?
13:15:54 13       MR. KHOURY:
13:15:55 14          I'm gonna object to the form.
13:15:57 15   A   I think that's what they relied on REC to do
13:16:01 16   for them.
13:16:02 17   BY MR. SHEPPARD:
13:16:02 18   Q   Okay.
13:16:02 19   A   They pay an operating fee for them to do
13:16:06 20   that.
13:16:07 21   Q   Okay.  Would you agree that OTS has a duty
13:16:15 22   and a responsibility to ensure that the crew on the
13:16:19 23   vessels that it owns are proper and well trained?
13:16:26 24       MR. KHOURY:
13:16:27 25          Object to the form.

13:16:27 1        MS. SCOTT:
13:16:27 2           Object to the form.
13:16:29 3        MR. KHOURY:
13:16:29 4           It's a bareboat charter.
13:16:32 5    A   That's correct.
13:16:32 6    BY MR. SHEPPARD:
13:16:33 7    Q   So it would be -- it would be incumbent on
13:16:36 8    REC to make sure it properly stocks it's vessels and
13:16:40 9    trains its workers to ensure that the, you know, the
13:16:42 10   vessel is seaworthy, right?
13:16:44 11   A   Correct.
13:16:44 12   Q   Okay.  Part of having a competent crew is
13:16:50 13   them following the rules, right?
13:16:53 14   A   Correct.
13:16:54 15   Q   Competent crew that follows the rules, does
13:16:58 16   JSAs when required, right?
13:17:01 17   A   Sure.
13:17:03 18   Q   Competent crew --
13:17:04 19       MR. KHOURY:
13:17:05 20          Are you talking about OTS now or are you
13:17:06 21   back to REC?
13:17:08 22       MR. SHEPPARD:
13:17:08 23          Back -- so, with REC.
13:17:09 24   BY MR. SHEPPARD:
13:17:10 25   Q   So, as it relates to REC, they are -- one of

13:17:18 1    the things that they need to do to make sure they have
13:17:21 2    a competent crew is make sure that they are doing JSAs
13:17:25 3    when JSAs are supposed to be done, right?
13:17:31 4    A   Correct.
13:17:31 5    Q   Okay.  Completing incident reports when
13:17:32 6    they're supposed to be completed?
13:17:35 7        MR. KHOURY:
13:17:36 8           Object to form.
13:17:37 9    A   Yeah.
13:17:37 10   BY MR. SHEPPARD:
13:17:43 11   Q   Notifying shoreside personnel when there is a
13:17:47 12   incident involving an injury?
13:17:49 13   Q   Notifying the Coast Guard when they are
13:17:53 14   supposed to notify the Coast Guard?
13:17:55 15   A   Yes.
13:17:58 16   Q   Completing the weekly, monthly, annual, three
13:18:07 17   year and four year training so part of that training
13:18:13 18   matrix, right?
13:18:17 19   A   Right.
13:18:20 20   Q   And doing that at the time that it's supposed
13:18:22 21   to be done, right?
13:18:23 22   A   Correct.
13:18:43 23   Q   You'd agree with me that if you look at the
13:18:48 24   very first page of the Health, Safety and

13:18:53  1   Environmental manual it says focus on safety, right?
13:18:58  2       A   Right.
13:18:58  3       Q   So the most important thing, the number one
13:19:02  4   priority for REC is to focus on safety, right?
13:19:05  5       A   Right.
13:19:08  6       Q   Because, you know, offshore workers have been
13:19:11  7   seriously injured and some have died because of people
13:19:15  8   not following the rules or doing things safely, right?
13:19:18  9       A   Right.
13:19:19  10      Q   Has that ever happened for -- has REC had any
13:19:22  11  employee die as a result of some injury suffered
13:19:26  12  offshore?
13:19:26  13      A   No.
13:19:28  14      Q   But REC has had employees that have been
13:19:31  15  injured or seriously injured as a result of an
13:19:35  16  incident that occurred offshore?
13:19:37  17         MR. KHOURY:
13:19:38  18             Object to the form.
13:19:40  19      A   Is that even relevant to this?
13:19:41  20  BY MR. SHEPPARD:
13:19:43  21      Q   Has REC had, uh -- has REC had, uh -- sorry.
13:19:47  22  Have REC employees been injured offshore as a result
13:19:56  23  of --
13:19:56  24      A   Yes.
13:19:56  25      Q   -- work being done unsafely?

13:19:58  1       A   Not unsafely, but they've been injured
13:20:01  2   before.  Yes.
13:20:02  3       Q   Have REC workers claimed that they were
13:20:18  4   injured because of unsafe practices that occurred
13:20:21  5   offshore?
13:20:23  6       A   Um, I don't know.  Possibly.
13:20:35  7       Q   And it's important to REC that all of its
13:20:37  8   jobs are adequately staffed?
13:20:40  9       A   Yes.
13:20:40  10      Q   And all of its employees and all of its
13:20:43  11  captains, it's deckhand, engine room personnel,
13:20:45  12  they're all adequately trained?
13:20:48  13      A   Yes.
13:20:50  14      Q   And is that because REC employees have a
13:20:52  15  right to expect a safe place to work?
13:20:55  16      A   Yes.
13:21:01  17      Q   Do REC workers have a right to expect that
13:21:04  18  operations like basket transfer operations are being
13:21:09  19  properly supervised?
13:21:11  20      A   Yes.
13:21:12  21      Q   Do REC workers have a right to expect that
13:21:14  22  captains will not step away from the controls during a
13:21:16  23  basket transfer operations?
13:21:19  24      A   Yes.
13:21:20  25      Q   Do REC workers have the right to expect that

13:21:22  1   captains will not make phone calls during a basket
13:21:25  2   transfer operation?
13:21:27  3       A   Yes.
13:21:28  4       Q   Do REC workers have a right to expect that
13:21:30  5   captains will not step away from the controls while
13:21:33  6   they are engaged and the vessels moving forward to
13:21:36  7   make a phone call during a basket transfer operation,
13:21:39  8   correct?
13:21:40  9       A   Yes.
13:21:41  10      Q   Okay.  Um, in your opinion, have any of my
13:21:48  11  questions today been tricky or manipulative?
13:21:53  12      A   Some may have been, yes.
13:21:55  13      Q   Okay.  Because that's why I'm asking.  If
13:21:57  14  they were I'd like to, you know, go back to 'em and,
13:22:01  15  you know, fix those things so if there's anything that
13:22:04  16  you think that I can -- that we can fix, let me know.
13:22:07  17      A   I'm good.
13:22:08  18      Q   Okay.  So, no questions that I need to fix
13:22:11  19  for being tricky or manipulative, right?
13:22:15  20      A   No, I'm good.
13:22:16  21      Q   Have you been given a fair and full
13:22:19  22  opportunity to answer all of my questions?
13:22:21  23      A   Yes.
13:22:22  24      Q   Are there -- would you like to supplement,
13:22:24  25  amend, change any of the answers that you've given?

13:22:28  1       A   No.
13:22:31  2       Q   These are the real tough ones.  Have I made
13:22:34  3   you feel stressed during this deposition?
13:22:37  4       A   No.
13:22:39  5       Q   Have I repeatedly cut you off during this
13:22:41  6   deposition?
13:22:42  7       A   No.
13:22:42  8       Q   I really didn't cut you off at all during
13:22:46  9   this deposition?
13:22:47  10      A   No.
13:22:48  11      Q   Were you given times to take a break if you
13:22:50  12  needed it?
13:22:51  13      A   Yes.
13:23:19  14      Q   Um, sometime in these cases I see where there
13:24:27  15  is some training that's been completed.  There's
13:24:30  16  sometimes modules whether it's computer based or
13:24:33  17  written.  You know, there's some documents showing
13:24:36  18  that.  Does REC or any of the companies have any
13:24:41  19  computer-based training?
13:24:44  20      A   Nothing computer based.  A lot of our stuff
13:24:48  21  is done by third party vendors.
13:24:51  22      Q   Okay.
13:24:53  23      A   Or they'll watch like a training video or
13:24:55  24  something like that.  It's all documented.
13:24:57  25      Q   Okay.  And when a person sits down for a

13:25:02 1    new-hire training orientation, how long is that
13:25:05 2    process, typically?
13:25:07 3      A  It could take a couple hours.
13:25:09 4      Q  Okay.  Um, that's to kind of go through the
13:25:12 5    company policies, how we do things here, stuff like
13:25:15 6    that?
13:25:16 7      A  Correct.
13:25:17 8      Q  Are there any specific videos or materials
13:25:20 9    that you know that are reviewed?
13:25:23 10      A  Yes, it's right here.  All these topics are
13:25:26 11    done in a PowerPoint, everything on here as the
13:25:30 12    initial training.
13:25:33 13      Q  Uh-huh.
13:25:34 14      A  If they do not have, like, say, safe gulf,
13:25:36 15    rigger, water survival, we will send them off to a
13:25:40 16    training facility to get those things done.
13:25:43 17      Q  Okay.  That's where they get their
13:25:45 18    certificates and their cards and stuff like that?
13:25:48 19      A  Correct.
13:25:50 20      Q  Are the PowerPoints that are used in those
13:25:53 21    topics are they static or do they change?
13:25:56 22      A  Uh, they changed.  They change but not all
13:26:02 23    that much.
13:26:02 24      Q  Maybe there's something recent that happened
13:26:06 25    and we want people to take notice of it.  Things like

13:26:09 1    that?
13:26:10 2      A  Yes.  Mainly the change would happen in the
13:26:12 3    manual.
13:26:14 4      Q  Um, the manual that I handed you, you had
13:26:22 5    mentioned that there was a newer version of it.  Is
13:26:25 6    the manual that I've provided to you and I've shown to
13:26:28 7    you, is that the one that was -- are those the
13:26:30 8    documents that were approved and in circulation back
13:26:33 9    in 2018?
13:26:35 10      A  Yeah.  I mean it should have been the only
13:26:37 11    form that I saw was not the latest revision was that
13:26:41 12    JSA form.
13:26:42 13      Q  Okay.  Do you know when that was revised?
13:26:45 14      A  I don't know off the top of my head.  I don't
13:26:47 15    know.
13:26:47 16      Q  Well, it's a big manual.  I understand.
13:26:49 17      A  It would be after, sometime, maybe around
13:26:51 18    '16, maybe '17.
13:26:53 19      Q  Okay.
13:26:58 20      A  I don't do the revisions so I don't --
13:27:01 21      Q  Okay.  One other thing I wanted to touch on I
13:27:07 22    forgot about.
13:27:10 23      I'll represent to you this is a cell phone
13:27:12 24    policy that -- a cell phone policy that the company
13:27:17 25    has.  It applies -- it looks like in the manual that

13:27:20 1    it applies to people that are driving a vehicle.
13:27:24 2    Would this be something that would apply to, you know,
13:27:28 3    people operating a vessel as well?
13:27:30 4      A  Yes.
13:27:31 5      MR. SHEPPARD:
13:27:33 6      I'm going to mark that as Exhibit 15.
13:27:37 7    BY MR. SHEPPARD:
13:27:44 8      Q  Can we change things in there like driving to
13:27:46 9    operating a vessel or something like that?  Would that
13:27:50 10    be a fair...
13:27:51 11      A  You know, it may -- it may be in there as a
13:27:53 12    revision so that may be outdated, I don't know.
13:27:56 13      Q  Okay.  Well, no, what I'm asking:  It says,
13:27:58 14    "Whenever possible do not use a cell phone while
13:28:01 15    driving."  People don't drive vessels, you know, they
13:28:04 16    operate and maneuver them.  Would that be a fair thing
13:28:08 17    to say whenever -- whenever possible do not use a cell
13:28:11 18    phone when operating a vessel?
13:28:13 19      A  I mean, I know what you're saying but a lot
13:28:15 20    of people just use the term driving.  I mean --
13:28:19 21      Q  You would take that --
13:28:20 22      A  Driving a boat, I mean, right?
13:28:21 23      Q  Okay.  Fair enough.
13:28:22 24      A  It's got a steering wheel.  You got
13:28:24 25    throttles.

13:28:25 1      Q  You consider it kind of the same thing,
13:28:26 2    driving, operating a vessel?
13:28:29 3      A  Yeah.
13:28:29 4      Q  Talking about the same thing there?
13:28:31 5      A  It can be interchanged.
13:28:42 6      MR. SHEPPARD:
13:28:42 7      I pass the witness.
13:28:43 8      MS. SCOTT:
13:28:43 9      Can I talk to you?
13:28:45 10    VIDEOGRAPHER:
13:28:45 11      We're going to go off the record.  The
13:28:50 12    time is 1:29 P.M.
13:28:52 13      (OFF THE RECORD)
13:28:52 14    VIDEOGRAPHER:
13:31:31 15      Going back on the record.  The time is
13:31:37 16    1:31 P.M.
13:31:39 17    MR. KHOURY:
13:31:42 18      Do you know if you put his employment
13:31:43 19    application for REC as an exhibit?
13:31:46 20    MR. SHEPPARD:
13:31:47 21      I thought I did.
13:31:48 22    THE WITNESS:
13:31:51 23      I don't think so.
13:31:53 24    MR. KHOURY:
13:31:54 25      I think I have the JNB.

## Page 141

13:31:55 1      MR. SHEPPARD:
13:31:56 2      I remember asking you about it. It was
13:31:56 3  a three page document.
13:31:57 4      MR. KHOURY:
13:31:58 5      Okay. Here we go.
13:31:58 6         EXAMINATION
13:31:58 7 BY MR. KHOURY:
13:31:58 8   Q. So, Mr. Harris, I'm going to ask you a couple
13:32:04 9 questions about Mr. Griffin's employment application.
13:32:07 10 It's Exhibit 9. And this is when he applied for the
13:32:11 11 job at REC when there was a transfer of employees. If
13:32:16 12 you'll look on the second page it asks -- it asks
13:32:28 13 Mr. Griffin, "Have you had any motor vehicle accident
13:32:32 14 or had your license suspended during the past five
13:32:35 15 years?" Do you see it that?
13:32:36 16   A. Yes.
13:32:38 17   Q. And what's circled there?
13:32:39 18   A. No.
13:32:40 19   Q. If Mr. Griffin, in fact, had been involved in
13:32:44 20 a car accident sometime after he started working for
13:32:49 21 JNB and was involved in a lawsuit for injuries at the
13:32:55 22 time he was employed for JNB, would you expect him to
13:32:59 23 have disclosed that on the application for REC Marine?
13:33:03 24   A. Yes.
13:33:03 25      MR. SHEPPARD:

## Page 142

13:33:04 1      Object to form. Speculation.
13:33:06 2 BY MR. KHOURY:
13:33:06 3   Q. And if he did, if he failed to disclose
13:33:09 4 something like that about prior injuries, about an
13:33:12 5 injury in a car accident that resulted in a lawsuit
13:33:18 6 for neck and back injuries, is that something that
13:33:21 7 y'all would want to know and when I say "y'all", REC
13:33:24 8 Marine, in terms of whether this person should be
13:33:28 9 hired on to work for REC Marine?
13:33:31 10   A. Yes.
13:33:31 11      MR. SHEPPARD:
13:33:31 12      Objection to form. Asked and answered.
13:33:33 13 BY MR. KHOURY:
13:33:35 14   Q. And why would you want to know that? Is it
13:33:37 15 because, you know, something as -- something like a
13:33:42 16 neck or a back injury is something that is material to
13:33:46 17 the work of a deckhand?
13:33:48 18      MR. SHEPPARD:
13:33:48 19      Objection to form. Leading. Asked and
13:33:49 20 answered.
13:33:51 21   A. You would, yeah, you would want to know that
13:33:53 22 so you can further evaluate if he would be fit for
13:33:56 23 duty.
13:33:57 24 BY MR. KHOURY:
13:33:59 25   Q. Um, I'm going to refer you to Exhibit 4 which

## Page 143

13:34:04 1 was a set of vessel logs and particularly I want to
13:34:10 2 look at who was on the vessels -- on the DUSTIN DANOS
13:34:15 3 from about April 25th of 2018, which was when
13:34:20 4 Mr. Griffin claims that his first incident occurred
13:34:25 5 where he -- his shoulder hit the firehose rack while
13:34:32 6 picking up a starter. That's the date that he lists
13:34:35 7 that occurred and it looks like crew on board on that
13:34:38 8 date was Captain Mike Hauglund, Captain Joshua
13:34:43 9 Winhauer, McArthur Griffin and William Badeaux,
13:34:48 10 correct?
13:34:48 11   A. Correct.
13:34:48 12   Q. And then we had, it looks likes about the
13:34:50 13 same crew that continued to work on the boat through
13:34:55 14 the 26th, 27th, 28th, the 29th, the 30th. It looks
13:35:14 15 like we have a duplicate of the 30th. The 30th, and
13:35:19 16 then the 1st and 2nd of May. And then the next log we
13:35:26 17 have is for the 4th of April and the crew has changed.
13:35:33 18 Mr. -- uh, Mr. Badeaux is no longer listed as a
13:35:37 19 deckhand; is that right?
13:35:39 20      MR. SHEPPARD:
13:35:40 21      The 4th of May.
13:35:40 22      MR. KHOURY:
13:35:41 23      Yeah, the 4th of May.
13:35:42 24      MR. SHEPPARD:
13:35:42 25      You said April.

## Page 144

13:35:43 1      MR. KHOURY:
13:35:43 2      Oh, I'm sorry. Yeah, 4th of May.
13:35:44 3 BY MR. KHOURY:
13:35:45 4   Q. So, it looks like going from the date of
13:35:48 5 April 25th, 2018, Mr. Badeaux was on the vessel up
13:35:54 6 until and including May 2nd, right?
13:35:58 7   A. Correct.
13:35:59 8   Q. All right.
13:36:03 9      MR. SHEPPARD:
13:36:03 10      And I'll -- just to the point where
13:36:05 11 we're missing a date there.
13:36:06 12      MR. KHOURY:
13:36:06 13      Yeah.
13:36:07 14      MR. SHEPPARD:
13:36:07 15      I don't know if he was there the
13:36:09 16 following day. We don't have the May 3rd.
13:36:11 17      MR. KHOURY:
13:36:13 18      Yeah. I don't see a May 3rd, but.
13:36:13 19 BY MR. KHOURY:
13:36:14 20   Q. But in any event on May 4th Mr. Badeaux is
13:36:18 21 not listed on the vessel, correct?
13:36:20 22   A. Correct.
13:36:22 23   Q. And you also saw where, um -- and I'm going
13:36:26 24 to refer to the incident reports. We made that
13:36:55 25 Exhibit Number 12.

13:36:57  1     Um, the -- we have two separate incident
13:37:00  2  reports. One where Mr. Griffin says he hit his
13:37:04  3  shoulder on the firehose rack while picking up a
13:37:07  4  starter. That the date of incident was April 25th and
13:37:11  5  the date this was completed, this form, was May 5th,
13:37:14  6  2018. And then we have a second incident report which
13:37:21  7  lists the date as June 20th of 2018 and Mr. Griffin
13:37:27  8  writes, "Lifting a starter and I got -- lifting a
13:37:31  9  starter and I hit my left shoulder onto the firehose
13:37:35 10  rack in the hallway area, number 2 rack, and a few
13:37:39 11  days after I was smashed between the large box and the
13:37:44 12  man basket." You see that?
13:37:46 13     A  Yes.
13:37:47 14     Q  So, according to Mr. Griffin, his second
13:37:51 15  incident where he was smashed by the personnel basket
13:37:55 16  into a cargo box or a grocery box happened a few days
13:38:01 17  after the first incident on April 25th, 2018, right?
13:38:06 18     A  Right.
13:38:07 19     Q  Um, counsel has shown you -- counsel for
13:38:12 20  Mr. Griffin has shown you a statement. I don't think
13:38:19 21  we've marked that as an exhibit but -- or maybe we
13:38:22 22  did. Number 10, a statement that Mr. Badeaux had
13:38:27 23  signed saying that he saw Mr. Griffin's accident where
13:38:34 24  he got smashed by the personnel basket. And what I
13:38:39 25  want to ask you is -- what I'm trying to do is nail

13:38:42  1  down some sort of timing as to when Mr. Griffin is
13:38:46  2  claiming that his second accident occurred because he
13:38:50  3  couldn't tell us at his deposition when that occurred.
13:38:55  4  We know he said it was a couple days after the first
13:38:58  5  incident. We also know Mr. Badeaux is claiming that
13:39:01  6  he witnessed it, and it looks like Mr. Badeaux got off
13:39:06  7  the vessel either on the 2nd or 3rd of May, correct?
13:39:11  8     A  Correct.
13:39:11  9        MR. SHEPPARD:
13:39:11 10           Object to form. Form, leading and um,
13:39:17 11     mischaracterizes Mr. Griffin's testimony.
13:39:21 12        MR. KHOURY:
13:39:21 13           What did I mischaracterize?
13:39:22 14        MR. SHEPPARD:
13:39:23 15           Couple days. I don't think he said
13:39:26 16     "couple."
13:39:27 17        MR. KHOURY:
13:39:28 18           No, I'm talking about what the accident
13:39:30 19     report says; not his testimony.
13:39:31 20        MR. SHEPPARD:
13:39:32 21           Okay.
13:39:32 22  BY MR. KHOURY:
13:39:33 23     Q  And then we see, and if we go through the
13:39:36 24  rest of these logs there's never a time at least
13:39:41 25  through, um, May that Mr. McArthur Griffin -- it looks

13:39:50  1  like there was another guy named David Griffin on
13:39:53  2  these logs -- but it looks like we don't see another
13:39:56  3  time that Mr. McArthur Griffin would have been on the
13:39:59  4  vessel at the same time as Mr. Badeaux, and I'm
13:40:05  5  flipping through these so you can see that and we'll
13:40:07  6  just go through at least until the end of what's
13:40:11  7  attached here. Um --
13:40:14  8        MR. SHEPPARD:
13:40:15  9           Are you talking about beginning May 4th?
13:40:17 10        MR. KHOURY:
13:40:18 11           Yeah.
13:40:19 12        MR. SHEPPARD:
13:40:20 13           Okay.
13:40:20 14  BY MR. KHOURY:
13:40:21 15     Q  We don't see Mr. McArthur Griffin working
13:40:24 16  with Mr. Badeaux or being on the vessel through the
13:40:26 17  rest of those logs, correct?
13:40:28 18     A  Correct.
13:40:29 19     Q  So, what I want you to do then is assume for
13:40:32 20  me that, as I mentioned, Mr. Griffin wasn't sure at
13:40:38 21  his deposition when the second accident happened, but
13:40:42 22  based on him saying in the accident report that the
13:40:46 23  second incident happened, um, a few days after,
13:40:53 24  combined with the fact that if in fact Mr. Badeaux
13:40:57 25  witnessed it, it would have had to have been at the

13:41:00  1  latest May 3rd. I want to ask you a couple questions
13:41:05  2  based on that premise. Were you -- were you involved
13:41:12  3  in getting Mr. Griffin medical treatment after the
13:41:18  4  starter incident.
13:41:20  5     A  Yes.
13:41:21  6     Q  Okay. So, and also if we'll go back and look
13:41:25  7  at exhibit -- Exhibit 11, there was a statement from
13:41:46  8  Mr. Griffin dated May 13th and then I don't think we
13:41:51  9  attached this, but we also had a statement from
13:41:55 10  Mr. Griffin.
13:41:56 11        MR. KHOURY:
13:41:56 12           Which I'll mark as the next exhibit.
13:42:00 13        COURT REPORTER:
13:42:00 14           Sixteen.
13:42:00 15        MR. KHOURY:
13:42:00 16           Sixteen.
13:42:00 17  BY MR. KHOURY:
13:42:00 18     Q  That says, "I McArthur Griffin was seen by
13:42:04 19  the doctor on May 14, 2018 and I feel good enough to
13:42:08 20  go back to work," is that correct?
13:42:10 21     A  Correct.
13:42:11 22     Q  All right. So, would you have been the one
13:42:15 23  on behalf of REC Marine arranged for him to see a
13:42:18 24  doctor on May 14?
13:42:21 25     A  Yes.

| | | |
|---|---|---|
| 13:42:22 | 1 | Q   All right.  And you had talked to him by that |
| 13:42:27 | 2 | time, and I guess based on his statement on the 13th, |
| 13:42:33 | 3 | it would have been the 13th that he got off the boat, |
| 13:42:37 | 4 | right? |
| 13:42:39 | 5 | A   Uh, 13th, maybe early 14th -- |
| 13:42:41 | 6 | Q   Okay. |
| 13:42:41 | 7 | A   -- in the morning or something. |
| 13:42:43 | 8 | Q   All right.  Any event, either the 13th or |
| 13:42:46 | 9 | 14th was when he first got off the boat after the |
| 13:42:49 | 10 | starter incident, right? |
| 13:42:51 | 11 | A   Correct. |
| 13:42:51 | 12 | MR. SHEPPARD: |
| 13:42:51 | 13 | Object to the form. |
| 13:42:52 | 14 | BY MR. KHOURY: |
| 13:42:52 | 15 | Q   And you had arranged for his medical |
| 13:42:55 | 16 | treatment that is referenced in the second statement |
| 13:42:59 | 17 | that's Exhibit 16? |
| 13:43:01 | 18 | A   Yes. |
| 13:43:03 | 19 | Q   At anytime -- and again I want to take you |
| 13:43:07 | 20 | back to -- I want you to make the assumption that |
| 13:43:11 | 21 | based on Mr. Griffin's statement that the second |
| 13:43:13 | 22 | accident happened a few days later combined with the |
| 13:43:15 | 23 | fact that Mr. Badeaux is saying he saw that, and he |
| 13:43:19 | 24 | got off the vessel at the latest on May 3rd, the |
| 13:43:25 | 25 | second incident where he's claiming he got smashed by |

| | | |
|---|---|---|
| 13:43:29 | 1 | the personnel basket would have had to have occurred |
| 13:43:31 | 2 | by the time you arranged him getting medical treatment |
| 13:43:34 | 3 | on May 14, correct? |
| 13:43:36 | 4 | A   Correct. |
| 13:43:37 | 5 | Q   At anytime when you talked to him after he |
| 13:43:39 | 6 | got -- |
| 13:43:40 | 7 | Did you go with him to the doctor? |
| 13:43:42 | 8 | A   Yes. |
| 13:43:42 | 9 | Q   At anytime before he saw the doctor, after he |
| 13:43:48 | 10 | saw the doctor, anytime you talked to him after he got |
| 13:43:52 | 11 | off the boat on May 13th or 14th, did he ever say |
| 13:43:57 | 12 | anything to you about, hey, I got smashed by a |
| 13:44:00 | 13 | personnel basket into a cargo box? |
| 13:44:03 | 14 | A   He did not and -- and I also saw him in the |
| 13:44:07 | 15 | office.  He had gotten off the boat.  He went back to |
| 13:44:09 | 16 | work on the 14th and worked until, I want to say the |
| 13:44:12 | 17 | 20th or 21st.  Got off for about a week and came back |
| 13:44:16 | 18 | to work on the 31st of May and, um, I saw him in the |
| 13:44:20 | 19 | office.  He was going to work.  He never mentioned |
| 13:44:23 | 20 | anything. |
| 13:44:23 | 21 | Q   He never said anything about a personnel |
| 13:44:25 | 22 | basket smashing him into a box? |
| 13:44:27 | 23 | A   No, and he also did not mention anything |
| 13:44:29 | 24 | about his shoulder still hurting. |
| 13:44:31 | 25 | Q   And that was on the 30st of May? |

| | | |
|---|---|---|
| 13:44:34 | 1 | A   The 31st, and he went back to work. |
| 13:44:36 | 2 | Q   At anytime, and I'm assuming, based on your |
| 13:44:39 | 3 | prior answer I would know what the answer to this |
| 13:44:42 | 4 | question is going to be, but he never told you I would |
| 13:44:44 | 5 | assume -- or did he tell you anything on the 13th or |
| 13:44:48 | 6 | 14th when you spoke to him about Captain Mike ever |
| 13:44:53 | 7 | being on a telephone during a personnel transfer? |
| 13:44:57 | 8 | A   No. |
| 13:44:58 | 9 | Q   Did he ever tell you anything about Captain |
| 13:45:00 | 10 | Mike stepping away from the controls of the vessel |
| 13:45:02 | 11 | during a personnel transfer? |
| 13:45:06 | 12 | A   No. |
| 13:45:06 | 13 | Q   Did he ever tell you that he thought Captain |
| 13:45:08 | 14 | Mike was an unsafe captain? |
| 13:45:10 | 15 | A   No. |
| 13:45:10 | 16 | Q   Did he ever have any complaints at all about |
| 13:45:12 | 17 | working with Captain Mike Hauglund? |
| 13:45:15 | 18 | A   No. |
| 13:45:23 | 19 | Q   Um, we talked a little bit about the second |
| 13:45:26 | 20 | incident report which was, looks like, completed on |
| 13:45:31 | 21 | June 20.  I think you mentioned earlier that you |
| 13:45:38 | 22 | didn't actually receive this report on the 20th? |
| 13:45:42 | 23 | A   Right.  I got that in the mail, crew change |
| 13:45:46 | 24 | mail, around the 29th or so; 20th, 29th.  And Captain |
| 13:45:51 | 25 | Mike had called on the 20th to report to me that his |

| | | |
|---|---|---|
| 13:45:56 | 1 | shoulder was still hurting from the starter incident. |
| 13:46:00 | 2 | Q   McArthur's was still hurting? |
| 13:46:03 | 3 | A   Right. |
| 13:46:03 | 4 | Q   Okay. |
| 13:46:03 | 5 | A   And arrangements were made from there to get |
| 13:46:06 | 6 | him further evaluated. |
| 13:46:10 | 7 | Q   All right.  And what I'm going to do is I'm |
| 13:46:19 | 8 | gonna show you -- it's a document REC 00005 and it's |
| 13:46:25 | 9 | notes that you had taken that are dated 6/20. |
| 13:46:33 | 10 | A   This is the phone call notes. |
| 13:46:34 | 11 | Q   So, this -- yeah.  Explain to me what this -- |
| 13:46:37 | 12 | this document is that I'm showing you? |
| 13:46:41 | 13 | A   So, it looks like 14:39 is the time on 6/20 |
| 13:46:46 | 14 | and that's what time the phone call came in. |
| 13:46:49 | 15 | Q   And that was a phone call from who? |
| 13:46:51 | 16 | A   Captain Mike. |
| 13:46:52 | 17 | Q   Okay. |
| 13:46:53 | 18 | A   So it says, "DUSTIN DANOS, Captain Mike |
| 13:46:55 | 19 | Hauglund, called to report."  I'm jotting down notes |
| 13:46:58 | 20 | on the phone so that's just my phone call notes. |
| 13:47:00 | 21 | McArthur Griffin just got back to the boat at 5/31. |
| 13:47:04 | 22 | He's still feeling pain since first visit.  Wants to |
| 13:47:07 | 23 | see another doctor.  Feels something in bone shoulder. |
| 13:47:10 | 24 | Says he can wait until crew change 6/28.  And then I |
| 13:47:14 | 25 | have a little asterisk.  I saw McArthur Griffin in the |

| | | |
|---|---|---|
| 13:47:18 | 1 | office on 5/31. He was waiting for crew change he did |
| 13:47:22 | 2 | not mention anything about his shoulder still hurting. |
| 13:47:25 | 3 | Q   And as of this time whenever Captain Mike |
| 13:47:29 | 4 | called you and said that McArthur's Griffin -- |
| 13:47:31 | 5 | McArthur Griffin's shoulder was still sore, was that |
| 13:47:36 | 6 | in reference to the starter incident? |
| 13:47:40 | 7 | A   Correct. |
| 13:47:41 | 8 | Q   Nothing was ever told to you on 6/20 of 2018 |
| 13:47:47 | 9 | about Mr. Griffin being smashed by a personnel basket? |
| 13:47:54 | 10 | A   Correct. |
| 13:47:54 | 11 | MR. SHEPPARD: |
| 13:47:55 | 12 | Object to form. Asked and answered. |
| 13:48:12 | 13 | BY MR. KHOURY: |
| 13:48:13 | 14 | Q   All right. What I'm going to show you is a |
| 13:48:14 | 15 | second set of notes that I believe were written by |
| 13:48:17 | 16 | you. It's REC 00007. |
| 13:48:21 | 17 | MR. KHOURY: |
| 13:48:21 | 18 | Um, and we'll attach this as Exhibit 17. |
| 13:48:25 | 19 | BY MR. KHOURY: |
| 13:48:25 | 20 | Q   Can you tell me what this set of notes |
| 13:48:28 | 21 | references? |
| 13:48:31 | 22 | A   6/29/18, 9:40 A.M. Just received an incident |
| 13:48:37 | 23 | report from the DUSTIN DANOS dated 6/20/18. Incident |
| 13:48:42 | 24 | 4/25/18. Mentioned being smashed between a box and a |
| 13:48:47 | 25 | man basket. This is the first time anyone has heard |

| | | |
|---|---|---|
| 13:48:50 | 1 | of this. I spoke to McArthur multiple times this week |
| 13:48:54 | 2 | and once last week. There was no mention of being |
| 13:48:57 | 3 | smashed by a box. He told me the shoulder was still |
| 13:49:00 | 4 | sore from the starter-firehose rack incident. No one |
| 13:49:02 | 5 | on the boat reported him ever being smashed between a |
| 13:49:05 | 6 | box at anytime. |
| 13:49:09 | 7 | Q   So, this conversation or this note |
| 13:49:13 | 8 | memorializes, I guess, the first time that you become |
| 13:49:17 | 9 | aware or anyone at the office became aware that |
| 13:49:19 | 10 | McArthur Griffin was claiming that he had been smashed |
| 13:49:25 | 11 | by a personnel basket? |
| 13:49:26 | 12 | A   Correct. |
| 13:49:27 | 13 | MR. SHEPPARD: |
| 13:49:28 | 14 | By "office" do you mean just the folks |
| 13:49:29 | 15 | that work here or just folks that are |
| 13:49:31 | 16 | associated with REC? |
| 13:49:33 | 17 | MR. KHOURY: |
| 13:49:34 | 18 | Um, I -- what I mean is anyone at REC |
| 13:49:37 | 19 | Marine's office? |
| 13:49:38 | 20 | A   Right. The first time anybody was notified, |
| 13:49:40 | 21 | notified. |
| 13:49:41 | 22 | BY MR. KHOURY: |
| 13:49:46 | 23 | Q   And you have -- and subsequent to this is |
| 13:49:49 | 24 | that when you had spoken to Captain Mike or did you |
| 13:49:53 | 25 | speak to Captain Mike to ask him if he knew anything |

| | | |
|---|---|---|
| 13:49:56 | 1 | about this? |
| 13:49:57 | 2 | A   Right. So after I got that I called Captain |
| 13:49:59 | 3 | Mike and he couldn't verify anything that happened. |
| 13:50:03 | 4 | Q   He didn't recall the plaintiff ever being |
| 13:50:06 | 5 | smashed by the personnel basket? |
| 13:50:09 | 6 | A   No. |
| 13:50:12 | 7 | Q   And just to be clear in -- I think you were |
| 13:50:17 | 8 | asked a question a little bit earlier whether -- who |
| 13:50:21 | 9 | fills out these accident reports and did you say the |
| 13:50:24 | 10 | captain fills these out? |
| 13:50:26 | 11 | A   The captain should fill those out. |
| 13:50:28 | 12 | Q   Okay. With the -- is it with the exception |
| 13:50:30 | 13 | of the portion that says, with the description and the |
| 13:50:33 | 14 | Section 5 says, "description of accidents to be |
| 13:50:36 | 15 | completed by injury/ill party? |
| 13:50:38 | 16 | A   It doesn't matter who fills that out as long |
| 13:50:41 | 17 | as the injured/ill party signs off on it. |
| 13:50:44 | 18 | Q   Okay. |
| 13:50:44 | 19 | A   Um, but the captain is -- we like him to fill |
| 13:50:47 | 20 | it out for accuracy as far as the weather and location |
| 13:50:50 | 21 | and all that stuff. |
| 13:50:51 | 22 | Q   Okay. |
| 13:50:52 | 23 | A   But this clearly, McArthur sent it in. |
| 13:50:55 | 24 | Captain Mike probably didn't even know he filled it |
| 13:50:57 | 25 | out. |

| | | |
|---|---|---|
| 13:50:58 | 1 | Q   Okay. And to be clear on this description of |
| 13:51:04 | 2 | the incident, McArthur Griffin doesn't say anything |
| 13:51:09 | 3 | about the captain being on a cell phone at the time of |
| 13:51:13 | 4 | the accident, does he? |
| 13:51:14 | 5 | A   No. |
| 13:51:15 | 6 | Q   And he doesn't say anything about the captain |
| 13:51:18 | 7 | stepping away from the controls, does he? |
| 13:51:21 | 8 | A   No. |
| 13:51:22 | 9 | Q   And he doesn't say anything about the boat |
| 13:51:25 | 10 | shifting forward does he? |
| 13:51:27 | 11 | A   No. |
| 13:51:42 | 12 | Q   Um, the first time that you arranged for Mr. |
| 13:51:46 | 13 | Griffin to get medical treatment, was he taken to OMS? |
| 13:51:52 | 14 | A   Yes. |
| 13:51:52 | 15 | Q   And that's a clinic that y'all use? |
| 13:51:54 | 16 | A   Right. |
| 13:51:55 | 17 | Q   Okay. At anytime when you were with him on |
| 13:51:58 | 18 | the 13th or the 14th, or after his appointment, did he |
| 13:52:03 | 19 | ever say anything to you about anything hurting other |
| 13:52:05 | 20 | than his shoulder? |
| 13:52:07 | 21 | A   No. |
| 13:52:08 | 22 | Q   Did he ever say anything to you about having |
| 13:52:11 | 23 | injured his neck? |
| 13:52:13 | 24 | A   No. |
| 13:52:13 | 25 | Q   Has he ever said anything to you about having |

13:52:16  1   injured his back?
13:52:17  2       A.  No.
13:52:17  3       Q.  All right.  Let's fast forward even further.
13:52:20  4   Once you learned that he is claiming he got smashed by
13:52:24  5   a personnel basket and that his shoulder was still
13:52:27  6   hurting, is that when y'all arranged for him to be
13:52:30  7   treated at Gulf Coast Orthopedics.
13:52:33  8       A.  Yes.
13:52:34  9       Q.  By Dr. Casey?
13:52:35  10      A.  Yes.
13:52:35  11      Q.  Okay.  Did you have any communication -- were
13:52:38  12  you the one who communicated with him on behalf of REC
13:52:42  13  to set that up?
13:52:43  14      A.  Yes.
13:52:44  15      Q.  All right.  Did you transport him to Dr.
13:52:45  16  Casey's office?
13:52:46  17      A.  We did.
13:52:47  18      Q.  Did he ever say anything to you at that time
13:52:50  19  about having injured anything other than his shoulder?
13:52:53  20      A.  No.
13:52:55  21      Q.  And just ask you, just to be clear and for
13:52:58  22  purposes of the record, did he ever say anything to
13:53:00  23  you at that time at the end of June or early July that
13:53:04  24  he had injured his neck?
13:53:05  25      A.  No.

13:53:06  1       Q.  Did he ever tell you that he had injured his
13:53:08  2   back?
13:53:08  3       A.  No.
13:53:11  4       Q.  Is this lawsuit the first time that you've
13:53:14  5   become aware that Mr. Griffin is now claiming an
13:53:17  6   injury to his neck or his back?
13:53:19  7       A.  Yes.  And I did see it in one of Dr. Casey's
13:53:24  8   reports.
13:53:24  9       Q.  Okay.
13:53:26  10      A.  That was at the end.
13:53:28  11      Q.  Okay.  Was that when he released him to MMI
13:53:30  12  and he said that now Mr. Griffin is complaining with a
13:53:34  13  neck injury and I don't feel that that's related
13:53:35  14  because he didn't complain about that before with me?
13:53:40  15      A.  Right.
13:53:40  16          MR. SHEPPARD:
13:53:40  17          Object to form, and leading.
13:53:48  18          MR. KHOURY:
13:53:57  19          All right.  I think those are all I
13:53:59  20  have.
13:54:00  21          MS. SCOTT:
13:54:00  22          I'm good.
13:54:02  23          MR. SHEPPARD:
13:54:03  24          Okay.  A couple questions.
13:54:04  25               EXAMINATION

13:54:04  1   BY MR. SHEPPARD:
13:54:04  2       Q.  Um, when you were asked about a conversation
13:54:09  3   on the 20th with Captain Hauglund, you remember that?
13:54:12  4       A.  Yes.
13:54:13  5       Q.  You didn't talk to Mr. Griffin that day, did
13:54:15  6   you?
13:54:15  7       A.  On the 20th?
13:54:17  8       Q.  Right.
13:54:17  9       A.  I don't remember if I did.  I think I did,
13:54:19  10  though.
13:54:19  11      Q.  It's not documented in any of those notes
13:54:22  12  that you took, right?
13:54:23  13      A.  No.
13:54:23  14      Q.  Okay.  And all those conversations that
13:54:24  15  you're saying that you had with Mr. Griffin, when he
13:54:28  16  was with medical providers, transferring to and from,
13:54:32  17  those are not documented either, are they?
13:54:34  18      A.  Not here.
13:54:34  19      Q.  Okay.  Where are they documented?
13:54:37  20      A.  Could be in the medical file.
13:54:38  21      Q.  Do you have documentation of conversations
13:54:40  22  that you had with Mr. Griffin --
13:54:42  23      A.  Not conversations, but I attended just about
13:54:44  24  every single visit.
13:54:45  25      Q.  Okay.  Do you have doc-- do you have

13:54:45  1   handwritten notes like you were pointing out there
13:54:49  2   with Exhibit 17 or maybe 16 where you were -- where
13:54:55  3   you're documenting conversations you're having with
13:54:58  4   various people?
13:54:59  5       A.  No.  Probably because I didn't talk to him
13:55:01  6   specifically.  Whenever I'm on the phone with anyone
13:55:05  7   that called to report something, I document it.  So
13:55:07  8   Captain Mike might have been the one making the
13:55:10  9   report.
13:55:11  10      Q.  You, also, said Mr. Griffin is the one that
13:55:13  11  sent in that report.
13:55:15  12          MR. KHOURY:
13:55:17  13          Which one?
13:55:17  14          MR. SHEPPARD:
13:55:17  15          The second report.
13:55:18  16  BY MR. SHEPPARD:
13:55:18  17      Q.  You're saying Mr. Griffin is the one that put
13:55:20  18  that in the mail.  Is there anything that you have
13:55:21  19  that shows that he did that?
13:55:23  20      A.  That's his handwriting.
13:55:24  21      Q.  Okay.  Is it him that put it in the mail?
13:55:26  22      A.  Likely.
13:55:27  23      Q.  If --
13:55:27  24      A.  I don't --
13:55:28  25      Q.  If Mr. Griffin testified that Captain

| | | |
|---|---|---|
| 13:55:29 | 1 | Hauglund -- I'm sorry.  I didn't mean to interrupt |
| 13:55:32 | 2 | you.  Um, if Mr. Griffin testified that Captain |
| 13:55:35 | 3 | Hauglund told him what to write and told him what to |
| 13:55:38 | 4 | put down, that's what he did.  Is the company |
| 13:55:41 | 5 | disputing that? |
| 13:55:42 | 6 | A   Yes. |
| 13:55:42 | 7 | MS. SCOTT: |
| 13:55:42 | 8 | Object to form. |
| 13:55:43 | 9 | BY MR. SHEPPARD: |
| 13:55:43 | 10 | Q   The company's disputing that because they've |
| 13:55:45 | 11 | had specific conversation with Captain Hauglund about |
| 13:55:48 | 12 | the preparation of that incident report, right? |
| 13:55:51 | 13 | A   Captain Hauglund does not know anything about |
| 13:55:54 | 14 | that. |
| 13:55:54 | 15 | Q   Okay.  And you had a conversation with him -- |
| 13:55:56 | 16 | A   Yes. |
| 13:55:56 | 17 | Q   -- and that's documented somewhere too, |
| 13:55:58 | 18 | right? |
| 13:55:58 | 19 | A   It's not documented. |
| 13:56:00 | 20 | Q   Okay.  When you had that call with Captain |
| 13:56:02 | 21 | Hauglund on the 20th how long was it? |
| 13:56:05 | 22 | A   I don't know. |
| 13:56:05 | 23 | Q   Okay.  Because that's not documented either. |
| 13:56:08 | 24 | A   No. |
| 13:56:09 | 25 | MR. KHOURY: |

| | | |
|---|---|---|
| 13:56:09 | 1 | What's not documented, the length of the |
| 13:56:11 | 2 | phone call. |
| 13:56:13 | 3 | MR. SHEPPARD: |
| 13:56:13 | 4 | Yes. |
| 13:56:19 | 5 | BY MR. SHEPPARD: |
| 13:56:19 | 6 | Q   You said that you saw Mr. Griffin a few times |
| 13:56:24 | 7 | after he had gone to the doctor on the 14th.  You had |
| 13:56:28 | 8 | seen him on the, I think it was the 29th? |
| 13:56:33 | 9 | A   Thirty-first.  I saw him at the office. |
| 13:56:35 | 10 | Q   Okay.  And where were you and where was he? |
| 13:56:38 | 11 | A   He was in personnel's office and I was just |
| 13:56:41 | 12 | walking through the hall when I saw him.  I stopped in |
| 13:56:45 | 13 | and talked to him. |
| 13:56:46 | 14 | Q   What'd you talk about? |
| 13:56:48 | 15 | A   Asked about his shoulder. |
| 13:56:49 | 16 | Q   Okay.  That's not documented as well, right? |
| 13:56:51 | 17 | A   No. |
| 13:56:51 | 18 | Q   Okay.  Anything else you talked about? |
| 13:56:52 | 19 | A   No. |
| 13:56:53 | 20 | Q   Okay.  You said you saw him a few other times |
| 13:56:56 | 21 | during crew change.  Where was he and where were you? |
| 13:56:59 | 22 | A   I didn't see him.  What you mean during crew |
| 13:57:01 | 23 | change? |
| 13:57:02 | 24 | Q   I thought you had said crew change.  If I |
| 13:57:03 | 25 | have it wrong -- |

| | | |
|---|---|---|
| 13:57:03 | 1 | A   It was here for crew change that day. |
| 13:57:05 | 2 | Q   Okay.  Are we talking about the same day? |
| 13:57:07 | 3 | A   Yes, sir.  Just what I told you. |
| 13:57:09 | 4 | Q   When you went into the personnel office -- |
| 13:57:11 | 5 | A   Right. |
| 13:57:11 | 6 | Q   -- that the same when he was there for crew |
| 13:57:12 | 7 | change? |
| 13:57:13 | 8 | A   Yes. |
| 13:57:17 | 9 | Q   All right.  Are any of the conversations that |
| 13:57:19 | 10 | you had with Mr. Griffin documented? |
| 13:57:22 | 11 | A   All I have documented is this right here. |
| 13:57:24 | 12 | Q   Okay.  The ones that are with you and Captain |
| 13:57:26 | 13 | Mike and the fact the incident was received by your |
| 13:57:29 | 14 | office on June 29th? |
| 13:57:31 | 15 | MR. KHOURY: |
| 13:57:31 | 16 | That's the one.  This document Number 17 |
| 13:57:34 | 17 | does document a conversation with the |
| 13:57:36 | 18 | plaintiff. |
| 13:57:38 | 19 | A   Uh, well, it says I spoke to McArthur |
| 13:57:41 | 20 | several -- multiple times this week and once last |
| 13:57:44 | 21 | week. |
| 13:57:45 | 22 | Q   Okay.  What else does it say? |
| 13:57:47 | 23 | A   There was no mention of being smashed by a |
| 13:57:49 | 24 | box.  He told me his shoulder was still sore from the |
| 13:57:52 | 25 | starter-firehose rack incident. |

| | | |
|---|---|---|
| 13:57:54 | 1 | Q   Okay.  But all of those conversations you had |
| 13:57:56 | 2 | with McArthur you didn't document any of those, right? |
| 13:57:59 | 3 | A   That's what I have right here. |
| 13:58:00 | 4 | Q   All of the -- you didn't -- okay.  You |
| 13:58:01 | 5 | didn't, like you did with the call from Captain |
| 13:58:04 | 6 | Hauglund -- |
| 13:58:05 | 7 | A   This wasn't a call.  This was just a note |
| 13:58:07 | 8 | documenting what I received. |
| 13:58:08 | 9 | Q   Okay. |
| 13:58:08 | 10 | A   And really it was -- yeah, it wasn't a phone |
| 13:58:12 | 11 | call.  It was just, this is what I received today and |
| 13:58:15 | 12 | making a note for myself. |
| 13:58:17 | 13 | Q   Okay.  Do you recall how long any of your |
| 13:58:22 | 14 | conversations that you had with Mr. Griffin were when |
| 13:58:25 | 15 | you were taking about the shoulder? |
| 13:58:26 | 16 | A   Five minutes. |
| 13:58:27 | 17 | Q   In total for all of them or for each one? |
| 13:58:30 | 18 | A   I can't remember that. |
| 13:58:31 | 19 | Q   Okay. |
| 13:58:31 | 20 | A   This is three years ago. |
| 13:58:32 | 21 | Q   Right.  Would some have been kind of short? |
| 13:58:39 | 22 | You now, maybe a minute, maybe 30 seconds? |
| 13:58:40 | 23 | A   Could have been 30 minutes, could have been a |
| 13:58:43 | 24 | minute. |
| 13:58:43 | 25 | Q   Okay.  You don't know one way or the other, |

| | | |
|---|---|---|
| 13:58:45 | 1 | right? |
| 13:58:45 | 2 | A No. I went there every single visit. They |
| 13:58:47 | 3 | could have been two, three hours sometimes. |
| 13:58:50 | 4 | Q Are you talking about the doctor visit or you |
| 13:58:52 | 5 | talking about -- |
| 13:58:52 | 6 | A Just -- just anytime spent with him, yes. |
| 13:58:55 | 7 | Q Okay. You spend time with Mr. Griffin for |
| 13:58:59 | 8 | two or three hours where you weren't at a hospital or |
| 13:59:02 | 9 | a clinic? |
| 13:59:03 | 10 | A At the clinic. |
| 13:59:04 | 11 | Q Okay. Were you sitting in the exam room with |
| 13:59:06 | 12 | him? |
| 13:59:07 | 13 | A Yes. |
| 13:59:07 | 14 | Q Were you sitting in the waiting room with |
| 13:59:09 | 15 | him? |
| 13:59:10 | 16 | A Yes. |
| 13:59:10 | 17 | Q Okay. Is that standard for one of the health |
| 13:59:23 | 18 | safety, HSE managers to go sit in appointments with |
| 13:59:29 | 19 | doctors and go sit in waiting rooms? |
| 13:59:31 | 20 | A Yes. |
| 13:59:36 | 21 | Q Again, this is a doctor that the company |
| 13:59:39 | 22 | chose, right, or a clinic the company chose? |
| 13:59:42 | 23 | A Yes. |
| 13:59:44 | 24 | MR. KHOURY: |
| 13:59:44 | 25 | Are you talking about OMS? |

| | | |
|---|---|---|
| 14:00:31 | 1 | like a copy? |
| 14:00:31 | 2 | MR. KHOURY: |
| 14:00:31 | 3 | Yes. Read and sign and I would like a |
| 14:00:44 | 4 | copy. |
| 14:00:45 | 5 | COURT REPORTER: |
| 14:00:45 | 6 | Where would you like the read and sign |
| 14:00:45 | 7 | sent? |
| 14:00:45 | 8 | MR. KHOURY: |
| 14:00:45 | 9 | Can you give her the office address. |
| 14:00:51 | 10 | THE WITNESS: |
| 14:00:51 | 11 | It's 4535 Highway 38, Raceland 70394. |
| 14:01:46 | 12 | MR. KHOURY: |
| 14:01:49 | 13 | Just a housekeeping thing, I'm going |
| 14:01:51 | 14 | to -- I meant to attach Mr. Harris' notes |
| 14:01:58 | 15 | from 6/20 as Exhibit 17 and then his notes |
| 14:02:08 | 16 | from June 29, 2018 as Exhibit 18. That's it. |
| 14:02:18 | 17 | COURT REPORTER: |
| 14:02:18 | 18 | And Ms. Scott, did you want a copy? |
| 14:02:18 | 19 | MS. SCOTT: |
| 14:02:18 | 20 | Oh, yes. |
| 14:02:18 | 21 | COURT REPORTER: |
| 14:02:18 | 22 | Okay. Thank you. |
| | 23 | |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 13:59:46 | 1 | MR. SHEPPARD: |
| 13:59:46 | 2 | Um-hum. |
| 13:59:46 | 3 | BY MR. SHEPPARD: |
| 13:59:47 | 4 | Q OMS is a clinic that the company chose, |
| 13:59:49 | 5 | right? |
| 13:59:49 | 6 | A Yes. |
| 13:59:50 | 7 | Q Okay. |
| 13:59:51 | 8 | A And if he doesn't want us in the rooms with |
| 13:59:54 | 9 | him, he can tell us. We ask before we go. |
| 13:59:58 | 10 | Q Okay. |
| 14:00:11 | 11 | MR. SHEPPARD: |
| 14:00:11 | 12 | On the last one just object to the |
| 14:00:11 | 13 | nonresponsive portions. |
| 14:00:23 | 14 | All right, pass the witness. |
| 14:00:24 | 15 | MS. SCOTT: |
| 14:00:25 | 16 | I'm good. |
| 14:00:25 | 17 | MR. KHOURY: |
| 14:00:26 | 18 | All right. |
| 14:00:26 | 19 | VIDEOGRAPHER: |
| 14:00:27 | 20 | This is the conclusion of the |
| 14:00:28 | 21 | deposition. We're going off the record. The |
| 14:00:30 | 22 | time is 2:00 P.M. |
| 14:00:31 | 23 | (WHEREUPON DEPOSITION CONCLUDED AT 2:00 P.M.) |
| 14:00:31 | 24 | COURT REPORTER: |
| 14:00:31 | 25 | Read and sign or waive and would you |

| | |
|---|---|
| 1 | |
| 2 | WITNESS' CERTIFICATE |
| 3 | |
| 4 | I, Brian Harris, read or have had the |
| 5 | foregoing testimony read to me and hereby certify |
| 6 | that it is a true and correct transcription of my |
| 7 | testimony taken May 12, 2021 with the exception of |
| 8 | any attached corrections or changes. |
| 9 | |
| 10 | |
| 11 | |
| 12 | _____ |
| 13 | |
| 14 | _____ Signed with corrections noted. |
| 15 | _____ Signed without corrections noted. |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 169

```
 1
 2              REPORTER'S CERTIFICATE
 3         I, BELINDA D. VIGUEIRA, Certified Court
         Reporter in and for the State of Louisiana,
 4       Certificate No. 83075, as the officer before whom
         this testimony was taken, do hereby certify that
 5       Brian Harris, to whom the oath was administered,
         after having been duly sworn by me upon authority of
 6       R.S. 37:2554, did testify as hereinbefore set forth
         in the foregoing 167 pages;
 7
              That this testimony was reported by me in
 8       the stenotype reporting method, was prepared and
         transcribed by me or under my personal direction and
 9       supervision, and is a true and correct transcript to
         the best of my ability and understanding;
10
              That the transcript has been prepared in
11       compliance with transcript format guidelines required
         by statute or by rules of the board;
12
              That I have acted in compliance with the
13       prohibition on contractual relationships, as defined
         by Louisiana Code of Civil Procedure Article 1434 and
14       in rules and advisory opinions of the board;
15            That I am not related to counsel or to the
         parties herein, nor am I otherwise interested in the
16       outcome of this matter.
17            Dated this 28th day of May 2021.
18
19
                         _____
20                       Belinda D. Vigueira, CCR
                         Certificate No. 83075
21
22
23
24
25
```