UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

MCARTHUR GRIFFIN : CIVIL ACTION

VERSUS : NO. 20-92-BAJ-EWD

REC MARINE, ET AL : MAY 1, 2023

==================================================

TRIAL BY JURY
BEFORE THE HONORABLE BRIAN A. JACKSON
UNITED STATES DISTRICT JUDGE

DAY 5

A P P E A R A N C E S

FOR THE PLAINTIFF:

MORROW & SHEPPARD LLP
BY: DANIEL SHEPPARD, ESQUIRE
5151 SAN FELIPE STREET, SUITE 100
HOUSTON, TEXAS 77056

ROBINS CLOUD LLP
BY: PATRICK HOGAN LEATHERWOOD, ESQUIRE
2000 WEST LOOP SOUTH, 22ND FLOOR
HOUSTON, TEXAS 77027

CLAYTON, FRUGE, WARD & HENDRY
BY: BRILLIANT PIERRE CLAYTON, ESQUIRE
3741 LA HIGHWAY 1 SOUTH
PORT ALLEN, LOUISIANA 70767

FOR DEFENDANT REC MARINE:

PUSATERI, JOHNSTON, GUILLOT &
GREENBAUM, LLC
BY: SALVADOR JOSEPH PUSATERI, ESQUIRE
BY: KYLE ANDREW KHOURY, ESQUIRE
BY: KRISTIAN B. DOBARD, ESQUIRE
1100 POYDRAS STREET, SUITE 2250
NEW ORLEANS, LOUISIANA 70163

REPORTED BY: NATALIE W. BREAUX, RPR, CRR
UNITED STATES COURTHOUSE

777 FLORIDA STREET
BATON ROUGE, LOUISIANA 70801
(225) 389-3565
NATALIE_BREAUX@LAMD.USCOURTS.GOV

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING COMPUTER-AIDED TRANSCRIPTION SOFTWARE

I N D E X

PAGE

DEFENSE WITNESSES:

BRETT CASEY, M.D.(VIA VIDEO DEPOSITION) ..........6

BRIAN HARRIS

DIRECT EXAMINATION BY MR. KHOURY .............8

CROSS-EXAMINATION BY MR. SHEPPARD ...........34

REDIRECT EXAMINATION BY MR. KHOURY ..........50

CLOSING ARGUMENTS:

BY MR. SHEPPARD ............................75

BY MR. KHOURY .............................109

BY MR. SHEPPARD ...........................139

VERDICT ......................................214

08:40a

**(20-CV-92 GRIFFIN V REC JURY TRIAL 5-1-23)**

**PROCEEDINGS**

**(CALL TO THE ORDER OF COURT.)**

**THE COURT:** LET'S ALL REMAIN STANDING FOR THE JURY.

**(WHEREUPON, THE JURY IS IN THE COURTROOM.)**

**THE COURT:** BE SEATED.

GOOD MORNING, LADIES AND GENTLEMEN, AND WELCOME BACK TO FEDERAL COURT. WELL, LAST WEEK WAS A WEEKEND -- A LONG WEEK, I SHOULD SAY, AND UNFORTUNATELY A SHORT WEEKEND. BUT I HOPE YOU ALL NONETHELESS HAD A CHANCE TO RELAX A LITTLE BIT.

BEFORE WE ADJOURNED ON FRIDAY EVENING, I GAVE THE USUAL INSTRUCTIONS: NOT TO THE DISCUSS THE CASE WITH ANYONE OVER THE WEEKEND; NOT TO WATCH, LISTEN TO, OR READ ANY POSSIBLE NEWS ACCOUNTS OF THIS CASE; NOT TO CONDUCT ANY OUTSIDE RESEARCH OF ANYTHING YOU'VE LEARNED ABOUT THUS FAR; AND NOT TO BEGIN TO FORM ANY OPINIONS ABOUT THE ISSUES IN THE CASE.

IF ANYONE WAS UNABLE TO ABIDE BY THOSE INSTRUCTIONS, PLEASE RAISE YOUR HAND. LET THE RECORD REFLECT THAT NO HANDS ARE RAISED, SO THANK YOU ALL ONCE AGAIN FOR FOLLOWING THOSE INSTRUCTIONS.

ALL RIGHT. SO WE ARE DOWN TO THE WIRE. WE HAVE TWO MORE WITNESSES WHO WILL TESTIFY BEFORE

08:41a

YOU. THE FIRST IS BY VIDEO DEPOSITION. IT WILL BE LENGTHY BUT NOT NEARLY AS LENGTHY AS THE LAST ONE YOU HEARD. SO YOU ALL WERE VERY, VERY ATTENTIVE ON FRIDAY, AND I APPRECIATE THAT, THE LAWYERS APPRECIATE THAT. AND SO WE'RE GOING TO GO ON AND GET TO IT RIGHT AWAY.

LET'S GO TO THE HEADSETS.

**(WHEREUPON, THE FOLLOWING BENCH CONFERENCE VIA HEADSETS WAS HELD.)**

**THE COURT:** ALL RIGHT. SO, MR. LEATHERWOOD, I WAS ABOUT TO ASK WHERE IS YOUR CLIENT. I SEE HE'S WALKING IN NOW. WOULD YOU ASK HIM TO PLEASE BE SURE HE'S ON TIME THE NEXT TIME. WE REALLY NEED HIS PRESENCE HERE THROUGHOUT THIS TRIAL.

**MR. LEATHERWOOD:** YES, YOUR HONOR.

**THE COURT:** THANK YOU.

**(WHEREUPON, THE BENCH CONFERENCE VIA HEADSETS WAS CONCLUDED.)**

**THE COURT:** ALL RIGHT, JOSH. I THINK WE'RE READY TO ROLL.

AND THE DEFENSE CALL THEIR NEXT WITNESS.

**MR. PUSATERI:** YOUR HONOR, WE CALL DR. CASEY, BUT THIS IS JUST CONTINUING TESTIMONY FROM FRIDAY.

08:42a

**THE COURT:** RIGHT. THANK YOU FOR THE REMINDER. YOU CAN TELL HOW MY WEEKEND WENT; IT WAS TOO SHORT.

THIS IS -- AS MR. PUSATERI CORRECTLY POINTS OUT, THAT THIS IS THE CONTINUATION OF THE WITNESS'S TESTIMONY.

**MR. PUSATERI:** THANK YOU, YOUR HONOR.

**THE COURT:** THANK YOU.

**(WHEREUPON, THE VIDEO DEPOSITION OF DR. BRETT CASEY, M.D., CONTINUED PLAYING.)**

**THE COURT:** JOSH, LET'S STOP IT FOR JUST A MOMENT.

**(VIDEO PAUSED)**

**THE COURT:** SO AS YOU CAN SEE, THE TRANSCRIPT IS NOT PULLING UP. IS THAT A QUICK FIX, OR SHOULD WE --

**MR. STADICK:** THAT WOULD HAVE TO DO WITH WHOEVER TOOK THE DEPOSITION, THEY DIDN'T SYNC THE TRANSCRIPT PROPERLY.

**THE COURT:** THANK YOU.

SO IT'S GOING TO BE ESPECIALLY IMPORTANT NOW, LADIES AND GENTLEMEN, TO LISTEN CAREFULLY AND TO DISREGARD, OBVIOUSLY, THE PART OF THE TRANSCRIPT THAT'S ON THE BOTTOM OF YOUR SCREEN. SO AGAIN, PLEASE JUST LISTEN VERY, VERY CAREFULLY

09:09a

SINCE WE DON'T HAVE THE AID OF THE RUNNING TRANSCRIPT THIS TIME.

ALL RIGHT. LET'S PROCEED.

**MR. STADICK:** AND, YOUR HONOR, IT SHOULD START BACK UP STARTING ON THE NEXT DESIGNATIONS.

**THE COURT:** OKAY. THANK YOU.

**(WHEREUPON, THE VIDEO DEPOSITION OF DR. BRETT CASEY, M.D., CONTINUED PLAYING.)**

**(VIDEO PAUSED)**

**THE COURT:** NEEDLESS TO SAY, LADIES AND GENTLEMEN, THAT HAS CONCLUDED MR. KHOURY'S PORTION OF THE EXAMINATION. NOW WE'RE MOVING ON NOW TO MR. SHEPPARD. OKAY? I KNOW I STATE THE OBVIOUS. I KNOW YOU CAN YOU DETERMINE AND DISTINGUISH THE VOICES, BUT JUST SO THAT THE RECORD IS CLEAR.

ALL RIGHT. LET'S PROCEED.

**(WHEREUPON, THE VIDEO DEPOSITION OF DR. BRETT CASEY, M.D., CONTINUED PLAYING.)**

**THE COURT:** AGAIN, THANK YOU FOR BEING ATTENTIVE DURING THE PLAYING OF THE REMAINDER OF THE VIDEO DEPOSITION.

AT THIS TIME THE DEFENDANTS WILL CALL THEIR NEXT WITNESS.

**MR. KHOURY:** THE DEFENSE CALLS BRIAN HARRIS.

09:52a

**(WHEREUPON, BRIAN HARRIS, BEING PREVIOUSLY DULY SWORN, TESTIFIED AS FOLLOWS.)**

**THE COURT:** SO I WILL REMIND YOU ON THE RECORD, MR. HARRIS, THAT YOU ARE STILL UNDER OATH.

**MR. KHOURY:** MAY I PROCEED, YOUR HONOR?

**THE COURT:** YES.

**DIRECT EXAMINATION**

**BY MR. KHOURY:**

**Q** GOOD MORNING, MR. HARRIS. WOULD YOU REMIND THE JURY, JUST SINCE IT'S BEEN A FEW DAYS SINCE YOU'VE TESTIFIED -- AGAIN, STATE YOUR NAME FOR THE RECORD AND WHAT POSITION YOU HOLD AT REC MARINE.

**A** BRIAN HARRIS. HSE MANAGER.

**Q** AND WHAT DOES HSE MANAGER STAND FOR?

**A** HEALTH, SAFETY, ENVIRONMENTAL.

**Q** I'M GOING TO REFER YOU TO JOINT EXHIBIT 4, REC 1.

**THE COURT:** THAT'S ALREADY IN EVIDENCE.

**MR. KHOURY:** YES, YOUR HONOR.

**BY MR. KHOURY:**

**Q** IS THIS REC MARINE'S STANDARD INCIDENT REPORT FORM?

**A** YES.

**Q** CAN YOU READ THE DESCRIPTION OF THE -- UNDER SECTION 5 OF THE REPORT?

09:54a

A "PICKING UP OLD STARTER AND DIDN'T REALIZE I WAS SO CLOSE TO THE FIRE HOSE CONTAINER IN THE HALL-WAY AREA. I PICKED UP THE STARTER AND TURNED AROUND TO FAST AND GOT MY LEFT SHOULDER CAUGHT ON THE RACK."

Q AS A GENERAL MATTER, WHEN AN EMPLOYEE IS COMPLETING AN INCIDENT REPORT LIKE THIS, ARE THEY SUPPOSED TO DESCRIBE THE EVENT THAT CAUSES THEIR INJURY OR ILLNESS, AS IT STATES IN THE PREFACE OF SECTION 5?

A YES.

Q AND IN THIS PARTICULAR REPORT THAT WAS COMPLETED ON MAY 5TH OF 2018, IS THERE ANY REFERENCE TO A PERSONNEL BASKET INCIDENT?

A NO.

Q IS THERE ANY INDICATION THAT MR. GRIFFIN IS REPORTING NECK OR BACK PAIN OR INJURY?

A NO.

Q ARE YOU AWARE THAT MR. GRIFFIN IS CLAIMING THAT THIS INCIDENT HAPPENED ON MAY 2ND OF 2018?

A YES.

Q WHENEVER I REFER TO "THIS INCIDENT," I'M TALKING ABOUT THE ONE THAT'S INVOLVED IN THIS LAWSUIT, WHICH IS THE PERSONNEL BASKET INCIDENT. CORRECT?

09:55a

A YES.

Q IF, IN FACT, THE PERSONNEL BASKET INCIDENT OCCURRED ON MAY 2ND, WOULD YOU EXPECT IT TO HAVE BEEN REPORTED IN AN INCIDENT REPORT ON MAY 5TH?

A NO.

Q YOU WOULDN'T?

A ON MAY -- IF THE INCIDENT HAPPENED ON MAY 2ND, IT SHOULD HAVE BEEN REPORTED ON MAY 2ND.

Q OKAY. BUT IF MR. GRIFFIN WAS GOING TO REPORT AN INCIDENT -- AND THAT'S A GOOD POINT, SO LET ME BACK UP A LITTLE BIT.

SO I'M ASSUMING WHAT YOU'RE SAYING IS THAT ANY INCIDENTS THAT INVOLVED INJURY ON A VESSEL ARE SUPPOSED TO BE REPORTED ON THE DAY THEY OCCUR. CORRECT?

A YES.

Q AND THIS PARTICULAR REPORT WAS COMPLETED TEN DAYS AFTER THE STARTER INCIDENT. IS THAT RIGHT?

A YES.

Q ALL RIGHT. I'M GOING TO BRING UP JOINT EXHIBIT 4, REC 2, WHICH IS THE SECOND INCIDENT REPORT.

I'M GOING TO REFER YOU AGAIN TO SECTION 5 OF THIS REPORT. I THINK YOU CAN SEE -- I'M NOT GOING TO ASK YOU TO READ IT AGAIN. BUT THE DESCRIPTION OF THE

09:57a

INCIDENT BASICALLY DESCRIBES A STARTER INCIDENT WHERE MR. GRIFFIN HIT HIS LEFT SHOULDER ONTO A FIRE HOSE RACK. AND THEN IT MENTIONS A FEW DAYS AFTER HE WAS SMASHED BETWEEN THE LARGE BOX AND THE MAN BASKET. DO YOU SEE THAT?

A YES.

Q AND THEN A LITTLE BIT FURTHER BELOW WHERE MR. GRIFFIN'S SIGNATURE APPEARS, THERE IS A STATEMENT THAT SAYS, "I NOTIFIED THE CAPTAIN MIKE AND WE CALLED" -- I BELIEVE THAT'S SUPPOSED TO BE BRIAN -- "THE SAFETY MAN AT THE GOL OFFICE INFORMED HIM ABOUT THIS SITUATION AND HE SET UP A" DATE -- "A TIME AND DATE FOR ME TO VISIT A DOCTOR."

WHEN THIS PARTICULAR PORTION OF THE INCIDENT REPORT REFERS TO "THIS SITUATION," WHAT SITUATION DID YOU UNDERSTAND WAS BEING REFERRED TO HERE?

A HIS SHOULDER.

Q OKAY.

A FROM LIFTING THE STARTER.

Q THAT'S WHAT I WAS REALLY GETTING AT, IS -- WAS YOUR UNDERSTANDING THAT MR. GRIFFIN WAS COMPLAINING ABOUT PAIN IN HIS SHOULDER AND THE NEED TO SEE A DOCTOR BECAUSE OF THE STARTER INCIDENT OR A PERSONNEL BASKET INCIDENT?

A THE STARTER INCIDENT.

09:58a

**Q** I AM GOING TO REFER YOU TO JOINT EXHIBIT 5, REC 5.

CAN YOU DESCRIBE WHAT THIS DOCUMENT IS, FOR THE JURY?

**A** THIS IS MY HANDWRITTEN NOTES FROM A PHONE CALL.

**Q** AND WHEN DID THE PHONE TAKE PLACE?

**A** ON JUNE 20TH AT 1439. THAT WOULD HAVE BEEN 2:39 P.M.

**Q** AND THAT WOULD HAVE BEEN THE SAME DAY THE ACCIDENT REPORT WE WERE JUST LOOKING AT WAS AT LEAST FILLED OUT AND SIGNED. IS THAT RIGHT?

**A** YES; JUNE 20TH.

**THE COURT:** JOINT 5 IS NOT IN, ACCORDING TO MY NOTES.

**MR. KHOURY:** OKAY. I'M SORRY.

**THE COURT:** BUT IT'S A JOINT EXHIBIT. I ASSUME THERE IS NO OBJECTION. CORRECT?

**MR. SHEPPARD:** NO, OBJECTION, YOUR HONOR.

**THE COURT:** VERY WELL. ADMITTED AND MAY BE PUBLISHED.

**BY MR. KHOURY:**

**Q** ALL RIGHT. SO YOU JUST EXPLAINED THAT YOU WERE, I GUESS, RECORDING A PHONE CALL THAT CAME IN. WERE YOU AT THE REC MARINE OFFICES AT THE TIME?

10:00a

A YES. I WAS -- WHEN I RECEIVED THIS CALL, I WAS SITTING AT MY DESK AT THE OFFICE.

Q AND THIS IS REPORTING A CALL THAT YOU RECEIVED FROM CAPTAIN MIKE HAGLUND?

A YES.

Q AND WHAT DOES THE NOTE REFLECT THAT YOU WERE TOLD BY CAPTAIN HAGLUND?

A MCARTHUR GRIFFIN JUST GOT BACK TO THE BOAT ON MAY 31ST. HE WAS STILL FEELING PAIN SINCE HIS FIRST VISIT. THAT WOULD BE THE FIRST VISIT TO THE DOCTOR. HE WANTS TO SEE ANOTHER DOCTOR. HE FEELS SOMETHING IN HIS BONE-SHOULDER. AND HE SAYS HE CAN WAIT UNTIL CREW CHANGE ON JUNE 28TH. I SAW MCARTHUR GRIFFIN IN THE OFFICE ON MAY 31ST. HE WAS WAITING FOR CREW CHANGE. HE DID NOT MENTION ANYTHING ABOUT HIS SHOULDER STILL HURTING.

Q WHEN CAPTAIN HAGLUND RELAYED THAT MR. GRIFFIN WAS STILL FEELING PAIN, WHAT DID YOU UNDERSTAND MR. GRIFFIN -- OR MISTER -- OR CAPTAIN HAGLUND TO BE RELATING THAT TO?

A WHEN HE'S TALKING ABOUT SINCE HIS FIRST VISIT --

**MR. SHEPPARD:** OBJECTION, YOUR HONOR. SPECULATION AS TO WHAT CAPTAIN HAGLUND WAS RELATING IT TO OR WHAT MR. GRIFFIN WAS RELATING IT TO.

10:01a

**THE COURT:** COUNSEL?

**MR. KHOURY:** I MEAN, I THINK IT'S --

**THE COURT:** IT SOUNDS -- IF YOU HAVE A BASIS.

**MR. KHOURY:** I THINK IT'S THE PLAINTIFF IS COMPLAINING -- THAT COMPLAINT IS BEING RELAYED TO THE OFFICE. AND I'M JUST ASKING THE WITNESS WHAT HE UNDERSTOOD MR. GRIFFIN'S COMPLAINTS OF PAIN WAS RELATED TO.

**THE COURT:** I'LL ALLOW -- IT IS HEARSAY REALLY, BUT I DON'T KNOW IF IT CALLS -- WELL, I'LL ALLOW THE QUESTION. IT IS HEARSAY, BUT I WILL NONETHELESS -- I DIDN'T WANT TO -- I UNDERSTAND THE OBJECTION, MR. SHEPPARD. BUT I WILL ALLOW IT BECAUSE I BELIEVE THAT THE RECORDS AND THE NOTATIONS LAY A SUFFICIENT FOUNDATION FOR THE WITNESS TO ANSWER THE QUESTION.

**BY THE WITNESS:**

**A** HE HAD MENTIONED SINCE -- HE WAS STILL FEELING PAIN IN HIS BONE-SHOULDER SINCE THE FIRST VISIT, WHICH WOULD HAVE TOLD ME IT WAS RELATED TO THAT FIRST INITIAL STARTER INCIDENT.

**Q** IS THAT BECAUSE THAT'S THE -- WHENEVER HE INITIALLY WENT TO THE DOCTOR, THAT WAS ALL THAT HE WAS GOING FOR WAS FOR PAIN IN HIS SHOULDER RELATED TO

10:02a

THE STARTER INCIDENT?

A YES.

Q AS FAR AS YOU'RE AWARE?

A THAT WAS THE ONLY REPORT WE HAD RECEIVED.

Q IS THERE ANY INDICATION FROM YOUR NOTES OF YOUR CONVERSATION WITH CAPTAIN HAGLUND THAT THERE WAS ANY MENTION OF MR. GRIFFIN EXPERIENCING NECK OR BACK PAIN?

A NO.

Q ALL RIGHT. I'M GOING TO MOVE ON TO JOINT EXHIBIT 5. IT'S JUST THE NEXT PAGE I BELIEVE, WHICH IS -- WELL, SORRY. THERE IS A DUPLICATE HERE, SO I THINK IT'S ACTUALLY REC 7, WHICH IS THE THIRD PAGE.

WOULD YOU MIND READING THE FIRST BULLETED PART OF THIS HANDWRITTEN NOTATION?

A "JUST RECEIVED AN INCIDENT REPORT FROM THE MOTOR VESSEL *DUSTIN DANOS*. DATED 6/20/18. INCIDENT 4/25/18. MENTIONED 'BEING SMASHED BETWEEN BOX AND MAN BASKET.'"

Q AND THEN THE NEXT LINE SAYS, "THIS IS THE FIRST ANYONE HAS HEARD OF THIS." WHEN YOU SAY "THIS IS THE FIRST TIME ANYONE HAS HEARD OF THIS," ARE YOU REFERRING TO ON JUNE 29TH THAT'S THE FIRST TIME ANYONE IN THE OFFICE HAD HEARD OF IT?

A YES.

10:04a

Q AND WHEN YOU SAY "HEARD OF IT," THAT'S SPECIFICALLY REFERENCING THE "SMASHED BETWEEN BOX AND MAN BASKET"?

A YES.

Q YOU NOTE IN THIS PARTICULAR HANDWRITTEN NOTATION THAT YOU "SPOKE TO MCARTHUR GRIFFIN MULTIPLE TIMES THIS WEEK AND ONCE LAST WEEK." WOULD THE "ONCE LAST WEEK" BE REFERRING TO THE JUNE 20TH CALL?

A YES, THAT'S WHAT IT WOULD HAVE BEEN FROM.

Q AND DO YOU HAVE ANY RECOLLECTION OF WHAT Y'ALL WOULD HAVE DISCUSSED MULTIPLE TIMES THIS WEEK? I'M GUESSING THE WEEK OF THE 29TH OR A FEW DAYS BEFORE THAT.

A I DON'T. BUT MY ASSUMPTION WOULD HAVE BEEN SINCE --

**MR. SHEPPARD:** OBJECTION, YOUR HONOR. HE ANSWERED. HE SAID HE DOESN'T REMEMBER.

**THE COURT:** IF HE DOESN'T --

**MR. KHOURY:** JUST GOING ON TO EXPLAIN.

**MR. SHEPPARD:** HE SAID HE'S MAKING --

**THE COURT:** WHY DON'T YOU REPHRASE THE QUESTION.

**BY MR. KHOURY:**

Q DO YOU HAVE ANY RECOLLECTION OF WHAT YOUR -- YOU MENTION IN THIS PARTICULAR NOTE THAT YOU HAD A

10:05a

CONVERSATION WITH HIM ON JUNE -- "LAST WEEK," WHAT YOU SAID WAS JUNE 20TH -- WOULD HAVE REFERENCED THE JUNE 20TH CALL -- AND "MULTIPLE TIMES THIS WEEK." DO YOU KNOW WHAT Y'ALL WOULD HAVE TALKED ABOUT THE MULTIPLE TIMES THIS WEEK, QUOTE, UNQUOTE?

**MR. SHEPPARD:** OBJECTION, YOUR HONOR. HE ANSWERED THE LAST QUESTION SAYING HE HAD NO IDEA WHAT THAT WOULD BE IN REFERENCE TO. HE DIDN'T HAVE A RECOLLECTION OF IT.

**THE COURT:** IT'S A DIFFERENT QUESTION AND SOME CONTEXT HAS BEEN PROVIDED, SO I'LL ALLOW THE WITNESS TO ANSWER THE QUESTION.

**BY THE WITNESS:**

**A** THE WEEK BEFORE IT LOOKED LIKE HE HAD REQUESTED TO SEE ANOTHER DOCTOR, SO THE CONVERSATION MORE THAN LIKELY WOULD HAVE BEEN ABOUT SETTING HIM UP FOR ANOTHER DOCTOR AND GETTING HIM OFF THE BOAT.

**Q** AND WOULD THAT HAVE BEEN SETTING HIM UP FOR A DOCTOR -- TO SEE A DOCTOR ABOUT HIS SHOULDER?

**A** YES; THE ORTHOPEDIC DOCTOR.

**Q** AS OF THE DATE THIS NOTATION WAS MADE, WAS THERE ANY INDICATION THAT MR. GRIFFIN WAS COMPLAINING OF NECK PAIN?

**A** NO.

**Q** WAS THERE ANY INDICATION THAT MR. GRIFFIN

10:06a

WAS COMPLAINING OF LOW BACK PAIN?

A NO.

Q DID HE ASK TO BE EVALUATED FOR NECK OR LOW BACK PAIN?

A NO.

Q DID MR. GRIFFIN EVER TELL YOU ABOUT ANY TIME WHERE HE BELIEVED THAT CAPTAIN HAGLUND WAS ON HIS CELL PHONE DURING A PERSONNEL BASKET TRANSFER?

A NO.

Q WHAT ABOUT WILL BADEAUX? DID HE EVER REPORT ANYTHING ABOUT CAPTAIN HAGLUND BEING ON HIS PHONE DURING A PERSONNEL BASKET TRANSFER?

A NO.

Q IF AN EMPLOYEE OF REC MARINE WERE TO SEE A CAPTAIN ON THEIR PHONE DISTRACTED DURING A PERSONNEL BASKET TRANSFER, WHAT SHOULD THEY DO?

A IF A -- IF SOME -- THEY SHOULD REPORT IT TO THE OFFICE.

Q AND IF THEY WERE COMPLETING AN INCIDENT REPORT INDICATING THAT THERE WAS A PERSONNEL BASKET INCIDENT, IF THEY BELIEVED THAT THE -- FOR INSTANCE, IF MR. GRIFFIN BELIEVED THAT THAT WAS CAUSED BY THE CAPTAIN BEING ON HIS CELL PHONE, SHOULD HE HAVE PUT THAT IN THE JUNE 20TH INCIDENT REPORT?

A YES, THAT WOULD BE A PLACE YOU CAN PUT IT.

10:08a

Q IN ADDITION TO --

**THE COURT:** 15 MINUTES.

**BY MR. KHOURY:**

Q IN ADDITION TO REPORTING IT TO THE OFFICE?

A YES.

Q ALL RIGHT. I BELIEVE YOU INITIALLY INDICATED THAT YOU -- AND THIS WAS YOUR TESTIMONY A FEW DAYS AGO -- THAT YOU PERSONALLY TOOK MR. GRIFFIN TO OCCUPATIONAL MEDICINE SERVICES ON MAY 14TH OF 2018. IS THAT CORRECT?

A CORRECT.

Q DID THE MEDICAL PROVIDER AT OCCUPATIONAL MEDICINE SERVICES RELEASE MR. GRIFFIN TO FULL-DUTY WORK?

A YES.

Q AND DID HE REJOIN THE VESSEL FOR THE REMAINDER OF HIS HITCH?

A YES.

Q BEFORE HE GOT BACK ON THE VESSEL, DID MR. GRIFFIN EVER SAY ANYTHING TO YOU ABOUT NECK PAIN?

A NO.

Q DID HE EVER SAY ANYTHING TO YOU ABOUT LOW BACK PAIN?

A NO.

Q HAS REC MARINE EVER, TO YOUR KNOWLEDGE,

10:09a

FIRED AN EMPLOYEE FOR REPORTING AN INJURY?
A NO.
Q HAS REC MARINE EVER FIRED AN EMPLOYEE FOR SEEKING MEDICAL TREATMENT?
A NO.
Q NOW, MR. GRIFFIN EVENTUALLY BEGAN TREATING WITH DR. BRETT CASEY. ARE YOU GENERALLY FAMILIAR WITH THAT?
A YES.
Q DID REC MARINE PAY FOR MR. GRIFFIN'S TREATMENT WITH DR. CASEY?
A YES.
Q AND DID REC MARINE PAY FOR MR. GRIFFIN TO UNDERGO ARTHROSCOPIC SHOULDER SURGERY?
A YES.
Q DID REC MARINE PAY MR. GRIFFIN MAINTENANCE BENEFITS UP UNTIL THE POINT THAT DR. CASEY DETERMINED HIS SHOULDER WAS AT MAXIMUM MEDICAL IMPROVEMENT?
A YES.
Q I'M GOING TO SHOW YOU A FEW CHECKS THAT WERE ISSUED TO MR. GRIFFIN. GIVE ME ONE SECOND. THIS IS JOINT EXHIBIT 7. AND I'M GOING TO REFER TO REC 00619.
**MR. KHOURY:** I'M NOT SURE WE'VE ADMITTED THIS, BUT IT'S A JOINT EXHIBIT, YOUR HONOR.

10:11a

**THE COURT:** LET'S TAKE A LOOK. JOINT 7, YOU SAID?

**MR. KHOURY:** YES, YOUR HONOR.

**THE COURT:** IT'S NOT IN. I ASSUME THERE ARE NO OBJECTIONS TO JOINT EXHIBIT 7?

**MR. SHEPPARD:** NO OBJECTION, YOUR HONOR.

**THE COURT:** THANK YOU. IT IS ADMITTED AND MAY BE PUBLISHED.

**BY MR. KHOURY:**

**Q** MR. HARRIS, I'M NOT GOING TO GO THROUGH EVERY SINGLE ONE OF THESE BECAUSE THERE IS QUITE A FEW. BUT I AM GOING TO DRAW YOUR ATTENTION TO REC 619.

**MR. KHOURY:** DO YOU HAVE THAT PULLED UP? OKAY.

**BY MR. KHOURY:**

**Q** THIS IS A PARTICULAR CHECK THAT WAS WRITTEN ON -- THAT WAS WRITTEN ON MARCH 25TH OF 2019. IS THAT CORRECT?

**A** MARCH 25, 2019, YES.

**Q** YES. AND DO YOU SEE THE AREA AT THE BOTTOM WHERE IT GIVES A DESCRIPTION OF WHAT THE CHECK IS FOR AND WHAT THE AMOUNTS ARE COMPRISED OF?

**A** YES.

**Q** AND WHAT DOES THAT INDICATE?

10:12a

A 1,050 IN MAINTENANCE.
Q WAS THAT THROUGH APRIL OF 2019?
A APRIL 2019.
Q AND WHAT'S THE SECOND NOTATION?
A ADVANCE ON SETTLEMENT MARCH 22ND -- LOOKS LIKE TO APRIL 18TH.
Q OF 2019?
A OF 2019. 1,540.
Q IS THIS ESSENTIALLY A REPRESENTATION OF THE ADVANCED WAGES THAT MR. GRIFFIN WAS BEING PAID IN ADDITION TO HIS MAINTENANCE BENEFITS?
A YES.
**THE COURT:** TEN MINUTES.
**BY MR. KHOURY:**
Q I'M GOING TO REFER YOU TO -- SAME EXHIBIT, THIS IS GOING TO BE REC 623. IS THIS ANOTHER EXAMPLE OF A MAINTENANCE CHECK THAT WAS PAID -- WAS -- MAINTENANCE PAYMENTS THROUGH MAY OF 2019?
A YES.
Q AND THERE IS A NOTATION DOWN THERE AT THE BOTTOM ABOUT FUEL. WHAT WOULD THAT REPRESENT?
A FUEL REIMBURSEMENT OR MILEAGE REIMBURSEMENT, TRAVELING FROM HIS EITHER THERAPY OR DOCTORS' VISITS.
Q NOW, DR. CASEY REPORTED ON APRIL 10TH OF 2019 THAT MR. GRIFFIN WAS COMPLAINING OF NECK PAIN.

10:14a

HAD REC MARINE RECEIVED ANY NOTICE AS OF THAT TIME THAT MR. GRIFFIN WAS COMPLAINING OF NECK PAIN OR HAD A NECK INJURY?

**A** WHAT WAS THE DATE?

**Q** APRIL 10TH OF 2019 WAS WHEN HE REPORTED NECK PAIN TO DR. CASEY. THIS IS APPROXIMATELY 11 MONTHS AFTER THE INCIDENT.

DID REC MARINE HAVE ANY INDICATION PRIOR TO THAT TIME THAT MR. GRIFFIN WAS COMPLAINING OF NECK PAIN?

**A** NO.

**Q** YOU TESTIFIED A FEW DAYS AGO, I BELIEVE, THAT REC MARINE RELIES ON ITS INSURANCE ADJUSTERS AND ATTORNEYS TO ASSIST IN MAKING MAINTENANCE AND CURE DECISIONS. IS THAT ACCURATE?

**A** YES.

**Q** DO YOU RECALL AN INDIVIDUAL NAMED DREW AUCOIN?

**A** YES.

**Q** AND HE IS AN ADJUSTER FOR -- OR USED TO DO ADJUSTING WORK FOR REC MARINE. IS THAT RIGHT?

**A** YES.

**Q** I'M GOING TO REFER YOU TO JOINT EXHIBIT 26 --

**MR. KHOURY:** THIS HAS ALREADY BEEN ADMITTED,

10:15a

YOUR HONOR.

**BY MR. KHOURY:**

**Q** -- AND SPECIFICALLY TO REC 730. ALL RIGHT. I'M JUST GOING TO READ THIS. IT'S A LETTER FROM DR. CASEY TO DREW AUCOIN. IT SAYS, "I AM IN RECEIPT OF YOUR REQUEST REGARDING MY OPINION" --

**MR. SHEPPARD:** OBJECTION, YOUR HONOR. THIS IS GETTING A BIT CUMULATIVE. WE JUST HAD THIS READ BY DR. CASEY JUST A FEW MINUTES AGO.

**MR. KHOURY:** THIS IS CRUCIAL TO THE MAINTENANCE AND CURE ASPECT SPECIFICALLY REGARDING DAMAGES, YOUR HONOR.

**THE COURT:** I'LL ALLOW IT.

**BY MR. KHOURY:**

**Q** IT SAYS, "I AM IN RECEIPT OF YOUR REQUEST REGARDING MY OPINION AS TO WHETHER MR. GRIFFIN'S NECK CONDITION IS RELATED TO HIS SHOULDER CONDITION. CURRENTLY HIS SHOULDER IS AT MAXIMUM MEDICAL IMPROVEMENT AND HE IS DOING QUITE WELL. HE HAS CONTINUED TO COMPLAIN OF OFF AND ON NECK PAIN, BUT THAT DID NOT START UNTIL WELL AFTER HIS INITIAL INJURY; THEREFORE, BASED ON THAT INFORMATION IT IS MY OPINION THAT MR. GRIFFIN'S NECK CONDITION ALTHOUGH PRESENT IS NOT RELATED TO HIS INJURY ON THE BOAT."

DID I READ THAT ACCURATELY?

10:16a

A YES.

Q DOES REC MARINE HAVE ANYONE IN THE HSE DEPARTMENT OR IN MANAGEMENT THAT IS A MEDICAL DOCTOR?

A NO.

Q DOES REC MARINE RELY ON THE OPINIONS OF QUALIFIED MEDICAL DOCTORS TO DETERMINE OR TO ASSIST IN DETERMINING MAINTENANCE AND CURE DECISIONS?

A YES.

Q AND DID REC MARINE RELY ON DR. CASEY, MR. GRIFFIN'S OWN TREATING PHYSICIAN, HIS OPINION WITH RESPECT TO WHETHER THE NECK CONDITION WAS RELATED TO ANY INCIDENT ON THE BOAT IN DECIDING WHETHER MAINTENANCE AND CURE SHOULD BE PAID FOR THAT INJURY?

A YES.

Q OR ALLEGED INJURY?

A YES, THEY DID.

**MR. KHOURY:** I WANT TO QUICKLY CUE UP -- IT'S GOING TO BE -- THIS IS DEFENSE EXHIBIT NO. 8. IT'S A RECORDED STATEMENT FROM MR. GRIFFIN THAT WAS TAKEN BY AN INSURANCE ADJUSTER.

**THE COURT:** FIVE MINUTES.

**MR. KHOURY:** YOUR HONOR, ARE WE ALLOWED TO PLAY IT? I THINK THIS IS -- IT'S A DEFENSE EXHIBIT, BUT --

**THE COURT:** THIS WAS DEFENSE EXHIBIT NO. 8,

10:17a

YOU SAID?

**MR. KHOURY:** YES, YOUR HONOR. IT'S THE STATEMENT. WE SUBMITTED THE TRANSCRIPT.

**THE COURT:** IT'S BEEN PROVIDED IN DISCOVERY. CORRECT?

**MR. KHOURY:** YES, YOUR HONOR.

**(WHEREUPON, DEFENSE EXHIBIT 8 WAS PLAYED.)**

**BY MR. KHOURY:**

**Q** I'LL REPRESENT TO YOU THAT THIS STATEMENT THAT MR. GRIFFIN MADE WAS ON JULY 5TH OF 2018. THAT WOULD HAVE BEEN MORE THAN TWO MONTHS AFTER HE ALLEGES THIS PERSONNEL BASKET INCIDENT OCCURRED. AND I THINK, AS YOU JUST HEARD, MR. GRIFFIN INDICATED THAT HE DIDN'T HAVE ANY OTHER -- ANY INJURY TO ANYTHING OTHER THAN HIS SHOULDER. DID YOU HEAR THAT?

**A** YES.

**Q** WOULD THAT FURTHER SUPPORT REC MARINE'S DECISION THAT HIS -- THAT THE NECK INJURY THAT HE BEGAN COMPLAINING ABOUT IN APRIL OF 2019 WAS NOT RELATED TO ANY INCIDENT THAT OCCURRED ON THE M/V *DUSTIN DANOS*?

**A** YES.

**Q** DID REC MARINE VALUE MR. GRIFFIN AS AN EMPLOYEE?

**A** YES.

10:19a

Q AND IN -- I KNOW YOU'VE PROBABLY HEARD SOME OF THE TESTIMONY THAT'S TAKEN PLACE IN THIS CASE. MR. GRIFFIN SAYS THAT HE FELT THAT IF HE GOT OFF OF THE BOAT OR REPORTED AN INJURY THAT HE MIGHT BE FIRED. DID YOU HEAR THAT?

A YES.

Q WHEN MR. GRIFFIN DID FINALLY GET OFF THE BOAT ON JUNE 28TH OF 2019, REC MARINE DIDN'T FIRE HIM, DID THEY?

A NO.

Q IN FACT, REC MARINE PAID FOR ALL OF HIS MEDICAL TREATMENT; THEY PAID HIM ADVANCED WAGES AND THEY PAID HIM MAINTENANCE AND CURE -- THEY PAID HIM MAINTENANCE BENEFITS AND FOR HIS MEDICAL TREATMENT UNTIL HIS OWN DOCTOR DETERMINED THAT HE WAS AT MAXIMUM MEDICAL IMPROVEMENT AND COULD GO BACK TO WORK AS A DECKHAND. IS THAT RIGHT?

A CORRECT.

**MR. PUSATERI:** MAY I APPROACH?

**BY MR. KHOURY:**

Q DID -- DID MR. GRIFFIN EVER TELL YOU ABOUT A PERSONNEL BASKET INCIDENT?

A NO.

Q AND THAT IS AT NO TIME WHEN YOU WERE INTERACTING WITH HIM GETTING MEDICAL TREATMENT OR

10:20a

ANYTHING LIKE THAT?
A CORRECT.
Q ARE YOU AWARE OF WHAT'S KNOWN AS A CRANE REPORTABLE INCIDENT?
A YES.
Q IF MR. GRIFFIN -- IF THIS PERSONNEL BASKET INCIDENT OCCURRED IN THE WAY WHICH MR. GRIFFIN ALLEGES -- THAT HE WAS -- THE BASKET -- PERSONNEL BASKET INCIDENT WAS COMING OFF THE DECK AND HE WAS THROWN OR SMASHED INTO A CONEX BOX -- IS IT YOUR UNDERSTANDING THAT THAT WOULD BE A CRANE REPORTABLE INCIDENT FOR THE PLATFORM?
A YES.
Q AND WHERE DO THEY TYPICALLY REPORT THAT OR WHO DO THEY REPORT IT TO?
A BESSIE.
Q WHEN THERE IS A CRANE REPORTABLE INCIDENT THAT INVOLVES THE BOAT, DO YOU TYPICALLY GET WORD FROM THE PLATFORM THAT THERE HAS BEEN A CRANE INCIDENT THAT INVOLVED A PERSONNEL BASKET AND THE BOAT TO SAY "WE NEED FURTHER INFORMATION FROM THE BOAT COMPANY"?
A YES, THEY WOULD NEED TO OBTAIN INFORMATION ON OUR REPORT.
Q AND YOU'VE HEARD TESTIMONY --

10:21a

**MR. KHOURY:** I'M ALMOST DONE. ONE MINUTE.

**BY MR. KHOURY:**

**Q** YOU'VE HEARD TESTIMONY THAT THERE WERE THREE PLATFORM PERSONNEL ON THIS PERSONNEL BASKET THAT WAS BEING LIFTED UP TO THE STONE ENERGY PLATFORM. DID YOU HEAR THAT?

**A** YES.

**Q** AND YOU'VE HEARD THAT THEY EITHER JUMPED OFF OR THAT THE BASKET JUST KEPT GOING UP AND THEY WERE LIFTED ONTO THE PLATFORM AFTER MR. GRIFFIN WAS THROWN INTO THE BOX. CORRECT?

**A** YES.

**Q** DID STONE ENERGY EVER CONTACT REC MARINE AND SAY "HEY, WE'RE AWARE OF AN INCIDENT. OUR CREW WAS GETTING LIFTED OFF THE BOAT AND THEY SLAMMED SOMEONE INTO A PERSONNEL BASKET" -- I'M SORRY -- "INTO A CONEX BOX. CAN THE BOAT PROVIDE ANY FURTHER INFORMATION ON THAT"?

**A** NO.

**MR. KHOURY:** THOSE ARE ALL THE QUESTIONS I HAVE.

**THE COURT:** THANK YOU.

ALL RIGHT, LADIES AND GENTLEMEN. WE'RE GOING TO TAKE OUR MORNING BREAK AT THIS TIME. PLEASE FOLLOW THE RULES. DON'T DISCUSS THE CASE AMONG

10:22a

YOURSELVES AND DON'T BEGIN TO FORM ANY OPINIONS ABOUT ANYTHING WE HAVE DISCUSSED SO FAR. WE'LL BE IN RECESS FOR TEN MINUTES.

LET'S ALL RISE.

**(WHEREUPON, THE JURY IS OUT OF THE COURTROOM.)**

**THE COURT:** BE SEATED.

MR. HARRIS, AS YOU KNOW AND AS YOU'VE HEARD ME INSTRUCT OTHER WITNESSES, DURING THE BREAK YOU'RE NOT TO DISCUSS YOUR TESTIMONY WITH ANYONE, CERTAINLY NOT YOUR LAWYERS OR THE PARTIES OR ANYONE ELSE. OKAY?

**THE WITNESS:** YES, SIR.

**THE COURT:** DO YOU HAVE ANY QUESTIONS ABOUT THAT, SIR?

**THE WITNESS:** NO, SIR.

**THE COURT:** IF YOU'D BE KIND ENOUGH TO BE BACK IN ABOUT THE SEVEN- OR EIGHT-MINUTE MARK SO WE CAN HAVE YOU BACK IN THE WITNESS BOX BEFORE THE JURY RETURNS, I'D APPRECIATE THAT.

ANYTHING WE SHOULD TAKE UP BEFORE WE TAKE OUR MORNING BREAK?

**MR. SHEPPARD:** I WANTED TO JUST CHECK. ARE Y'ALL FINE WITH THE DEMONSTRATIVE THAT I HAD SENT OVER WITH YOUR -- GOING INTO EVIDENCE WITH YOUR

10:23a

CONVERSION?

**MR. PUSATERI:** WE'RE STILL WORKING ON IT.

**MR. SHEPPARD:** I WAS JUST SEEING IF WE COULD ADDRESS THAT BEFORE WE --

**THE COURT:** AGREED. SO IF Y'ALL COULD TRY TO GET THAT COMPLETED AND DISCUSS THAT DURING THE BREAK, I WOULD APPRECIATE THAT. OKAY?

ALL RIGHT. COURT IS IN RECESS.

**(WHEREUPON, A RECESS WAS TAKEN.)**

**THE COURT:** LET'S ALL REMAIN STANDING FOR THE JURY.

**MR. KHOURY:** YOUR HONOR, MAY I BRING SOMETHING UP VERY QUICKLY BEFORE THE JURY COMES IN?

**THE COURT:** SURE.

**MR. KHOURY:** MR. PUSATERI AND I WERE CHECKING OUR RECORDS AND COMPARING NOTES, AND WE THOUGHT THAT YOUR HONOR SAID ON THURSDAY THAT WE WOULD BE GIVEN 45 MINUTES TO QUESTION MR. HARRIS. IT DID CHANGE ON I BELIEVE FRIDAY. BUT ON THURSDAY WE THOUGHT YOU SAID THAT WE WOULD BE GIVEN 45 AND THAT THE PLAINTIFF WOULD BE GIVEN 20.

JUST AS A PRACTICAL MATTER, AS YOU KNOW, THE PLAINTIFF CALLED MR. HARRIS IN THEIR CASE-IN-CHIEF. AND BASICALLY THE WAY THINGS ARE SHAKING OUT IS THAT PLAINTIFF GETS DOUBLE THE AMOUNT OF TIME

10:36a

TO QUESTION OUR CORPORATE REPRESENTATIVE. THEY GET AN HOUR. THEY HAD 30 MINUTES THEN, 30 MINUTES NOW, AND -- ON TOP OF THAT.

**THE COURT:** LET ME CHECK MY NOTES TO SEE WHAT I MENTIONED, IF I DID MENTION 40 MINUTES.

DO YOU RECALL THAT, AMBER?

**MR. KHOURY:** WE HAD 45, YOUR HONOR, IN OUR NOTES.

**THE COURT:** LET ME SEE. I'VE GOT NOTES ALL OVER THE PLACE HERE. OKAY.

MR. SHEPPARD?

**MR. SHEPPARD:** ON FRIDAY WE DISCUSSED THIS. YOUR HONOR SAID THAT THEY DEFERRED THEIR EXAMINATION OF --

**THE COURT:** CORRECT.

**MR. SHEPPARD:** -- OF HIM AND YOU DIDN'T WANT TO HAMSTRING US -- NOT YOUR WORDS -- BUT DIDN'T WANT TO HAMSTRING US INTO BEING CONFINED TO A LESS AMOUNT OF TIME WHEN THEY'RE BRINGING UP NEW INFORMATION AND, YOU KNOW, EFFECTIVELY MAKING IT HARDER FOR US TO DO OUR CROSS AND HAVING LESS TIME TO DO THAT.

**THE COURT:** RIGHT. I RECALL THAT. THE QUESTION HERE IS, NOW, WILL I GIVE THE PLAINTIFF ANY ADDITIONAL TIME. WE'VE GOT TO KEEP THIS CASE GOING. SO YOU MAY NOT EVEN GET 30 MINUTES, I'M GOING TO TELL

10:37a

YOU RIGHT NOW.

**MR. SHEPPARD:** I PLAN TO GO THROUGH VERY QUICKLY. I DON'T EXPECT TO USE IT ALL, BUT I JUST DON'T WANT TO BE CONFINED TO IT IF THERE IS SOME AREA OF INQUIRY THAT --

**THE COURT:** I UNDERSTAND THAT.

**MR. SHEPPARD:** -- THAT'S IMPORTANT.

**THE COURT:** WELL, THIS IS WHAT I'LL DO. I'LL GIVE YOU AN EXTRA FIVE MINUTES, SEE IF YOU -- WHATEVER YOU CAN DO IN FIVE MINUTES. WE'VE GOT TO GET THIS THING GOING. WE'VE ALREADY ORDERED LUNCH FOR THESE PEOPLE. I'M GOING TO HAVE TO ORDER DINNER FOR THEM, ASSUMING THEY WANT TO STAY. NOT THAT I'M TRYING TO LIMIT YOU IN ANY WAY.

**MR. KHOURY:** I UNDERSTAND, YOUR HONOR.

**THE COURT:** ANOTHER FIVE MINUTES. LET'S JUST SEE WHERE THE DEFENSE GOES. I MAY GIVE YOU SOME ADDITIONAL TIME.

**MR. KHOURY:** IS THAT GOING TO BE ON RECROSS?

**THE COURT:** ON RECROSS. LET'S JUST SEE HOW IT GOES. OKAY?

**MR. KHOURY:** YES, YOUR HONOR.

**THE COURT:** I'LL GIVE YOU AN ADDITIONAL FIVE MINUTES ON DIRECT.

LET'S ALL RISE FOR THE JURY.

10:37a

**(WHEREUPON, THE JURY IS IN THE COURTROOM.)**

**THE COURT:** BE SEATED.

CHANGE IN PLANS, LADIES AND GENTLEMEN. I'LL GIVE -- HOW MUCH TIME YOU'RE GOING TO HAVE ON REDIRECT?

**MR. KHOURY:** FIVE ON RECROSS -- REDIRECT. I'M SORRY.

**THE COURT:** ALL RIGHT. WELCOME BACK, LADIES AND GENTLEMEN. MR. SHEPPARD WILL BEGIN HIS CROSS-EXAMINATION OF THE WITNESS.

**CROSS-EXAMINATION**

**BY MR. SHEPPARD:**

**Q** GOOD MORNING.

**A** GOOD MORNING.

**Q** YOU LISTENED A FEW MOMENTS AGO TO A RECORDED STATEMENT MR. GRIFFIN VOLUNTARILY GAVE TO AN INSURANCE ADJUSTER. HAVE YOU HAD THE OPPORTUNITY TO LISTEN TO IT?

**A** I DID NOT.

**Q** OKAY. DID YOU LISTEN TO ANY OF THE PARTS THAT WERE PRESENTED AT TRIAL TODAY BEFORE TODAY?

**A** WHICH PARTS?

**Q** ANY OF THE -- ANY OF THE RECORDING, HAD YOU EVER HEARD THAT BEFORE YOU WERE SITTING IN COURT TODAY?

10:39a

A NO.

Q SO CERTAINLY THAT'S NOT SOMETHING THAT REC MARINE CONSIDERED IN PART OF ITS EVALUATION AS TO WHETHER MR. GRIFFIN WAS ENTITLED TO MAINTENANCE AND CURE. RIGHT?

A NOT THE RECORDING.

Q RIGHT. DID YOU LOOK AT A TRANSCRIPT?

A NO.

Q DID YOU LOOK AT ANYTHING THAT DOCUMENTED WHAT WAS DISCUSSED IN THE RECORDING?

A ME PERSONALLY? NO, I HAVE NOT.

Q DID ANYONE AT THE COMPANY THAT YOU'RE AWARE OF LOOK AT IT?

A I DON'T KNOW.

Q OKAY. SO SITTING HERE TODAY, DOES THE COMPANY HAVE AN OPINION ONE WAY WHATSOEVER WHETHER OR NOT ANYTHING CONTAINED IN THE RECORDING THAT YOU LISTENED TO, OR THE TRANSCRIPT THAT'S PART OF IT, HAD ANY BEARING ON REC MARINE'S DECISIONS REGARDING MR. GRIFFIN'S MAINTENANCE AND CURE?

A NO.

Q WOULD IT SURPRISE YOU THAT ON THE RECORDED STATEMENT MR. GRIFFIN AT THAT POINT -- AND I THINK THIS WAS JULY OF 2018 -- WAS SAYING THAT CAPTAIN HAGLUND SAID THAT HE WAS -- THAT DAVID HOLLYWOOD

10:40a

GRIFFIN WAS CALLING ABOUT CREW CHANGE?
A IT WOULDN'T SURPRISE ME.
**THE REPORTER:** I'M SORRY?
**THE WITNESS:** IT WOULD NOT SURPRISE ME.
**BY MR. SHEPPARD:**
Q WOULD IT SURPRISE YOU THAT WHEN MR. GRIFFIN WAS GIVING HIS STATEMENT TO THE INSURANCE FOLKS, THAT HE WAS IDENTIFYING WHERE HE WAS IN THE GULF OF MEXICO WHEN HE WAS INVOLVED IN THE MAN BASKET INCIDENT?
A MR. GRIFFIN WAS EXPLAINING?
Q YES.
A I DIDN'T KNOW IF YOU WERE TALKING ABOUT DAVID GRIFFIN.
Q SORRY. THANK YOU FOR THE CLARIFICATION.
WOULD IT SURPRISE YOU THAT MR. MCARTHUR GRIFFIN IDENTIFIED WHERE IN THE GULF OF MEXICO HE WAS WHEN THE MAN BASKET INCIDENT HAPPENED?
A IF HE KNEW.
Q YOU UNDERSTAND IN THE RECORDING HE DOES IDENTIFY WHERE HE WAS, OR DO YOU HAVE ANY REASON --
A I HAVEN'T --
Q -- TO DISPUTE --
**THE REPORTER:** I'M SORRY.
**THE WITNESS:** I HAVE NOT HEARD THE RECORDING.

10:41a

BY MR. SHEPPARD:

Q ARE YOU AWARE THAT -- IS THERE A REASON WHY THIS INFORMATION WASN'T GIVEN TO THE COMPANY AS IT PERTAINS TO AN INCIDENT ON BOARD ONE OF YOUR VESSELS?

A I DON'T KNOW ANY PARTICULAR REASON WHY IT WASN'T.

Q WOULDN'T THAT BE SOMETHING THAT YOU'D WANT TO BE PART OF YOUR INVESTIGATION?

A POSSIBLY.

Q ESPECIALLY IF THEY'RE DISCUSSING WITNESSES THAT MAY HAVE SEEN THE INCIDENT?

A POSSIBLY.

Q OKAY. HAVE YOU EVER HAD THIS SORT OF THING HAPPEN BEFORE WHERE A WORKER CLAIMS TO BE INJURED AND THERE IS A STATEMENT TAKEN BY THE INSURANCE FOLKS?

A YES.

Q HAVE YOU LISTENED TO THOSE IN THE PAST?

A NO.

Q DOES ANYONE AT THE COMPANY LISTEN TO THOSE?

A I THINK THOSE GO TO THE -- OUR ATTORNEYS FOR THE COMPANY. I DON'T KNOW WHO LISTENS TO IT AFTER THAT.

Q DO Y'ALL GET ANY INFORMATION ABOUT WHAT MIGHT BE CONTAINED IN THE RECORDING?

A I DO NOT.

10:42a

**MR. KHOURY:** I JUST WANT TO OBJECT, TO THE EXTENT THAT COULD GET INTO ATTORNEY-CLIENT PRIVILEGE ON WHAT THEIR ATTORNEYS GIVE THEM OR TELL THEM ABOUT WHAT A STATEMENT SAYS.

**THE COURT:** SO WE'LL JUST BE VERY CAREFUL TO NOT DISCLOSE THE SUBSTANCE OF ANY SUCH COMMUNICATIONS.

**BY MR. SHEPPARD:**

**Q** WOULD IT SURPRISE YOU THAT MR. GRIFFIN IDENTIFIES WILLIAM BADEAUX AS A WITNESS TO THE INCIDENT?

**A** IT WOULDN'T SURPRISE ME.

**Q** WOULD IT SURPRISE YOU THAT HE IDENTIFIES THE CREW THAT WAS ON BOARD WHEN HE WAS INJURED IN THE MAN BASKET INCIDENT?

**A** I WOULD THINK HE WOULD KNOW THE CREW ON BOARD.

**Q** ALL OF THESE -- ALL OF THIS INFORMATION IS SOMETHING THAT MR. GRIFFIN IS TALKING ABOUT, YOU KNOW, VERY CLOSE IN TIME TO THE INCIDENT. IS THAT FAIR? IF THE RECORDING IS GIVEN IN JULY OF 2018?

**A** YES.

**Q** WE MENTIONED -- YOU MENTIONED MR. AUCOIN. IS HE THE PERSON THAT IS COORDINATING MR. GRIFFIN'S MEDICAL CARE? HOW DOES THAT WORK?

10:43a

A AS FAR AS APPOINTMENT TIMES AND LETTING MR. GRIFFIN KNOW WHAT TIME HE NEEDS TO BE THERE AND LINING UP TRANSPORTATION, THAT WOULD BE ME. THE ADJUSTER WOULD BE COORDINATING BILLING AND APPROVALS FOR THE TREATMENT.

Q ARE YOU AWARE THAT MR. GRIFFIN HAD EXECUTED A MEDICAL RECORDS RELEASE BACK IN MAY OF 2018 FOR REC MARINE TO GET COPIES OF HIS MEDICAL RECORDS AT OMS?

A I'M NOT AWARE OF THAT.

Q IS THAT SOMETHING THAT'S USUAL AND CUSTOMARY WHEN SOMEONE GOES TO ONE OF THE DOCTORS THAT YOU BRING THEM TO?

A I'M NOT SURE. THAT WOULD BE SOMETHING THAT THE ADJUSTER DOES. I DON'T KNOW WHAT HE USES IT FOR.

Q IT'S SOMETHING THAT GOES -- IT'S SO THE ADJUSTER CAN GET THE RECORDS?

A YES.

**MR. SHEPPARD:** MR. LEATHERWOOD, COULD YOU PULL UP JOINT EXHIBIT 20, PAGE 15?

EXHIBIT 20 HAS BEEN PREVIOUSLY ADMITTED, YOUR HONOR.

CAN YOU HIGHLIGHT THE THIRD PARAGRAPH: "PERSONS TO WHOM INFORMATION MAY BE DISCLOSED."

**BY MR. SHEPPARD:**

Q AND IT SAYS COMPANY REPRESENTATIVE -- "YOUR

10:45a

COMPANY AND ITS REPRESENTATIVE." RIGHT?
A YES.
Q "YOUR COMPANY" WOULD BE REC MARINE?
A YES.
Q AT THE BOTTOM OF THE FORM IS MR. GRIFFIN's SIGNATURE. CORRECT?
A YES.
Q AUTHORIZING THEM TO RELEASE RECORDS TO REC MARINE. CORRECT?
A YES.
Q YOU GUYS NEVER TRIED TO GET THE RECORDS?
A NO.
Q YOU ALSO RECOGNIZE -- YOU WERE ASKED A QUESTION -- AND YOU WERE ASKED: "YOU WERE NEVER TOLD ABOUT A PERSONNEL BASKET INCIDENT?" DO YOU REMEMBER BEING ASKED THAT?
A BY WHO?
Q MR. KHOURY.
A YES.
Q AND YOU ANSWERED THAT YOU'D NEVER BEEN TOLD ABOUT THE PERSONNEL BASKET INCIDENT. DO YOU RECALL THAT ANSWER?
A YES.
Q CERTAINLY YOU FOUND OUT ABOUT THE PERSONNEL BASKET INCIDENT ON JUNE 29TH. RIGHT?

10:46a

A YES. BUT I WAS NEVER TOLD.

Q OKAY. SO NO ONE SPECIFICALLY SAID THE WORDS TO YOU?

A CORRECT.

Q AND AGAIN, YOU WERE WITH MR. GRIFFIN ON MAY 14, 2018, WHEN HE WENT TO OCCUPATIONAL MEDICAL SERVICES. RIGHT?

A YES.

Q THE ONLY TIME YOU WERE NOT WITH HIM IS WHEN HE GOT X-RAYS?

A YES.

Q AND AS WE SHOWED ON -- A COUPLE DAYS AGO OR A FEW DAYS AGO, THOSE MEDICAL RECORDS REFLECT THAT MR. GRIFFIN WAS INVOLVED IN AN INCIDENT INVOLVING A MAN BASKET WHERE HE GOT SMASHED INTO A CONEX BOX. RIGHT?

A YES.

Q AND YOU WERE WITH HIM WHILE HE WAS THERE?

A YES.

Q YOU WERE WITH HIM WHEN HE TALKED TO THE DOCTORS?

A YES.

Q YOU WERE SITTING IN THE EXAM ROOM WITH HIM?

A YES.

Q YOU WERE SHOWN A -- YOU'VE BEEN ASKED

10:47a

QUESTIONS ABOUT WHETHER OR NOT REC HAS PAID AN ADVANCE ON MR. GRIFFIN'S WAGES. YOU'VE BEEN SITTING HERE THE WHOLE TIME. RIGHT?
A YES.
Q YOU'VE SEEN MR. GRIFFIN'S 2018 W-2. CORRECT?
A YES.
Q DOES IT REFLECT THAT HE WAS PAID HIS ENTIRETY OF WAGES FOR 2018?
A NO, NOT THE W-2.
Q ISN'T THAT WHERE THE COMPANY REPORTS WAGES FOR THEIR EMPLOYEES?
A YES.
Q HAVE WE SEEN A W-2 FOR 2019?
A NO.
Q ISN'T THAT WHERE -- THAT WOULD BE SOMETHING THAT THE COMPANY WOULD HAVE TO ISSUE IF THEY WERE GOING TO PROVIDE WAGES TO AN EMPLOYEE. CORRECT?
A NOT IF HE'S RECEIVING MAINTENANCE IN ADVANCES.
Q THIS IS AN ADVANCE ON WAGES. RIGHT?
A YES.
Q SO THOSE ARE WAGES?
A IT'S AN ADVANCE TOWARD A FUTURE SETTLEMENT, SO I DON'T KNOW EXACTLY HOW IT WORKS WITH THE TAXES.

10:48a

I KNOW THEY DON'T REPORT IT ON A TAX FORM.
Q "ADVANCES TOWARD A FUTURE SETTLEMENT," I SAW THAT. AND YOU WERE ASKED IF THAT WAS JUST PAYMENT OF WAGES, OF FUTURE WAGES. CORRECT?
A YES.
Q BUT YOU'RE SAYING NOW IT'S A SETTLEMENT OF SOME SORT OF CLAIM?
A THE MAINTENANCE AND THE ADVANCED PAYMENTS, THE NET AMOUNT EQUALED WHAT HE WOULD HAVE MADE IF HE WAS EARNING HIS FULL PAY.
Q BUT NOT WHAT HE WOULD HAVE BEEN EARNING, YOU KNOW, FROM THAT POINT FORWARD TILL NOW. RIGHT?
A I DON'T -- I DON'T KNOW -- CAN YOU REPEAT THAT?
Q SURE. IF THE JURY DOESN'T FIND THAT MR. GRIFFIN HAS REACHED MAXIMUM MEDICAL IMPROVEMENT FOR HIS NECK OR HIS BACK AND THAT HE'S ENTITLED TO MAINTENANCE AND CURE, THE PAYMENTS THAT THE COMPANY HAS THUS FAR MADE WOULD NOT COMPENSATE HIM FULLY FOR HIS MAINTENANCE AND CURE. CORRECT?
A WE PAID HIM UNTIL HIS MMI DATE.
Q BUT IF THE JURY FINDS THAT MR. GRIFFIN HASN'T REACHED MAXIMUM MEDICAL IMPROVEMENT FOR HIS NECK OR HIS BACK, ARE YOU SAYING THAT THE MONEY THAT YOU'VE PAID FOR HIS SHOULDER COMPENSATES HIM FULLY

10:49a

FOR HIS SHOULDER, HIS NECK, AND HIS BACK?
A WE HAVE NOT PAID ANYTHING PAST THE MMI DATE.
Q HAVE YOU PAID ANYTHING FOR THE TREATMENT THAT MR. GRIFFIN HAS BEEN RECOMMENDED FOR HIS NECK OR HIS BACK?
A NO.
Q YOU'VE SEEN THAT DIAGRAM THAT WE KEEP PULLING UP FROM WHEN MR. GRIFFIN -- BEFORE HE TREATED WITH DR. CASEY. CORRECT?
A I'D HAVE TO SEE THE DIAGRAM YOU'RE REFERRING TO. I'M NOT SURE.

**MR. KHOURY:** YOUR HONOR, THIS IS BEYOND THE SCOPE OF THE DIRECT EXAMINATION QUITE FAR --

**MR. SHEPPARD:** HE WAS TALKING ABOUT THE INJURIES.

**THE COURT:** TALKING ABOUT WHAT?

**MR. SHEPPARD:** HE WAS TALKING ABOUT THE INJURIES MR. GRIFFIN SUSTAINED, WHETHER THEY PAID MAINTENANCE AND CURE UNTIL HE REACHED MMI. I'M TRYING TO TALK ABOUT THOSE FEW THINGS.

**THE COURT:** I'LL GIVE YOU VERY LIMITED LATITUDE. YOU CAN GO ON AND ASK THE QUESTION.

**MR. SHEPPARD:** SURE. YES, YOUR HONOR, I MEAN, NOT "SURE."

I CAN MOVE ON TO SOMETHING ELSE,

10:50a

ACTUALLY. WE'VE SEEN THE DIAGRAM ENOUGH.

**BY MR. SHEPPARD:**

**Q** YOU HEARD DR. FERACHI TESTIFY. CORRECT?

**A** YES.

**Q** YOU HEARD DR. GREENE TESTIFY. CORRECT?

**A** YES.

**Q** DID YOU CONSIDER THEIR OPINIONS AS TO MR. GRIFFIN'S NECK PAIN?

**A** DID I CONSIDER IT FOR THE NECK PAIN?

**THE COURT:** WASN'T THIS COVERED IN THE DIRECT EXAMINATION?

**MR. SHEPPARD:** THAT MIGHT HAVE BEEN. SORRY. IT MIGHT HAVE BEEN. IT'S A FEW DAYS. I'VE KIND OF FORGOTTEN.

**THE COURT:** YES.

**BY MR. SHEPPARD:**

**Q** YOU WERE ASKED QUESTIONS ABOUT THE SECOND INCIDENT WHERE MR. GRIFFIN USES THE WORD "SITUATION." DO YOU REMEMBER THOSE QUESTIONS?

**A** YES.

**Q** DO YOU HAVE ANY SPECIFIC MEMORY AS TO WHAT THAT MEANT?

**A** I DO NOT.

**Q** FOR THESE HANDWRITTEN NOTES, IS THERE ANY POLICY THAT REC HAS FOR YOU TO TAKE NOTES OF

10:51a

TELEPHONE CONVERSATIONS THAT YOU HAVE WITH CAPTAINS AND INJURED WORKERS THAT CALL YOU FROM THE BOAT ABOUT AN INJURY?

A THERE IS NO POLICY.

Q DID YOU HEAR MR. GRIFFIN'S TESTIMONY THAT AROUND APRIL 25TH HE WROTE AN INCIDENT REPORT FOR WHAT HAPPENED IN THE ENGINE ROOM?

A YES.

Q DID YOU ASK CAPTAIN HAGLUND WHAT HAPPENED TO THAT INCIDENT REPORT?

A THE ONE FOR APRIL 25TH?

Q DID YOU HEAR MR. GRIFFIN'S TESTIMONY THAT AROUND APRIL 25TH, APRIL 26TH HE WROTE AN INCIDENT REPORT RELATED TO THE ENGINE ROOM?

A YES.

Q DID YOU ASK CAPTAIN HAGLUND WHAT HAPPENED TO THAT INCIDENT REPORT?

A NO.

Q YOU HEARD MR. GRIFFIN TESTIFY THAT HE WAS ASKED TO COMPLETE A SECOND INCIDENT REPORT FOR THE ENGINE ROOM ON MAY 5TH. DO YOU REMEMBER THAT?

A THAT HE WAS ASKED TO?

Q YES.

A I HEARD HIM SAY THAT, YES.

Q AND HE SAID HE HAD TO COMPLETE THAT INCIDENT

10:52a

REPORT BECAUSE IT NEEDED TO BE -- AN ORIGINAL COPY NEEDED TO BE PROVIDED TO THE HEALTH, SAFETY AND ENVIRONMENTAL DEPARTMENT?

A YES.

Q DID YOU ASK CAPTAIN HAGLUND AS TO WHY HE ASKED MR. GRIFFIN FOR A SECOND -- TO COMPLETE A SECOND INCIDENT REPORT FOR THAT?

A I DON'T REMEMBER ASKING HIM.

**THE COURT:** ANYTHING FURTHER?

**MR. SHEPPARD:** SORRY, YOUR HONOR.

**BY MR. SHEPPARD:**

Q YOU WERE ASKED A QUESTION ABOUT THAT IT'S A CRANE RESPONSIBLE INCIDENT. DO YOU REMEMBER THOSE QUESTIONS?

A CRANE RESPONSIBLE?

Q THAT'S WHAT I WROTE. OR SORRY. CRANE REPORTABLE INCIDENT?

A YES.

Q WHEN REC MARINE'S EMPLOYEES ARE INJURED, IF THERE IS A CRANE REPORTABLE INCIDENT, DOES REC MARINE JUST NOT FILL OUT ANY PAPERWORK ON THE SUBJECT?

A NO, THEY DO.

Q WHAT DO THEY FILL OUT?

A AN INCIDENT REPORT.

Q AND DID YOU HEAR MR. GRIFFIN'S TESTIMONY

10:54a

THAT AS HE WAS LEAVING THE WHEELHOUSE AFTER THE INCIDENT AND GOING ELSEWHERE ON THE SHIP, HE OVERHEARD COMMUNICATIONS FROM THE CRANE OPERATOR? DO YOU RECALL THAT?

A NOT SPECIFICALLY.

Q IF MR. GRIFFIN TESTIFIED THAT HE HEARD COMMUNICATIONS COMING OVER THE RADIO FROM THE CRANE OPERATOR, IS THERE ANY REASON TO DISPUTE THAT?

A NO.

Q AND IF THOSE FOLKS WERE CALLING TO CHECK ON MR. GRIFFIN, IS THAT ONE OF THE THINGS THAT YOU WOULD EXPECT THE CRANE OPERATOR TO DO FOR A CRANE REPORTABLE INCIDENT?

A NOT NECESSARILY.

Q BUT IS THAT ONE WAY THAT THEY COULD FIND OUT THE INFORMATION ABOUT WHO WAS INJURED AND WHAT HAPPENED?

A NO.

Q THEY DON'T -- THEY WOULDN'T RADIO DOWN TO THE VESSEL AND FIND OUT --

A THEY WOULD -- SORRY.

Q NO. THEY WOULDN'T RADIO DOWN TO THE VESSEL AND FIND OUT WHO THE EMPLOYEE WAS?

A THAT COMMUNICATION WOULD GO THROUGH THE CAPTAIN.

10:55a

Q OKAY. AND THAT -- SO IT WOULD GO TO THE WHEELHOUSE?
A YES.
Q COULD IT GO OVER THE SPEAKERS?
A NO.
Q WHERE WOULD IT GO THROUGH?
A IT WOULD BE DIRECT LINE OF COMMUNICATION TO THE CAPTAIN. OR IT WOULD COME THROUGH THE OFFICE.
Q HOW WOULD THEY GET HIS PHONE NUMBER?
A I'M SURE THEY HAVE HIS PHONE NUMBER. IT'S THEIR ONLY LINE OF COMMUNICATION.
Q ARE THEY ABLE TO COMMUNICATE THROUGH A WALKIE-TALKIE OR SOMETHING LIKE THAT?
A YES. SECONDARY.
Q SO THAT'S A WAY THEY COULD COMMUNICATE --
A YES.
Q THAT'S A WAY THEY COULD ASK FOR THE INFORMATION. RIGHT?
A FROM THE CAPTAIN, YES.
Q AND IF MR. GRIFFIN IS OVERHEARING THOSE SORTS OF QUESTIONS BEING ASKED, WOULD THAT BE INDICATIVE OF THE CRANE OPERATOR ASKING THOSE QUESTIONS?
A I DON'T KNOW IF HE OVERHEARD ANYTHING OR NOT.

10:55a

Q IF HE'S TESTIFIED THAT HE HAS, DO YOU HAVE ANY REASON TO DISPUTE THAT?
A HAS HE?
Q I BELIEVE SO.
A I DIDN'T HEAR ANYTHING, SO I DON'T KNOW.
Q OKAY. THE JURY WILL RECALL HIS TESTIMONY, I'M SURE.
**MR. SHEPPARD:** THAT'S ALL I HAVE, YOUR HONOR.
**THE COURT:** ALL RIGHT. ANY REDIRECT?
**MR. KHOURY:** JUST A FEW, YOUR HONOR.

**REDIRECT EXAMINATION**

**BY MR. KHOURY:**
Q MR. HARRIS, YOU WERE ASKED A FEW MINUTES AGO ABOUT --
**MR. KHOURY:** DO YOU KNOW WHAT EXHIBIT THIS IS?
**BY MR. KHOURY:**
Q -- J20. AND IT'S A MEDICAL RECORDS RELEASE THAT MR. GRIFFIN HAD APPARENTLY SIGNED. IF YOU'LL LOOK AT THE --
**MR. KHOURY:** OH, I'M SORRY. IT'S NOT BACK UP.
**BY MR. KHOURY:**
Q THIS PARTICULAR RELEASE ONLY ALLOWED RECORDS

10:57a

FROM OCCUPATIONAL MEDICINE SERVICES. DO YOU SEE THAT?

A YES.

Q IT WASN'T JUST A GENERAL RELEASE TO OBTAIN HIS MEDICAL RECORDS, WAS IT?

A THAT'S NOT WHAT IT LOOKS LIKE.

Q WE DISCUSSED A FEW MINUTES AGO THIS STATEMENT MR. GRIFFIN GAVE WHERE HE WAS ASKED BY THE ADJUSTER "DID YOU INJURE ANYTHING OTHER THAN YOUR SHOULDER?" AND HE SAID "NO." AND THIS IS TWO MONTHS -- MORE THAN TWO MONTHS AFTER THIS INCIDENT. MR. GRIFFIN SAYS, "NO. JUST THE SHOULDER."

I THINK YOU WERE TESTIFYING EARLIER THAT REC MARINE RELIES ON ATTORNEYS AND ADJUSTERS, PEOPLE WHO TAKE THESE TYPES OF STATEMENTS, TO ASSIST REC MARINE IN MAKING DECISIONS ON WHETHER TO PAY MAINTENANCE AND CURE BENEFITS. IS THAT WHAT YOU SAID?

A YES.

Q SO EVEN THOUGH YOU DIDN'T PERSONALLY LISTEN TO THIS STATEMENT THAT WAS GIVEN TO AN ADJUSTER, DO YOU NEVERTHELESS BELIEVE THAT MR. GRIFFIN SAYING TWO MONTHS -- MORE THAN TWO MONTHS LATER THAT IT WAS ONLY HIS SHOULDER SUPPORTS REC MARINE'S DECISION THAT IT WAS NOT REQUIRED TO PAY MAINTENANCE OR CURE BENEFITS FOR MR. GRIFFIN'S NECK OR LOW BACK?

10:58a

A YES.

Q PRIOR TO THIS LAWSUIT, WAS REC MARINE EVER ADVISED THAT MR. GRIFFIN WAS CLAIMING A LOW BACK INJURY?

A NO.

**MR. KHOURY:** THOSE ARE THE ONLY QUESTIONS I HAVE. THANK YOU.

**THE COURT:** ALL RIGHT. WELL, THANK YOU, MR. HARRIS. YOU ARE NOW EXCUSED AND MAY RETURN TO COUNSEL TABLE.

**THE WITNESS:** THANK YOU.

**THE COURT:** ALL RIGHT. THE DEFENSE MAY NOW CALL ITS NEXT WITNESS.

**MR. KHOURY:** YOUR HONOR, DEFENSE RESTS.

**THE COURT:** VERY WELL. THANK YOU.

**(WHEREUPON, THE DEFENSE RESTS.)**

**THE COURT:** SO, LADIES AND GENTLEMEN, THAT'S WHAT YOU -- AS YOU JUST HEARD, THE DEFENDANT DOES NOT WISH TO PRESENT ANY ADDITIONAL EVIDENCE AT THIS TIME. HOWEVER, I HAVE TO DETERMINE -- I HAVE TO TAKE UP A MATTER OUTSIDE OF YOUR PRESENCE WITH THE PARTIES, AND SO I WOULD ASK YOU TO BE EXCUSED AT THIS TIME. THIS SHOULD NOT TAKE VERY LONG.

PLEASE DON'T, AGAIN, DISCUSS THE, CASE WITH ANYONE, ANY OF THE EVIDENCE OR TESTIMONY AND

10:59a

PLEASE DON'T YET BEGIN TO FORM ANY OPINIONS.

LET'S ALL RISE FOR THE JURY.

**(WHEREUPON, THE JURY IS OUT OF THE COURTROOM.)**

**THE COURT:** BE SEATED.

ALL RIGHT. I ASSUME THAT THE DEFENSE WISHES TO RENEW THEIR RULE 50 MOTION?

**MR. KHOURY:** YES, YOUR HONOR.

**THE COURT:** YOU CAN TAKE THE FORWARD PODIUM.

ANY ADDITIONAL ARGUMENTS FROM THE LAST TIME?

**MR. KHOURY:** MAY I PROCEED, YOUR HONOR?

**THE COURT:** YES.

**MR. KHOURY:** YOUR HONOR, WE WOULD LIKE TO RENEW OUR RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE ISSUE OF MAINTENANCE AND CURE. I'M GOING TO BREAK IT DOWN BETWEEN THE THREE SEPARATE ALLEGED INJURIES, BECAUSE THAT'S HOW IT'S BROKEN DOWN IN THE JURY CHARGES, IN THE JURY INTERROGATORIES.

MR. GRIFFIN WAS DETERMINED TO BE AT MAXIMUM MEDICAL IMPROVEMENT BY DR. CASEY, HIS ORIGINAL TREATING PHYSICIAN FOR HIS SHOULDER. BY LAW, THAT'S THE DATE THAT MAINTENANCE AND CURE WITH RESPECT TO HIS SHOULDER INJURY TERMINATED. THERE HAS BEEN NO EVIDENCE IN THIS TRIAL THAT MR. GRIFFIN HAS

11:01a

ANY PENDING RECOMMENDATIONS, ANTICIPATED RECOMMENDATIONS FOR HIS LEFT SHOULDER. THERE IS NO MAINTENANCE AND CURE OBLIGATION UNLESS THERE IS CURATIVE TREATMENT ONGOING. AND THERE HAS BEEN NO DETERMINATION THAT SOMETHING IS GOING TO BE NEEDED, OTHER THAN I THINK PERHAPS DR. COWEN, WHOSE OPINION WASN'T SUPPORTED BY AN ACTUAL TREATING PHYSICIAN SAYING THAT HE WOULD NEED A SHOULDER SURGERY. I THINK HE WAS, IN FACT, PLANNING THAT PERHAPS HE MAY SOMETIME IN THE FUTURE.

BUT THAT IS NOT A CURRENT -- YOU DON'T JUST LEAVE MAINTENANCE AND CURE OPEN FOR 20 YEARS BECAUSE SOMEBODY MIGHT NEED A SHOULDER SURGERY IN THE FUTURE WHEN THEY'VE BEEN DETERMINED TO BE AT MMI. SO I THINK WITH THE SHOULDER -- WITH RESPECT TO THE SHOULDER, IT'S PRETTY CLEAR.

WITH RESPECT TO MR. GRIFFIN'S LOW BACK AND NECK, I THINK THAT WE HAVE ACTUALLY ESTABLISHED A *MCCORPEN* DEFENSE. AS YOUR HONOR PROBABLY KNOWS, THERE IS THREE ELEMENTS TO THE *MCCORPEN* DEFENSE: INTENTIONAL CONCEALMENT, MATERIALITY, AND A CAUSAL RELATION BETWEEN THE PRIOR INJURY AND THE INJURY ALLEGED IN THE LAWSUIT. THE CAUSAL RELATION, THE FIFTH CIRCUIT HAS BEEN VERY CLEAR THAT IT JUST HAS TO BE TO THE SAME BODY PART.

11:02a

MR. GRIFFIN FILED A LAWSUIT ALLEGING SEVERE AND PERMANENT INJURIES IN 2014 TO HIS NECK AND TO HIS LOW BACK. HE FAILED TO DISCLOSE THAT WHEN HE WAS ASKED TO DISCLOSE PRIOR CIVIL LAWSUITS AND GIVE A BRIEF EXPLANATION OF THE CLAIM, WHICH CLEARLY WOULD HAVE REVEALED THAT HE WAS SUING FOR, YOU KNOW, DAMAGES, PAST LOST WAGES, MEDICAL EXPENSES ONLY IN 2014.

MISTER -- THERE IS A HEIGHTENED STANDARD WHEN AN EMPLOYEE DOESN'T UNDERGO A PREEMPLOYMENT PHYSICAL. MR. GRIFFIN'S EMPLOYMENT WAS TRANSFERRED FROM JNB TO REC MARINE. HE DIDN'T UNDERGO A PREEMPLOYMENT PHYSICAL. SO THE TEST THEN FOR INTENTIONAL CONCEALMENT IS WHETHER THE EMPLOYEE THEMSELVES WOULD HAVE CONSIDERED THEIR PRIOR CONDITION A MATTER OF IMPORTANCE.

MR. GRIFFIN ADMITTED ON THE STAND THAT HE THOUGHT THAT -- YOU KNOW, I ASKED HIM "DO YOU THINK MISTER" -- I'M SORRY -- "DID YOU THINK THAT REC MARINE WOULD HAVE WANTED TO KNOW THAT YOU HAD FILED A LAWSUIT ALLEGING SEVERE AND PERMANENT INJURIES TO YOUR NECK AND LOW BACK?" AND HIS RESPONSE WAS "YEAH, I THINK THEY WOULD WANT TO KNOW THAT."

I'LL TELL YOU THAT I DON'T OFTEN GET THAT ADMISSION FROM A PLAINTIFF. IT'S -- I ACTUALLY

11:04a

HAVE NEVER GOTTEN THAT ADMISSION FROM THE PLAINTIFF IN A SCENARIO WHERE THEY HAVE NOT UNDERGONE A PREEMPLOYMENT PHYSICAL. SO I THINK WE'VE ACTUALLY MET THAT STANDARDS -- THAT STANDARD.

OUR FALL-BACK POSITION, YOUR HONOR, IS THAT IT'S BECOME VERY CLEAR THAT THE PUNITIVE DAMAGES CLAIM SHOULD BE DISMISSED. THERE HAS BEEN SOME TALK ABOUT THE ADVANCED WAGES. REGARDLESS OF HOW IT WAS PUT ON THE TAX RETURNS, I THINK WHAT IS EVIDENT IS THAT IT WAS DONE FOR TAX REASONS, SO IT'S PAID AS ADVANCES ON SETTLEMENT SO IT'S NOT TAXED TO THE EMPLOYEE. SO THAT'S WHY IT'S NOT REFLECTED ON YOUR TAX RETURN.

THE TRUTH -- BUT THE TRUTH IS, IS THAT NO ONE DISPUTES, AND MR. GRIFFIN DOESN'T DISPUTE, THAT HE GOT THIS MONEY AND HE CASHED THE CHECKS, SO HE IS PAID FOR A YEAR AFTER THIS PERSONNEL BASKET INCIDENT ALLEGEDLY OCCURRED. WE HAVE -- THE ONLY EVIDENCE THAT THEY HAVE RELIED ON IS -- WITH RESPECT TO A NECK INJURY -- IS JUNE 29TH, WHICH THAT IN AND OF ITSELF IS 59 DAYS AFTER THE PERSONNEL BASKET INCIDENT HAPPENED, WHICH IS -- PUTS YOU RIGHT IN THE ONE DAY FROM DR. FERACHI WHO SAID, "THAT IS THE LONGEST I COULD POSSIBLY GO." WELL, OBVIOUSLY DR. HADDAD SAYS FOUR TO SIX. YOU'VE ALSO GOT DR. CASEY,

11:05a

A TREATING PHYSICIAN, WHO SAYS THE NECK IS NOT RELATED.

WHAT IS A DEFENDANT SUPPOSED TO DO IN THOSE CIRCUMSTANCES? IN MY VIEW AND IN OUR VIEW, IF THAT IS ENOUGH TO LEAVE PUNITIVE DAMAGES ON THE TABLE, THEN PUNITIVE DAMAGES ALWAYS GO TO THE JURY. AND PUNITIVE DAMAGES, THE SUPREME COURT, THE FIFTH CIRCUIT HAS BEEN VERY CLEAR THAT THIS IS FOR EGREGIOUS BEHAVIOR. AND, YOU KNOW, WE -- THIS IS NOT EGREGIOUS BEHAVIOR. THIS IS A COMPANY THAT I WOULD SUBMIT WENT ABOVE AND BEYOND. MR. GRIFFIN MAY DISAGREE. BUT THAT GOES TO WHETHER HE'S ENTITLED TO MAINTENANCE AND CURE, NOT TO WHETHER OUR -- THE COMPANY NEEDS TO BE PUNISHED, WHICH, AS YOUR HONOR KNOWS, COULD BE AN UNINSURED EXPOSURE. AND I THINK THAT WE NEED TO MAKE SURE THAT WE'RE RESERVING PUNITIVE DAMAGES FOR THE TRULY EGREGIOUS CASE. AND I DON'T THINK THAT WE'VE EVEN COME CLOSE TO REACHING THAT POINT.

AND I'LL JUST WRAP UP WITH THE BACK, BECAUSE I DIDN'T REALLY TOUCH ON THAT. THERE IS NO REFERENCE -- WE ARE ALL IN AGREEMENT THAT THE FIRST REFERENCE TO ANYTHING ABOUT A LOW BACK CAME AT BATON ROUGE ORTHOPAEDIC JANUARY 31ST OF 2020 WHEN MR. GRIFFIN UNDERWENT AN MRI AND HE COMPLETED A FORM

11:06a

WHERE HE SAID -- I BELIEVE HE SAID "SHOULDER, NECK, ALSO BACK." IT'S ALMOST AN AFTERTHOUGHT. AND THAT'S WHAT WE'RE -- I MEAN, THAT IS A YEAR AND EIGHT MONTHS AFTER THAT.

SO WE'RE SUPPOSED TO ASSUME NOW THAT IF AN EMPLOYEE COMES TO US A YEAR AND EIGHT MONTHS LATER AND SAYS, "OH, AND ALSO I INJURED MY BACK," THAT WE THEN HAVE TO PAY MAINTENANCE AND CURE BENEFITS FOR THAT? I THINK IT'S JUST -- AT THIS POINT I THINK THE PUNITIVE DAMAGES HAS JUST NOT BEEN ESTABLISHED AND IT SHOULDN'T BE ALLOWED TO GO TO THE JURY.

**THE COURT:** THANK YOU, MR. KHOURY.

**MR. KHOURY:** THANK YOU, YOUR HONOR.

**THE COURT:** MR. SHEPPARD?

**MR. SHEPPARD:** YES, YOUR HONOR.

JUST KIND OF WALKING THROUGH THE POINTS THAT WERE MADE. FIRST, DR. COWEN IS A PHYSICIAN. HE IS FULLY CAPABLE OF DIAGNOSING AND TREATING. HE SPECIALIZES IN PAIN MEDICINE AND REHABILITATION. THAT IS HIS CHOSEN VOCATION. THAT'S WHAT HE DOES.

AS TO THE FIRST PRONG OF THE *MCCORPEN* DEFENSE, THE NO INTENTIONAL CONCEALMENT, I'D REMIND THE COURT THAT MR. GRIFFIN REPORTED THIS INJURY -- THIS INCIDENT IN THE 2013 CAR CRASH TO JNB, MR. ALEX GRIFFIN. MR. ALEX GRIFFIN WAS THE HR MANAGER. AND

11:08a

HE CONTINUED WORKING THROUGH. AND YOU'LL SEE HIS NAME ON PERSONNEL RECORDS AS THE HR MANAGER FOR EMPLOYEES WORKING FOR REC MARINE. SO THIS INFORMATION THAT HE RECEIVED IN 2013 WOULD ALSO BE PROVIDED TO THE COMPANY THE MOMENT HE WAS TRANSFERRED OVER THERE. THEY HAD THIS INFORMATION. IT WASN'T KEPT SECRET. HE TOLD THE COMPANY, HE TOLD THE CAPTAIN. HE RETURNED -- HE WAS LATE TO CREW CHANGE AND WENT TO WORK. AND HE SERVED OUT HIS HITCH AND THEN CONTINUED WORKING FOR FIVE YEARS WITHOUT INCIDENT.

YOUR HONOR, THERE IS AN INSTRUCTION HERE IN THE JURY INSTRUCTIONS; HOWEVER, IF THERE EXISTED REASONABLE GROUNDS FOR PLAINTIFF GRIFFIN'S GOOD-FAITH BELIEF THAT HE WAS FIT FOR DUTY, THE *MCCORPEN* DEFENSE DOES NOT APPLY. IT JUST DOESN'T APPLY HERE. HE WENT TO THE CLINIC, HE GOT CHECKED OUT AT THE COMPANY'S -- AT THEIR URGING TO MAKE SURE THAT HE WAS OKAY. HE WENT THERE ONE OR TWO TIMES. THEY SAID HE WAS OKAY. HE RETURNED TO WORK. THAT'S A GOOD-FAITH BELIEF THAT HE'S FIT FOR DUTY. THOSE RECORDS DON'T EXIST BECAUSE HE WENT TO DR. TASSIN AND THE RECORDS WERE LOST IN A FLOOD. BUT MR. GRIFFIN HAS TESTIFIED HE'S GONE THERE ONCE, MAYBE TWICE AND HE WAS CHECKED AT THE COMPANY'S URGENCY AND

11:09a

EVERYTHING WAS FINE. IN THAT REGARD, YOUR HONOR, I DON'T BELIEVE THERE HAS BEEN INTENTIONAL CONCEALMENT.

AS TO WHETHER OR NOT IT WAS A MATTER OF IMPORTANCE, THE FILING OF THE LAWSUIT IS NOT SOMETHING THAT WOULD TRIGGER *MCCORPEN.* BUT PUTTING THINGS IN A LAWSUIT IS NOT SOMETHING THAT WOULD TRIGGER *MCCORPEN.* *IT'S* THE INJURIES THEMSELVES. SO TO SAY MR. GRIFFIN -- THE INFORMATION WOULD HAVE BEEN A MATTER OF IMPORTANCE, IT'S RELATED TO THE INJURY. AND YOU TAKE THAT INTO THE CONTEXT OF WHAT WAS GOING ON.

AGAIN, MR. GRIFFIN WAS IN A FENDER-BENDER. HE APPARENTLY WAS ABLE TO DRIVE TO THE DOCK AND GET TO CREW CHANGE. HE MISSED NO TIME FROM WORK. HE VISITED A DOCTOR ONCE. HE WORKED FOR FIVE YEARS WITHOUT INCIDENT. THERE IS NO -- THERE IS NO EVIDENCE FROM ANY OF THE FOLKS THAT HAVE COME TO TESTIFY -- CAPTAIN HAGLUND, JOSH WINHAUER, ANY -- WILLIAM BADEAUX, ANY OF THE FOLKS THAT WERE WORKING WITH MR. GRIFFIN OVER A LENGTH OF TIME -- THAT PRIOR TO ANY OF THIS HE HAD PROBLEMS WITH HIS NECK OR BACK OR SHOULDER. IT JUST DOESN'T EXIST.

**THE COURT:** LET'S TALK ABOUT THE PUNITIVE DAMAGES.

**MR. SHEPPARD:** AS TO THE PUNITIVE DAMAGES,

11:10a

YOUR HONOR, REC MARINE IS JUST ARBITRARILY CHOOSING WHO THEY'RE GOING TO LISTEN TO. THEY'RE CHOOSING TO LISTEN TO THE PEOPLE THAT ARE GIVING THEM FAVORABLE INFORMATION. THEY'RE CHOOSING TO LISTEN TO THE PEOPLE THAT ARE SAYING THESE THINGS ARE NOT CONNECTED.

IF YOU LISTEN TO DR. GREENE, DR. FERACHI, THEY BOTH SAY THAT THE NECK INJURY WAS RELATED TO WHAT HAPPENED. THEY BOTH SAY THAT, TO A REASONABLE DEGREE OF MEDICAL PROBABILITY, IT'S MORE LIKELY THAT IT WAS THE BASKET.

**THE COURT:** THEY DON'T HAVE TO LISTEN TO JUST THE PLAINTIFF'S POSITIONS. THEY'RE ENTITLED TO LISTEN TO THEIR OWN -- TO TAKE NOTE AND HEED THE COUNSEL OF THEIR POSITIONS. RIGHT?

**MR. SHEPPARD:** CORRECT, YOUR HONOR. AND THAT'S WHY THEIR CHOSEN DOCTOR THAT THEY FIRST SENT MR. GRIFFIN TO WHEN HE WENT TO OCCUPATIONAL MEDICINE SERVICES, THE RECORDS THAT THEY HAVE GENERATED REFLECT THE ENGINE ROOM INCIDENT WOULD HAVE CAUSED NOTHING MORE THAN A CONTUSION. AND THEY GO ON TO SAY SPECIFICALLY "WOULD NOT CAUSE A ROTATOR CUFF TEAR." THEY ADDRESS THAT IN THAT NOTE. THAT IS FROM THE FIRST VISIT HE EVER WENT TO. AND THEY'RE CHOOSING TO IGNORE THAT.

11:11a

AND DR. GREENE AND DR. FERACHI AND DR. COWEN AND EVEN TO AN EXTENT DR. CASEY, YOU KNOW, THAT MR. GRIFFIN CAN SUFFER THESE INJURIES AS A RESULT OF THE MAN BASKET, THEY ARE CHERRY-PICKING WHAT THEY'RE LISTENING TO AND WHAT THEY'RE CONSIDERING. AND THAT'S ARBITRARY.

**THE COURT:** ALL RIGHT. WELL, I'M PREPARED TO RULE AT THIS TIME. THANK YOU, MR. SHEPPARD.

**MR. SHEPPARD:** YES, YOUR HONOR.

**THE COURT:** THE COURT WILL DENY THE RULE 50 MOTION AT THIS TIME. AGAIN, "AT THIS TIME" MEANING THAT THE COURT IS ENTITLED, AS YOU ALL KNOW, UNDER THE RULE, TO CONSIDER IT EVEN AFTER THE JURY RENDERS A VERDICT. NONETHELESS, AT THIS TIME I WILL DENY THE MOTION.

THE LAW IS CLEAR THAT WHERE THERE ARE AMBIGUITIES OR DOUBTS AS TO A SEAMAN'S RIGHTS FOR MAINTENANCE AND CURE, THE AMBIGUITIES AND DOUBTS ESSENTIALLY HAVE TO BE RESOLVED BY THE TRIER OF FACT; THE JURY IN THIS CASE. THAT'S AS IN EVERY CASE, IN FACT.

THERE ARE DISCREPANCIES AND AMBIGUITIES AS TO DR. CASEY'S TESTIMONY REGARDING THE SHOULDER AS WELL AS THE PLAINTIFF'S EXPERTS REGARDING THE SHOULDER. AND AGAIN, THE COURT WILL NOT IMPOSE ITS

11:13a

JUDGMENT OR ITS ASSESSMENT OF THE EVIDENCE FOR THAT OF THE JURY. HOWEVER, AGAIN, THE COURT WILL RESERVE ITS RIGHT TO CONSIDER THE MATTER AT A LATER TIME.

WITH RESPECT TO THE *MCCORPEN* DEFENSE -- BY THE WAY, I WILL ALSO NOTE THAT THE DEFENSE HAS ESSENTIALLY CALLED INTO QUESTION WHETHER THE INCIDENT ITSELF EVEN OCCURRED. OBVIOUSLY, THAT'S A MATTER FOR THE TRIER OF FACT TO CONSIDER. SO AGAIN, FOR THOSE REASONS -- WITH RESPECT TO THE *MCCORPEN* DEFENSE -- THAT'S MAINTENANCE AND CURE. WITH RESPECT TO THE *MCCORPEN* DEFENSE, THERE IS, AGAIN, AMBIGUITY AS TO WHETHER THE PLAINTIFF BELIEVED THAT THE PRIOR INJURY WAS SO SIGNIFICANT THAT HE SHOULD HAVE REPORTED IT.

NOW, WE'VE HEARD, ONCE AGAIN, CONFLICTING EVIDENCE. I MEAN, IF HE THOUGHT IT WAS SO SIGNIFICANT, WHY DID HE CONTINUE TO WORK? I UNDERSTAND, MR. KHOURY, THE ANSWER HE PROVIDED UNDER QUESTIONING. BUT NONETHELESS, I THINK, BASED UPON EVERYTHING THAT I'VE HEARD, THAT THERE IS CERTAINLY SUFFICIENT AMBIGUITY HERE; SPECIFICALLY A DISPUTE WHETHER THIS -- WHATEVER EFFECT THIS 2014 INCIDENT HAD -- THE CAR ACCIDENT HAD ON HIS ABILITY TO WORK FOUR YEARS LATER, FOR INSTANCE. AND, OF COURSE, AS I MENTIONED, THERE IS AN ASSESSMENT -- A CREDIBILITY ASSESSMENT, IN FACT, THAT MUST BE MADE BY THE JURY

11:14a

WITH RESPECT TO THE PLAINTIFF'S GOOD-FAITH BELIEF THAT HE WAS FIT FOR DUTY AND WAS ABLE TO WORK.

NOW, FINALLY AS RESPECT -- AS REGARDS TO THE PUNITIVE DAMAGES -- AND, MR. SHEPPARD, YOU MAY BE SEATED AT THIS TIME.

**MR. SHEPPARD:** YES, YOUR HONOR.

**THE COURT:** -- THIS IS A MUCH CLOSER CALL. AND WHILE THE COURT MAY HAVE ISSUES WITH WHETHER THE DEFENSE CONDUCT WAS RECKLESS OR CALLOUS IN THIS REGARD, AGAIN, I WILL DECLINE TO SUBSTITUTE MY JUDGMENT AND ASSESSMENT OF THE EVIDENCE FOR THAT OF THE JURY. AGAIN, I HAVE TO FIND THAT THERE IS SUFFICIENT CONFLICTING EVIDENCE ON THIS FACTUAL ISSUE AS WELL. AND FOR THAT REASON, I WILL ALLOW THAT MATTER, THAT ISSUE ALSO TO GO TO THE JURY BUT UNDERSTANDING THAT THE COURT MAY CONSIDER OR RECONSIDER THE RULING AT A LATER TIME.

ALL RIGHT. THE OBJECTION, MR. KHOURY, IS NOTED FOR THE RECORD.

**MR. KHOURY:** THANK YOU, YOUR HONOR.

**THE COURT:** SO LET'S TALK ABOUT THE JURY INSTRUCTIONS. AND FIRST OF ALL, DO YOU HAVE ANY REBUTTAL EVIDENCE?

**MR. SHEPPARD:** NOT REBUTTAL. BUT I DO HAVE MY OWN MOTION TO MAKE, YOUR HONOR.

11:15a

**THE COURT:** YES.

**MR. SHEPPARD:** YOUR HONOR, WE HAD MET TUESDAY AND I STARTED ADDRESSING CONCERNS WITH THE VESSEL DEFENDANTS' LIMITATION OF LIABILITY ACT TO LIMIT THE LIABILITY TO THE VALUE OF THE VESSEL AND THE FREIGHT ON BOARD. THERE HAS BEEN NO EVIDENCE FOR THE VALUE OF THIS VESSEL. THERE HAS BEEN NO TESTIMONY FOR THE VALUE OF THE VESSEL. THERE HAS BEEN NO TESTIMONY ABOUT WHAT WAS ON BOARD AND HOW MUCH IT WAS WORTH.

I HAD MENTIONED THAT I THOUGHT IT WAS A LITTLE DIFFICULT TO BELIEVE THAT THERE IS NO DOCUMENT OUT THERE THAT WOULD SHOW WHAT THIS VESSEL IS WORTH, THAT HAVEN'T PROVIDED INFORMATION TO INSURANCE COMPANIES IN ORDER FOR THEM TO HAVE IT INSURED. WE HAVEN'T RECEIVED ANY DOCUMENTS SHOWING WHAT IT'S WORTH. THERE IS NO DOCUMENTS IN EVIDENCE SHOWING WHAT IT'S WORTH. AND THAT'S THEIR DEFENSE TO PROVE.

AND THEY HAVEN'T PROVIDED ANY EVIDENCE TO THE COURT TO DEMONSTRATE THAT THEY'RE ENTITLED TO A LIMIT -- TO, ONE, THEY'RE ENTITLED TO LIMITATION OF LIABILITY AND; TWO, WHAT THAT LIABILITY WOULD BE. AND THAT'S SOMETHING THAT THEY WOULD NEED TO HAVE DONE AT THIS POINT.

**THE COURT:** COUNSEL?

11:16a

**MR. KHOURY:** YOUR HONOR, I THINK, AS YOU KNOW, WE'VE STIPULATED THAT THE ISSUE OF LIMITATION OF LIABILITY WOULD BE TRIED, YOUR HONOR, IF AND WHEN THERE IS A JUDGMENT ON LIABILITY AND DAMAGES. OFTENTIMES THE WAY THAT THIS IS DONE IS THROUGH THE TESTIMONY OF THE CORPORATE REPRESENTATIVE WITH KNOWLEDGE OF THE VALUE OF A VESSEL. WHILE THERE ARE SOMETIMES DOCUMENTS THAT COULD REFER TO THE VALUE OF THE VESSEL SUCH AS THE INSURED VALUE ON AN INSURANCE POLICY, IT'S PRETTY WELL-KNOWN THAT THAT'S ALMOST NEVER THE ACTUAL FAIR MARKET VALUE OF THE VESSEL. AND THAT'S WHAT THE COURT HAS TO CONSIDER IS WHAT THE FAIR MARKET VALUE OF THE VESSEL IS.

**THE COURT:** AND I DON'T MEAN TO BE RUDE.

**MR. KHOURY:** SURE.

**THE COURT:** LET ME ASK YOU, MR. SHEPPARD, IF YOU WILL. SO I UNDERSTAND THE NATURE OF YOUR MOTION. IT WAS MY UNDERSTANDING GOING IN THAT BOTH SIDES WOULD HAVE THE COURT ADDRESS THE ISSUE AT A LATER TIME. AM I INCORRECT ABOUT THAT?

**MR. SHEPPARD:** THE ISSUE OF WHETHER IT APPLIES, I THOUGHT THAT WAS SOMETHING FOR THE COURT TO CONSIDER -- THAT WAS THE COURT'S DECISION TO MAKE. BUT WHETHER THERE IS EVIDENCE OF IT, I THOUGHT THAT WAS SOMETHING THAT THEY NEED TO BRING IN THEIR CASE-

11:17a

IN-CHIEF.

**THE COURT:** I AGREE. BUT I GUESS MY QUESTION TO YOU IS: WHAT WOULD YOU HAVE ME DO AT THIS POINT?

**MR. SHEPPARD:** I DON'T -- WELL, YOUR HONOR, THE FACT THAT WE'VE NEVER RECEIVED ANY DOCUMENTS, WE HAVE NO TESTIMONY ON IT, I WOULD SAY THAT THEY HAVEN'T PROVIDED ANY SUFFICIENT BASIS FOR THAT DEFENSE TO CONTINUE AT THIS POINT.

**THE COURT:** FOR WHAT TO CONTINUE?

**MR. SHEPPARD:** FOR THAT PARTICULAR DEFENSE TO CONTINUE. THAT THEY HAVEN'T PROVIDED ANY EVIDENCE TO SUPPORT THAT DEFENSE -- THE DEFENSE.

**THE COURT:** AND SO, AGAIN, WHAT WOULD YOU HAVE ME DO AT THIS POINT IN THE TRIAL?

**MR. SHEPPARD:** I WOULD ASK THE COURT TO STRIKE THE DEFENSE AND WE, YOU KNOW, MOVE FORWARD.

**THE COURT:** WELL, I'M NOT GOING TO DO THAT. WOULD YOU AGREE WITH ME THAT GIVEN THAT THE COURT WILL ADDRESS THE ISSUE -- AND IT'S A FACTUAL ISSUE -- AT A LATER TIME PURSUANT TO THE STIPULATION, THAT THE COURT IS STILL ENTITLED TO RECEIVE EVIDENCE DEPENDING ON -- MY ASSUMPTION -- AND IT'S ONLY AN ASSUMPTION HERE -- IS THAT BECAUSE OF THE STIPULATION, THAT THE PLAINTIFF -- THE DEFENSE DOESN'T HAVE TO PRESENT ANY

11:18a

EVIDENCE AT THIS POINT BECAUSE IT MAY BE EXTRANEOUS TO WHAT THIS JURY IS -- THE ISSUES TO BE ADDRESSED BY THIS JURY.

**MR. SHEPPARD:** I WOULD THINK THAT THEY WOULD JUST HAVE TO ASK TWO QUESTIONS: YOU KNOW, WHAT'S THE VALUE OF THE VESSEL? WHAT ARE YOU BASING IT ON? WHAT'S THE VALUE OF THE FREIGHT? WHAT ARE YOU BASING IT ON? THAT WASN'T DONE.

**THE COURT:** RIGHT. BUT THAT'S NOT -- THAT'S FOR ME TO CONSIDER AT THE APPROPRIATE TIME, IS MY POINT.

**MR. SHEPPARD:** OKAY, YOUR HONOR.

**THE COURT:** SO TO THE EXTENT WE REQUIRE ADDITIONAL EVIDENCE, WE'LL DO IT IF AND WHEN IT BECOMES NECESSARY TO CONSIDER THE ISSUE. OKAY?

**MR. SHEPPARD:** YES, YOUR HONOR.

**MR. KHOURY:** THANK YOU, YOUR HONOR.

**THE COURT:** SO THIS IS -- I HAVE ONE CHANGE WE'RE GOING TO MAKE TO THE JURY INSTRUCTIONS; AND THAT'S AT PAGE -- WHAT PAGE IS -- SO ON PAGE 9 WE HAVE -- NO, THAT'S NOT PAGE 9.

**THE LAW CLERK:** PAGE 10 OR 9. THE PAGES HAVE MOVED AROUND BECAUSE WE DELETED THINGS. SO THE PAPER COPY THAT YOU HAVE IS NO LONGER THE MOST RECENT.

11:20a

**THE COURT:** OKAY, IT'S 12. ALL RIGHT. SO PAGE 12 -- WELL, THAT'S THE OLD PAGE 12. DEPOSITION TESTIMONY. RIGHT?

**MR. PUSATERI:** WHICH NUMBER?

**THE LAW CLERK:** TRANSCRIPT OF RECORDED CONVERSATION.

**THE COURT:** YES. AND SO WE HAVE PAGE -- DEPOSITION -- THE INSTRUCTION ON DEPOSITION TESTIMONY. CORRECT? NOW, THE FOLLOWING -- AFTER THAT SHOULD BE A TRANSCRIPT OF THE RECORDED CONVERSATION.

**MR. SHEPPARD:** YES, YOUR HONOR.

**THE COURT:** NOW, THERE WERE NO RECORDINGS OF DEFENSE EXHIBIT --

**MR. PUSATERI:** THERE IS NO TRANSCRIPT, YOUR HONOR. WE DIDN'T PRODUCE THE TRANSCRIPT BECAUSE WE USED SO LITTLE OF IT.

**THE COURT:** CORRECT. AND SO THERE WAS NO TRANSCRIPT. HOWEVER, FOR THAT REASON, THE FIRST TWO PARAGRAPHS WHICH REFLECT A TRANSCRIPT FOR DEFENSE EXHIBIT 8, OF COURSE, WILL NOT GO TO THE JURY BECAUSE THERE IS NO TRANSCRIPT. CORRECT?

HOWEVER, THE THIRD PARAGRAPH OF THE INSTRUCTION WILL BE GIVEN TO THE JURY BECAUSE OF THE -- AS WE DISCUSSED YESTERDAY -- FRIDAY -- THERE

11:21a

WAS A TRANSCRIPT THAT SCROLLED AT THE BOTTOM OF CAPTAIN HAGLUND'S TESTIMONY.

MY INSTRUCTION TO THEM THEN -- IT WILL BE THE SAME TODAY -- THAT IF THERE IS A DISCREPANCY OR SOME INCONSISTENCY IN THE TRANSCRIPT AND WHAT THEY HEARD IN THE TESTIMONY, THEY'RE SUPPOSED TO ESSENTIALLY RELY ON WHAT THEY ACTUALLY HEARD. AND THAT IS PRECISELY, I BELIEVE, WHAT THIS PARAGRAPH ADDRESSES.

IF Y'ALL WANT TO TAKE A BRIEF FEW SECONDS TO REVIEW THAT -- BECAUSE WHAT I'D LIKE TO DO IS SIMPLY ADD THAT THIRD PARAGRAPH TO THE INSTRUCTION ON DEPOSITION TESTIMONY.

**MR. PUSATERI:** SOUNDS REASONABLE TO THE DEFENSE, YOUR HONOR.

**MR. SHEPPARD:** NO OBJECTION FROM THE PLAINTIFF.

**THE COURT:** HAVE YOU GOT THAT, AMBER?

**THE LAW CLERK:** YES.

**THE COURT:** SO -- AGAIN, SO LET ME JUST ASK ON THE RECORD ONCE AGAIN, MR. SHEPPARD: NO ADDITIONAL EVIDENCE FROM THE PLAINTIFF; IN OTHER WORDS, NO REBUTTAL EVIDENCE. CORRECT?

**MR. SHEPPARD:** NO REBUTTAL EVIDENCE, YOUR HONOR.

11:22a

**THE COURT:** SO THIS IS WHAT I'D LIKE TO DO. I'LL GO ON AND BRING THE JURY BACK. AND WHAT I'D LIKE TO DO IS BEGIN THE CLOSING ARGUMENTS.

HOW MUCH TIME DO YOU WANT ON YOUR FIRST CLOSING?

**MR. SHEPPARD:** 45 MINUTES, YOUR HONOR.

**THE COURT:** SO WE'LL GO TILL -- WE'LL GO 45 MINUTES, WE'LL TAKE A BRIEF THREE-MINUTE BREAK. AND RIGHT AT 11:25 WE'LL BRING THE JURY BACK.

I WILL TURN TO YOU AND ASK: "NOW THAT THE DEFENSE HAS RESTED, WOULD THE PLAINTIFF LIKE TO PROVIDE ANY REBUTTAL EVIDENCE?" YOU CAN JUST SIMPLY STATE ON THE RECORD THAT "NO." FROM THAT POINT ON I WILL THEN INSTRUCT THE JURY THAT WE WILL NOW IMMEDIATELY GO INTO CLOSING ARGUMENTS. OKAY? AND THAT YOU'LL HAVE 45 MINUTES, AND I WILL GIVE YOU -- AT ABOUT THE TEN-MINUTE MARK OR FIVE-MINUTE MARK I'LL LET YOU KNOW. RIGHT AFTER THAT WE'LL GO ON AND HAVE LUNCH. IT WILL BE ABOUT A 40-MINUTE LUNCH OR SO. I'D LIKE TO GET BACK ON TRACK RIGHT AT 1:00 FOR THE DEFENSE CLOSING AND THE BALANCE OF ANY REBUTTAL ARGUMENT. OKAY? ANY QUESTIONS?

**MR. SHEPPARD:** THEN YOU'RE READING THE INSTRUCTIONS AFTER THAT?

**THE COURT:** AND RIGHT AFTER THAT WE'LL READ

11:23a

THE INSTRUCTIONS.

**MR. PUSATERI:** YOUR HONOR, AT THIS POINT IF WE WOULD LIKE TO, CAN WE REFER TO THE INSTRUCTIONS IN OUR CLOSING?

**THE COURT:** YES, INDEED YOU CAN. SO WE'RE GOING TO TURN THE PODIUM. AND IF YOU HAVE ANYTHING YOU WANTED TO GET SET UP, READY TO GO, ANY DEMONSTRATIVE AIDS?

**MR. PUSATERI:** NOTHING FOR US, YOUR HONOR, AT THIS POINT. WE'LL DO THAT AT LUNCH.

**MR. SHEPPARD:** YOUR HONOR, WE'VE SPOKEN. THERE ARE TWO EXHIBITS THAT WE EACH WERE SEEKING TO ADMIT. ONE IS THIS -- THEY'RE GRAY SLIDES THAT I USED WHEN I WAS QUESTIONING DR. RICE. AND I BELIEVE THEY'VE SAID THAT THAT'S OKAY.

**MR. PUSATERI:** CORRECT.

**MR. SHEPPARD:** AND THEY'VE SOUGHT TO ADMIT SOME SLIDES THAT HAVE WOOD PANELING, AND I SAID THAT THEY'RE OKAY, PROVIDED THEY'RE THE ONES THEY SENT TO ME EARLIER.

**THE COURT:** VERY GOOD.

**MR. PUSATERI:** WE NEED TO IDENTIFY THOSE BY --

**MR. SHEPPARD:** I THINK THAT WOULD BE PLAINTIFF'S EXHIBIT 12. THAT WOULD BE WHAT WE'RE

11:24a

ADDING, WHICH WOULD BE THE GRAY SLIDES.

**THE COURT:** THAT'S FINE.

AMBER, DO YOU HAVE THE CHANGES?

**THE LAW CLERK:** YES.

**MR. PUSATERI:** I GUESS THE QUESTION IS THE PHOTOS, THE SCREENSHOT PHOTOS. THOSE WERE 10 AND 11. SO I THINK THIS IS DEFENSE EXHIBIT 12, TOO. DOES THAT SOUND RIGHT?

**THE COURT:** I'M CONFUSED NOW. YES, I THINK THAT -- IS THAT RIGHT, ELIZABETH?

**THE COURTROOM DEPUTY:** YES.

**MR. PUSATERI:** SO THEY'RE BOTH, PLAINTIFF'S 12 AND DEFENSE 12, SUMMARY EXHIBITS.

**THE COURT:** ANYTHING ELSE?

**MR. SHEPPARD:** NO, YOUR HONOR.

**THE COURT:** LET'S TAKE A QUICK BREAK. WHEN WE GET BACK, WE'LL BEGIN THE CLOSING ARGUMENTS.

**(WHEREUPON, A RECESS WAS TAKEN.)**

**THE COURT:** BE SEATED.

DO YOU NEED A COPY OF THE INSTRUCTIONS DURING YOUR CLOSING?

**MR. SHEPPARD:** I'M GOING TO BRIEFLY TOUCH ON IT.

**THE COURT:** DO YOU NEED THE FRESH COPY OR ARE YOU GOING TO WORK FROM WHAT YOU ALREADY HAVE?

11:31a

**MR. SHEPPARD:** I CAN USE THIS.

**THE COURT:** BECAUSE IF YOU'RE GOING TO USE THE ELMO, WE'LL WAIT FOR IT. BUT IF YOU'RE OKAY --

**MR. SHEPPARD:** I WAS GOING -- I'LL JUST READ FROM IT. THAT WAY I DON'T HAVE TO GO BACK AND FORTH.

**THE COURT:** THAT'S FINE.

WITH THAT BEING THE CASE, WHY DON'T WE ALL RISE FOR THE JURY AND WE CAN GET STARTED.

**(WHEREUPON, THE JURY IS IN THE COURTROOM.)**

**THE COURT:** BE SEATED.

ALL RIGHT. THE NEXT ITEM TO BE TAKEN UP IS WHETHER THE PLAINTIFF WILL OFFER ANY REBUTTAL EVIDENCE AT THIS TIME?

**MR. SHEPPARD:** NO, YOUR HONOR.

**THE COURT:** THANK YOU.

SO, LADIES AND GENTLEMEN, AS YOU'VE HEARD, THAT IS ALL THE EVIDENCE THAT YOU -- THAT'S OFFERED FOR YOUR CONSIDERATION. DURING YOUR DELIBERATIONS I WILL HAVE INSTRUCTIONS ON HOW TO ASSESS THE CREDIBILITY OF THE WITNESSES AND OTHER FACTORS THAT PERTAIN TO YOUR EVALUATION OF THE EVIDENCE WHEN I PROVIDE THE INSTRUCTIONS FOR YOU.

BUT WE HAVE NOW REACHED THE POINT IN THE TRIAL WHERE THE LAWYERS WILL NOW ADDRESS YOU IN WHAT WE CALL CLOSING ARGUMENT. NOW, AS I TOLD YOU,

11:32a

WHAT THE LAWYERS SAY IS NOT EVIDENCE. HOWEVER, ESPECIALLY AT THIS STAGE OF OUR TRIAL, THE CLOSING ARGUMENTS ARE INDEED VERY IMPORTANT, AND I WOULD ASK YOU TO GIVE THEM YOUR FULL ATTENTION AT THIS TIME.

ALL RIGHT. MR. SHEPPARD, YOU MAY BEGIN.

**MR. SHEPPARD:** MAY I GET THE SCREENS, PLEASE, MS. BREDA?

GOOD MORNING, EVERYONE. I KNOW Y'ALL HAVE BEEN HERE A LONG, LONG TIME. YOU'VE HEARD FROM A LOT OF PEOPLE. I COUNTED I THINK SOMEWHERE AROUND 17 WITNESSES MAYBE, MAYBE A LITTLE LESS, A LOT OF EXPERTS, A LOT OF MEDICAL CONDITIONS WITH LONG NAMES. YOU'VE SEEN LOTS AND LOTS OF DOCUMENTS AND, YOU KNOW, IN SOME TIME YOU'LL BE ABLE TO GO BACK AND LOOK THROUGH ALL OF THAT. AND I THANK YOU -- LIKE I SAID AT THE BEGINNING, I THANK YOU FOR BEING HERE. I THANK YOU FOR YOUR SACRIFICE BEING HERE. I KNOW THAT IT HAS BEEN DIFFICULT. AND, YOU KNOW, WITHOUT YOU, THIS WHOLE THING IS IMPOSSIBLE. YOU'RE THE LINCHPIN HERE.

THE JUDGE IS GOING TO, LIKE HE SAID, INSTRUCT YOU ON THE LAW. HE'S GOING TO TALK TO YOU ABOUT HOW THE EVIDENTIARY STANDARD IN THIS CASE IS PREPONDERANCE OF THE EVIDENCE. AND THAT'S ALSO KIND

11:34a

OF KNOWN AS THE MORE LIKELY THAN NOT STANDARD. IT'S -- THAT'S THE LENS THAT YOU KIND OF EVALUATE THIS EVIDENCE, IS ARE WE PROVING OUR CASE MORE LIKELY THAN NOT. SOME LAWYERS DISCUSS THIS IN DIFFERENT WAYS. THEY PUT UP TWO REAMS OF PAPER AND THEY MOVE ONE SHEET OVER. SOME PEOPLE SAY 51 PERCENT. BUT IT'S JUST THE GREATER WEIGHT OF CREDIBLE EVIDENCE. THAT'S IT. HOWEVER YOU WANT TO THINK OF THAT IS PERFECTLY FINE, BUT IT'S: WE JUST HAVE TO SHOW IT BY JUST A LITTLE BIT MORE THAN 50 PERCENT OF THE CREDIBLE EVIDENCE. THIS ISN'T BEYOND A REASONABLE DOUBT LIKE THEY WOULD HAVE IN A MURDER TRIAL. THIS ISN'T CLEAR AND CONVINCING. IT'S RIGHT IN THE MIDDLE.

WHEN WE FIRST MET I HAD TALKED TO YOU ABOUT THE JONES ACT AND THE LAW OF THE SEA. IT'S IMPORTANT IN THIS CASE BECAUSE MR. GRIFFIN AS A SEAMAN IS ENTITLED TO CERTAIN RIGHTS. HE'S ENTITLED TO MAINTENANCE AND CURE. THAT'S YOUR ROOM AND BOARD; THAT'S MAINTENANCE. AND YOU'RE GOING TO GET MORE DETAILED DEFINITIONS OF THIS FROM THE JUDGE. CURE IS THE PAYMENT OF YOUR MEDICAL EXPENSES RELATED TO AN INJURY ON BOARD A VESSEL. THESE ARE BASIC, BASIC, BASIC RIGHTS FOR ALL SEAMEN.

AS YOU HEARD FROM CAPTAIN HAGLUND --

11:35a

SORRY, NOT CAPTAIN HAGLUND -- COMMANDER LEBSACK, THAT THINGS WERE NOT ALWAYS SO NICE FOR SEAMEN BACK IN THE DAY. HUNDREDS OF YEARS THEY WERE MISTREATED, SO THEY GET THESE SPECIAL RIGHTS TO PROTECT THEM. AND THEY DON'T HAVE TO ESTABLISH FAULT TO GET MAINTENANCE AND CURE. IF YOU'RE INJURED IN THE SERVICE OF THE VESSEL, THAT'S ALL YOU'VE GOT TO SHOW. NOW, THERE ARE SOME EXCEPTIONS TO THAT, BUT I DON'T BELIEVE THAT THEY APPLY HERE.

REC MARINE HAS DENIED THESE RIGHTS FOR MR. GRIFFIN'S NECK AND BACK FOR NEARLY FOUR YEARS. WE'RE COMING UP ON IT, ACTUALLY. THE INCIDENT HAPPENED MAY 2ND OF 2018, SO FOR FIVE YEARS -- OR NO. SORRY. THEY STARTED PAYING THE SHOULDER IN 2018 TO 2019. SO FOUR YEARS THEY'VE DENIED IT. AND YOU'RE GOING TO SEE THAT FAILURE TO PAY MAINTENANCE AND CURE CAN HAVE CONSEQUENCES. WE'VE GONE OVER THIS. IT'S A BIG DEAL: PUNITIVE DAMAGES.

SO I'M GOING TO KIND OF WALK US THROUGH AND GIVE YOU AN IDEA OF WHERE I'M GOING. I'M GOING TO START ABOUT THINGS THAT HAPPENED OR DIDN'T HAPPEN BEFORE THE INCIDENT. I'M GOING TO TALK ABOUT THE INCIDENT. THEN I'M GOING TO GO FORWARD FROM THERE. THEN I'LL START TALKING ABOUT SOME OF THE TESTIMONY THAT I THINK THAT'S IMPORTANT THAT YOU'VE HEARD. AND

11:36a

THEN WE'LL TALK ABOUT DAMAGES. JUST WANT TO GIVE YOU A ROADMAP OF WHERE WE'RE GOING.

NO JSAs WERE COMPLETED. YOU HAVE NO EVIDENCE OF ONE. YOU HAVE TESTIMONY THAT THIS WOULD BE KEPT AT A PLATFORM. YOU HAVE TESTIMONY THAT THEY WOULDN'T DO IT. BUT YOU HAVE WRITTEN POLICIES THAT HAVE NOT CHANGED, THAT THE COMPANY SAYS THEY WILL FOLLOW, THAT SAY THESE THINGS NEED TO BE DOCUMENTED. AND THESE ARE HIGH-RISK OPERATIONS. AND YOU'LL SEE I'VE PUT SOME NAMES NEXT TO SOME OF THESE BULLET POINTS. THOSE ARE FOLKS THAT AGREE WITH IT.

YOU DO THIS BECAUSE YOU WANT TO PREVENT FURTHER INJURIES TO PEOPLE. YOU DON'T WANT THEM GETTING HURT. MR. GRIFFIN GOT HURT. THERE IS NO. JSAs. THEY'RE NOT -- THERE IS NO JSA COMPLETED. AND THE JSA THAT CAPTAIN HAGLUND SAYS HE DID, WHICH, AT BEST, INVOLVES ASKING SOMEBODY TO GO SOMEWHERE ON THE BOAT, LOOK AT A DOCUMENT AND SIGN A PIECE OF PAPER, DID YOU EVER SEE THE DOCUMENT THEY WERE SUPPOSED TO REVIEW? WAS IT EVER SHOWN TO YOU? BECAUSE IT DOESN'T EXIST. THEY CAN SAY ALL THEY WANT. BUT WHEN YOU ASK THEM TO SHOW YOU SOMETHING, THEY CAN'T.

YOU DO THIS -- JSAs MUST BE DONE BEFORE PERSONNEL BASKET OPERATIONS CAN START. I DON'T THINK THAT THIS IS GOING TO BE DISPUTED. I THINK WHAT

11:38a

THEY'RE GOING TO SAY IS THAT THE PLATFORM SHOULD HAVE DONE IT. BUT THE PLATFORM CAN'T DO IT ALONE BECAUSE THE PLATFORM ISN'T WORKING ALONE. THE PLATFORM IS WORKING IN CONJUNCTION WITH THE FOLKS ON THE DECK OF THE *DUSTIN DANOS*. YOU HAVE TO INVOLVE THOSE PEOPLE. AND THEIR POLICIES SAY "PRIOR TO BEGINNING AN UNFAMILIAR, HAZARDOUS" -- WHICH PERSONNEL BASKET TRANSFER OPERATION IS -- "OR MAJOR PROJECT, ALL PARTICIPANTS INVOLVED SHALL HAVE A SAFETY MEETING. STEP-BY-STEP PROCEDURES (JSA) SHOULD BE ANALYZED AND AGREED ON. UNDER NO CIRCUMSTANCES SHOULD WORK BEGIN BEFORE A SAFETY MEETING IS HELD." THIS IS IN PLAINTIFF'S EXHIBIT 1, PAGE 38.

IF YOU LOOK ON THE VERY NEXT PAGE, IT DOESN'T SAY THAT THEY CAN SOMETIMES FILL OUT PAPERWORK, SOMETIMES NOT FILL OUT PAPERWORK. IT SAYS, "A WRITTEN RECORD OF THESE MEETINGS WILL BE MADE BY MEANS OF COMPLETING THE REPORT OF" -- THAT SHOULD SAY SAFETY MEETINGS. "THE COMPLETED REPORT SHALL BE FORWARDED TO THE HEALTH SAFETY & ENVIRONMENTAL DEPARTMENT." THAT'S BRIAN HARRIS. THEY'RE SUPPOSED TO FILL THIS STUFF OUT, THEY'RE SUPPOSED TO GIVE IT TO THE SAFETY GUYS. THAT WASN'T DONE. SORRY. I DIDN'T REALIZE I HADN'T SHOWN YOU THAT SECOND PAGE.

11:39a

HERE'S THEIR POLICIES IN THEIR HANDBOOK. THIS TALKS ABOUT A JOB SAFETY ANALYSIS: IDENTIFY EXISTING POTENTIAL HAZARDS TO WORKERS' HEALTH AND SAFETY; DESCRIBE HAZARDS IN DETAIL; DEVISE METHODS AND PROCEDURES TO REDUCE OR ELIMINATE THE HAZARDS; IT IS WELL-SUITED TO DISCOVER HIDDEN DANGERS; HIDDEN DANGERS ARE THE MOST INSIDIOUS; THE IDENTIFICATION OF HAZARDS IS A CRUCIAL COMPONENT OF ANY SUCCESSFUL SAFETY PROGRAM.

THAT'S WHAT THEY HAVE TO DO. THESE ARE THEIR POLICIES. WE DIDN'T WRITE THEM FOR THEM. THIS IS WHAT THEY WROTE. THIS IS WHAT THEY'VE SAID TO THE COAST GUARD THEY'LL DO. THEY'VE PRIORITIZED THE JOBS TO BE ANALYZED. THE BASKET TRANSFER OPERATION IS ONE OF THEM.

THIS IS THE WORKSHEET THEY'RE SUPPOSED TO COMPLETE. YOU WILL NOT SEE THIS. IT WAS NOT COMPLETED. THEY BLAME IT ON: YOU SHOULD HAVE THE PLATFORM DO IT. YOU HEARD FROM CAPTAIN HAGLUND -- SORRY. YOU HEARD FROM COMMANDER LEBSACK: THAT IS SOMETHING THAT NEEDS TO BE DONE ON THE VESSEL. HE SAID, ACCORDING TO THE INTERNATIONAL MARINE CONTRACTORS ASSOCIATION, PERSONNEL BASKETS ARE HIGH-RISK OPERATIONS; EXTRAORDINARY CARE SHOULD BE TAKEN TO ENSURE PERSONNEL AND EQUIPMENT ARE PROPERLY

11:40a

PREPARED; AND THEN DEFENDANTS FAILED IN THEIR SHARED RESPONSIBILITY TO TRAIN FOR AND CONDUCT A SUCCESSFUL PERSONNEL BASKET TRANSFER OPERATION.

SO WHAT ARE THEIR EXCUSES? WE'VE TALKED ABOUT IT. "WE'RE NOT REQUIRED TO COMPLETE IT." THAT'S EXCUSE NO. 1. "IT'S ON THE PLATFORM'S. IT'S THEIR JOB." BUT AGAIN, THEIR OWN POLICIES SAY THEY'RE SUPPOSED TO DO IT, THEY'RE SUPPOSED TO IDENTIFY IT. "IT'S PROBABLY ON THE PLATFORM SOMEWHERE." WE'VE NEVER SEEN IT. "WE DON'T NEED TO DOCUMENT JSAs." THEIR OWN POLICIES SAY THEY NEED TO WRITE IT OUT AND SEND IT TO BRIAN HARRIS OVER AT HEALTH AND SAFETY.

MR. GRIFFIN COULD HAVE REVIEWED THE PREPRINTED NONSPECIFIC JSAs ON BOARD. THERE IS NOT A SINGLE DOCUMENT IN THIS CASE SHOWING THAT THAT DOCUMENT EVEN EXISTS. THERE IS NOT A SINGLE PREPRINTED JSA IN THIS CASE BECAUSE IT DOESN'T EXIST. IF IT EXISTED, IT WOULD BE HERE.

MR. GRIFFIN SUED THE DEFENDANTS FOR THE INCIDENT INVOLVING THE MAN BASKET. THERE HAS BEEN SOME TALK ABOUT MR. GRIFFIN BUMPING HIS SHOULDER INTO A FIRE HOSE RACK IN THE ENGINE ROOM. HE DOES NOT DISPUTE THAT HAPPENING. IN FACT, HE SAYS IT HAPPENED. HE TELLS THEM IT HAPPENED. DOESN'T SHY

11:42a

AWAY FROM THAT. AS PART OF THE INCIDENT THE CAPTAIN OKAYS THE HIGH-RISK MAN BASKET OPERATION AND THE LOCATION ON THE BACK DECK.

NOW, YOU HEARD -- YOU SAW MR. GRIFFIN'S DIAGRAM. IT'S A DEMONSTRATIVE. I BELIEVE IT'S JOINT EXHIBIT 37. IT'S THE YELLOW SHEET OF PAPER WHERE HE DRAWS OUT WHAT IT KIND OF LOOKED LIKE ON THE DECK. YOU SAW THAT AND YOU SAW MR. BADEAUX'S. HIS WAS A LITTLE FURTHER BACK. THERE IS A LITTLE DIFFERENCE GOING ON THERE.

BUT WHAT'S NOT DIFFERENT IS THAT WHERE THIS HAPPENED, WHO WAS THERE. AND NOT JUST IT HAPPENED ON THE BOAT, IT HAPPENED IN A VERY SPECIFIC AREA OF THE GULF OF MEXICO ON A SPECIFIC PLATFORM WHERE STONE ENGINEERING WORKERS WERE PRESENT, AROUND MAY, WHERE THEY HAD CAPTAIN HAGLUND, MR. GRIFFIN, MR. BADEAUX, AND MR. WINHAUER ALL ON THE SAME BOAT AT THE SAME TIME. THEY ALL REMEMBER THAT. THOSE THINGS HAVEN'T CHANGED. BUT AFTER FIVE YEARS, SOME OF THE SMALLER DETAILS HAVE SHIFTED.

MR. GRIFFIN WHILE HE'S TRYING TO GUIDE THE BASKET, PREVENT IT FROM HITTING THINGS ON THE DECK, PREVENTING THE -- TRYING TO PREVENT THE PEOPLE FROM GETTING HURT, WHAT HAPPENS? THE VESSEL IS MOVING. IT'S MOVING AWAY FROM THE PLATFORM. WHY?

11:43a

BECAUSE THE CAPTAIN ENGAGES THE CONTROLS, PUTS THEM IN FORWARD, STEPS AWAY FROM THE CONTROLS, STARTS FUSSING AROUND WITH HIS CELL PHONE AND WASN'T PAYING ATTENTION TO WHAT WAS HAPPENING. IT'S NO WONDER HE DIDN'T SEE IT. HE WASN'T LOOKING AT WHAT WAS HAPPENING.

MR. GRIFFIN ATTEMPTED TO PREVENT THAT BASKET AND THREE MEN FROM GETTING HURT. AND YOU'RE GOING TO SEE IN THE INSTRUCTIONS MR. GRIFFIN IS NOT TO BE HELD AT FAULT FOR, YOU KNOW, FOLLOWING ORDERS EVEN IF THOSE ORDERS WERE DANGEROUS. THOSE WILL BE SOME INSTRUCTIONS YOU'LL GET LATER. HE SUFFERED SIGNIFICANT SHOULDER, NECK, AND BACK INJURIES TRYING TO PROTECT OTHER PEOPLE. HE WAS LEFT ALONE TO FEND FOR HIMSELF AND HE WAS JUST CARRYING OUT HIS ORDERS.

NOW, YOU HEARD FROM MR. KHOURY IN HIS OPENING. HE SAID THAT WE MAY TRY TO DOWNPLAY WHAT HAPPENED IN THE ENGINE ROOM. HE USED THAT WORD "DOWNPLAY." WE BROUGHT IT UP IN OUR OPENING. WE TOLD YOU ABOUT IT. WE'RE NOT DOWNPLAYING ANYTHING. YOU'VE HEARD FROM DR. GREENE, DR. FERACHI: THE INCIDENT IN THE ENGINE ROOM DOES NOT CAUSE A ROTATOR CUFF TEAR; DOES NOT CAUSE A HERNIATED DISK; IT DOES NOT CAUSE BACK INJURIES. YOU SAW THE OMS RECORD, OCCUPATIONAL MEDICINE SERVICES. IT DOESN'T -- THEY

11:45a

DON'T THINK IT EVEN CAUSES A ROTATOR CUFF TEAR. AT BEST, THEY THOUGHT IT MIGHT CAUSE A CONTUSION, A BRUISE. WE'RE NOT DOWNPLAYING ANYTHING. THE DOCTORS HAVE TOLD US THIS ISN'T RELATED.

DR. FERACHI TESTIFIED THAT IT'S MORE LIKELY THAT MR. GRIFFIN'S INJURIES STEM FROM THE INCIDENT INVOLVING THE PERSONNEL BASKET. THIS WAS ECHOED BY DR. GREENE.

THIS IS THE BOAT LOG. THESE ARE ALL THE THINGS THAT EVERYONE KIND OF AGREES ON: WHERE THEY WERE, LBJ. THAT'S IN MR. GRIFFIN'S TESTIMONY. HE HAS BEEN SAYING THAT FROM THE VERY BEGINNING. HE'S BEEN SAYING THAT FROM WHEN THE INSURANCE ADJUSTER CAME AND RECORDED HIS STATEMENT. HE'S BEEN SAYING WHO WAS ON THE BOAT: HAGLUND, WINHAUER, HIMSELF, BADEAUX. HE SAYS WHO HE WAS DEALING WITH; STONE ENGINEERING.

SO THEY REPORT THIS TO CAPTAIN HAGLUND. MR. GRIFFIN GOES TO THE WHEELHOUSE. MR. BADEAUX IS THERE. THEY TALK ABOUT WHAT HAPPENED. CAPTAIN HAGLUND TELLS MR. GRIFFIN THAT DAVID HOLLYWOOD GRIFFIN WAS CALLING HIM FOR CREW CHANGE. MR. BADEAUX REMEMBERS SOMETHING ABOUT CAPTAIN HAGLUND BEING ON HIS PHONE OR USING HIS PHONE TO TALK TO HIS WIFE. THAT'S A SMALL DETAIL. THAT'S A SLIGHT

11:46a

INCONSISTENCY. BUT WHAT THEY BOTH KNOW IS THAT CAPTAIN HAGLUND GAVE THEM INFORMATION LETTING THEM KNOW THAT HE WAS ON HIS PHONE. AND MR. GRIFFIN, HE TOLD YOU "I WAS" -- HE SAID, "DAVID GRIFFIN IS CALLING ME ABOUT CREW CHANGE."

FOR MR. BADEAUX, HE SAW IT. HE LOOKED AND PEERED INTO THE WHEELHOUSE. HE LOOKED AND SAW WHAT WAS HAPPENING. THE CONTROLS WERE ENGAGED. THE VESSEL WAS MOVING AWAY FROM THE PLATFORM, AND HE SEES STRAIGHT THROUGH THAT THE CAPTAIN HAD BEEN FUSSING WITH HIS PHONE AND WAS GOING BACK TO THE CONTROLS. HE DIDN'T SEE WHAT HAPPENED ON DECK BECAUSE HE WASN'T PAYING ATTENTION.

AFTER THEY CONFRONT CAPTAIN HAGLUND ABOUT WHAT HAPPENED, MR. GRIFFIN GOES BACK TO WORK. HE'S SEEN LATER BY MR. BADEAUX ICING HIS NECK IN BETWEEN HIS SHOULDER AND HIS NECK, KIND OF THE SAME AREA WHERE HE EVENTUALLY PUTS AN "X" ON.

CAPTAIN HAGLUND DOESN'T REPORT MAN BASKET INCIDENT. AND IT IS HIS JOB TO DO THAT. MR. GRIFFIN SAID HE WANTED TO LEAVE THE BOAT AND GET CHECKED OUT. CAPTAIN HAGLUND DOESN'T COMPLETE AN INCIDENT REPORT. MR. GRIFFIN WASN'T ALLOWED TO. AND THIS IS IMPORTANT, BECAUSE REC MARINE HAS GENERAL SAFETY POLICIES -- AND I'M ABOUT TO SHOW THEM -- THAT

11:47a

REQUIRE THE COMPANY TO REPORT INCIDENTS. THEY HAVE SPECIFIC POLICIES THAT REQUIRE THEM TO REPORT INCIDENTS. THERE IS INDUSTRY CUSTOMS AND PRACTICE THAT REQUIRE THEM TO REPORT IT AND COAST GUARD REQUIREMENTS THAT REQUIRE THEM TO REPORT IT. NONE OF THAT WAS ENOUGH FOR THEM TO REPORT THIS.

AND BY THE WAY, CAPTAIN HAGLUND IS THE ONLY PERSON WHO WAS ACTUALLY ON THE VESSEL THAT DENIES THE INCIDENT. MR. GRIFFIN SAYS IT HAPPENED; MR. BADEAUX SAYS IT HAPPENED. WE HEARD FROM CAPTAIN WINHAUER; HE DOESN'T RECALL ANYTHING. BUT HE TESTIFIED SPECIFICALLY: "THAT DOES NOT MEAN IT DIDN'T HAPPEN. THAT JUST MEANS I DON'T REMEMBER."

THE ONLY PERSON SAYING IT DOESN'T HAPPEN IS CAPTAIN HAGLUND, WHO IS THE ONLY PERSON WHO'S AT FAULT, WHO IS THE ONLY PERSON WHO YOU HEARD COULD BE FIRED OVER THIS, WHO COULD BE TERMINATED OVER THIS. AND THAT'S THE PERSON WHO THEY RELIED UPON TO GET THEIR INFORMATION FROM AS TO WHETHER OR NOT THIS HAPPENED.

HERE ARE THE POLICIES: MAKE AN ENTRY IN THE LOG; ACTIONS TAKEN BY THE SUPERVISOR FOR ACCIDENT/INCIDENT REPORTING; COMPLETES THE EMPLOYER'S PERSONAL INJURY AND ILLNESS REPORT, THE WHOLE THING. IT DOESN'T SAY YOU JUST COMPLETE SECTIONS 1, 2, 3, 4.

11:49a

IT SAYS THE WHOLE THING. THIS IS THEIR OWN POLICY. YOU HEARD THEM. THEY KEPT TRYING TO SAY "WELL, THE EMPLOYEE COMPLETES THIS PART AND THEN WE COMPLETE THE REST." THEY'RE SAYING THAT NOW. THESE ARE THE POLICIES THAT THEY SAID THAT THEY WERE GOING TO FOLLOW. THESE ARE THE POLICIES THAT THEY SAID THEY EXPECT EMPLOYEES TO FOLLOW, THAT THEY'VE PUT OUT THERE. AND THESE ARE WHAT THEY'RE SUPPOSED TO DO. BUT THEY DON'T DO IT.

NOW, MR. GRIFFIN'S HAD SOME INJURIES; HIS SHOULDER. I DON'T THINK IT'S GENUINELY IN DISPUTE THAT HE INJURED HIS SHOULDER. I THINK THEY'RE GOING TO SAY THAT HE INJURED IT IN THE ENGINE ROOM, BECAUSE THAT HELPS THEM. BUT IN ANY CASE, IT WAS OPERATED ON. IT WAS OPERATED ON. AND YOU KNOW THAT IT WOULDN'T BE CAUSED BY WHAT HAPPENED IN THE ENGINE ROOM. YOU HEARD FROM DR. GREENE, YOU HEARD FROM DR. FERACHI, THERE IS THE OMS RECORD. ALL SAY IT WOULDN'T HAVE HAPPENED IN THE ENGINE ROOM.

THE NECK WITH RADIATING PAIN TO HIS SHOULDER, TRICEPS, BICEPS, AND HAND. MR. GRIFFIN REPORTED THIS INJURY BEFORE HIS FIRST VISIT -- BEFORE HIS FIRST VISIT TO THE ORTHOPEDIC SURGEON. HE WENT TO GET AN MRI. HE REPORTS NECK PAIN, HE REPORTS SHOULDER PAIN, HE REPORTS BICEP PAIN AND BURNING

11:50a

SENSATIONS IN HIS HAND. YOU'VE HEARD FROM THE DOCTORS. THAT IS RADICULOPATHY.

YOU'VE SEEN THE IMAGING THAT DIAGNOSES MR. GRIFFIN WITH A PROTRUSION WITH PARTS OF THE DISK INVADING AND PUTTING PRESSURE ONTO THE NERVE ROOT, WHICH IS CAUSING ALL THESE PAIN SIGNALS TO GO DOWN. HE IDENTIFIED THAT ON JUNE 29TH. AND THAT IS RIGHT WITHIN THE WINDOW THAT YOU HEARD FROM DR. FERACHI THAT IT CAN TAKE FOR ALL THIS TO MANIFEST. HE ALSO EXPLAINED DISTRACTING PAIN. Y'ALL REMEMBER THAT? PAIN THAT IS SO GREAT IN ONE AREA OF THE BODY THAT YOU CAN'T FEEL THE PAIN ELSEWHERE. IT CAN CAUSE YOU TO THINK THAT MAYBE IT'S JUST YOUR SHOULDER WHEN REALLY YOU HAVE A NECK PROBLEM. AND YOU HEARD FROM DR. GREENE AND DR. FERACHI: THAT HAPPENS ALL THE TIME.

DR. FERACHI HAS TESTIFIED: PATIENTS LIKE MR. GRIFFIN HAVE DIFFICULTY IDENTIFYING NECK PAIN. GREENE CONFIRMS THIS: THAT IS THE DISTRACTING PAIN. DR. FERACHI HAS TESTIFIED THAT THE MAN BASKET INCIDENT CAUSED MR. GRIFFIN'S NECK INJURIES, CAUSED HIS NECK PAIN. HE SAYS IT EXPLICITLY: MORE LIKELY THAN NOT, MR. GRIFFIN'S NECK PAIN IS THE RESULT OF THIS BASKET INCIDENT, NOT THE ENGINE ROOM. DR. FERACHI WAS ASKED, AND THAT'S WHAT HE SAID RIGHT

11:51a

AFTER THAT. THE BACK. DR. FERACHI HAS TESTIFIED THAT MR. GRIFFIN'S BACK INJURIES COULD BE THE RESULT OF BEING SMASHED BETWEEN A MAN BASKET. AND DR. GREENE CONCURS WITH HIM.

PROCEDURES FOR HANDLING AND REPORTING INCIDENTS. WE'VE GONE OVER THIS. THE COMPANY HAS A POLICY THAT SAYS THEY CAN -- IF NOTIFICATION ABOUT THE INJURY, ILLNESS AND INCIDENT ISN'T IMMEDIATELY GIVEN, IT'S CONSIDERED QUESTIONABLE. THEIR OWN POLICIES ALLOW THEM TO QUESTION THINGS. THEIR OWN POLICIES ALLOW THEM TO SAY THINGS DIDN'T HAPPEN. THEY HAVE THAT POLICY. THEY FOLLOWED THAT POLICY TO THE TEE, BUT NOT THE OTHER ONES.

HERE'S SOME DATES THAT I THINK ARE VERY IMPORTANT AND I THINK YOU'RE GOING TO CONSIDER THROUGH YOUR DELIBERATIONS. APRIL 25TH, RIGHT AROUND THEN, MR. GRIFFIN FILLS OUT THE FIRST INCIDENT REPORT FOR THE ENGINE ROOM. THIS DOCUMENT CANNOT BE FOUND. ON MAY 2ND MR. GRIFFIN IS INJURED IN THE BASKET INCIDENT. ON THE 5TH CAPTAIN HAGLUND ASKS MR. GRIFFIN TO FILL OUT ANOTHER ONE FOR THE ENGINE ROOM. ANOTHER ONE. SO THEY GIVE IT TO THE SAFETY GUY BECAUSE HE NEEDS AN ORIGINAL. NO ONE HAS CONTESTED THAT. WE JUST ASKED MR. HARRIS ABOUT IT.

ON THE 13TH, FOR WHATEVER REASON, THE

11:53a

DAY BEFORE THEY'RE SUPPOSED TO TAKE MR. GRIFFIN TO THE DOCTOR TO GET CHECKED OUT, TO GET EVALUATED, TO GET THE HELP HE NEEDS, THEY HAVE HIM WRITE A STATEMENT OF HIS OWN, A STATEMENT SAYING "I FEEL OKAY TO WORK. THEY'VE PUT ME ON NIGHTS SO I DON'T HAVE TO WORK ON THE BACK DECK AS MUCH." BACK DECK IS WHERE THIS INCIDENT TOOK PLACE. THE BACK DECK IS WHERE MR. GRIFFIN GOT HURT.

ON MAY 14TH THEY TAKE MR. GRIFFIN TO OMS. AND THIS IS A BIG ONE. YOU HEARD FROM BRIAN HARRIS THAT HE WAS IN THE ROOM WHEN MR. GRIFFIN WAS TALKING TO DOCTORS, IN THE ROOM WHEN HE'S TELLING THEM WHAT HAPPENED, IN THE ROOM WHILE MR. GRIFFIN IS GETTING EXAMINED. HE DROVE HIM TO THE APPOINTMENT, DROVE HIM HOME. HE'S THERE FOR THE ENTIRE TIME. THE ONLY TIME HE'S NOT SEEING MR. GRIFFIN IS WHEN HE GOES TO GET X-RAYS. HE GETS SOME IMAGING DONE. BUT OTHER THAN THAT, EVERY MOMENT HE IS TALKING TO THE MEDICAL FOLKS, MR. HARRIS IS IN THE ROOM. AND MR. HARRIS WANTS YOU TO BELIEVE THAT HE DIDN'T HEAR MR. GRIFFIN TALK ABOUT THE MAN BASKET INCIDENT? HE WAS THERE. WE KNOW HE HEARD IT. HE HAD TO START SAYING THAT BECAUSE OTHERWISE HIS NOTES LATER ON JUST STOP MAKING SENSE.

ON JUNE 20TH, KIND OF FEIGNS IGNORANCE:

11:54a

"I GOT A CALL FROM THE CAPTAIN AND I GOT A CALL FROM MR. GRIFFIN, WHOM NEITHER OF THEM MENTIONED THIS INCIDENT TO ME EITHER." THE CAPTAIN IS NOT MENTIONING IT NOW. NOT ONLY ARE THE MEDICAL PEOPLE NOT GETTING -- MR. GRIFFIN IS HAVING SOME SORT OF SECRET CONVERSATION WITH THEM, BUT NOW THE CAPTAIN ISN'T TELLING HIM WHAT'S IN THE INCIDENT REPORT DATED JUNE 20, 2018. IT'S JUST NOT CREDIBLE. IT'S NOT CREDIBLE.

SO THEN MR. HARRIS WRITES HIMSELF ANOTHER NOTE ON JUNE 29TH CLAIMING THAT HE'S ONLY NOW LEARNING OF THE INCIDENT. FIRST TIME EVER. HE CAN POINT TO NO REASON AS TO WHY HE WROTE THESE NOTES. HE JUST DID. AND HERE ARE SOME OF THE NOTES THAT WE'RE GOING THROUGH. AS YOU'LL RECALL, MAY 14TH PATIENT GOT HIT BETWEEN A MAN BASKET AND A GROCERY BOX AND HIT THAT SAME SHOULDER, TRIED TO TAKE ADVIL AND IBUPROFEN WITH NO HELP. NOW PATIENT CAN'T SLEEP. NOW, YOU HEARD FROM DR. CASEY: YOU KNOW, FOLKS THAT HAVE THESE ROTATOR CUFF TEARS HAVE DIFFICULTY SLEEPING.

HERE'S THE OMS RECORD: WOULD INDICATE A CONTUSION TO THE LEFT SHOULDER, MECHANISM OF INJURY BEING WHAT HAPPENED IN THE ENGINE ROOM. THEY HAVE MR. GRIFFIN WRITE NOTES: "I FEEL GOOD ENOUGH TO GO

11:56a

BACK TO WORK." WHY ARE THEY ASKING HIM? WHY ARE THEY PAPERING THIS FILE IN SUCH A WAY? IF A DOCTOR HAS RELEASED HIM, WHY ARE THEY ASKING HIM? HERE'S THE ONE FROM -- HERE'S THE REPORT FROM THE 20TH. HERE'S THE MEDICAL RECORDS SIDE BY SIDE WITH A NOTE. THESE DON'T MAKE SENSE. IF HE'S IN THE ROOM, HE HEARD IT. WE KNOW THAT. AND THIS IS THE 29TH. THE SAME THING. HE'S IN THE ROOM, HE HEARD IT. THIS DOESN'T MAKE SENSE.

THEN REC MARINE DOES AN INVESTIGATION AND THEY SAY THAT WITNESS INTERVIEWS AND STATEMENTS WILL BE COLLECTED. WILL BE COLLECTED. THIS ISN'T A "MAY." IT'S NOT A "IF WE GET AROUND TO IT." IT'S "WILL BE COLLECTED." WHO DO THEY NOT TALK TO? THEY DIDN'T TALK TO MR. BADEAUX. THEY TOLD YOU THEY DIDN'T. THEY DIDN'T TALK TO HIM AT ANY POINT IN TIME WHEN THEY LEARNED THAT HE WAS A WITNESS. THEY NEVER SOUGHT TO FIND OUT WHAT HE KNEW, WHAT HE SAW. ALL THEY DID WAS CALL THE CAPTAIN, WHO WAS BEING ACCUSED OF DOING SOMETHING WRONG, TO GET HIS OPINION. AND THEN THEY TOOK A RECORDED STATEMENT OF MR. GRIFFIN WITH AN INSURANCE ADJUSTER.

HE GOES TO GULF COAST ORTHOPEDICS -- FINALLY SEES AN ORTHOPEDIC DOCTOR -- AND HE IDENTIFIES NECK PAIN, SHOULDER PAIN, BICEP PAIN, AND

11:57a

BURNING SENSATION IN HIS HAND. THIS IS SOMETHING THAT THEY CAN'T DISPUTE. THIS IS THE FIRST VISIT. NOW, HIS TREATMENT GOES ON FOR A WHILE. HE TREATS FOR ABOUT A YEAR. AND HE GETS -- HE GETS PHYSICAL THERAPY, HE GETS SURGERY, A REPAIR OF HIS ROTATOR CUFF AS BEST AS THEY CAN. YOU'VE HEARD HE'S GOT SOME INABILITIES TO HAVE FULL RANGE OF MOTION, BUT HE'S DONE AS BEST HE COULD.

AND THEN TOWARDS THE END OF THAT, WHEN THE NECK PAIN STILL HASN'T GONE AWAY, HE MENTIONS IT AND THEY SAY "NO." THE INSURANCE GUY GETS INVOLVED, ASKS IF IT'S CONNECTED, AND THEY SAY "NO." AND DR. CASEY, FOR BETTER OR FOR WORSE -- I THINK MISTAKES -- DOESN'T NOTE THIS NECK PAIN ON THE NECK. AND WE KNOW THAT BECAUSE HE STARTS TALKING ABOUT, IN HIS DEPOSITION THAT YOU HEARD TODAY, THAT MR. GRIFFIN WAITED A YEAR TO IDENTIFY NECK PAIN. BUT WE KNOW THAT'S NOT TRUE. HE IDENTIFIED IT ON DAY ONE. I THINK DR. CASEY JUST MADE A MISTAKE.

SO THEN MR. GRIFFIN GOES TO THE BATON ROUGE ORTHOPAEDIC CENTER HERE IN TOWN. HIS FIRST VISIT WAS AUGUST 20, 2019. AND THIS IS AFTER THEY REFUSED TO PAY FOR ANY MORE OF HIS MEDICAL CARE. HE PRESENTS WITH PAIN IN THE SAME AREA THAT HE DID WHEN HE WENT TO THE ORTHOPEDIC CLINIC THAT THE COMPANY

11:59a

SENT HIM TO: LEFT TRAPEZIUS. HE HAS A POSITIVE SPURLING'S TEST. HE HAD THAT WHEN HE WAS PREVIOUSLY TREATED. DECREASED OVERALL STRENGTH, TENDERNESS IN THE AC JOINT. THAT'S RIGHT HERE. THAT'S WHERE YOUR SHOULDER AND CLAVICLE MEET. HE'S GOT A POSITIVE O'BRIEN'S TEST, NEER'S, HAWKINS, CROSS BODY ADDUCTION, ALL DEMONSTRATING SHOULDER PROBLEMS STILL. HE'S GIVEN AN INJECTION TO RELIEVE THE PAIN.

LATER RECORDS: STILL HAVING THAT PARASPINAL TENDERNESS THAT YOU HEARD MR. GRIFFIN HAD WHEN HE WAS TREATING WITH DR. CASEY. AND FINALLY, THEY DO SOME IMAGING THAT REVEALS A DISK HERNIATION, A DISK HERNIATION THAT'S PRESSING ON THE NERVE ROOTS. AND HE'S RECOMMENDED SURGERY. HE'S A SURGICAL CANDIDATE. HE CAN'T AFFORD IT. IT'S A VERY EXPENSIVE SURGERY. CAN'T AFFORD IT.

SO YOU'VE HEARD ABOUT THIS EMG STUDIES, AND YOU'VE HEARD FROM DR. GREENE AND DR. FERACHI THAT THESE ARE NOT VERY HELPFUL IN DIAGNOSING CERVICAL RADICULOPATHY. THEY CAN IDENTIFY PERIPHERAL NEUROPATHY, THEY CAN IDENTIFY CARPAL TUNNEL, BUT THEY'RE NOT GOOD TESTS AT PICKING UP CERVICAL RADICULOPATHY. AND WHAT WE HAVE HERE, ALTHOUGH A NEGATIVE TEST, WE HAVE MRI IMAGING STUDIES CORRELATING WITH A LEFT C7 RADICULOPATHY. THAT CAME

12:00p

DIRECTLY FROM DR. FERACHI.

MR. GRIFFIN IS STILL TREATING TO THIS DAY. HE IS STILL GETTING PHYSICAL THERAPY. HE IS STILL TREATING WITH DOCTORS. HE IS STILL TRYING TO GET BETTER. THROUGHOUT THIS LITIGATION, I REMEMBER WHEN MR. KHOURY FIRST CAME UP, HE SAID WE'RE GOING TO TALK ABOUT THAT WE WERE GOING TO TRY TO MINIMIZE A PREVIOUS INCIDENT; WE'RE GOING TO MINIMIZE WHAT HAPPENED IN THE ENGINE ROOM. THAT'S WHAT HE SAID. BUT THEN DAY ONE, THAT PATH NO LONGER MADE SENSE. BECAUSE AFTER DAY ONE DR. FERACHI HAD TESTIFIED AND SAID, "THERE IS NO WAY MR. GRIFFIN COULD HAVE SUFFERED ANY OF THESE INJURIES BY HITTING HIS SHOULDER INTO A FIRE HOSE RACK."

AND THEN IMMEDIATELY AFTER THAT WE STARTED HEARING ABOUT EVERYTHING ELSE. WE STARTED HEARING ABOUT HOW MR. GRIFFIN GOT HIT IN THE HEAD IN THE '90s; MAYBE THAT'S WHAT CAUSED ALL OF HIS INJURIES TODAY. HE GOT INTO A CAR WRECK IN '95 BUT THERE WASN'T REALLY ANY TREATMENT; MAYBE THAT'S WHAT CAUSED EVERYTHING. HE GOT INTO A CAR WRECK IN 2013. AND JUST REMIND YOU, 1995 WHEN MR. GRIFFIN WAS INJURED IN THE BASKET TRANSFER OPERATION, THAT WAS 23 YEARS LATER.

HE GETS INTO A CAR WRECK IN 2013. YOU

12:02p

HEARD HIM. HE NOTIFIED ALEX GRIFFIN, WHO WAS THE HR GUY AT THE COMPANY AT JNB WHO THEN LATER GOES TO WORK ON OVER AT DEFENDANT'S COMPANY NOW. AND HE NOTIFIES THE CAPTAIN. HE REPORTED TO WORK LATE BUT JUST LATE TO CREW CHANGE. DID HIS HITCH, COMES BACK, GETS CHECKED OUT. HE'S FINE. HE KEEPS WORKING.

HE HAS A LAWYER AT THE TIME NAMED BO WEST, AND BO WEST FILES A LAWSUIT FOR HIM, AND HE PUTS IN THERE HE HAS PERMANENT INJURIES TO HIS NECK, BACK, AND LOW BACK. MR. GRIFFIN HAD NEVER SEEN THAT BEFORE IT WAS FILED. HE CERTAINLY DID NOT HAVE PERMANENT INJURIES TO HIS NECK, BACK, AND LOW BACK. HE WORKED FOR FIVE YEARS AFTER THAT. FIVE YEARS. NO INCIDENTS. FIVE YEARS. BUT THEY WANT TO TALK ABOUT 2013.

AND IN CASE THAT DOESN'T WORK -- THEY'RE THROWING SPAGHETTI AT THE WALL TO SEE WHAT STICKS -- THEY WANT TO TALK ABOUT SOME FALLS THAT HE HAD: HE FELL IN THE TUB, HE FELL IN THE KITCHEN. MR. GRIFFIN HAS TOLD YOU HONESTLY THAT HIS PAIN INCREASED FOR A PERIOD OF TIME, WENT BACK TO NORMAL, HIS NORMAL. HIS NORMAL. STILL PAIN. AND WE'VE TALKED TO THE DOCTORS. DOES THAT MEAN THAT THERE IS A -- DOES THAT -- JUST BECAUSE YOU HAVE AN INCREASE IN PAIN, DOES THAT MEAN MR. GRIFFIN HAS FURTHER

12:03p

DAMAGE? NO, IT DOESN'T MEAN THAT. IT JUST MEANS MORE PAIN. WE'VE ALL HAD THAT HAPPEN. YOU HAVE A STUBBED TOE, YOU TOUCH IT AGAINST SOMETHING, IT HURTS. IT DOESN'T MEAN YOU DAMAGED IT FURTHER. IT JUST MEANS YOU GOT THAT SHOCK THAT WAKES YOU UP REALLY WELL.

SO I WANT TO TALK ABOUT MR. BADEAUX. HE WITNESSES THE INCIDENT. HE IDENTIFIED WHERE IT TOOK PLACE. HE IDENTIFIED THE ENTIRE GULF OF MEXICO WHERE IT TOOK PLACE, THE TIME OF DAY, THE PERSONS ON THE VESSEL. HE SAW THE CAPTAIN STEP AWAY FROM THE CONTROLS, USING HIS PHONE, NOT PAYING ATTENTION; THAT THE CAPTAIN WOULDN'T LET MR. GRIFFIN COMPLETE AN INCIDENT REPORT AND THAT SAW MR. GRIFFIN COMPLAIN OF INJURIES TO HIS NECK AND BACK.

ADMITTEDLY, HE ALSO FILLED OUT A DECLARATION THAT I PUT TOGETHER. AND I PUT IN SOMETHING THERE THAT WAS NOT ACCURATE. AND WHEN MR. BADEAUX WAS ASKED ABOUT IT THE FIRST TIME IN HIS DEPOSITION, HE DIDN'T FIGHT IT, HE DIDN'T PUSH BACK. HE SAID, "I DIDN'T SAY BACK." HE CLEARED IT UP RIGHT THEN AND THERE. HE DID THE SAME THING ON THE STAND.

THERE ARE SLIGHT DISCREPANCIES BETWEEN WHAT MR. BADEAUX REMEMBERS AND WHAT MR. GRIFFIN REMEMBERS. BUT THE SOLID FACTS, THE CONCRETE FACTS,

12:05p

THE IMPORTANT FACTS, THEY'RE ALL RELATIVELY THE SAME. AND AGAIN, IT'S BEEN FIVE YEARS SINCE THIS INCIDENT HAS HAPPENED.

CAPTAIN HAGLUND DOESN'T DOCUMENT THE JSA BECAUSE THEY WOULD STILL BE SITTING AT THE RIG RIGHT NOW. DO YOU REMEMBER HIM SAYING THAT? GETTING REAL ANGRY. CLAIMS HE WAS GOING TO FIRE MR. BADEAUX. NOT A SINGLE WRITE-UP IN HIS FILE. MR. BADEAUX SAYS HE THINKS HE WOULD BE LET GO ANYWAY BECAUSE THE CAPTAIN DIDN'T REALLY LIKE HIM. HE CLAIMS THE JSA WAS VERBALLY DONE, THEN SAYS THE JSA WAS DONE BY THE PLATFORM. AND THEY HAVE NO RECORD OF IT. WHICH IS IT? VERBALLY DONE? PLATFORM DID IT? HE CHANGES HIS STORIES THROUGHOUT HIS TESTIMONY.

HE CLAIMS THERE IS PREWRITTEN JSAs ON THE VESSEL. NONE HAVE BEEN PRODUCED. YOU WILL NOT SEE ONE. ADMITS THAT THERE ARE NO JSAs FOR THE PERSONNEL TRANSFER OPERATION DOCUMENTED. NO RECOLLECTION OF MR. HARRIS CALLING HIM TO DISCUSS THE MAN BASKET INCIDENT. THAT'S BIG. THAT'S BIG. THERE IS AN INCIDENT, YOU'RE INVESTIGATING IT, AND THE PERSON DOESN'T EVEN REMEMBER YOU CALLING THEM? HOW BIG WAS THIS INVESTIGATION? HOW FRUITFUL CAN IT BE WHEN YOU'RE JUST GOING TO DENY THE INCIDENT HAPPENED?

AND YOU HEARD FROM THE CAPTAIN, CAPTAIN

12:06p

HAGLUND. TO DETERMINE WHETHER OR NOT HE WAS TEXTING OR TALKING OR DRIVING ON THE BOAT, HE STARTED ASKING PEOPLE "DO I DO THAT?" MR. BRIAN HARRIS SAYS THAT THEY NEED TO FOLLOW THEIR OWN POLICIES; THAT CAPTAINS, THEY'RE THE ONES THAT WERE SUPPOSED TO COMPLETE THE INCIDENT REPORT PER THEIR POLICIES. THEY PUT THE POLICIES IN PLACE FOR THE INDUSTRY CUSTOM AND PRACTICE. REC MARINE SHOULD ALWAYS BE FOLLOWING THEIR POLICIES; EMPLOYEES SHOULD ALWAYS FOLLOW REC MARINE'S POLICIES. THIS GOES ON AND ON AND ON.

DR. CHARLES HADDAD, THEIR EXPERT: MAN BASKET INCIDENT IS A REASONABLE MECHANISM OF INJURY THAT WOULD CAUSE A ROTATOR CUFF, THAT WOULD CAUSE THE CERVICAL INJURY. THEIR EXPERT, HE AGREES WITH DR. FERACHI THAT MR. GRIFFIN, HIS NECK PAIN WAS WITHIN THE APPROPRIATE WINDOW, MANIFESTED WITHIN TWO MONTHS.

DR. DAVID FERACHI, BOARD CERTIFIED IN ORTHOPEDIC SURGERY, TREATED THOUSANDS OF PATIENTS WITH NECK PAIN AND BACK PAIN: MAN BASKET INCIDENT IS THE ONE THAT CAUSED IT -- WE TALKED ABOUT THIS -- THE TREATMENT WAS MEDICALLY NECESSARY; PAIN MANAGEMENT IS NEEDED TO TREAT MR. GRIFFIN'S INJURIES; THE ENGINE ROOM INCIDENT DIDN'T CAUSE MR. GRIFFIN'S SHOULDER INJURY; YOU KNOW, IT'S THE DEGREE OF SEVERITY;

12:07p

TURNING AND HITTING SOMETHING DOESN'T CAUSE A TORN ROTATOR CUFF, DOESN'T CAUSE A DISK HERNIATION, DOESN'T CAUSE LONG-TERM BACK PAIN; UNLIKELY THE BUMP WOULD CAUSE A ROTOR CUFF TEAR. NO EVIDENCE THAT THE DISTRACTING INCIDENTS CAUSED FURTHER INJURY.

TODD COWEN, HE'S A PHYSICIAN LIFE CARE PLANNER, MEDICAL DOCTOR, SPECIALIZES IN PHYSICAL MEDICINE AND REHABILITATION. HE PRESCRIBED MEDICATION. HE INTERVIEWED MR. GRIFFIN. AND HE IDENTIFIED ALL THE TREATMENT HE'S GOING TO NEED IN THE FUTURE.

**THE COURT:** TEN MINUTES.

**MR. SHEPPARD:** THANK YOU, YOUR HONOR.

HERE'S SOME OF THE TREATMENT THAT HE'S GOING TO NEED. WE'RE GOING TO GO THROUGH THAT A LITTLE BIT FURTHER ON THESE NEXT SLIDES. HE'S TAKEN ALL THE MONEY -- AND YOU'RE GOING TO HAVE THIS IN SOME FORM TO LOOK AT AS AN EXHIBIT WHEN YOU GO TO THE JURY ROOM. IT IDENTIFIES ALL THE TREATMENT THAT MR. GRIFFIN IS GOING TO NEED OVER THE COURSE OF HIS LIFE, ALL THE TREATMENT THAT HE'S GOING TO NEED, ALL THE STUDIES, ALL THE MEDICATION, EVERYTHING THAT HE WILL NEED.

AND DR. COWEN, HE HAS LOOKED THROUGH TONS AND TONS AND TONS OF RECORDS IN ORDER -- YOU

12:09p

KNOW, MEDICATION COSTS AND THINGS LIKE THAT -- IN ORDER TO FIND OUT WHAT NEEDS TO BE -- WHAT'S AN APPROPRIATE AMOUNT. YOU'RE GOING TO HEAR ABOUT PAIN AND SUFFERING, MENTAL ANGUISH. IT'S EVERY DAY HE CAN'T SLEEP; IT'S CONSTANT; HE CAN'T DO THINGS FOR HIMSELF; HE'S GAINED A LOT OF WEIGHT. YOU'VE HEARD THAT ALL OF HIS INJURIES CAN BE VERY PAINFUL.

WE'VE GONE OVER MAINTENANCE AND CURE. WE HAVE LOST WAGES IN THE PAST. THIS IS WHAT YOU'LL HAVE COMING BACK TO YOU. LOST WAGES IN THE FUTURE. WE TALKED ABOUT WHAT THE *DUSTIN DANOS* AND EVERYONE ELSE HAS DONE WRONG: YOU KNOW, YOU SHOULDN'T BE OPERATING A VESSEL WHILE ON THE PHONE; YOU SHOULDN'T BE STEPPING AWAY FROM THE CONTROLS; YOU SHOULD BE WATCHING WHAT'S HAPPENING ON DECK; YOU SHOULDN'T LEAVE PEOPLE TO WORK ALONE. BUT THEY DID THAT. THEY DELAYED MR. GRIFFIN'S TREATMENT. THEY KEPT HIM ON THE VESSEL FOR A WEEK. THEY HAD HIM MAKE THE DETERMINATION WHETHER OR NOT HE WAS MEDICALLY FIT TO GO AND KEEP WORKING. THAT'S NOT WHAT THEY'RE SUPPOSED TO DO. THEY DON'T REPORT IT TO THE COAST GUARD.

SO WE'RE GOING TO GET TO THE VERDICT FORM, AND THE COURT IS GOING TO GO OVER THIS WITH YOU. DO YOU FIND -- AND I'VE PUT WHAT I THINK -- I

12:10p

WOULD SUGGEST THAT YOU ANSWER THESE QUESTIONS. INTERROGATORY 1, ESSENTIALLY, DO YOU THINK MR. GRIFFIN INJURED -- BY A PREPONDERANCE OF THE EVIDENCE, MR. GRIFFIN INJURED HIS SHOULDER AS A RESULT OF THE PERSONNEL TRANSFER BASKET OPERATION? YES. FOR THE NECK, YES. FOR THE BACK, YES. YOU'VE HEARD TESTIMONY FROM MR. GRIFFIN, FROM DOCTORS. WE THINK THOSE ARE ALL "YES."

FOR 4, ON OFFSHORE TRANSPORT SERVICES -- THERE IS SOMEONE WHO IS GOING TO BE MENTIONED A LITTLE LATER -- DO YOU FIND THAT DEFENDANTS WERE NEGLIGENT AND THAT SUCH NEGLIGENCE WAS A CAUSE, IN WHOLE OR PART, OF TO THE DAMAGE OR INJURY TO MR. GRIFFIN? YES.

DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT THE VESSEL WAS UNSEAWORTHY AND THE UNSEAWORTHINESS WAS THE PROXIMATE CAUSE? YES. THEY DIDN'T HAVE A COMPETENT CREW. THEY DIDN'T PROVIDE SUFFICIENT TRAINING. YOU SHOULDN'T BE GETTING ON YOUR PHONE WHILE THESE OPERATIONS ARE TAKING PLACE. YOU SHOULD BE WATCHING WHAT'S GOING ON DECK.

AND HAVING A COMPETENT CREW DOES NOT MEAN HAVING THE APPROPRIATE NUMBER OF CREW. THIS VESSEL WAS SUPPOSED TO HAVE TWO DECKHANDS, TWO CAPTAINS. THEY HAD THAT. THEY HAVE TO BE PROPERLY

12:11p

TRAINED TO DO THE JOB. THEY NEED TO FOLLOW THE POLICIES THAT THEY'RE SUPPOSED TO FOLLOW. AND THOSE THINGS DIDN'T HAPPEN. THEY ALSO COULD HAVE HAD MR. BADEAUX COME ON THE DECK AND HELP OUT. THEY DIDN'T DO THAT, EITHER.

DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT MR. GRIFFIN WAS NEGLIGENT AND SUCH NEGLIGENCE CONTRIBUTED, IN WHOLE OR IN PART, TO HIS ALLEGED INJURIES? NO. MR. GRIFFIN WAS THERE ALONE. HE WAS FOLLOWING HIS ORDERS. HE WAS TRYING TO PREVENT THREE MEN FROM GETTING HURT. HE WAS TRYING TO HELP THEM. HE WAS TRYING TO PROTECT THEM. MR. GRIFFIN DID THE RIGHT THING.

IN ALLOCATING THE PERCENTAGE OF FAULT, I THINK YOU SHOULD PUT 90 PERCENT ON REC MARINE, 10 PERCENT ON OFFSHORE TRANSPORT SERVICES, NOTHING ON MR. GRIFFIN. WE ASK YOU TO AWARD GENERAL DAMAGES. AND THESE ARE DIFFERENT THAN LOST INCOME, LOST EARNING CAPACITY, PAST MEDICAL EXPENSES AND FUTURE MEDICAL EXPENSES. THESE ARE THINGS LIKE PHYSICAL IMPAIRMENT, DISFIGUREMENT, PAIN AND SUFFERING, MENTAL ANGUISH, AND LOSS OF ENJOYMENT OF LIFE.

WE THINK YOU SHOULD AWARD MR. GRIFFIN $510,720 FOR HIS PAST GENERAL DAMAGES. THAT'S HIS DAY RATE FOR EVERY DAY HE'S BEEN IN PAIN IN THE PAST

12:12p

FOR HIS PAIN AND SUFFERING, WHICH IS ONE ELEMENT OF DAMAGES, AND HIS MENTAL ANGUISH.

IT ALSO INCLUDES, YOU KNOW, THE LOSS OF ENJOYMENT OF LIFE. YOU'VE HEARD THAT HE CAN'T DO THINGS WITH HIS KIDS ANYMORE. HE JUST KIND OF -- HE CAN'T RIDE HORSES WITH THEM, CAN'T GO ON FOUR-WHEELERS WITH THEM, CAN'T TEACH THEM TO SWIM, BASIC, BASIC THINGS THAT HE WANTS TO BE ABLE TO DO. FOR FUTURE GENERAL DAMAGES, WE RECOMMEND THAT YOU AWARD $2,452,800. THAT'S THE SAME CALCULATION AS BEFORE: $140 A DAY, HIS DAY RATE, UNTIL THE DAY HE'S SUPPOSED TO DIE, 44 YEARS FROM NOW. MR. COWEN HAS PERFORMED A -- HAS IDENTIFIED THE LIFE EXPECTANCY, AND THAT'S WHAT IT IS. SO WE ASK THAT YOU AWARD THE FULL AMOUNT OF HIS DAMAGES THERE.

THE PAST WAGE LOSS. YOU HEARD FROM DR. RICE. HE PUT IT INTO PRESENT VALUE. MR. GRIFFIN HAS NOT BEEN ABLE TO WORK SINCE THE INCIDENT. HIS LOST WAGES ARE 144,995. AND THEY TALKED ABOUT HOW THEY ADVANCED WAGES. THEY CAN'T SHOW THAT THERE ARE ANYTHING, ANYTHING, ANYTHING IN HIS TAX DOCUMENTS TO REFLECT THAT. WE DON'T KNOW WHAT THOSE THINGS WERE. APPARENTLY THEY'RE FOR AN ADVANCE ON A SETTLEMENT IN SOME OF THESE -- IN SOME OF THOSE DOCUMENTS THAT THEY POINTED OUT. DOESN'T ALL SAY FUTURE WAGES. WE DON'T

12:14p

KNOW WHAT IT IS. IT'S CERTAINLY NOT ON HIS W-2. AND THAT IS WHERE YOU DOCUMENT WAGES.

FUTURE LOSS OF EARNING CAPACITY, 321,589. THAT IS WHAT YOU CAN SEE IN DR. RICE'S REPORT. HE HAS DONE THE -- HE'S APPLIED THE APPROPRIATE METHODOLOGY IN ORDER TO DETERMINE LOSS OF EARNING CAPACITY. HE DID A -- HE DISCOUNTED IT. HE DIDN'T ACCOUNT -- HE HAS NO INFLATION OR HE DOESN'T HAVE LIKE WHAT SORT OF INFLATION WE'VE BEEN SEEING CALCULATED IN IT. DOESN'T ACCOUNT FOR MR. GRIFFIN GETTING PROMOTIONS AT WORK. IT'S VERY, VERY, VERY MODEST IN TERMS OF WHAT HE CAN EARN OVER THE NEXT -- THE REMAINDER OF HIS WORKABLE LIFE.

MEDICAL EXPENSES. THERE HAS BEEN MORE THAN $60,000 IN PAST MEDICAL EXPENSES. A LOT OF THEM WERE PAID BY THE COMPANY WHEN THEY PROVIDED MR. GRIFFIN WITH HIS SHOULDER SURGERY AND THE PHYSICAL THERAPY RELATED TO HIS SHOULDER. THEY PAID FOR NOTHING ELSE. MR. GRIFFIN HAS ADDITIONAL CARE OF $10,944 THAT HASN'T BEEN PAID FOR. WE ASK YOU TO REIMBURSE HIM FOR THAT. AND THEN FUTURE MEDICAL EXPENSES. THESE HAVE BEEN TURNED INTO PRESENT VALUE, AGAIN USING THE SAME APPROPRIATE METHODOLOGY FOR ECONOMISTS; AND THAT'S $590,503.

WITH RESPECT TO MR. GRIFFIN'S SHOULDER,

12:15p

NECK AND BACK INJURIES, DO YOU FIND THAT PLAINTIFF HAS REACHED MAXIMUM MEDICAL CARE? FOR THE BACK AND THE NECK, NO. FOR THE SHOULDER, YES. HE HASN'T HAD TREATMENT IN A WHILE. AND, FRANKLY, THE FACT THAT HE'S BEEN RECOMMENDED A SURGERY FOR HIS SHOULDER, YOU KNOW, SOME POINT DOWN IN THE FUTURE, THE DEFENDANT SHOULDN'T BE OBLIGATED TO SIT ON THE HOOK FOR THAT UNTIL HE ACTUALLY HAS THAT. SO WE DO AGREE HE'S REACHED MAXIMUM MEDICAL IMPROVEMENT THERE.

DO YOU FIND THAT REC MARINE LOGISTICS OWES ANY PAST OR FUTURE MAINTENANCE AND CURE BENEFIT TO MR. GRIFFIN? YES. FOR MAINTENANCE, $62,790. IF YOU LOOK AT THE CHECKS THAT THEY INTRODUCED INTO EVIDENCE, THEY TALK ABOUT THE DAY RATE FOR MAINTENANCE, AND IT'S $35 A DAY. AND FOR EACH DAY THAT HE'S NOT IN THE HOSPITAL, HE IS SUPPOSED TO BE RECEIVING MAINTENANCE. AND FROM TODAY GOING BACK TO THE LAST PAYMENT THAT WAS MADE IN MAY OF 2018, THAT'S $62,790. AND CURE, YOU CAN AWARD IT HERE ALTERNATIVELY FOR $10,944. BUT IF YOU AWARD HIM HIS PAST MEDS, PAST MEDICAL EXPENSES, YOU SHOULDN'T GIVE HIM A DOUBLE DIP. YOU SHOULDN'T HAVE HIM -- YOU SHOULDN'T GIVE HIM CURE HERE.

**THE COURT:** ONE MINUTE.

**MR. SHEPPARD:** OH. THANK YOU, YOUR HONOR.

12:17p

REC MARINE ACTED UNREASONABLY IN FAILING TO PROVIDE MAINTENANCE AND CURE TO PLAINTIFF RESULTING IN SOME HARM AND INJURY? YES. HE HAS BEEN IN PAIN. HE IS CONSTANTLY IN PAIN. IT'S GOING TO KEEP GOING.

DO YOU FIND THAT THEY ACTED UNREASONABLY BUT ALSO WILLFULLY AND WANTONLY? THEY'RE PICKING AND CHOOSING WHICH DOCTORS THEY'RE GOING TO LISTEN TO. YOU'VE HEARD FROM A LOT OF DOCTORS SAYING THESE ARE ALL CONNECTED, BUT THEY'RE NOT LISTENING TO THEM. THEY'RE ONLY LISTENING TO THE ONES THAT ARE IN THE SAME -- THAT BELIEVE WHAT THEY WANT THEM TO BELIEVE, BUT THEY DON'T HAVE TO PAY ANYTHING. SO WE AGREE YOU SHOULD FIND "YES."

AND THESE ARE PUNITIVE DAMAGES MEANT TO PUNISH, MEANT TO PREVENT THIS FROM HAPPENING EVER AGAIN. WE WANT TO STOP COMPANIES FROM DOING THIS BECAUSE IT IS DANGEROUS. WE WANT TO MAKE SURE COMPANIES ARE TAKING CARE OF THEIR EMPLOYEES. AND TO MAKE SURE THAT THEY DON'T DO IT AGAIN, WE ASK THAT YOU AWARD PUNITIVE DAMAGES FOR $3 MILLION.

I THANK YOU FOR YOUR TIME.

**THE COURT:** ALL RIGHT.

**MR. SHEPPARD:** AND I THINK THAT IS MY TIME.

**THE COURT:** INDEED IT IS.

12:18p

**MR. SHEPPARD:** RIGHT ON TIME.

**THE COURT:** THANK YOU, MR. SHEPPARD.

WELL, THAT CONCLUDES THE PLAINTIFF'S FIRST CLOSING. I SHOULD HAVE NOTED TO YOU THAT THE LAW ENABLES THE PLAINTIFF THROUGH COUNSEL TO ADDRESS YOU TWICE. AND THAT'S BECAUSE, AS I MENTIONED EARLIER IN THIS TRIAL, THE PLAINTIFF BEARS THE BURDEN OF PROOF IN THIS MATTER. AND SO FOR THAT REASON, HE -- MR. SHEPPARD OR MR. LEATHERWOOD OR MR. CLAYTON WILL HAVE AN OPPORTUNITY TO ADDRESS YOU FOR A VERY SHORT PERIOD OF TIME AFTER THE CLOSE -- OF THE DEFENSE CLOSE.

BUT WE'RE GOING TO TAKE A LUNCH BREAK RIGHT NOW. YOUR LUNCH SHOULD BE HERE BY NOW IN THE BACK READY FOR YOU. WE'RE GOING TO TAKE ABOUT A 45-MINUTE -- ACTUALLY A LITTLE LESS THAN 45 MINUTES. WE'RE GOING TO BE -- IT'S GOING TO BE ABOUT 40 MINUTES. SO WE WANT TO HAVE YOU BACK IN THE COURTROOM RIGHT AT 1:00 SO WE CAN GET THE OPENING STATEMENTS -- THE CLOSING ARGUMENTS, EXCUSE ME, WRAPPED UP. AGAIN, PLEASE DON'T DISCUSS THE CASE AMONG YOURSELVES AT THIS POINT AND DON'T BEGIN TO FORM ANY OPINIONS ABOUT THE ISSUES IN THE CASE.

LET'S ALL RISE FOR THE JURY.

**(WHEREUPON, THE JURY IS OUT OF THE**

12:19p

**COURTROOM.)**

**THE COURT:** COUNSEL, TRY TO BE BACK ABOUT FIVE MINUTES TO ONE SO WE CAN BEGIN ON TIME.

COURT IS IN RECESS.

**(WHEREUPON, A LUNCH RECESS WAS TAKEN.)**

**THE COURT:** LET'S REMAIN STANDING FOR THE JURY.

**(WHEREUPON, THE JURY IS IN THE COURTROOM.)**

**THE COURT:** BE SEATED.

WELCOME BACK, LADIES AND GENTLEMEN. I HOPE YOU ALL ENJOYED YOUR STEAKS FROM RUTH'S CHRIS. I DIDN'T GET A STEAK FROM RUTH'S CHRIS, I CAN TELL YOU THAT.

WELL, LISTEN, AS WE MENTIONED -- AS I MENTIONED BEFORE OUR LUNCH BREAK, YOU'VE ONLY HEARD NOW FROM COUNSEL FOR THE PLAINTIFF. NOW, AT THIS TIME YOU'LL HEAR FROM COUNSEL FOR THE DEFENDANT. AND AGAIN, I WOULD ASK YOU TO GIVE MR. KHOURY YOUR FULL ATTENTION.

MR. KHOURY.

**MR. KHOURY:** THANK YOU, YOUR HONOR.

**THE COURT:** OKAY.

**MR. KHOURY:** MAY I PROCEED?

GOOD AFTERNOON, LADIES AND GENTLEMEN. I'D ALSO LIKE TO REITERATE WHAT MR. SHEPPARD SAID.

01:03p

WE APPRECIATE YOUR ATTENTION. YOU KNOW, IT'S NOT EASY TO SIT THROUGH SOME OF THESE LONG DAYS AND TALKS ABOUT PERSONNEL BASKET TRANSFERS AND OFFSHORE WORK. BUT I TRUST YOU'LL ALL HAVE SOME GOOD BARROOM TALK AFTER THIS WEEK IS OVER. SO AGAIN, WE APPRECIATE YOUR SERVICE AND YOUR ATTENTION.

THIS IS A CASE OF TWO DIFFERENT ACCIDENTS. ONE, AS YOU KNOW, MR. GRIFFIN PICKS UP A STARTER, TURNS AROUND TOO FAST IN THE ENGINE ROOM AND HITS HIS LEFT SHOULDER ON A FIRE HOSE RACK. THEN WE HAVE THE PERSONNEL BASKET INCIDENT THAT WE'VE ALL BEEN TALKING ABOUT.

THERE ARE SEVERAL THINGS WE KNOW ABOUT THE INCIDENT WHERE MR. GRIFFIN HITS HIS SHOULDER ON THE FIRE HOSE RACK. ONE, EVERYONE AGREES THAT THAT INCIDENT HAPPENED; NO. 2, EVERYONE AGREES ON THE DATE THAT INCIDENT HAPPENED; NO. 3, EVERYONE INCLUDING MR. GRIFFIN AGREES REC MARINE WAS NOT AT FAULT FOR THAT INCIDENT; NO. 4, EVERYONE AGREES THAT THAT INCIDENT INJURED MR. GRIFFIN'S LEFT SHOULDER, EVEN THOUGH THEY MIGHT DISPUTE THE EXTENT TO WHICH IT INJURED HIS LEFT SHOULDER. AND THE LAST THING I'LL MENTION IS THAT THIS INCIDENT WAS DOCUMENTED, WELL-DOCUMENTED, IN ALL THE RECORDS THAT YOU'VE SEEN.

NOW LET'S TALK ABOUT THE PERSONNEL

01:04p

BASKET INCIDENT. THERE ARE SEVERAL THINGS WE KNOW ABOUT THIS INCIDENT. OUT OF SEVEN OR EIGHT PEOPLE ON THE *DUSTIN DANOS*, ONLY TWO SAY THAT THIS INCIDENT HAPPENED. NEXT, MR. GRIFFIN GIVES AT LEAST THREE DIFFERENT DATES THAT THIS ACCIDENT ALLEGEDLY OCCURRED, AS WELL AS SOME OTHER INCONSISTENT INFORMATION WHICH I'LL GET TO IN A BIT. NO. 3, IF THE ACCIDENT OCCURRED ON MAY 2ND, AS NOW ALLEGED, MR. GRIFFIN COMPLETED AN ACCIDENT REPORT ON MAY 5TH JUST THREE DAYS LATER BUT SAID NOTHING ABOUT IT. NEXT, WE KNOW THAT MR. GRIFFIN AND MR. BADEAUX HAVE GIVEN DRASTICALLY DIFFERENT VERSIONS OF WHAT OCCURRED WITH RESPECT TO THIS ALLEGED PERSONNEL BASKET INCIDENT. FINALLY, THE ALLEGATION THAT CAPTAIN HAGLUND WAS ON THE PHONE DOES NOT MAKE SENSE. AND WE'LL GET TO THE REASONS WHY IN SOME OF THE LATER SLIDES.

I'VE KIND OF BROKEN DOWN WHAT THE PREVIOUS BULLET POINTS WERE AND I'M GOING TO EXPOUND UPON THOSE NOW. SO WITH RESPECT TO ONLY TWO PEOPLE SAYING THE INCIDENT HAPPENED, THERE IS ONE PERSON WHO CORROBORATES MR. GRIFFIN'S ALLEGATION, AND THAT'S WILLIAM BADEAUX. YOU'VE HEARD SOME EXTENSIVE TESTIMONY FROM MR. BADEAUX.

THE NEXT THING I WANT TO POINT OUT IS THAT CAPTAIN HAGLUND AND CAPTAIN WINHAUER HAVE NO

01:06p

RECOLLECTION OF MR. GRIFFIN REPORTING A PERSONNEL BASKET INCIDENT TO THEM. MR. GRIFFIN WAS ASKED WHY HE FILLED OUT THE JUNE 20TH ACCIDENT REPORT. HE EXPLAINED THAT CAPTAIN JOSH TOLD HIM HIS ROTATOR CUFF WAS INJURED AND SHOWED HIM HIS OWN ROTATOR CUFF SCARS. HE SAID HE HAD TWO SURGERIES, AND HE TOOK OFF HIS SHIRT AND SHOWED HIM HIS ROTATOR CUFF SCARS.

BUT THE LOGS SHOW THAT MR. WINHAUER, CAPTAIN WINHAUER, WAS NOT EVEN ON THE VESSEL THAT DAY. IN FACT, CAPTAIN WINHAUER HAD NOT BEEN ON THE BOAT FOR OVER A MONTH. I'M GOING TO SHOW YOU -- THIS IS THE LOG FOR THE LAST DATE THAT CAPTAIN WINHAUER WAS ON THE VESSEL. HE WAS NOT ON THE VESSEL AGAIN FOR THE REMAINDER OF MAY OF 2018 AND FOR THE REMAINDER OF JUNE. YOU WON'T SEE HIS NAME, WHICH CALLS INTO QUESTION HOW THIS CONVERSATION COULD HAVE HAPPENED.

THE LAST POINT I'LL MAKE UNDER THIS IS THAT CAPTAIN WINHAUER IS A NEUTRAL WITNESS. HE SAID HE DID NOT -- HE SAID HE DID NOT RECALL MR. GRIFFIN EVER REPORTING THE PERSONNEL BASKET INCIDENT TO HIM. BUT HE ALSO SAID THAT HE -- AND HE ALSO SAID THAT HE WOULD EXPECT MR. GRIFFIN TO TELL HIM ABOUT THE BASKET INCIDENT IF IT HAPPENED. AND WHEN HE WAS ASKED WHY, CAPTAIN WINHAUER RESPONDED "BECAUSE HE'S MY FRIEND."

01:08p

NOW LET'S GET INTO THE DATES AND THE DISCREPANCIES THERE WITH RESPECT TO THE PERSONNEL BASKET INCIDENT. MR. GRIFFIN HIMSELF HAS GIVEN AT LEAST THREE DIFFERENT DATES THAT THIS ALLEGED ACCIDENT OCCURRED. HE TELLS DR. CASEY THAT IT HAPPENED ON MAY 25TH OF 2018. AND YOU'LL SEE THAT RIGHT HERE ON AN INTAKE FORM FOR DR. CASEY WHERE IT SAYS, "DATE OF ACCIDENT OR INJURY?" THE DATE LISTED IS MAY 25TH OF 2018.

HE TELLS MS. BECKWITH, WHO YOU'VE HEARD FROM, WHO IS A VOCATIONAL REHABILITATION EXPERT, THAT THE INCIDENT HAPPENED ON MAY 28TH OF TWO THOUSAND AND NINE- -- MAY 28TH OF 2018. I'M SORRY, THAT'S A TYPO RIGHT THERE. HE NOW ALLEGES THAT THE ACCIDENT OCCURRED ON MAY 2ND OF 2018. THERE IS ONE OTHER INCONSISTENCY CONTAINED IN HIS CURRENT TREATING PHYSICIAN -- OR ONE OF HIS CURRENT TREATING PHYSICIAN'S RECORDS, WHICH IS WHEN HE SEES DR. GREENE, DR. CRAIG GREENE, ON AUGUST 20TH OF 2019. AND HE TELLS HIM THE PERSONNEL BASKET INCIDENT HAPPENED ALMOST TWO YEARS PRIOR. THAT WOULD BE AUGUST OF 2017. THESE ARE NOT SMALL DISCREPANCIES IN DATES. THESE ARE CONSISTENT REPORTS OF VARYING DATES ON WHICH AN INCIDENT WHICH MR. GRIFFIN SAYS HAS CHANGED HIS LIFE OCCURRED.

01:09p

AND THIS IS JUST AN EXAMPLE OF THE REPORT FROM DR. GREENE. IT SAYS, "HE STATES THAT HE HAD AN INITIAL INJURY APPROXIMATELY TWO YEARS AGO." AND AGAIN, AS I MENTIONED, THAT WOULD PUT THIS WAY BACK IN 2017. IF THE INCIDENT OCCURRED ON MAY 2ND AS MR. GRIFFIN NOW CLAIMS, AS I'VE MENTIONED, THERE WAS A REPORT ON MAY 5TH. IT'S IN MR. GRIFFIN'S OWN HANDWRITING. HE ACKNOWLEDGES THAT HE SIGNS THE DOCUMENT. AND THERE IS NOTHING ABOUT A PERSONNEL BASKET INCIDENT. THE ONLY REFERENCE IN THERE IS TO PICKING UP A STARTER AND HITTING HIS LEFT SHOULDER ON A FIRE HOSE RACK ON APRIL 25, 2018.

AND YOU'VE SEEN THIS REPORT. I WON'T BELABOR THE POINT. WE ALL KNOW WHAT IT SAYS. THE THING IS, IS THAT THIS IS COMPLETED THREE DAYS AFTER THIS INCIDENT ALLEGEDLY OCCURS; BUT YET YOU MENTION SOMETHING THAT HAPPENED TEN DAYS BEFORE. AND I THINK AS THE WITNESS TESTIMONY HAS SHOWN, WHEN YOU FILL OUT THIS SECTION 5, IT SPECIFICALLY STATES "DESCRIPTION OF THE ACCIDENT TO BE COMPLETED BY INJURED/ILL PARTY." AND THEY'RE SUPPOSED TO DESCRIBE THE INCIDENT, THE OCCURRENCE THAT RESULTED IN THEIR INJURY. AND THIS IS NOT SOMEONE ELSE FILLING THIS OUT. THIS IS MR. GRIFFIN FILLING THIS OUT.

NOW, I WANT TO SWITCH TRACKS TO THE

01:11p

DIFFERING ACCOUNTS OF WHAT OCCURRED GIVEN BY MR. GRIFFIN AND THE ONLY OTHER WITNESS WHO CORROBORATES MISTER -- OR ATTEMPTS TO CORROBORATE MR. GRIFFIN'S VERSION. SO THESE ARE THE MAIN DISCREPANCIES THAT THE TESTIMONY HAS LAID OUT. ONE IS THE LOCATION OF THE PERSONNEL BASKET LIFT. MR. GRIFFIN TESTIFIES THAT ALL OF THIS OCCURRED UP TOWARDS THE FRONT PORTION OF THE BACK DECK OF THIS VESSEL, PARALLEL -- AND YOU'LL SEE THIS -- PARALLEL TO THE COOLER.

NOW, YOU'LL SEE THIS IS A DIAGRAM THAT MR. GRIFFIN HAD DRAWN. WE'VE TALKED ABOUT IT DURING THE TESTIMONY, AND MR. GRIFFIN DRAWS THE PERSONNEL BASKET AS THE CIRCLE RIGHT ACROSS FROM THE COOLER, PARALLEL TO THE COOLER. NOW, YOU'LL LOOK AT THE ACTUAL PHOTOGRAPH OF THE VESSEL ON THE RIGHT-HAND SIDE OF THE SCREEN. AND IF YOU'LL RECALL, THIS WAS A PHOTO THAT WAS SHOWN TO MR. BADEAUX WHEN HE WAS TESTIFYING. AND HE WAS ASKED TO MARK AN "X" FOR WHERE THE CONEX BOXES WERE LOCATED. AND IF YOU CAN SEE, THE LITTLE RED DOT IS WHERE THE PERSONNEL BASKET WAS APPARENTLY SITUATED.

THESE ARE NOT SMALL DISCREPANCIES AS TO WHERE THIS OCCURRED. THIS IS A LARGE VESSEL WITH A 90-FOOT BACK DECK. WHAT'S CLEAR FROM THE PHOTOGRAPH MISTER -- OR FOR THE DIAGRAM THAT MR. GRIFFIN DREW,

01:13p

IS THAT IF YOU WERE LOOKING AT THE COOLER FROM THE SIDE OF THIS ACTUAL PHOTOGRAPH, YOU WOULD SEE THE PERSONNEL BASKET LINED UP WITH THE COOLER. BUT THAT'S NOT WHERE MR. BADEAUX PLACES IT, WHICH IS ONE OF THE REASONS WHY WE THINK THAT HE DIDN'T SEE WHAT HE SAYS HE SAW.

THE NEXT ISSUE WHICH ILLUSTRATES HOW DIFFERING -- HOW DIFFERENT THEIR ACCOUNTS ARE IS WHAT HAPPENED WITH THE THREE OR FOUR PEOPLE ON THE BASKET. ACCORDING TO MR. BADEAUX, WHEN THE BASKET KNOCKS OR ROLLS MR. GRIFFIN INTO THE CONEX BOX, THE THREE OR FOUR PEOPLE WHO WERE ON THE PERSONNEL BASKET JUMP OFF, EITHER TO AVOID BEING HURT OR TO CHECK ON MR. GRIFFIN. BUT MR. GRIFFIN SAYS THAT THE BASKET JUST KEEPS GOING STRAIGHT UP.

SO IF YOU WERE SOMEONE WITNESSING THIS, YOU'RE SEEING TWO PEOPLE GIVING A DRASTICALLY DIFFERENT VERSION OF WHAT HAPPENED. ONE, SLAMS HIM INTO THE CONEX BOX, EVERYONE OFF CHECKING ON HIM VERSUS SLAMS HIM INTO THE BOX, CRANE OPERATOR JUST KEEPS LIFTING THE PEOPLE ON THE BASKET ALL THE WAY UP TO THE PLATFORM.

THE NEXT DISCREPANCY IS IN WHAT HAPPENED TO MR. GRIFFIN. YOU HEARD TESTIMONY AT THIS TRIAL THAT MR. GRIFFIN THINKS HE MAY HAVE BLACKED OUT

01:15p

WHEN THE BASKET HIT HIM. AND HE SAYS HE REMEMBERS GETTING UP AND GRABBING HIS HARD HAT. THE DIFFERENCE IS, WAS MR. BADEAUX WAS ASKED WHETHER MR. GRIFFIN FELL TO THE DECK WHENEVER THE BASKET HIT HIM. AND HIS RESPONSE WAS "NO, SIR." SO THAT'S SORT OF THE THIRD THING, IS WE HAVE A SITUATION WHERE MR. GRIFFIN SAYS HE BLACKS OUT, HE'S ON THE GROUND, GETS UP, GRABS HIS HARD HAT; AND MR. BADEAUX, WHO IS SUPPOSED TO BE THE PERSON THAT CORROBORATES HIS VERSION OF EVENTS, SAYS HE NEVER FELL.

THERE HAS BEEN AN ALLEGATION -- AND YOU'VE HEARD LOTS ABOUT IT FROM VARIOUS WITNESSES -- ABOUT WHETHER CAPTAIN HAGLUND WAS ON THE PHONE AT THE TIME THIS INCIDENT HAPPENED. I TALKED ABOUT THE INCIDENT REPORT THAT WAS COMPLETED ON MAY 5TH. NOW I'M GOING TO TALK ABOUT THE INCIDENT REPORT THAT WAS COMPLETED ON JUNE 20TH OF 2018. THIS ONE DOES REFERENCE THE PERSONNEL BASKET INCIDENT. BUT WHAT IT DOESN'T SAY IS ANYTHING ABOUT CAPTAIN HAGLUND BEING ON HIS PHONE. THAT'S A PRETTY IMPORTANT DETAIL TO LEAVE OUT OF AN INCIDENT REPORT LIKE THIS WHERE YOU'RE SAYING THAT THE PERSONNEL BASKET SLAMS YOU INTO A CONEX BOX AND YOU APPARENTLY KNOW THE REASON WHY IT HAPPENED BUT YOU DON'T PUT THAT IN THE INCIDENT REPORT.

01:16p

ANOTHER REASON WHY IT DOESN'T MAKE SENSE THAT CAPTAIN HAGLUND WAS ON THE PHONE IS BECAUSE, DESPITE MR. GRIFFIN ACKNOWLEDGING THAT THAT WOULD BE EXTREMELY DANGEROUS AND THAT YOU WOULDN'T WANT TO WORK WITH SOMEBODY WHO WOULD JUST IN THE MIDDLE OF AN ACTIVE PERSONNEL BASKET TRANSFER JUST LEAVE THE WHEEL OF THE VESSEL, JUST WALK AWAY, NEITHER MR. GRIFFIN NOR MR. BADEAUX GO REPORT THIS TO THE OTHER CAPTAIN, THE OTHER MOST SENIOR PERSON ON THE VESSEL, TO SAY "HEY, YOU KNOW, WE'VE GOT A CAPTAIN" -- WHO MR. GRIFFIN THINKS AND MR. BADEAUX SAYS HE SEES -- "WHO IN THE MIDDLE OF A PRETTY SENSITIVE OPERATION WHERE THE BASKET IS COMING UP OFF THE DECK JUST LEAVES THE WHEEL."

CAPTAIN HAGLUND HAS 30 YEARS OF EXPERIENCE. HE'S BEEN LICENSED CONTINUOUSLY BY THE COAST GUARD. HE'S NEVER HAD HIS LICENSE SUSPENDED OR REVOKED. A CAPTAIN WHO WOULD JUST ABANDON THE WHEEL TO GO TALK TO SOMEONE OR TEXT SOMEONE DURING A PERSONNEL BASKET TRANSFER IS PROBABLY NOT SOMEBODY WHO IS GOING TO BE IN THIS INDUSTRY FOR VERY LONG.

THE NEXT REASON WHY THE ALLEGATION OF MR. HAGLUND BEING ON THE PHONE DOESN'T MAKE SENSE IS BECAUSE MR. GRIFFIN RECOUNTS THAT THERE IS A CONFRONTATION IN THE WHEELHOUSE WITH CAPTAIN HAGLUND

01:18p

AFTER THE INCIDENT HAPPENS WHERE, AS YOU'VE HEARD, CAPTAIN HAGLUND ALLEGEDLY ADMITS THAT "HEY, WHILE THAT WAS HAPPENING, DAVID HOLLYWOOD GRIFFIN WAS CALLING." AND DESPITE MR. GRIFFIN SAYING THAT MR. BADEAUX WAS IN THE WHEELHOUSE WHEN THIS CONFRONTATION TOOK PLACE, MR. BADEAUX NEVER SAYS ANYTHING LIKE "WELL, YEAH, I WAS WATCHING YOU AND I SAW YOU ON THE PHONE." IT SEEMS STRANGE FOR MR. BADEAUX TO HAVE REMAINED SILENT IF HE'S THE ONE WHO SAYS "WELL, ACTUALLY I SAW WHAT YOU'RE SAYING HAPPENED."

THERE IS ALSO A DISCREPANCY IN WHAT MR. BADEAUX SAYS HE SAW. MR. BADEAUX SAYS CAPTAIN HAGLUND WAS TEXTING, NOT TALKING ON THE PHONE. I'M SORRY. I MISSED A POINT HERE, WHICH I THINK IS REALLY IMPORTANT, IS THAT, AS I MENTIONED, MR. BADEAUX DOESN'T SAY ANYTHING WHILE THIS CONFRONTATION IS GOING ON. BUT WHAT MR. BADEAUX DOES IS HE WAITS SEVERAL YEARS AND CALLS MR. GRIFFIN OUT OF THE BLUE AND SAYS HE HAS THIS INFORMATION THAT WOULD HELP MR. GRIFFIN'S CASE.

IT SEEMS LIKE IF YOU KNEW THIS INFORMATION, YOU'D REPORT IT TO THE COMPANY; YOU WOULDN'T WANT TO WORK WITH THAT CAPTAIN ANYMORE; YOU'D REPORT IT TO CAPTAIN JOSH WINHAUER; YOU'D CALL BRIAN HARRIS, THE HSE MANAGER; YOU WOULDN'T WAIT TWO

01:20p

YEARS AND THEN TELL SOMEONE YOU HAD SOME INFORMATION TO HELP THEM ON THEIR CASE.

AND THIS IS JUST AN ILLUSTRATION OF THE INCIDENT REPORT. BUT YOU CAN SEE IT'S THE JUNE 20TH INCIDENT REPORT, AGAIN, WHERE NOTHING IS MENTIONED ABOUT THE CAPTAIN BEING ON HIS PHONE.

THERE IS ALSO A FEW OTHER PROBLEMS WITH MR. BADEAUX'S TESTIMONY. FROM WHERE MR. BADEAUX SAYS HE WAS STANDING, LADIES AND GENTLEMEN, HE COULD NOT HAVE SEEN THIS INCIDENT. IF YOU'LL RECALL, THE PHOTOGRAPH IN THE BOTTOM RIGHT-HAND CORNER WAS A PHOTOGRAPH THAT MR. BADEAUX WAS SHOWN WHEN HE WAS TESTIFYING. YOU SEE OFF TO THE -- HE'S -- OFF TO THE LEFT SIDE HE'S DRAWN THE LETTER "B" TO INDICATE WHERE HE WAS STANDING. YOU ALSO SAW A PHOTOGRAPH, WHICH YOU CAN ACTUALLY SEE IN THE TOP LEFT-HAND PHOTOGRAPH -- YOU SEE THAT THERE IS A SIDE WINDOW ON THE STERN CONTROLS. IT'S HARD TO SEE THE LITTLE -- HOW IT'S INSET ON THE BOTTOM RIGHT-HAND PHOTOGRAPH. BUT IT SHOWS IT MORE CLEARLY ON THE TOP LEFT-HAND PHOTOGRAPH. IT'S THE SAME ON THE OTHER SIDE OF THE WHEELHOUSE.

NOW, YOU ALSO SAW A PHOTOGRAPH LOOKING INTO THE SIDE WINDOW. AND YOU CAN SEE THERE IS A PHOTOGRAPH AND YOU SEE A CAPTAIN SITTING KIND OF

01:21p

FURTHER BACK. YOU CAN REALLY SEE HIS HANDS AND YOU CAN SEE A COFFEE CUP. SO HE'S ALL THE WAY AT THE EDGE OF WHERE THAT -- IF YOU LOOK AT THE SIDE WINDOW ON THE TOP LEFT-HAND PHOTOGRAPH, HE'S ALL THE WAY BACK. WHAT MR. BADEAUX SAYS IS THAT HE WAS THREE FEET FURTHER BEHIND HIM.

NOW, KEEP IN MIND THIS IS ON THE LEFT SIDE OF THE WHEELHOUSE AND THERE IS WHAT HE CALLED A STACK. AND YOU CAN SEE IT IN THE LEFT-HAND PHOTOGRAPH IMMEDIATELY RIGHT BEHIND THE -- THE SIDE WINDOW IS WHAT'S CALLED THE STACK. NOW, IF MR. BADEAUX WAS STANDING ON THE PORT SIDE, THE LEFT SIDE, THREE FEET BEHIND WHERE YOU CAN SEE THAT CAPTAIN HOLDING THE COFFEE CUP -- IF YOU COMPARE THAT WITH WHERE MR. GRIFFIN SAID THE PERSONNEL BASKET WAS LANDED, MR. BADEAUX COULDN'T HAVE SEEN IT. THE STACK WOULD HAVE OBSTRUCTED HIS VIEW.

THIS IS ONE REALLY IMPORTANT POINT THAT I WANT TO BRING UP BECAUSE I THINK IT DRIVES HOME THE POINT THAT MR. BADEAUX DIDN'T SEE WHAT HE SAID HE SAW. MR. BADEAUX TESTIFIED ON THE WITNESS STAND THAT IT TOOK ONE TO TWO MINUTES FROM WHEN THE VESSEL STARTED MOVING FORWARD -- MR. GRIFFIN IS -- HAS THE PERSONNEL BASKET IN PLACE. WE'VE GOT THREE PEOPLE GET ON THE PERSONNEL BASKET AND THERE IS -- THEY'RE

01:23p

READY TO LIFT UP OFF THE DECK. MR. BADEAUX SAYS THAT IT TAKES ONE OR TWO MINUTES FROM WHEN THE VESSEL STARTS MOVING FORWARD UNTIL MR. GRIFFIN GRABS THE BASKET AND IS SLAMMED INTO THE CONEX BOX. THIS IS COMPLETELY IMPLAUSIBLE.

MR. GRIFFIN'S ALLEGATION IS THAT THE BASKET STARTS COMING UP PERHAPS BECAUSE THE CAPTAIN HAS ABANDONED THE WHEEL AND LEFT THE CONTROLS IN FORWARD, IT JUST STARTS GOING FORWARD AND THAT HE'S TRYING TO GRAB THE BASKET AND IT THROWS HIM INTO THE CONEX BOX. IF THAT'S WHAT OCCURRED, THAT OCCURS WITHIN FIVE, MAYBE TEN SECONDS MAX. BUT WHAT MR. BADEAUX SAYS IS FROM THE TIME THE VESSEL STARTS MOVING FORWARD, LURCHING FORWARD BECAUSE THE CAPTAIN HAS ABANDONED THE WHEEL, IT'S ONE TO TWO MINUTES. NOW, I'M NOT GOING TO SIT HERE AND, YOU KNOW, PUT A TIMER SO WE ALL SIT IN SILENCE. BUT THAT'S COMPLETELY IMPLAUSIBLE.

THE LAST POINT I'M GOING TO MAKE ON THIS ISSUE IS: MR. BADEAUX ADMITTEDLY PROVIDED FALSE INFORMATION IN A SWORN DECLARATION THAT WAS GIVEN UNDER PENALTY OF PERJURY. AND HE TESTIFIED ON THE STAND. HE WAS LIKE, "OKAY. WELL, NOW I WANT TO CORRECT THAT." THAT'S NO SMALL THING TO COME INTO COURT ACKNOWLEDGING THAT YOU'VE LIED UNDER PENALTY OF

01:25p

PERJURY.

THERE IS A DECLARATION THAT -- THE SWORN DECLARATION THAT MR. BADEAUX PROVIDED WHERE THERE IS TWO -- THERE IS NOT JUST ONE INCORRECT STATEMENT IN THERE. MR. BADEAUX ACKNOWLEDGED THAT THE STATEMENT AS A RESULT OF THE -- HE WRITES IN THERE AS A RESULT OF -- OR I'M SORRY. THE DECLARATION WAS CRAFTED BY MR. SHEPPARD. MR. BADEAUX HAD AN OPPORTUNITY TO REVIEW IT AND SIGNED IT AS HIS OWN SWORN DECLARATION. I JUST WANT TO BE CLEAR ABOUT THAT. HE DIDN'T TYPE THIS UP.

BUT IT'S WRITTEN IN HERE THAT "AS A RESULT OF THE INCIDENT, MR. GRIFFIN HIT HIS SHOULDER, NECK, AND HIS BACK." WELL, MR. BADEAUX HAS CANDIDLY ACKNOWLEDGED HE DIDN'T HIT HIS BACK. IT'S ALSO STATED IN HERE THAT "IMMEDIATELY FOLLOWING THE INCIDENT, MR. GRIFFIN COMPLAINED OF PAIN TO HIS SHOULDER, HIS BACK, AND HIS NECK." MR. BADEAUX TOLD YOU HE DIDN'T COMPLAIN OF PAIN IN HIS BACK.

NOW, LET'S ASSUME THAT THE JURY -- LADIES AND GENTLEMEN, THAT YOU FIND THAT THE PERSONNEL BASKET INCIDENT OCCURRED. OUR POSITION IS THAT MR. GRIFFIN BEARS SOME RESPONSIBILITY FOR THAT. MR. BADEAUX WAS VERY CLEAR THAT WHAT HAPPENED WAS, IF YOU BELIEVE HIM, THAT MR. GRIFFIN WENT UP TO THE

01:26p

PERSONNEL BASKET AND GRABBED THE PERSONNEL BASKET. IF THAT'S TRUE, MR. GRIFFIN VIOLATED PRETTY WELL-ESTABLISHED PRINCIPLES OF RIGGING. HE'S A CERTIFIED RIGGER. HE'S DONE IT FOR MANY YEARS. HE'S EXPERIENCED AND HE KNOWS HOW TO HANDLE A PERSONNEL BASKET.

THE WAY YOU HANDLE IT IS YOU HANDLE IT WITH A TAG LINE. AND THAT'S FOR YOUR OWN SAFETY. AND PEOPLE IN THE OFFSHORE INDUSTRY HAVE DONE THIS FOR A LONG TIME. THEY KNOW THAT THAT'S THE WAY TO KEEP SAFE IS WITH A TAG LINE, BECAUSE YOU'RE ABLE TO MANIPULATE THE BASKET FROM A SAFE DISTANCE. YOU'RE NEVER, UNDER ANY CIRCUMSTANCES, SUPPOSED TO GO UP TO A PERSONNEL BASKET AND TRY TO WRESTLE IT AWAY FROM CARGO. YOU'RE NOT GOING TO BE AS STRONG AS THE FORCES OF NATURE AND A CARGO BASKET -- I'M SORRY -- A PERSONNEL BASKET.

LET'S TALK ABOUT THE ALLEGED INJURIES. OUR POSITION IS THAT THE LEFT SHOULDER INJURY WAS CAUSED BY MR. GRIFFIN STRIKING HIS SHOULDER ON THE FIRE HOSE RACK. AND HOW DO WE KNOW THAT? WHEN MR. GRIFFIN COMPLETED THE INCIDENT REPORT ON MAY 5TH OF 2018, HE RELATED THE SHOULDER INJURY TO PICKING UP A STARTER AND HITTING HIS SHOULDER ON THE FIRE HOSE RACK.

01:28p

THE FIRST MEDICAL PROVIDER AT OCCUPATIONAL MEDICAL SERVICES, WHOM MR. GRIFFIN SAW ON MAY 14TH OF 2018, DIAGNOSED A SHOULDER CONTUSION. AND THAT PROVIDER LISTED THE DATE OF THE ACCIDENT AS APRIL 25TH OF 2018. THAT'S THE STARTER INCIDENT WHERE HE HITS HIS SHOULDER ON THE FIRE HOSE RACK. MR. GRIFFIN'S MOST RECENT SHOULDER DOCTOR, DR. GREENE, ACKNOWLEDGED THAT THAT TYPE OF INCIDENT COULD RESULT IN A ROTATOR CUFF INJURY. DR. HADDAD, THE DEFENDANT'S IME PHYSICIAN, ALSO TESTIFIED THAT THAT TYPE OF INCIDENT COULD RESULT IN A TORN ROTATOR CUFF.

AND THIS IS JUST A DESCRIPTION OF THE FIRST MEDICAL PROVIDER WHICH MR. GRIFFIN SAW WHO LISTED A DATE OF INJURY AS 4/25 OF 2018. I'LL ALSO JUST POINT OUT -- AND WE'LL GET TO SOME OF THE ISSUES WITH THE NECK AND THE BACK, BUT THE DESCRIPTION OF INJURY IS LEFT SHOULDER PAIN. THIS IS -- IF WE'RE GOING TO GO WITH THE MAY 2ND DATE AS THE DATE THIS HAPPENED, THIS IS 12 DAYS AFTER; ONLY A MENTION OF SHOULDER PAIN.

I'M GOING TO MOVE ON TO TALKING ABOUT MR. GRIFFIN'S ALLEGED NECK INJURY. OUR POSITION IS THAT THE CLAIMED NECK INJURY IS NOT RELATED TO THE PERSONNEL BASKET INCIDENT ALLEGED TO HAVE OCCURRED ON MAY 2ND. AND HOW DO WE KNOW THIS? AGAIN, I JUST

01:29p

MENTIONED TO YOU THAT MR. GRIFFIN WAS SEEN AT OCCUPATIONAL MEDICAL SERVICES 12 DAYS LATER. THE INTAKE FORM ASKED "WHAT IS YOUR INJURY OR YOUR COMPLAINT?" AND MR. GRIFFIN WRITES "ONLY MY LEFT SHOULDER." AND THIS IS JUST A LITTLE EXCERPT FROM THE FIRST MEDICAL PROVIDER HE SEES. AND AGAIN, THIS IS HIS OWN DESCRIPTION. THIS IS NOT SOMEONE WRITING THIS FOR HIM.

MR. GRIFFIN DID NOT REPORT ANY NECK PAIN. HE WAS UNDERGOING PHYSICAL THERAPY FOR ALMOST AN ENTIRE YEAR AFTER THIS ALLEGED PERSONNEL BASKET INCIDENT; AND YET HE DIDN'T REPORT NECK PAIN TO HIS PHYSICAL THERAPIST UNTIL APRIL 8TH OF 2019. THAT'S ALMOST A YEAR LATER. NEVER TOLD HIS PHYSICAL THERAPIST ANYTHING ABOUT LOW BACK PAIN. HE ALSO DIDN'T REPORT NECK PAIN TO DR. CASEY UNTIL APRIL 10TH OF 2019.

NOW, I KNOW -- I'M HESITANT TO EVEN BRING UP THIS DIAGRAM AGAIN BECAUSE I KNOW WE'VE ALL SEEN IT SO MANY TIMES. BUT MR. GRIFFIN'S WHOLE PITCH TO YOU, LADIES AND GENTLEMEN OF THE JURY, TO PROVE THAT HE SUSTAINED A NECK INJURY IS TO RELY EXCLUSIVELY ON ONE "X" MARK ON A DIAGRAM THAT HE COMPLETED ON JUNE 29TH OF 2018. AND KEEP IN MIND THAT EVEN THAT -- EVEN THAT DIAGRAM THAT WE'VE TALKED

01:31p

SO MUCH ABOUT AND THAT HE RELIES SO HEAVILY ON TO SAY "I ACTUALLY DID INJURE MY NECK," EVEN THAT WAS -- THE DIAGRAM WAS MADE BY MR. GRIFFIN 59 DAYS AFTER THIS ALLEGED PERSONNEL BASKET INCIDENT TOOK PLACE.

NOW, TO FIND THAT HE HAD A NECK INJURY, WHAT MR. GRIFFIN WANTS YOU TO IGNORE IS QUITE A LOT. HE WANTS YOU TO IGNORE THE FACT THAT THE ACTUAL MRI REPORT THAT WAS TAKEN IN CONNECTION WITH THIS DIAGRAM THAT HE COMPLETED EXPLAINS THAT HE WAS HAVING PAIN IN HIS TRAPEZIUS AND HIS LEFT SHOULDER. NO MENTION OF HIS NECK. THE PITCH IS JUST THAT THE TRAPEZIUS IS BASICALLY THE NECK. BUT IT'S NOT. THE TRAPEZIUS IS NOT THE NECK.

THERE IS ALSO A QUESTIONNAIRE THAT MR. GRIFFIN COMPLETED AT THE SAME TIME HE UNDERWENT THIS MRI ON JUNE 29TH OF 2018. AND IT SAYS, "WHAT ARE YOU SEEING THE DOCTOR FOR TODAY?" AND MR. GRIFFIN WRITES "MY LEFT SHOULDER." NOT "MY LEFT SHOULDER AND MY NECK." NOT "MY LEFT SHOULDER AND MY LOW BACK." "MY LEFT SHOULDER." AND THIS IS THE SAME DATE THAT THIS DIAGRAM IS COMPLETED THAT HE RELIES SO HEAVILY ON.

WHAT MR. GRIFFIN ALSO WANTS YOU TO IGNORE IS DR. CASEY'S JUNE 12, 2019 LETTER WHERE HE STATES UNEQUIVOCALLY THAT MR. GRIFFIN'S NECK INJURY IS NOT RELATED TO HIS ACCIDENT ON REC MARINE'S BOAT.

01:33p

NOW, THIS IS NOT JUST A DOCTOR THAT THE DEFENDANTS WENT OUT AND HIRED TO GIVE THEM A CERTAIN OPINION. THIS IS THE DOCTOR THAT TREATED MR. GRIFFIN FOR AN ENTIRE YEAR THAT HE TRUSTED APPARENTLY WELL ENOUGH TO ALLOW HIM TO DO SHOULDER SURGERY, TO FOLLOW HIM THROUGHOUT HIS RECOVERY.

AND THIS IS WHAT -- THIS IS AN EXCERPT FROM WHAT DR. CASEY SAYS. HE SAYS, "I AM IN RECEIPT OF YOUR REQUEST REGARDING MY OPINION AS TO WHETHER MR. GRIFFIN'S NECK CONDITION IS RELATED TO HIS SHOULDER CONDITION. CURRENTLY HIS SHOULDER IS AT MAXIMUM MEDICAL IMPROVEMENT AND HE IS DOING QUITE WELL. HE HAS CONTINUED TO COMPLAIN OF OFF AND ON NECK PAIN, BUT THAT DID NOT START UNTIL WELL AFTER HIS INITIAL INJURY; THEREFORE, BASED ON THAT INFORMATION IT IS MY OPINION THAT MR. GRIFFIN'S NECK CONDITION ALTHOUGH PRESENT IS NOT RELATED TO HIS INJURY ON THE BOAT."

NOW, AS I MENTIONED -- AND I MIGHT DO IT A FEW MORE TIMES -- IS THAT, AGAIN, WE'RE GOING BACK TO THIS PAIN DIAGRAM 59 DAYS LATER WITH THE MARK ON THE TRAPEZIUS. WHAT MR. GRIFFIN WANTS YOU TO IGNORE IS ALL OF THESE TIMES THAT HE WENT TO THE DOCTOR THAT HE DIDN'T SAY ANYTHING ABOUT HIS NECK. AND I'VE JUST LISTED THEM HERE FOR YOU. I'M NOT

01:35p

GOING TO READ THEM OUT. BUT HE WANTS YOU TO SAY THAT THIS DIAGRAM IS EVERYTHING; THAT PROVES EVERYTHING.

BUT WE FEEL LIKE THIS PROVES THE REAL STORY. THESE ARE THE LIST OF THE TIMES THAT HE HAS GONE TO A MEDICAL PROVIDER, TO A DOCTOR, OR TO A PHYSICAL THERAPIST AND SAID NOTHING ABOUT NECK PAIN. AND IT CONTINUES. THAT'S JUST THE DIAGRAM. SORRY. THESE ARE MORE DATES. THESE ARE DIFFERENT DATES THAN WAS ON THE PREVIOUS SLIDE. THIS IS CONTINUING. THESE ARE EVEN MORE DATES THAN ON THE PREVIOUS TWO SLIDES WHERE MR. GRIFFIN GOES TO A DOCTOR OR A PHYSICAL THERAPIST AND DOESN'T SAY ANYTHING ABOUT NECK PAIN OR A NECK INJURY.

IT CONTINUES. THIS IS A FOURTH PAGE OF TIMES WHERE MR. GRIFFIN WAS AT THE DOCTOR OR A PHYSICAL THERAPIST AND SAYS NOTHING ABOUT NECK PAIN. SORRY. I'M -- THAT WAS A -- IT'S NOT DOUBLE. I WENT BACK ONE. LADIES AND GENTLEMEN, THE TOTAL NUMBER OF TIMES MR. GRIFFIN WAS SEEN BY A MEDICAL PROVIDER WITHOUT ANY MENTION OF NECK PAIN IS 35.

WITH RESPECT TO THE NECK, FURTHER COMPLICATING FACTORS INCLUDE THE FOLLOWING: AS WE KNOW, MR. GRIFFIN FILED A LAWSUIT IN 2014 ALLEGING SEVERE AND PERMANENT INJURIES TO HIS LOWER BACK, BACK, AND NECK. HE DIDN'T DISCLOSE THIS TO REC

01:37p

MARINE WHEN HE WAS HIRED EVEN THOUGH THEY ASKED ABOUT ANY PRIOR CIVIL LAWSUITS YOU'VE BEEN INVOLVED IN. AND IT ASKED "GIVE A DESCRIPTION OF THE CLAIM IF YOU'VE BEEN INVOLVED IN A LAWSUIT." HE DIDN'T DISCLOSE IT.

YOU'VE ALSO HEARD QUITE A BIT OF TESTIMONY THROUGH SOME OF THE MEDICAL DOCTORS AND SOME OF THE EXPERTS ABOUT MULTIPLE FALLS THAT MR. GRIFFIN HAS HAD SUBSEQUENT TO WHEN THIS PERSONNEL BASKET INCIDENT ALLEGEDLY OCCURRED. YOU'VE SEEN TESTIMONY THAT FOR YEARS MR. GRIFFIN WAS NOT TAKING HIS HIGH BLOOD PRESSURE MEDICINE; HE WAS PRONE TO FALLS; HE WAS PRONE TO PASSING OUT. SEVERAL OF THESE RESULTED IN INJURY, ESPECIALLY IN MAY OF 2022 WHEN HE FELL AT HOME IN HIS KITCHEN AND HIT HIS HEAD, NECK AND -- AND HAD HEAD, NECK AND BACK PAIN FOR WHICH HE HAD TO BE EVALUATED AT THE EMERGENCY ROOM. THIS IS JUST A DESCRIPTION OF WHAT WAS ALLEGED IN THAT 2014 LAWSUIT: THAT MR. GRIFFIN SUFFERED SEVERE AND PERMANENT INJURIES.

I'M GOING TO MOVE ON TO MR. GRIFFIN'S CLAIM THAT HE SUSTAINED A LOW BACK INJURY IN THIS INCIDENT. THE CLAIMED LOW BACK INJURY IS NOT RELATED TO A PERSONNEL BASKET INCIDENT ON THE *DUSTIN DANOS*. HOW DO WE KNOW THIS? MR. GRIFFIN DIDN'T REPORT LOW

01:39p

BACK PAIN TO ANY MEDICAL PROVIDER UNTIL JANUARY 31 OF 2020 WHEN HE MENTIONED BACK PAIN. THIS WAS A YEAR AND EIGHT MONTHS AFTER THE PERSONNEL BASKET INCIDENT OCCURRED, IF IT OCCURRED ON MAY 2ND.

THIS IS -- THIS IS A DESCRIPTION OF WHEN HE FIRST MENTIONS BACK PAIN. THIS WAS WRITTEN BY MR. GRIFFIN IN JANUARY OF 2020 WHEN HE WENT IN TO GET AN MRI AT BATON ROUGE ORTHOPAEDIC CLINIC. AND IT ASKS "WHAT TYPE OF PROBLEM ARE YOU HAVING?" AND HE SAYS -- I BELIEVE THIS IS SUPPOSED TO BE "SHOULDER LEFT SIDE AND NECK, ALSO BACK PAIN," ALMOST AS IF IT'S JUST AN AFTERTHOUGHT: "WELL, LET'S THROW IN BACK PAIN, TOO. AND LET'S THROW IN BACK PAIN A YEAR AND EIGHT MONTHS AFTER THIS PERSONNEL BASKET INCIDENT HAPPENED."

THIS IS SIMILAR TO WHAT WE DID WITH THE NECK. THIS IS THE NUMBER OF TIMES MR. GRIFFIN HAS SEEN A MEDICAL PROVIDER WITHOUT ANY MENTION OF BACK PAIN. I'M GOING TO SCROLL TO THE NEXT LINE. SWITCH TO THE NEXT LINE. SWITCH TO THE NEXT LINE.

THIS IS THE NUMBER OF TIMES -- AND THIS IS AT THE LEAST -- THAT MR. GRIFFIN HAS SEEN A MEDICAL PROVIDER WITHOUT ANY MENTION OF BACK PAIN. AT LEAST 50.

YOUR HONOR, COULD I USE THE ELMO?

01:41p

**THE COURT:** SURE.

**MR. KHOURY:** MR. SHEPPARD ON BEHALF OF MR. GRIFFIN WENT THROUGH HOW THE PLAINTIFF WANTS YOU TO FILL OUT THE JURY VERDICT FORM, SO I'M GOING TO DO THE SAME THING ON BEHALF OF MY CLIENTS.

SO FOR INTERROGATORY NO. 1 -- AND THIS IS A VERDICT FORM YOU'LL BE GIVEN SHORTLY -- "DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT PLAINTIFF MCARTHUR GRIFFIN INJURED HIS SHOULDER AS A RESULT OF A PERSONNEL BASKET TRANSFER INCIDENT ON BOARD THE *DUSTIN DANOS*?" WE'RE ASKING YOU TO SELECT "NO."

"INTERROGATORY NO. 2: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT PLAINTIFF MCARTHUR GRIFFIN INJURED HIS NECK AS A RESULT OF A PERSONNEL BASKET TRANSFER INCIDENT ON BOARD THE *DUSTIN DANOS*? WE'RE ASKING YOU TO SELECT "NO."

REGARDING INTERROGATORY NO. 3, "DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT PLAINTIFF MCARTHUR GRIFFIN INJURED HIS BACK AS A RESULT OF A PERSONNEL BASKET" INCIDENT -- "PERSONNEL BASKET TRANSFER INCIDENT ON BOARD THE *DUSTIN DANOS*?" WE'RE ASKING YOU TO SELECT "NO."

AND BY THE WAY, IF THESE THREE BOXES ARE CHECKED "NO," THE JOB IS DONE WITH RESPECT TO ANY

01:43p

DAMAGES BECAUSE THERE WOULD BE NONE.

"INTERROGATORY NO. 4: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT DEFENDANT REC MARINE LOGISTICS WAS NEGLIGENT AND THAT SUCH NEGLIGENCE WAS THE CAUSE, IN WHOLE OR IN PART, OF THE DAMAGE OR INJURY TO PLAINTIFF MCARTHUR GRIFFIN?" WE BELIEVE THE ANSWER SHOULD BE "NO."

"NO. 5: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT THE VESSEL *DUSTIN DANOS* WAS UNSEAWORTHY AND THAT SUCH UNSEAWORTHINESS WAS THE PROXIMATE CAUSE OF THE DAMAGE OR INJURY TO PLAINTIFF MCARTHUR GRIFFIN?" WE'RE ASKING YOU TO CHECK "NO."

"INTERROGATORY NO. 6: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT PLAINTIFF MCARTHUR GRIFFIN WAS NEGLIGENT AND THAT SUCH NEGLIGENCE CONTRIBUTED, IN WHOLE OR IN PART, TO HIS ALLEGED INJURIES?" WE'RE ASKING THAT IF YOU DO FIND THAT THE PERSONNEL BASKET INCIDENT HAPPENED AND YOU DO FIND THAT THE DEFENDANTS ARE AT FAULT PARTIALLY, THAT YOU ALSO FIND THAT MR. GRIFFIN CONTRIBUTED TO HIS ALLEGED INJURIES.

WITH RESPECT TO INTERROGATORY NO. 7, OUR SUGGESTION OF APPORTIONMENT OF FAULT, IF YOU WERE TO FIND THAT THE PERSONNEL BASKET INCIDENT OCCURRED, IS THAT MR. GRIFFIN WAS RESPONSIBLE FOR IT.

01:45p

NOW, INTERROGATORY NO. 8 DISCUSSES DAMAGES OR THE AMOUNT OF MONEY THAT WOULD FAIRLY AND REASONABLY COMPENSATE MR. GRIFFIN. AND AGAIN, I HAVE TO MAKE THIS DISCLAIMER. THIS IS ONLY IF YOU FIND THAT THE DEFENDANTS WERE NEGLIGENT OR THAT THE VESSEL WAS UNSEAWORTHY OR THAT MAINTENANCE AND CURE WAS OWED. "PAST GENERAL DAMAGES, INCLUDING: PHYSICAL IMPAIRMENT, PAIN AND SUFFERING, MENTAL ANGUISH, AND LOSS OF ENJOYMENT OF LIFE," 50,000 WE SUGGEST WOULD BE A REASONABLE FIGURE.

WITH RESPECT TO THOSE SAME CATEGORIES OF DAMAGES IN THE FUTURE, WE ALSO WOULD SUGGEST THAT $50,000 WOULD BE REASONABLE. WITH RESPECT TO PAST LOST WAGES, AS YOU'VE HEARD A LOT OF TESTIMONY ON, THESE ARE RATHER MINIMAL GIVEN THE FACT THAT MR. GRIFFIN WAS PAID HIS FULL WAGES FOR A YEAR. NOW, YOU'VE HEARD A LOT OF TESTIMONY AS TO WHETHER THAT WAS ON TAX FORMS AND WHY IT WASN'T ON TAX FORMS. THE TRUTH IS THAT THAT'S PAID AS AN ADVANCE ON SETTLEMENT. IT WAS DONE THAT WAY SO THAT MR. GRIFFIN GOT MORE OF THE MONEY. AND SO IT WAS TAXED AS AN ADVANCE ON A SETTLEMENT AND NOT AS WAGES WHERE HE WOULD BE TAXED ON THAT MONEY.

SO NOT ONLY WERE THEY PAYING -- FOR THIS ENTIRE YEAR, NOT ONLY WERE THEY PAYING HIM

01:46p

MAINTENANCE BENEFITS, NOT ONLY WERE THEY COORDINATING AND PAYING FOR ALL OF HIS MEDICAL TREATMENT, THEY WERE PAYING HIM ADVANCES ON WAGES IN A WAY THAT PUT MORE MONEY IN HIS POCKET WHILE HE WAS RECOVERING FROM HIS SHOULDER SURGERY. SO OUR SUGGESTION OF PAST LOST WAGES WOULD BE $15,426.

WITH RESPECT TO FUTURE LOSS OF EARNING CAPACITY, OUR CONTENTION IS THAT MR. GRIFFIN DOESN'T HAVE A FUTURE LOSS OF EARNING CAPACITY. HIS SHOULDER WAS PLACED AT MMI. DR. CASEY, THE ONE WHO DID THE SHOULDER SURGERY, SAID THAT HE WAS CAPABLE OF GOING BACK TO WORK FULL DUTY. AND OBVIOUSLY OUR CONTENTION IS THAT THE NECK AND THE BACK INJURY ARE NOT RELATED TO THE PERSONNEL BASKET INCIDENT, IF YOU FIND THAT OCCURRED.

WITH RESPECT TO FUTURE MEDICAL EXPENSES -- I'M SORRY -- PAST MEDICAL EXPENSES, WE'RE ASKING YOU TO COME BACK WITH A VERDICT, IF YOU FIND THAT IT IS APPROPRIATE, OF $5,432. AND AGAIN, THIS IS ONLY IF YOU FIND THAT PAST MEDICAL EXPENSES ARE OWED.

WITH RESPECT TO FUTURE MEDICAL EXPENSES -- AND THIS IS TAKEN FROM THE -- CLOSELY IN LINE WITH OUR LIFE CARE PLANNING EXPERT'S REPORT, STEPHANIE HAUPT, WHICH VALUED THE COST OF FUTURE

01:48p

MEDICAL CARE, IN ACCORDANCE WITH THE RECOMMENDATIONS OF MEDICAL PROVIDERS WHO HAVE SEEN MR. GRIFFIN, FUTURE MEDICAL EXPENSES OF $37,934.

INTERROGATORY NO. 9 IS: "WITH RESPECT TO PLAINTIFF MCARTHUR GRIFFIN'S SHOULDER, NECK, AND/OR BACK INJURIES, DO YOU FIND THAT PLAINTIFF HAS REACHED MAXIMUM MEDICAL IMPROVEMENT?" YOU MAY HAVE HEARD US REFER TO THIS AS MMI. WE THINK THE ANSWER SHOULD BE "YES" TO EACH OF THESE.

"INTERROGATORY NO. 10: DO YOU FIND THAT DEFENDANT, REC MARINE LOGISTICS, LLC, OWES ANY PAST OR FUTURE MAINTENANCE AND CURE BENEFITS TO THE PLAINTIFF MCARTHUR GRIFFIN?" WE THINK THE ANSWER SHOULD BE "NO." WE BELIEVE THE EVIDENCE ESTABLISHES THAT MR. GRIFFIN REACHED MMI FOR HIS LEFT SHOULDER IN 2019, QUITE A LONG TIME AGO. WE ALSO BELIEVE THAT THE EVIDENCE SHOWS THAT MR. GRIFFIN IS NOT ENTITLED TO MAINTENANCE AND CURE FOR HIS NECK OR HIS BACK FOR MANY OF THE REASONS I'VE DISCUSSED EARLIER.

IF FOR SOME REASON YOU WERE TO AWARD MAINTENANCE AND CURE -- OR I'M SORRY -- MAINTENANCE BENEFITS, OUR SUGGESTION IS THAT MAINTENANCE BE LIMITED TO $12,775.

HERE I HAVE TO MAKE A CAVEAT AS FAR AS WITH RESPECT TO CURE. IF IN THE EVENT THAT YOU ARE

01:49p

INCLINED TO AWARD MAINTENANCE AND CURE, IF YOU HAVE AWARDED PAST AND FUTURE MEDICAL EXPENSES, YOU WOULD NOT DOUBLE THE AWARD HERE, SO THAT WOULD BE LEFT BLANK. AND I'M SORRY. THAT'S SPECIFICALLY WITH REGARD TO FUTURE MEDICAL EXPENSES.

"INTERROGATORY NO. 12: DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT REC MARINE ACTED UNREASONABLY IN FAILING TO PROVIDE MAINTENANCE AND CURE TO PLAINTIFF MCARTHUR GRIFFIN, RESULTING IN SOME HARM OR INJURY TO HIM?" OUR SUGGESTION IS THE ANSWER IS "NO." REC MARINE DIDN'T ACT UNREASONABLY. REC MARINE PAID FOR MR. GRIFFIN'S MEDICAL TREATMENT FOR HIS SHOULDER FOR OVER A YEAR. THEY PAID HIM HIS WAGES. THEY ARRANGED FOR HIS MEDICAL CARE. THEY TRANSPORTED HIM TO HIS MEDICAL CARE. AND THEY PAID HIM MAINTENANCE BENEFITS.

THEY DIDN'T DO WHAT MR. GRIFFIN SAID HE THOUGHT HE WOULD DO -- WHAT HE THOUGHT THEY WOULD DO IF HE REPORTED THE INCIDENT OR IF HE TOLD THEM HE WANTED TO GET OFF THE BOAT, WHICH WAS FIRE HIM. I WOULD SUGGEST TO YOU, LADIES AND GENTLEMEN, THAT THEY DID QUITE THE OPPOSITE OF THAT.

"INTERROGATORY NO. 13: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT REC MARINE LOGISTICS, IN FAILING TO PROVIDE MAINTENANCE AND CURE

01:51p

TO PLAINTIFF MCARTHUR GRIFFIN, ACTED NOT ONLY UNREASONABLY, BUT ALSO WILLFULLY, WANTONLY AND SUCH THAT PUNITIVE DAMAGES SHOULD BE AWARDED?" WE SUGGEST THAT THE ANSWER IS "NO," FOR THE REASONS I JUST DISCUSSED.

IF FOR SOME REASON YOU FEEL IMPRESSED UPON TO AWARD PUNITIVE DAMAGES TO PUNISH, WE CAN'T GIVE YOU ANYTHING OTHER THAN A DOLLAR, BECAUSE WE JUST DON'T FEEL THAT PUNISHMENT FOR PAYING FOR MEDICAL CARE, PAYING WAGES, PAYING MAINTENANCE AND CURE IS APPROPRIATE UNDER THESE CIRCUMSTANCES.

AGAIN, WE THANK YOU FOR YOUR ATTENTION.

AND THAT'S ALL I HAVE, YOUR HONOR.

**THE COURT:** THANK YOU, MR. KHOURY.

AS I MENTIONED EARLIER, LADIES AND GENTLEMEN, MR. SHEPPARD WILL NOW ADDRESS YOU ONE MORE TIME IN WHAT WE CALL THE REBUTTAL ARGUMENT. PLEASE GIVE HIM YOUR FULL ATTENTION.

**MR. SHEPPARD:** YOUR HONOR, MAY I JUST HAVE A TIMER OUT FOR MYSELF?

**THE COURT:** SURE.

**MR. SHEPPARD:** THANK YOU, YOUR HONOR. I JUST KNOW YOUR RULES. I DON'T WANT TO PULL MY CELL PHONE OUT AND GET IN TROUBLE.

**THE COURT:** WELL, THANK YOU FOR THAT.

01:53p

**MR. SHEPPARD:** THIS WILL BE THE LAST TIME I GET TO TALK TO YOU BEFORE YOU GUYS HEAR FROM THE JUDGE AND GO DELIBERATE.

I WANT TO TOUCH ON A FEW THINGS THAT HAVE BEEN SAID IN THE LAST 50 OR SO MINUTES. IT STARTED OFF WITH A SLIDE THAT SAID THERE WAS JUST SEVEN OR EIGHT PEOPLE POTENTIALLY ON THIS VESSEL AND ONLY TWO PEOPLE SAW IT HAPPEN. ONLY TWO PEOPLE REMEMBER SEEING IT HAPPEN. ONLY ONE PERSON SAYS IT DIDN'T HAPPEN. MR. GRIFFIN AND MR. BADEAUX SAY IT HAPPENED. CAPTAIN WINHAUER DOESN'T RECALL IT HAPPENING. AND YOU HEARD FROM MR. GRIFFIN WHEN HE OVERHEARD SOME FOLKS FROM THE CRANE CALLING IN TO THE WHEELHOUSE THAT THEY WERE ASKING ABOUT HOW HE'S DOING. ALL THESE THINGS HAVE COME OUT IN THIS CASE. ALL THESE THINGS ARE EVIDENCE FOR YOU TO CONSIDER.

WHEN WE'VE LOOKED AT MEDICAL RECORDS, WHEN WE'VE LOOKED AT THESE -- HEARD THE TESTIMONIES FROM THESE DOCTORS, REALLY NO ONE HAS SAID ANY MEASURE OF IT ACTUALLY HAPPENING THAT MR. GRIFFIN, WHEN HE WAS IN THE ENGINE ROOM, THAT HE SOMEHOW TORE HIS ROTATOR CUFF. THE OMS RECORDS DISPUTE THAT. DR. GREENE DISPUTES IT. DR. FERACHI DISPUTES THAT. YOU'VE HEARD FROM DR. HADDAD THAT THESE THINGS HAPPEN -- THESE THINGS CAN HAPPEN BECAUSE OF THE

01:54p

PERSONNEL TRANSFER BASKET. YOU HEARD FROM DR. FERACHI AND GREENE THAT IT'S MORE LIKELY THE PERSONNEL BASKET INCIDENT. THAT'S WHY MR. GRIFFIN HASN'T SAID THEY DID ANYTHING WRONG IN THE ENGINE ROOM. HE'S NEVER SAID THEY'VE DONE ANYTHING WRONG IN THE ENGINE ROOM. NOT ONCE.

YOU WERE TOLD THAT THERE WERE SOME INCONSISTENCIES WITH MR. GRIFFIN'S TESTIMONY; THAT HE TOLD CAPTAIN JOSH WEEKS, MONTHS LATER. IF YOU RECALL THE TESTIMONY, IT SAYS HE BELIEVES THAT HE TOLD CAPTAIN JOSH ABOUT THE MAN BASKET INCIDENT WITHIN ABOUT A DAY. AND THIS HAPPENED ON THE 2ND. THEY RETURNED ON THE 3RD. HE TOLD JOSH ABOUT -- CAPTAIN JOSH WINHAUER, BUT HE JUST DOESN'T REMEMBER IT. AND IT'S OKAY. IT'S BEEN FIVE YEARS.

MR. GRIFFIN HAS EXPLAINED WHY THERE WAS AN INCIDENT REPORT CREATED ON MAY 5TH. HE WAS TOLD TO DO IT. HE WAS TOLD "COMPLETE THIS. WE NEED ANOTHER ORIGINAL REPORT TO GO OUT." THEY HAVEN'T BEEN ABLE TO PRODUCE THE FIRST ONE HE DID. MR. GRIFFIN FILLED OUT A SECOND ONE BECAUSE HE WAS TOLD TO. HE WAS TOLD TO FILL THE SECOND ONE ABOUT THE INCIDENT IN THE ENGINE ROOM, SO HE DID.

YOU WERE TOLD THAT THERE ARE INCONSISTENCIES WITH WHAT MR. GRIFFIN RECALLS CAPTAIN

01:56p

HAGLUND SAYING IN THE WHEELHOUSE AND WHAT MR. BADEAUX RECALLS. BUT IT'S NOT ACTUALLY INCONSISTENT. MR. BADEAUX RECALLS WHAT HE HAD SEEN IN THE DAY, WHAT HE HAD HEARD THE CAPTAIN SAY IN THE DAY; HE WAS TEXTING HIS WIFE, CALLING HIS WIFE, ALL THESE ISSUES. REMEMBER, HE LEFT THE COMPANY BECAUSE OF FAMILY PROBLEMS.

MR. GRIFFIN TELLS WHAT HE HEARD THE CAPTAIN SAY. HE HEARD THE CAPTAIN IN THE WHEELHOUSE WHEN HE GOES TO APPROACH HIM ABOUT WHAT HAPPENED. HE TOLD HIM THAT THE CAPTAIN WAS TALKING TO HOLLYWOOD ABOUT CREW CHANGE. THESE AREN'T INCONSISTENT. IT'S JUST DIFFERENT MOMENTS OF TIME. MR. GRIFFIN'S MEMORY IS BASED ON WHAT HE SAW IN THE WHEELHOUSE. MR. BADEAUX'S MEMORY IS WHAT HE HEARD -- WHAT HE SAW WHEN HE WAS STANDING OUTSIDE.

THEY'VE SAID THAT THIS INCIDENT COULD NOT POSSIBLY HAVE BEEN WITNESSED. YOU'VE SEEN PHOTOS. THEY'VE TAKEN PHOTOS FROM THE DECK TO THE THIRD STORY OF THIS SHIP, THIRD STORY LOOKING DOWN. IF YOU CAN SEE WHERE MR. BADEAUX WAS, HE CAN SEE WHAT'S GOING ON THERE. IF YOU CAN TAKE THE PHOTO AND SEE MR. BADEAUX, HE CAN SEE YOU. IT'S JUST HOW IT WORKS. HE COULD SEE WHAT WAS HAPPENING.

AND THERE SEEM TO BE SOME COMMENTS

01:57p

ABOUT MR. BADEAUX MAKING A CALL TO -- I THINK THAT IT WAS HOLLYWOOD AGAIN, ASKING TO TALK TO MR. GRIFFIN. MCARTHUR GRIFFIN, NOT DAVID GRIFFIN. AND HE SAYS THIS WAS YEARS LATER; IT WAS OUT OF THE BLUE. BUT WHAT DO THEY LEAVE OUT? WHAT DIDN'T THEY POINT OUT WHEN THEY WERE TELLING YOU THAT? THAT IN JULY OF 2018 WHEN THEY HAD THEIR INSURANCE GUY GO OUT AND TAKE HIS STATEMENT, HE SAID THAT WILL WITNESSED IT. THIS ISN'T SOMETHING THAT HAPPENED YEARS AFTER THE FACT THAT THERE IS SOME WITNESS. IT WAS IDENTIFIED AT THAT MOMENT. WHEN THEY STARTED THEIR INVESTIGATION, THEY KNEW ABOUT WILL, AND THEY NEVER TRIED TO SPEAK TO HIM.

DO YOU REMEMBER THE CAPTAIN AND KIND OF HOW ANGRY HE WAS AT POINTS IN TIME IN HIS DEPOSITION? YOU KNOW, HE'S THE CAPTAIN. HE'S IN CHARGE. YOU DO WHAT HE SAYS. HE'S THE MASTER OF THE VESSEL. HE COMMANDS EVERYTHING AND HE HAS UTMOST AUTHORITY THERE. HE CAN TELL MR. GRIFFIN WHAT TO DO. HE CAN TELL ANYONE THERE WHAT TO DO. THAT IS HIS POWER, THAT IS HIS AUTHORITY, THAT'S WHAT HE HAS. MR. GRIFFIN HAS TO FOLLOW ORDERS. AND HIS ORDERS WERE TO GO TO THAT DECK AND HELP OUT WITH THIS OPERATION. HE DID THE BEST HE COULD.

AND YOU HEARD FROM MR. KHOURY. HE SAID

01:59p

THAT THERE WAS A TWO-MINUTE GAP BETWEEN THIS HAPPENING. AND I REMEMBER THAT TESTIMONY. I ASKED ABOUT THAT. SAID, "OH, I THINK IT WAS A MINUTE OR SO." I SAID, "FROM THE START OF THE OPERATION, WHEN THIS WAS ALL GOING ON, HOW MUCH TIME WAS THERE, YOU KNOW, BETWEEN MR. GRIFFIN BEING OUT THERE, TRYING TO GUIDE THIS AND THEN HIM GETTING HIT?" AND HIS ANSWER WAS: "I DON'T KNOW AN EXACT TIME. I'D HAVE TO TAKE A WILD GUESS AND I DON'T WANT TO DO THAT." HE DIDN'T GUESS.

YOU WERE SHOWED IMAGES AGAIN OF HOW HE COULD NOT HAVE POSSIBLY SEEN THIS. THERE ARE CROPS THAT MOVED OVER TO THE SIDE. HE COULD SEE INTO THE WHEELHOUSE. HE'S ABLE TO LEAN FORWARD, SEE INSIDE. HE WAS ABLE TO SEE THE DECK. IT'S ALL THERE.

ESSENTIALLY THE DEFENDANTS WANT YOU TO HOLD MR. GRIFFIN RESPONSIBLE FOR TRYING TO PROTECT SOMEBODY -- NOT SOMEBODY, THREE PEOPLE -- TRYING TO MAKE SURE THAT THOSE THREE PEOPLE DON'T GET HURT, DOING HIS LEVEL BEST TO HELP THEM, DOING HIS LEVEL BEST TO MAKE SURE THAT THEY GET TO THEIR JOB SAFELY 40, 50, 60 FEET IN THE AIR, WHATEVER IT IS. AND WHILE MR. GRIFFIN INITIALLY KIND OF RECALLED THAT THEY WENT STRAIGHT UP, SAID "I MUST NOT REMEMBER CORRECTLY" -- BECAUSE WILLIAM SAW IT. HE REMEMBERS

02:00p

IT DIFFERENTLY. AND OBVIOUSLY WILLIAM WASN'T -- MR. BADEAUX WASN'T THROWN INTO A CONEX BOX. HE DIDN'T HAVE HIS HARD HAT COME FLYING OFF, HIS RADIO COME FLYING OFF. A LOT OF THINGS HAPPENED.

YOU WERE SHOWN A LOT OF MEDICAL RECORDS AND YOU WERE POINTED OUT MR. GRIFFIN REPORTED ON THIS BECAUSE IT'S HIS SUBJECTIVE BELIEF. YOU HEARD FROM GREENE AND FERACHI. THEY HAVE EXPLAINED THAT DISTRACTING INJURIES OFTENTIMES PREVENT PEOPLE FROM BEING ABLE TO DIAGNOSE THE OTHER PROBLEMS, THE PROBLEMS WITH THEIR NECK, THE PROBLEMS WITH THEIR BACK.

YOU ALSO HEARD FROM DR. CASEY THAT MR. GRIFFIN WAS ON PAIN MEDICATION, MUSCLE RELAXERS FOR A YEAR. THAT'S ANOTHER REASON WHY THIS CAN BE DISTRACTING AND NOT BE THAT HE DIDN'T NOTICE IT. YOU WERE TOLD THAT GREENE SAID THAT THE INCIDENT IN THE ENGINE ROOM COULD RESULT IN A ROTATOR CUFF INJURY. BUT THEN WHAT DID HE SAY AFTER THAT? HE SAID HE'S OF THE OPINION THAT THE SEVERITY OF THE IMPACT WOULD MAKE IT MORE LIKELY THAN NOT THAT THE MAN BASKET INCIDENT IS WHAT CAUSED THE ROTATOR CUFF INJURY, WHAT CAUSED THE NECK INJURY. HE DOES NOT THINK THAT BUMPING YOUR SHOULDER INTO A FIRE HOSE RACK WOULD CAUSE A ROTATOR CUFF TEAR, WOULD CAUSE A DISK

02:02p

HERNIATION IN YOUR NECK, WHICH THEY -- IT'S NOT JUST SOME NOTION.

MR. GRIFFIN HAD SUBJECTIVE COMPLAINTS WITHIN THE WINDOW HE WAS SUPPOSED TO. HE HAD NECK PAIN, SHOULDER PAIN, HAND BURNING. THOSE ARE RADICULAR SYMPTOMS, THEY ARE SUBJECTIVE, AND THEY WERE CONFIRMED WITH IMAGING. AND THAT'S THE WAY YOU DO IT, NOT WITH AN X-RAY BUT WITH AN MRI. AND THAT'S WHAT HE DOES.

**THE COURT:** FIVE MINUTES.

**MR. SHEPPARD:** THANK YOU, YOUR HONOR.

WE TALKED ABOUT THE DIAGRAM A LOT. YOU CAN SEE WHERE MR. GRIFFIN INDICATES PAIN.

BUT HERE THEY JUST KEEP PRETENDING. THEY KEEP PRETENDING THAT THERE ISN'T A NECK INJURY. DR. FERACHI HAS SAID THERE IS A NECK INJURY. GREENE HAS SAID THERE IS A NECK INJURY. EVEN DR. CASEY SAID THAT "X" IS ON PART OF THE NECK. IT'S TO THE LEFT OF THE MIDLINE. HE DOESN'T HAVE PAIN IN HIS NECK. HE HAS PAIN STEMMING FROM HIS NECK, BECAUSE EVERYTHING IS PRESSING ON THE NERVE ROOTS.

WE HAVEN'T SAID THAT THE DIAGRAM TRIES TO PROVE EVERYTHING. THAT'S NOT WHAT ALL THIS IS. THERE IS IMAGING STUDIES. THERE IS THE DIAGRAM. THERE IS SUBJECTIVE COMPLAINTS. AND THIS GOES ON FOR

02:03p

A PERIOD OF TIME. AND THE COMPLAINTS CONTINUE. THEY CONTINUED A YEAR LATER. THEY CONTINUED WHEN HE WENT TO BATON ROUGE ORTHOPAEDIC CLINIC. THEY CONTINUED AFTER THAT. THEY CONTINUE TO TODAY.

AND I TOLD YOU THAT WHAT THIS CASE IS GOING TO BE ABOUT ON DAY ONE, IT WAS GOING TO BE ABOUT THEM NOT TAKING RESPONSIBILITY. THEM NOT TAKING RESPONSIBILITY. THE FIRST THREE QUESTIONS THEY WANT YOU TO ANSWER, THEY WANT YOU TO SAY "NO," BECAUSE THEY DON'T WANT TO TAKE RESPONSIBILITY FOR WHAT HAPPENED. THEY DON'T WANT TO TAKE RESPONSIBILITY FOR MR. GRIFFIN'S INJURIES.

AND WHAT DOESN'T MAKE SENSE TO ME IS THAT THEY WOULD COME UP HERE AND SAY, "WE DID NOTHING WRONG"; "WE DID NOT CAUSE THIS TO HAPPEN"; "THIS DIDN'T HAPPEN IN ANY WAY, SHAPE, OR FORM THE WAY MR. GRIFFIN IS SAYING." BUT FOR SOME REASON THEY'RE PAYING FOR IT. THEY PAID FOR THE SHOULDER SURGERY. THEY'RE SAYING IT DIDN'T HAPPEN BUT THEY'RE PAYING FOR IT. THEY KNOW IT HAPPENED. THAT'S WHY THEY PAID FOR IT. THAT'S WHY THEY DID IT.

THEY'RE ONLY HERE NOW TO DENY AND DIMINISH THE PROTECTION AND TO PROTECT THE COMPANY AND NOT THE SEAMAN, NOT MR. GRIFFIN. THEIR JOB IS TO PROTECT HIM, TO PROVIDE HIM WITH A SAFE PLACE TO

02:04p

WORK, TO PROVIDE HIM WITH A COMPETENT CREW. THE VESSEL HAS ALL OF THESE DUTIES AND RESPONSIBILITIES THAT IT OWES TO HIM. AND THEY DIDN'T DO THAT.

HOW MANY MORE WORKERS HAVE GOT TO GET INJURED LIKE MR. GRIFFIN BEFORE THEY CHANGE THEIR WAYS? HOW MANY MORE PEOPLE HAVE GOT TO GET HURT BEFORE THEY ACTUALLY DO INVESTIGATIONS TO TRY -- A BETTER DESIGN TO TRY TO FIND THE TRUTH? THESE INVESTIGATIONS WERE NOT DESIGNED TO FIND THE TRUTH. THEY WERE DESIGNED SO THAT THEY COULD PUT THEIR HEAD IN THE SAND AND DENY.

THEY HAVE THEIR OWN POLICY THAT SAYS "IF IT'S NOT REPORTED ON THIS LITTLE FORM AT THE APPROPRIATE TIME THAT OUR OTHER POLICY SAYS MUST BE COMPLETED BY MANAGERS, THEN WE'RE GOING TO JUST ASSUME THAT IT'S NOT CORRECT. WE'RE GOING TO ASSUME THAT THIS DIDN'T HAPPEN." HOW MANY MORE PEOPLE ARE GOING TO HAVE TO GET HURT BEFORE THESE POLICIES CHANGE AND THEY ACTUALLY FILL THINGS OUT?

AND YOU'VE BEEN SHOWN -- YOU'VE BEEN GIVEN AN IDEA OF WHAT THEY WANT YOU TO COMPENSATE MR. GRIFFIN. AFTER SAYING IN THIS ENTIRE TRIAL AND MOST OF THEIR CLOSING THAT THEY'VE DONE NOTHING WRONG, THEY HAVE ASKED YOU TO COMPENSATE MR. GRIFFIN WITH AS LITTLE AS POSSIBLE. THEY HAVE ASKED YOU NOT TO

02:05p

PROVIDE FOR HIS FUTURE MEDICAL CARE. THEY HAVE ASKED YOU TO NOT PROVIDE FOR HIS LOST WAGES. THEY HAVE ASKED YOU TO NOT PROVIDE FOR HIS FUTURE EARNINGS THAT HE NEEDS. THEY'VE ASKED YOU TO JUST DENY ALL OF THAT FROM HIM.

HE DOESN'T GET -- HE CAN'T COME BACK TOMORROW, A YEAR FROM NOW, TWO YEARS FROM NOW. THIS IS IT FOR HIM. THIS IS HIS ONE CHANCE TO TRY TO REGAIN HIS LIFE.

YOU'VE BEEN SHOWN RECORDS FROM THEIR VOC REHAB PERSON OF MAYBE SOME JOBS HE CAN DO.

**THE COURT:** ONE MINUTE.

**MR. SHEPPARD:** DID YOU SEE ANY JOB? DID HE SHOW YOU A LISTING? DID HE SHOW YOU THE SALARY FOR IT? NO. HE JUST SAID, "I'VE LOOKED AT THIS DATABASE AND THERE ARE JOBS," BUT HE HASN'T SHOWN YOU ANYTHING.

THE DEFENDANTS NEED TO BE HELD ACCOUNTABLE, AND THAT'S WHY WE'VE ASKED YOU TO AWARD PUNITIVE DAMAGES, BECAUSE THEY'VE ARBITRARILY DECIDED WHAT RECORDS THEY'RE GOING TO LOOK AT, WHAT RECORDS THEY'RE GOING TO CONSIDER, WHAT DOCTORS' OPINIONS MATTER TO THEM, AND THEY'VE EXCLUDED EVERYONE ELSE. THEY'VE EXCLUDED EVERYONE ELSE.

MR. GRIFFIN IS HURT. HE IS IN PAIN.

02:06p

HE IS IN PAIN EVERY DAY. AND THE ONLY WAY THAT HE IS GOING TO GET THE HELP HE CAN IS FROM YOU. BECAUSE WE'VE TRIED, THE LAW HAS TRIED, THE POLICIES HAVE TRIED, BUT NOTHING HAS GOT THEM TO CHANGE THEIR WAYS. THEY WILL CONTINUE DOING THIS. THEY WILL CONTINUE HURTING PEOPLE. AND THE ONLY WAY IT STOPS IS WITH YOU. THANK YOU.

**THE COURT:** ALL RIGHT. THANK YOU, MR. SHEPPARD.

LADIES AND GENTLEMEN, WE'RE GOING TO TAKE A VERY BRIEF FIVE-MINUTE BREAK, BECAUSE WHEN YOU RETURN I WILL GIVE YOU THE INSTRUCTIONS THAT WILL GUIDE YOUR DELIBERATIONS. AND THAT'S GOING TO TAKE SEVERAL MINUTES, SO WE'LL TAKE A QUICK BREAK AT THIS TIME.

LET'S ALL RISE FOR THE JURY.

**(WHEREUPON, THE JURY IS OUT OF THE COURTROOM.)**

**THE COURT:** BE SEATED.

ALL RIGHT. COUNSEL, I'M MAKING VERY MINOR CHANGES TO PAGE 2. THERE ARE TWO PORTIONS OF THE LAST PARAGRAPH ON PAGE 2 THAT REFERENCE WHEN A DEFENDANT OR A PARTY SERVES AS THEIR OWN COUNSEL. THAT'S CLEARLY NOT THE CASE HERE. SO JUST TO SIMPLIFY MATTERS, THAT'S THE ONLY CHANGE THAT WE'LL

02:08p

MAKE.

WE'LL TAKE FIVE MINUTES. AND WHEN WE RETURN, WE WILL CHARGE THE JURY.

COURT IS IN RECESS.

**(WHEREUPON, A RECESS WAS TAKEN.)**

**THE COURT:** LET'S ALL REMAIN STANDING FOR THE JURY.

**MR. SHEPPARD:** YOUR HONOR, I HAVE JUST ONE QUICK ISSUE.

**THE COURT:** YES.

**MR. SHEPPARD:** SO WE PLAYED THE DEPOSITION OF TWO PEOPLE, SO WE DIDN'T FORMALLY INTRODUCE EVIDENCE AT -- DURING THE TRIAL. BUT THERE ARE CERTAIN THINGS THAT WE USED DURING THOSE DEPOSITIONS THAT I THINK THAT WE WOULD LIKELY NEED TO ADMIT TO GO BACK TO THE JURY.

**THE COURT:** OKAY. WELL, LET'S DEAL WITH THAT AFTER WE GET THE JURY.

**MR. SHEPPARD:** I JUST WANTED TO TELL YOU.

**THE COURT:** YES. AND WE'LL HAVE TIME -- AFTER I CHARGE THE JURY AND THEY RETIRE TO THE JURY ROOM, WE'LL CAREFULLY GO OVER THE EVIDENCE, WHAT'S IN, WHAT'S NOT IN, AND TAKE IT UP AT THAT TIME.

**MR. SHEPPARD:** UNDERSTOOD.

**(WHEREUPON, THE JURY IS IN THE COURTROOM.)**

02:15p

**THE COURT:** BE SEATED.

WELCOME BACK, LADIES AND GENTLEMEN. I WILL NOW READ THE INSTRUCTIONS TO YOU. I REMIND YOU THAT YOU WILL BE PROVIDED A COPY OF THESE INSTRUCTIONS IN THE JURY ROOM WHEN YOU BEGIN YOUR DELIBERATIONS.

MEMBERS OF THE JURY, NOW THAT YOU HAVE HEARD ALL THE EVIDENCE AND THE ARGUMENTS OF THE PLAINTIFF AND OF THE COUNSEL FOR THE -- COUNSEL FOR THE PLAINTIFF, COUNSEL FOR THE DEFENDANTS, IT BECOMES MY DUTY TO GIVE YOU THE INSTRUCTIONS OF THE COURT CONCERNING THE LAW APPLICABLE TO THIS CASE.

IT IS YOUR DUTY AS JURORS TO FOLLOW THE LAW AS I SHALL STATE IT TO YOU AND TO APPLY THAT LAW TO THE FACTS AS YOU FIND THEM FROM THE EVIDENCE IN THIS CASE. YOU ARE NOT TO SINGLE OUT ONE INSTRUCTION ALONE AS STATING THE LAW BUT MUST CONSIDER THE INSTRUCTIONS AS A WHOLE. NEITHER ARE YOU TO BE CONCERNED WITH THE WISDOM OF ANY RULE OF LAW STATED BY ME.

IF I HAVE GIVEN YOU THE IMPRESSION DURING THE TRIAL THAT I FAVOR EITHER PARTY, YOU MUST DISREGARD THAT IMPRESSION. IF I HAVE GIVEN YOU THE IMPRESSION DURING THE TRIAL THAT I HAVE AN OPINION ABOUT THE FACTS OF THIS CASE, YOU MUST DISREGARD THAT

02:16p

IMPRESSION.

YOU ARE THE SOLE JUDGES OF THE FACTS OF THIS CASE. OTHER THAN MY INSTRUCTIONS TO YOU ON THE LAW, YOU SHOULD DISREGARD ANYTHING I MAY HAVE SAID OR DONE DURING THE TRIAL IN ARRIVING AT YOUR VERDICT. YOU SHOULD CONSIDER ALL THE INSTRUCTIONS ABOUT THE LAW AS A WHOLE AND REGARD EACH INSTRUCTION IN LIGHT OF THE OTHERS WITHOUT ISOLATING A PARTICULAR STATEMENT OR PARAGRAPH.

THE TESTIMONY OF THE WITNESSES AND OTHER EXHIBITS INTRODUCED BY THE PARTIES CONSTITUTE THE EVIDENCE. THE STATEMENTS OF COUNSEL ARE NOT EVIDENCE. THEY ARE ONLY ARGUMENTS. IT IS IMPORTANT FOR YOU TO DISTINGUISH BETWEEN THE ARGUMENTS OF COUNSEL AND THE EVIDENCE ON WHICH THOSE ARGUMENTS REST. WHAT THE LAWYERS SAY IS NOT EVIDENCE. YOU MAY, HOWEVER, CONSIDER THEIR ARGUMENTS IN LIGHT OF THE EVIDENCE THAT HAS BEEN ADMITTED AND DETERMINE WHETHER THE EVIDENCE ADMITTED IN THIS TRIAL SUPPORTS THE ARGUMENTS.

YOU MUST DETERMINE THE FACTS FROM ALL THE TESTIMONY THAT YOU HAVE HEARD AND THE OTHER EVIDENCE SUBMITTED. YOU ARE THE JUDGES OF THE FACTS. I REMIND YOU OF THAT. BUT IN FINDING THOSE FACTS, YOU MUST APPLY THE LAW AS I INSTRUCT YOU.

02:18p

YOU ARE REQUIRED TO -- BY LAW TO DECIDE THE CASE IN A FAIR, IMPARTIAL AND UNBIASED MANNER BASED ENTIRELY ON THE LAW AND ON THE EVIDENCE PRESENTED TO YOU IN THE COURTROOM. YOU MAY NOT BE INFLUENCED BY PASSION, PREJUDICE, OR SYMPATHY YOU MIGHT HAVE FOR THE PLAINTIFF OR THE DEFENDANT IN ARRIVING AT YOUR VERDICT.

A STIPULATION IS AN AGREEMENT. WHEN THERE IS NO DISPUTE ABOUT CERTAIN FACTS, THE ATTORNEYS MAY AGREE OR STIPULATE TO THOSE FACTS. YOU MUST ACCEPT STIPULATED FACTS AS EVIDENCE AND TREAT THAT FACT AS HAVING BEEN PROVEN HERE IN COURT.

IN THIS CASE THE PARTIES HAVE STIPULATED THAT JOINT EXHIBITS 1 THROUGH 62 HAVE BEEN STIPULATED TO; PLAINTIFF GRIFFIN IS A SEAMAN AS CONTEMPLATED BY THE JONES ACT.

CERTAIN PARTIES ARE NO LONGER INVOLVED IN THIS TRIAL. AS JURORS, IT IS YOUR DUTY TO CONSIDER THE ISSUES AMONG THE REMAINING PARTIES.

WHEN TESTIMONY OR AN EXHIBIT IS ADMITTED FOR A LIMITED PURPOSE, YOU MAY CONSIDER THAT TESTIMONY OR EXHIBIT ONLY FOR THE SPECIFIC LIMITED PURPOSE FOR WHICH IT WAS ADMITTED.

CERTAIN CHARTS AND SUMMARIES HAVE BEEN SHOWN TO YOU SOLELY TO HELP EXPLAIN OR SUMMARIZE THE

02:19p

FACTS DISCLOSED BY THE BOOKS, RECORDS, AND OTHER DOCUMENTS THAT ARE IN EVIDENCE. THESE ARE EXHIBITS -- THESE EXHIBITS ARE PLAINTIFF'S EXHIBIT 12 AND DEFENSE EXHIBIT 12. THESE CHARTS AND SUMMARIES ARE NOT EVIDENCE OR PROOF OF ANY FACTS. YOU SHOULD DETERMINE THE FACTS FROM THE EVIDENCE.

IN DETERMINING THE WEIGHT TO GIVE TO THE TESTIMONY OF WITNESSES, CONSIDER WHETHER THERE WAS EVIDENCE THAT AT SOME OTHER TIME THE WITNESS SAID OR DID SOMETHING OR FAILED TO SAY OR DO SOMETHING THAT WAS DIFFERENT FROM THE TESTIMONY GIVEN AT THE TRIAL.

A SIMPLE MISTAKE BY A WITNESS DOES NOT NECESSARILY MEAN THAT THE WITNESS DID NOT TELL THE TRUTH AS HE OR SHE REMEMBERS IT. PEOPLE MAY FORGET SOME THINGS OR REMEMBER OTHER THINGS INACCURATELY. IF A WITNESS MADE A MISSTATEMENT, CONSIDER WHETHER THAT MISSTATEMENT WAS AN INTENTIONAL FALSEHOOD OR SIMPLY AN INNOCENT MISTAKE. THE SIGNIFICANCE OF THAT MAY DEPEND ON WHETHER IT HAS TO DO WITH AN IMPORTANT FACT OR WITH ONLY AN UNIMPORTANT DETAIL.

CERTAIN TESTIMONY HAS BEEN PRESENTED TO YOU THROUGH A DEPOSITION. A DEPOSITION IS SWORN, RECORDED ANSWERS TO QUESTIONS A WITNESS WAS ASKED IN ADVANCE OF THE TRIAL. UNDER SOME CIRCUMSTANCES IF A

02:20p

WITNESS CANNOT BE PRESENT TO TESTIFY FROM THE WITNESS STAND, THE WITNESS'S TESTIMONY MAY BE PRESENTED UNDER OATH IN THE FORM OF A DEPOSITION.

SOMETIME BEFORE THE TRIAL, ATTORNEYS REPRESENTING THE PARTIES IN THIS CASE QUESTIONED THE WITNESS UNDER OATH. A COURT REPORTER WAS PRESENT AND RECORDED THE TESTIMONY. THE QUESTIONS AND ANSWERS HAVE BEEN SHOWN TO YOU. THIS DEPOSITION TESTIMONY IS ENTITLED TO THE SAME CONSIDERATION AND IT IS TO BE JUDGED BY YOU AS TO CREDIBILITY AS IF THE WITNESS HAD BEEN PRESENT AND HAD TESTIFIED FROM THE WITNESS STAND IN COURT.

YOU ARE SPECIFICALLY INSTRUCTED THAT WHETHER THE TRANSCRIPT OF THE DEPOSITION CORRECTLY OR INCORRECTLY REFLECTS THE CONTENT OF THE CONVERSATION OR THE IDENTITY OF THE SPEAKERS IS ENTIRELY FOR YOU TO DETERMINE BASED ON YOUR EVALUATION OF THE TESTIMONY YOU HAVE HEARD ABOUT THE PREPARATION OF THE TRANSCRIPT AND ON YOUR OWN EXAMINATION OF THE TRANSCRIPT IN RELATION TO YOUR HEARING OF THE RECORDING ITSELF AS THE PRIMARY EVIDENCE OF ITS OWN CONTENTS. IF YOU SHOULD DETERMINE THAT THE TRANSCRIPT IS IN ANY RESPECT INCORRECT OR UNRELIABLE, YOU SHOULD DISREGARD IT TO THAT EXTENT.

DO NOT LET BIAS, PREJUDICE, OR SYMPATHY

02:21p

PLAY ANY PART IN YOUR DELIBERATIONS. A CORPORATION AND ALL OTHER PERSONS ARE EQUAL BEFORE THE LAW AND MUST BE TREATED AS EQUALS IN A COURT OF JUSTICE.

PLAINTIFF MCARTHUR GRIFFIN HAS THE BURDEN OF PROVING HIS CASE BY A PREPONDERANCE OF THE EVIDENCE. TO ESTABLISH BY A PREPONDERANCE OF THE EVIDENCE MEANS TO PROVE SOMETHING IS MORE LIKELY THAN NOT SO -- IS MORE LIKELY SO THAN NOT SO. IF YOU FIND THAT PLAINTIFF GRIFFIN HAS FAILED TO PROVE ANY ELEMENT OF HIS CLAIM BY A PREPONDERANCE OF THE EVIDENCE, THEN HE MAY NOT RECOVER ON THAT CLAIM.

IN DECIDING WHETHER ANY FACT HAS BEEN PROVEN BY A PREPONDERANCE OF THE EVIDENCE, YOU MAY, UNLESS OTHERWISE INSTRUCTED, CONSIDER THE TESTIMONY OF ALL WITNESSES, REGARDLESS OF WHO MAY HAVE CALLED THEM, AND ALL EXHIBITS RECEIVED IN EVIDENCE, REGARDLESS OF WHO MAY HAVE PRODUCED THEM.

THE EVIDENCE YOU ARE TO CONSIDER CONSISTS OF THE TESTIMONY OF THE EYEWITNESSES, THE DOCUMENTS AND OTHER EXHIBITS ADMITTED INTO EVIDENCE, AND ANY FAIR INFERENCES AND REASONABLE CONCLUSIONS YOU CAN DRAW FROM THE FACTS AND CIRCUMSTANCES THAT HAVE BEEN PROVEN.

GENERALLY SPEAKING, THERE ARE TWO TYPES OF EVIDENCE. ONE IS DIRECT EVIDENCE SUCH AS THE

02:23p

TESTIMONY OF AN EYEWITNESS. THE OTHER IS INDIRECT OR CIRCUMSTANTIAL EVIDENCE. CIRCUMSTANTIAL EVIDENCE IS EVIDENCE THAT PROVES A FACT FROM WHICH YOU MAY LOGICALLY CONCLUDE ANOTHER FACT EXISTS.

AS A GENERAL RULE, THE LAW MAKES NO DISTINCTION BETWEEN DIRECT AND CIRCUMSTANTIAL EVIDENCE BUT SIMPLY REQUIRES THAT YOU FIND THE FACTS FROM A PREPONDERANCE OF ALL THE EVIDENCE, BOTH DIRECT AND CIRCUMSTANTIAL.

YOU MUST CONSIDER ONLY THE EVIDENCE IN THIS CASE. HOWEVER, YOU MAY DRAW SUCH REASONABLE INFERENCES FROM THE TESTIMONY AND EXHIBITS AS YOU FEEL ARE JUSTIFIED IN THE LIGHT OF COMMON EXPERIENCE. YOU MAY MAKE DEDUCTIONS AND REACH CONCLUSIONS THAT REASON AND COMMON SENSE LEAD YOU TO MAKE FROM THE TESTIMONY AND EVIDENCE.

YOU ALONE ARE TO DETERMINE THE QUESTIONS OF CREDIBILITY OR TRUTHFULNESS OF THE WITNESSES. IN DETERMINING THE TESTIMONY OF THE WITNESSES, YOU MAY CONSIDER THE WITNESS'S MANNER AND DEMEANOR ON THE WITNESS STAND, ANY FEELINGS OR INTEREST IN THE CASE, OR ANY PREJUDICE OR BIAS ABOUT THE CASE THAT HE OR SHE MAY HAVE, AND THE CONSISTENCY OR INCONSISTENCY OF HIS OR HER TESTIMONY CONSIDERED IN THE LIGHT OF THE CIRCUMSTANCES. HAS THE WITNESS

02:24p

BEEN CONTRADICTED BY OTHER CREDIBLE EVIDENCE? HAS HE OR SHE MADE STATEMENTS AT OTHER TIMES AND PLACES CONTRARY TO THOSE MADE HERE ON THE WITNESS STAND? YOU MUST GIVE THE TESTIMONY OF EACH WITNESS THE CREDIBILITY THAT YOU THINK IT DESERVES.

EVEN THOUGH A WITNESS MAY BE A PARTY TO THE ACTION AND, THEREFORE, INTERESTED IN ITS OUTCOME, THE TESTIMONY MAY BE ACCEPTED IF IT IS NOT CONTRADICTED BY DIRECT EVIDENCE OR BY ANY INFERENCE THAT MAY BE DRAWN FROM THE EVIDENCE, IF YOU BELIEVE THE TESTIMONY.

YOU ARE NOT TO DECIDE THIS CASE BY COUNTING THE NUMBER OF WITNESSES WHO HAVE TESTIFIED ON THE OPPOSING SIDES. WITNESS TESTIMONY IS WEIGHED; WITNESSES ARE NOT COUNTED. THE TEST IS NOT THE RELATIVE NUMBER OF WITNESSES BUT THE RELATIVE CONVINCING FORCE OF THE EVIDENCE.

THE TESTIMONY OF A SINGLE WITNESS IS SUFFICIENT TO PROVE ANY FACT, EVEN IF A GREATER NUMBER OF WITNESSES TESTIFIED TO THE CONTRARY, IF, AFTER CONSIDERING ALL OF THE OTHER EVIDENCE, YOU BELIEVE THAT WITNESS.

NOW, I HAVE SAID THAT YOU MUST CONSIDER ALL OF THE EVIDENCE. THIS DOES NOT MEAN, HOWEVER, THAT YOU MUST ACCEPT ALL OF THE EVIDENCE AS TRUE OR

02:25p

ACCURATE.

YOU ARE THE SOLE JUDGES OF THE CREDIBILITY OR BELIEVABILITY OF EACH WITNESS AND THE WEIGHT TO BE GIVEN TO HIS TESTIMONY. IN WEIGHING THE TESTIMONY OF A WITNESS, YOU SHOULD CONSIDER HIS RELATIONSHIP TO THE PLAINTIFF OR TO THE DEFENDANT; HIS INTEREST, IF ANY, IN THE OUTCOME OF THE CASE; HIS MANNER OF TESTIFYING; HIS OPPORTUNITY TO OBSERVE OR ACQUIRE KNOWLEDGE CONCERNING THE FACTS ABOUT WHICH HE TESTIFIED; HIS CANDOR, FAIRNESS AND INTELLIGENCE; AND THE EXTENT TO WHICH HE HAS BEEN SUPPORTED OR CONTRADICTED BY OTHER CREDIBLE EVIDENCE. YOU MAY, IN SHORT, ACCEPT OR REJECT THE TESTIMONY OF ANY WITNESS IN WHOLE OR IN PART.

ALSO, THE WEIGHT OF THE EVIDENCE, AGAIN, IS NOT NECESSARILY DETERMINED BY THE NUMBER OF WITNESSES TESTIFYING AS TO THE EXISTENCE OR NONEXISTENCE OF ANY FACT. YOU MAY FIND THAT THE TESTIMONY OF A SMALLER NUMBER OF WITNESSES AS TO ANY FACT IS MORE CREDIBLE THAN THE TESTIMONY OF A LARGER NUMBER OF WITNESSES TO THE CONTRARY.

WHEN KNOWLEDGE OF TECHNICAL SUBJECT MATTER MAY BE USEFUL TO THE JURY, A PERSON WHO HAS SPECIAL TRAINING OR EXPERIENCE IN THAT TECHNICAL FIELD IS PERMITTED TO STATE HIS OR HER OPINION ON

02:26p

THOSE TECHNICAL MATTERS. HOWEVER, YOU ARE NOT REQUIRED TO ACCEPT THAT OPINION. AS WITH ANY OTHER WITNESS, IT IS UP TO YOU TO DECIDE WHETHER TO RELY ON IT. THE FOLLOWING WITNESSES ARE CERTIFIED AS EXPERT WITNESSES OVER THE COURSE OF THE TRIAL: ONE, DR. DAVID FERACHI, QUALIFIED IN ORTHOPEDIC SURGERY; TWO, COMMANDER MIKE LEBSACK WHO IS QUALIFIED AS AN EXPERT IN MARITIME OPERATIONS AND REGULATIONS; DR. TODD COWEN WHO WAS QUALIFIED AS AN EXPERT IN PHYSICAL MEDICINE REHABILITATION, PAIN MANAGEMENT AND LIFE CARE PLANNING; DR. RANDY -- OR RANDOLPH RICE WHO WAS A QUALIFIED AS AN EXPERT AS A FORENSIC ECONOMIST; DR. JOYCE BECKWITH WHO WAS QUALIFIED AS AN EXPERT IN VOCATIONAL REHABILITATION; MR. JEFFREY CARLISLE WHO QUALIFIED AS AN EXPERT IN VOCATIONAL REHABILITATION; MS. STEPHANIE HAUPT WHO QUALIFIED AS AN EXPERT IN LIFE CARE PLANNING; DR. CHARLES HADDAD WHO QUALIFIED AS AN EXPERT IN ORTHOPEDIC SURGERY; MR. DAN CLIFFE WHO QUALIFIED AS A EXPERT IN FORENSIC ECONOMICS; MR. MARC FAZIOLI WHO TESTIFIED AS AN EXPERT IN MARITIME OPERATIONS AND REGULATIONS; AND FINALLY, DR. CRAIG GREENE WHO QUALIFIED AS AN EXPERT IN ORTHOPEDIC SURGERY.

IN THIS CASE, PLAINTIFF MCARTHUR GRIFFIN, WHO IS EMPLOYED IN THE MARITIME INDUSTRY,

02:27p

ALLEGES THAT HE SUFFERED INJURIES TO HIS SHOULDER, NECK, AND BACK WHILE ABOARD THE MOTOR VESSEL *DUSTIN DANOS* WHEN THE VESSEL WAS ALLOWED TO MOVE DURING A PERSONNEL BASKET TRANSFER OPERATION. PLAINTIFF CLAIMS THAT HE WAS STRUCK BY THE BASKET AND OTHER ITEMS ON THE VESSEL BECAUSE OF HOW THE OPERATION WAS IMPROPERLY PLANNED AND EXECUTED, THE CONDITION OF THE VESSEL, THE CONDUCT OF THE CAPTAIN, AND OTHER CIRCUMSTANCES. AT THE TIME OF THE ACCIDENT, PLAINTIFF WAS EMPLOYED BY DEFENDANT REC MARINE LOGISTICS AND THE VESSEL WAS ALSO EMPLOYED -- OR OPERATED BY DEFENDANT REC MARINE LOGISTICS. PLAINTIFF NOW SEEKS RECOVERY AGAINST DEFENDANTS REC MARINE LOGISTICS, LLC, AND OFFSHORE TRANSPORT SERVICES, LLC, THE OWNER OF THE M/V *DUSTIN DANOS*, UNDER THE JONES ACT AND GENERAL MARITIME LAW.

DEFENDANTS DENY ALL ALLEGATIONS OF NEGLIGENCE OR FAULT AGAINST THEM AND GENERALLY DENY THAT PLAINTIFF SUSTAINED THE INJURIES HE CLAIMS.

PLAINTIFF MCARTHUR GRIFFIN, A SEAMAN, IS ASSERTING THREE SEPARATE CLAIMS AGAINST DEFENDANTS REC MARINE LOGISTICS, LLC, AND OFFSHORE TRANSPORT SERVICES, LLC.

PLAINTIFF'S FIRST CLAIM, UNDER THE FEDERAL LAW KNOWN AS THE JONES ACT, IS THAT HIS

02:29p

EMPLOYER, DEFENDANT REC MARINE LOGISTICS, LLC, WAS NEGLIGENT AND THAT THIS NEGLIGENCE WAS THE CAUSE OF HIS INJURIES. PLAINTIFF'S SECOND CLAIM IS AGAINST OFFSHORE TRANSPORT SERVICES, LLC, AND ALLEGES THAT THE UNSEAWORTHINESS OF ITS VESSEL CAUSED HIS INJURIES. PLAINTIFF'S THIRD CLAIM IS FOR WHAT IS CALLED MAINTENANCE AND CURE.

YOU MUST CONSIDER EACH OF THESE CLAIMS SEPARATELY. PLAINTIFF IS NOT REQUIRED TO PROVE ALL OF THESE CLAIMS. HE MAY RECOVER IF HE PROVES ANY ONE OF THEM. HOWEVER, HE MAY RECOVER ONLY THOSE DAMAGES OR BENEFITS THE LAW PROVIDES FOR THE CLAIMS THAT HE PROVES, AND HE MAY NOT RECOVER THE SAME DAMAGES OR BENEFITS MORE THAN ONCE.

UNDER THE JONES ACT, PLAINTIFF MCARTHUR GRIFFIN MUST PROVE THAT HIS EMPLOYER WAS NEGLIGENT. NEGLIGENCE IS DOING AN ACT THAT A REASONABLY PRUDENT PERSON WOULD NOT DO, OR FAILING TO DO SOMETHING THAT A REASONABLY PRUDENT PERSON WOULD DO, UNDER THE SAME OR SIMILAR CIRCUMSTANCES. THE OCCURRENCE OF AN ACCIDENT, STANDING ALONE, DOES NOT MEAN THAT ANYONE WAS NEGLIGENT OR THAT ANYONE'S NEGLIGENCE CAUSED THE ACCIDENT.

THE JONES ACT CLAIM -- OR IN A JONES ACT CLAIM, THE WORD "NEGLIGENCE" IS LIBERALLY

02:30p

INTERPRETED. IT INCLUDES ANY BREACH OF DUTY THAT AN EMPLOYER OWES TO ITS EMPLOYEES WHO ARE SEAMEN, INCLUDING THE DUTY OF PROVIDING FOR THE SAFETY OF THE CREW. UNDER THE JONES ACT, IF THE EMPLOYER'S NEGLIGENT ACT WAS THE CAUSE, IN WHOLE OR IN PART, OF INJURY TO A SEAMAN EMPLOYEE, THEN YOU MUST FIND THAT THE EMPLOYER IS LIABLE UNDER THE JONES ACT. IN OTHER WORDS, UNDER THE JONES ACT, DEFENDANT REC MARINE LOGISTICS BEARS THE RESPONSIBILITY FOR ANY NEGLIGENCE THAT PLAYED A PART, HOWEVER SLIGHT, IN CAUSING PLAINTIFF'S INJURY. NEGLIGENCE MAY BE A CAUSE OF INJURY, EVEN THOUGH IT OPERATES IN COMBINATION WITH ANOTHER'S ACT OR WITH SOME OTHER CAUSE, IF THE NEGLIGENCE PLAYED ANY PART IN CAUSING SUCH INJURY.

NEGLIGENCE UNDER THE JONES ACT MAY CONSIST OF A FAILURE TO COMPLY WITH THE DUTY REQUIRED BY LAW. EMPLOYERS OF SEAMEN HAVE A DUTY TO PROVIDE THEIR EMPLOYEES WITH A REASONABLY SAFE PLACE TO WORK. IF YOU FIND THAT PLAINTIFF WAS INJURED BECAUSE PLAINTIFFS FAILED TO FURNISH HIM WITH A REASONABLY SAFE PLACE TO WORK AND THAT PLAINTIFF'S WORKING CONDITIONS COULD HAVE BEEN MADE SAFE THROUGH THE EXERCISE OF REASONABLE CARE, THEN YOU MUST FIND THAT THE DEFENDANTS WERE NEGLIGENT.

THE FACT THAT DEFENDANTS CONDUCTED

02:31p

THEIR OPERATIONS IN A MANNER SIMILAR TO THAT OF OTHER COMPANIES IS NOT CONCLUSIVE AS TO WHETHER DEFENDANTS WERE NEGLIGENT OR NOT.

YOU MUST DETERMINE IF THE OPERATION IN QUESTION WAS REASONABLY SAFE UNDER THE CIRCUMSTANCES. THE FACT THAT A CERTAIN PRACTICE HAD BEEN CONTINUED FOR A LONG PERIOD OF TIME DOES NOT NECESSARILY MEAN THAT IT IS REASONABLY SAFE UNDER ALL CIRCUMSTANCES. A LONG-ACCEPTED PRACTICE MAY BE AN UNSAFE PRACTICE. A PRACTICE IS NOT NECESSARILY UNSAFE OR UNREASONABLE, HOWEVER, MERELY BECAUSE IT INJURES SOMEONE.

A SEAMAN'S EMPLOYER IS LEGALLY RESPONSIBLE FOR THE NEGLIGENCE OF ONE OF ITS EMPLOYEES WHILE THAT EMPLOYEE IS ACTING WITHIN THE COURSE AND SCOPE OF HIS EMPLOYMENT.

PLAINTIFF MCARTHUR GRIFFIN SEEKS DAMAGES FOR PERSONAL INJURY THAT HE CLAIMS WAS CAUSED BY THE UNSEAWORTHINESS OF DEFENDANT OFFSHORE TRANSPORT SERVICES, LLC'S, VESSEL THE M/V *DUSTIN DANOS*.

A SHIPOWNER OWES EVERY MEMBER OF THE CREW EMPLOYED ON ITS VESSEL THE ABSOLUTE DUTY TO A KEEP AND MAINTAIN THE VESSEL AND ALL OF ITS DECKS AND PASSAGEWAYS, APPLIANCES, GEAR, TOOLS, PARTS AND EQUIPMENT IN A SEAWORTHY CONDITION AT ALL TIMES.

02:32p

A SEAWORTHY VESSEL IS ONE THAT IS REASONABLY FIT FOR ITS INTENDED USE. THE DUTY TO PROVIDE A SEAWORTHY VESSEL IS ABSOLUTE BECAUSE THE OWNER MAY NOT DELEGATE THAT DUTY TO ANYONE. LIABILITY FOR AN UNSEAWORTHY CONDITION DOES NOT IN ANY WAY DEPEND ON NEGLIGENCE OR FAULT OR BLAME. IF AN OWNER DOES NOT PROVIDE A SEAWORTHY VESSEL -- THAT IS, A VESSEL THAT IS REASONABLY FIT FOR ITS INTENDED USE -- NO AMOUNT OF CARE OR PRUDENCE EXCUSES THE OWNER.

THE DUTY TO PROVIDE A SEAWORTHY VESSEL INCLUDES THE DUTY TO SUPPLY AN ADEQUATE AND COMPETENT CREW. A VESSEL MAY BE UNSEAWORTHY, EVEN THOUGH IT HAS A NUMERICALLY ADEQUATE CREW, IF TOO FEW PERSONS ARE ASSIGNED TO A GIVEN TASK.

HOWEVER, THE VESSEL OWNER IS NOT REQUIRED TO FURNISH AN ACCIDENT FREE SHIP. IT NEED ONLY FURNISH A VESSEL AND APPURTENANCES THAT ARE REASONABLY FIT FOR INTENDED USE AND A CREW THAT IS REASONABLY ADEQUATE FOR THE ASSIGNED TASKS.

THE VESSEL OWNER IS NOT REQUIRED TO PROVIDE THE BEST APPLIANCES AND EQUIPMENT OR THE FINEST CREWS ON ITS VESSEL. IT IS REQUIRED TO PROVIDE ONLY GEAR THAT IS REASONABLY PROPER AND SUITABLE FOR ITS INTENDED USE AND A CREW THAT IS

02:33p

REASONABLY ADEQUATE.

IN SUMMARY, IF YOU FIND THAT THE VESSEL OWNER DID NOT PROVIDE AN ADEQUATE CREW OF SUFFICIENT NUMBER TO PERFORM THE TASKS REQUIRED, OR IF YOU FIND THAT THE VESSEL WAS IN ANY MANNER UNFIT UNDER THE LAW AS I HAVE EXPLAINED IT TO YOU AND THAT IT WAS THE PROXIMATE CAUSE OR A PROXIMATE CAUSE OF THE INJURY, A TERM I WILL EXPLAIN TO YOU, THEN YOU MAY FIND THAT THE VESSEL WAS UNSEAWORTHY AND THE VESSEL OWNER LIABLE, WITHOUT CONSIDERING ANY NEGLIGENCE ON THE PART OF THE VESSEL OWNER OR ANY OF ITS EMPLOYEES.

HOWEVER, IF YOU FIND THAT THE OWNER HAD A CAPABLE CREW AND HAD APPLIANCES AND GEAR THAT WERE SAFE AND SUITABLE FOR THEIR INTENDED USE, THEN THE VESSEL WAS NOT UNSEAWORTHY AND DEFENDANT OFFSHORE TRANSPORT SERVICES IS NOT LIABLE TO PLAINTIFF ON THE CLAIM OF UNSEAWORTHINESS.

NOT EVERY INJURY THAT FOLLOWS AN ACCIDENT NECESSARILY RESULTS FROM IT. THE ACCIDENT MUST BE THE CAUSE OF THE INJURY.

IN DETERMINING CAUSATION, DIFFERENT RULES APPLY TO THE JONES ACT CLAIM AND TO THE UNSEAWORTHINESS CLAIM.

UNDER THE JONES ACT, FOR BOTH THE EMPLOYER'S NEGLIGENCE AND THE SEAMAN'S CONTRIBUTORY

02:34p

NEGLIGENCE, AN INJURY OR DAMAGE IS CONSIDERED CAUSED BY AN ACT OR FAILURE TO ACT IF THE ACT OR OMISSION BROUGHT ABOUT OR ACTUALLY CAUSED THE INJURY OR DAMAGE, IN WHOLE OR IN PART. IN OTHER WORDS, UNDER THE JONES ACT, A DEFENDANT AND A PLAINTIFF EACH BEAR THE RESPONSIBILITY FOR ANY NEGLIGENCE THAT PLAYED A PART, HOWEVER SLIGHT, IN CAUSING THE PLAINTIFF'S INJURY.

FOR THE UNSEAWORTHINESS CLAIM, THE SEAMAN MUST SHOW NOT MERELY THE UNSEAWORTHY CONDITION THAT WAS A CAUSE OF THE INJURY BUT THAT SUCH CONDITION WAS A PROXIMATE CAUSE OF THE INJURY. THIS MEANS THAT THE PLAINTIFF, MCARTHUR GRIFFIN, MUST SHOW THAT THE CONDITION IN QUESTION WAS A SUBSTANTIAL FACTOR IN BRINGING ABOUT OR ACTUALLY CAUSING HIS INJURY AND THAT THE INJURY WAS EITHER A DIRECT RESULT OR A REASONABLE PROBABLE CONSEQUENCE OF THE CONDITION.

DEFENDANTS CONTEND THAT PLAINTIFF MCARTHUR GRIFFIN WAS NEGLIGENT AND THAT PLAINTIFF'S NEGLIGENCE CAUSED OR CONTRIBUTED TO CAUSING HIS INJURY. THIS IS THE DEFENSE OF CONTRIBUTORY NEGLIGENCE. PLAINTIFF'S NEGLIGENCE WILL BE CONSIDERED A CAUSE OF THE INJURY IF IT PLAYED A PART, NO MATTER HOW SLIGHT, IN BRINGING ABOUT HIS INJURY.

02:36p

DEFENDANTS HAVE THE BURDEN OF PROVING THAT PLAINTIFF WAS CONTRIBUTORILY NEGLIGENT. IF PLAINTIFF'S NEGLIGENCE CONTRIBUTED TO HIS INJURY, HE MAY STILL RECOVER DAMAGES, BUT THE AMOUNT OF HIS RECOVERY WILL BE REDUCED BY THE EXTENT OF HIS CONTRIBUTORY NEGLIGENCE.

A SEAMAN IS OBLIGATED UNDER THE JONES ACT TO ACT WITH ORDINARY PRUDENCE UNDER THE CIRCUMSTANCES. THE CIRCUMSTANCES OF A SEAMAN'S EMPLOYMENT INCLUDE NOT ONLY HIS RELIANCE UPON HIS EMPLOYER TO PROVIDE A SAFE WORK ENVIRONMENT BUT ALSO HIS OWN EXPERIENCE, TRAINING, AND EDUCATION. UNDER THE JONES ACT, A SEAMAN HAS THE DUTY TO EXERCISE THAT DEGREE OF CARE FOR HIS OWN SAFETY THAT A REASONABLE SEAMAN WOULD EXERCISE IN LIKE CIRCUMSTANCES.

HOWEVER, A SEAMAN SUCH AS PLAINTIFF IS NOT CONTRIBUTORILY NEGLIGENT FOR CARRYING OUT ORDERS THAT RESULT IN HIS OWN INJURY, EVEN IF HE RECOGNIZES POSSIBLE DANGER.

YOU MAY FIND PLAINTIFF WAS CONTRIBUTORILY NEGLIGENT IF YOU FIND THAT HE CONCEALED MATERIAL INFORMATION ABOUT A PREEXISTING INJURY OR PHYSICAL CONDITION FROM HIS EMPLOYER, EXPOSED HIS BODY TO A RISK OF REINJURING OR AGGRAVATING A PREEXISTING INJURY OR CONDITION, AND

02:37p

THEN SUFFERED REINJURY OR AGGRAVATION OF THAT INJURY OR CONDITION.

IF YOU FIND THAT THE DEFENDANTS WERE NEGLIGENT AND THAT THE NEGLIGENCE WAS A PROXIMATE CAUSE OF PLAINTIFF'S INJURY BUT YOU ALSO FIND THAT THE ACCIDENT WAS DUE PARTLY TO PLAINTIFF'S CONTRIBUTORY NEGLIGENCE, THEN YOU MUST DETERMINE THE PERCENTAGE PLAINTIFF'S NEGLIGENCE CONTRIBUTED TO THE ACCIDENT. YOU WILL PROVIDE THIS INFORMATION BY FILLING OUT IN THE APPROPRIATE BLANKS IN THE VERDICT FORM. DO NOT MAKE ANY REDUCTION IN THE AMOUNT OF DAMAGES YOU AWARD TO PLAINTIFF. IT IS MY JOB TO REDUCE ANY DAMAGES THAT YOU AWARD BY A PERCENTAGE OF CONTRIBUTORY NEGLIGENCE THAT YOU ASSIGN TO THE PLAINTIFF.

AN EMPLOYER SUCH AS DEFENDANT REC MARINE LOGISTICS, LLC, IS ENTITLED TO RELY ON CERTAIN LEGAL DEFENSES TO A CLAIM FOR MAINTENANCE AND CURE. IN A CASE CALLED *MCCORPEN VERSUS CENTRAL GULF STEAMSHIP CORPORATION*, THE U.S. FIFTH CIRCUIT COURT OF APPEALS HELD THAT A SEAMAN WHO "KNOWINGLY FAILS TO DISCLOSE A PREEXISTING PHYSICAL DISABILITY DURING HIS OR HER PREEMPLOYMENT PHYSICAL EXAMINATION" MAY NOT RECOVER MAINTENANCE AND CURE.

IN ORDER TO ESTABLISH A *MCCORPEN*

02:38p

DEFENSE, DEFENDANT MUST SHOW THAT, ONE, PLAINTIFF INTENTIONALLY MISREPRESENTED OR CONCEALED MEDICAL FACTS; TWO, THE NONDISCLOSED FACTS WERE MATERIAL TO THE DEFENDANT'S DECISION TO HIRE PLAINTIFF; AND THREE, A CONNECTION EXISTS BETWEEN THE WITHHELD INFORMATION AND THE INJURY COMPLAINED OF IN THE LAWSUIT.

IF THE DEFENDANT DOES NOT REQUIRE A PREEMPLOYMENT MEDICAL EXAMINATION OR INTERVIEW, THE RULE IS THAT PLAINTIFF MUST DISCLOSE A PAST ILLNESS OR INJURY ONLY WHEN IN HIS OWN OPINION THE DEFENDANT WOULD CONSIDER IT A MATTER OF IMPORTANCE.

HOWEVER, IF THERE EXISTED REASONABLE GROUNDS FOR PLAINTIFF GRIFFIN'S GOOD-FAITH BELIEF THAT HE WAS FIT FOR DUTY, THE *MCCORPEN* DEFENSE DOES NOT APPLY.

IF YOU FIND THAT DEFENDANTS WERE NEGLIGENT AND THAT PLAINTIFF WAS CONTRIBUTORILY NEGLIGENT -- THAT PLAINTIFF'S INJURY WAS DUE PARTLY TO HIS OWN FAULT -- THEN YOU MUST DECIDE TO WHAT EXTENT HIS INJURY WAS CAUSED BY HIS NEGLIGENCE. THIS SHOULD BE AFFIXED AS A PERCENTAGE.

IF YOU FIND THAT ANY PARTIES WERE NEGLIGENT AND YOU FIND THAT PLAINTIFF'S OWN NEGLIGENCE WAS IN PART RESPONSIBLE FOR HIS INJURY OR

02:39p

DAMAGE, YOU MUST FILL IN THAT PERCENTAGE AS YOUR FINDING IN THE BLANK PROVIDED ON THE VERDICT FORM THAT YOU WILL RECEIVE. IF YOU FIND THAT ANY PARTIES WERE NEGLIGENT, THE PERCENTAGE OF ANY PARTY'S NEGLIGENCE, IF ANY, IS FOR YOU TO DECIDE. YOU MIGHT FIND AN AMOUNT BETWEEN ONE PERCENT AND 99 PERCENT, BUT DO NOT MAKE ANY REDUCTION IN THE AMOUNT OF DAMAGES THAT YOU AWARD TO PLAINTIFF. AGAIN, I WILL REDUCE THE DAMAGES THAT YOU AWARD BY THE PERCENTAGE OF NEGLIGENCE THAT YOU ASSIGN TO PLAINTIFF.

IF YOU FIND THE DEFENDANTS LIABLE, YOU MUST ALSO AWARD THE AMOUNT YOU FIND BY A PREPONDERANCE OF THE EVIDENCE IS FULL AND JUST COMPENSATION FOR ALL OF PLAINTIFF'S DAMAGES.

YOU WILL ALSO BE ASKED TO DETERMINE IF DEFENDANTS ARE LIABLE FOR WHAT IS CALLED PUNITIVE DAMAGES. BECAUSE THE METHODS OF DETERMINING PUNITIVE DAMAGES AND COMPENSATORY DAMAGES DIFFER, I WILL INSTRUCT YOU SEPARATELY ON PUNITIVE DAMAGES. THE INSTRUCTIONS I GIVE YOU NOW APPLY ONLY TO YOUR CONSIDERATION OF COMPENSATORY DAMAGES.

COMPENSATORY DAMAGES ARE NOT ALLOWED AS A PUNISHMENT AGAINST A PARTY. SUCH DAMAGES CANNOT BE BASED ON SPECULATION BECAUSE COMPENSATORY DAMAGES MUST BE THE ACTUAL DAMAGES TO BE RECOVERED OR

02:40p

RECOVERABLE -- THAT ARE RECOVERABLE. BUT COMPENSATORY DAMAGES ARE NOT RESTRICTED TO OUT-OF-POCKET LOSSES OF MONEY OR LOST TIME. INSTEAD, COMPENSATORY DAMAGES MAY INCLUDE MENTAL AND PHYSICAL ASPECTS OF INJURY, TANGIBLE AND INTANGIBLE. COMPENSATORY DAMAGES ARE INTENDED TO MAKE PLAINTIFF WHOLE OR TO RESTORE HIM TO A POSITION HE WOULD HAVE BEEN IN IF THE ACCIDENT HAD NOT HAPPENED.

IN DETERMINING COMPENSATORY DAMAGES, YOU SHOULD CONSIDER ONLY THE FOLLOWING ELEMENTS, TO THE EXTENT YOU FIND THAT PLAINTIFF HAS ESTABLISHED THEM BY A PREPONDERANCE OF THE EVIDENCE: PAST AND FUTURE PHYSICAL PAIN AND SUFFERING, INCLUDING PHYSICAL DISABILITY, IMPAIRMENT AND INCONVENIENCE, AND THE EFFECT OF PLAINTIFF'S INJURIES AND INCONVENIENCE ON THE NORMAL PURSUITS AND PLEASURES OF LIFE; PAST AND FUTURE MENTAL ANGUISH AND FEELINGS OF ECONOMIC INSECURITY CAUSED BY DISABILITY; INCOME LOST IN THE PAST; IMPAIRMENT OF EARNING CAPACITY OR ABILITY IN THE FUTURE, INCLUDING IMPAIRMENT OF PLAINTIFF'S EARNING CAPACITY DUE TO HIS PHYSICAL CONDITION; PAST MEDICAL EXPENSES; AND THE REASONABLE VALUE, NOT EXCEEDING ACTUAL COST TO PLAINTIFF, OF MEDICAL CARE THAT YOU FIND FROM THE EVIDENCE WILL BE REASONABLY CERTAIN TO BE REQUIRED IN THE FUTURE AS A

02:41p

PROXIMATE RESULT OF THE INJURY IN QUESTION.

IF YOU FIND THAT PLAINTIFF IS ENTITLED TO AN AWARD OF DAMAGES FOR LOSS OF PAST OR FUTURE EARNINGS, THERE ARE TWO PARTICULAR FACTORS YOU MUST CONSIDER. FIRST YOU SHOULD CONSIDER LOSS AFTER INCOME TAXES; THAT IS, YOU SHOULD DETERMINE THE ACTUAL OR NET INCOME THAT PLAINTIFF HAS LOST OR WILL LOSE, TAKING INTO CONSIDERATION THAT ANY PAST OR FUTURE EARNINGS WOULD BE SUBJECT TO INCOME TAXES. YOU MUST ALSO AWARD THE PLAINTIFF ONLY FOR HIS NET EARNINGS AFTER TAX. THIS IS SO BECAUSE ANY AWARD YOU MAKE HERE -- OR YOU MAY MAKE HERE IS NOT SUBJECT TO INCOME TAX. THE FEDERAL OR STATE GOVERNMENT WILL NOT TAX ANY AMOUNT THAT YOU AWARD ON THIS BASIS.

SECOND, AN AMOUNT TO COVER A FUTURE LOSS OF EARNINGS IS MORE VALUABLE TO PLAINTIFF IF HE RECEIVED THE AMOUNT TODAY THAN IF HE RECEIVED THE SAME AMOUNT IN THE FUTURE. IF YOU DECIDE TO AWARD PLAINTIFF AN AMOUNT FOR LOST FUTURE EARNINGS, YOU MUST DISCOUNT THAT AMOUNT TO PRESENT VALUE CONSIDERING WHAT RETURN WOULD BE REALIZED ON A RELATIVELY RISK-FREE INVESTMENT AND DEDUCTING THAT AMOUNT FROM THE GROSS FUTURE EARNING AWARD.

HOWEVER, SOME OF THESE DAMAGES, SUCH AS MENTAL OR PHYSICAL PAIN AND SUFFERING, ARE INTANGIBLE

02:43p

THINGS ABOUT WHICH THERE IS -- NO EVIDENCE OF VALUE IS REQUIRED. IN AWARDING THESE DAMAGES, YOU ARE NOT DETERMINING VALUE, INSTEAD DETERMINING WHAT AMOUNT WILL FAIRLY COMPENSATE PLAINTIFF FOR HIS INJURIES.

PLAINTIFF'S THIRD CLAIM IS THAT, AS A SEAMAN, HE IS ENTITLED TO RECOVER MAINTENANCE AND CURE. THIS CLAIM IS SEPARATE AND INDEPENDENT FROM BOTH THE JONES ACT AND THE UNSEAWORTHINESS CLAIMS OF THE PLAINTIFF. YOU MUST DECIDE THIS CLAIM SEPARATELY FROM YOUR OWN DETERMINATION OF THE JONES ACT AND UNSEAWORTHINESS CLAIMS.

MAINTENANCE AND CURE PROVIDES A SEAMAN WHO IS DISABLED BY INJURY OR ILLNESS, WHILE IN THE SHIP'S SERVICE, WITH MEDICAL CARE AND TREATMENT AND THE MEANS OF MAINTAINING HIMSELF WHILE HE IS RECUPERATING.

MAINTENANCE AND CURE IS A SEAMAN'S REMEDY. PLAINTIFF IS A SEAMAN; THEREFORE, YOU MUST DETERMINE WHETHER HE IS ENTITLED TO MAINTENANCE AND CURE. WHEN THERE ARE AMBIGUITIES OR DOUBTS ABOUT A SEAMAN'S RIGHT TO MAINTENANCE AND CURE, YOU SHOULD RESOLVE THOSE AMBIGUITIES OR DOUBTS IN THE SEAMAN'S FAVOR.

A SEAMAN IS ENTITLED TO MAINTENANCE AND CURE EVEN THOUGH HE WAS NOT INJURED AS A RESULT OF

02:44p

ANY NEGLIGENCE ON THE PART OF HIS EMPLOYER OR ANY UNSEAWORTHY CONDITION OF THE VESSEL. TO RECOVER MAINTENANCE AND CURE, PLAINTIFF NEED ONLY SHOW THAT HE SUFFERED INJURY OR ILLNESS, WHILE IN THE SERVICE OF THE VESSEL ON WHICH HE WAS EMPLOYED AS A SEAMAN, WITHOUT WILLFUL MISBEHAVIOR ON HIS PART. THE INJURY OR ILLNESS NEED NOT BE WORK RELATED; IT NEED ONLY OCCUR WHILE THE SEAMAN IS IN THE SHIP'S SERVICE. MAINTENANCE AND CURE MAY NOT BE REDUCED BECAUSE OF ANY NEGLIGENCE ON THE SEAMAN'S PART.

THE CURE TO WHICH A SEAMAN MAY BE ENTITLED INCLUDES THE COST OF MEDICAL ATTENTION, INCLUDING THE SERVICES OF PHYSICIANS AND NURSES AS WELL AS HOSPITALIZATION, MEDICINES AND MEDICAL APPARATUS. HOWEVER, THE EMPLOYER HAS NO DUTY TO PROVIDE CURE FOR ANY PERIOD DURING WHICH A SEAMAN IS HOSPITALIZED AT THE EMPLOYER'S EXPENSE.

MAINTENANCE IS THE COST OF FOOD, LODGING AND TRANSPORTATION TO AND FROM A MEDICAL FACILITY. A SEAMAN IS NOT ENTITLED TO MAINTENANCE FOR ANY PERIOD THAT HE IS AN INPATIENT IN ANY HOSPITAL, BECAUSE THE CURE PROVIDED BY THE EMPLOYER THROUGH HOSPITALIZATION INCLUDES THE SEAMAN'S FOOD AND LODGING.

A SEAMAN IS ENTITLED TO RECEIVE

02:45p

MAINTENANCE AND CURE FROM THE DATE HE LEAVES THE VESSEL UNTIL HE REACHES WHAT IS CALLED MAXIMUM CURE. MAXIMUM CURE IS THE POINT AT WHICH NO FURTHER IMPROVEMENT IN THE SEAMAN'S MEDICAL CONDITION IS REASONABLY EXPECTED.

IF IT APPEARS THAT A SEAMAN'S CONDITION IS INCURABLE OR THAT THE TREATMENT WILL NOT IMPROVE A SEAMAN'S PHYSICAL CONDITION BUT WILL ONLY RELIEVE PAIN, HE HAS REACHED MAXIMUM CURE. THE OBLIGATION TO PROVIDE MAINTENANCE AND CURE USUALLY ENDS WHEN QUALIFIED MEDICAL OPINION IS TO THE EFFECT -- OR TO THE EFFECT THAT THE MAXIMUM POSSIBLE CURE HAS BEEN ACCOMPLISHED.

IF YOU DECIDE THAT PLAINTIFF IS ENTITLED TO MAINTENANCE AND CURE, YOU MUST DETERMINE WHEN THE EMPLOYER'S OBLIGATION TO PAY MAINTENANCE BEGAN AND WHEN IT ENDS. ONE FACTOR YOU MAY CONSIDER IN DETERMINING WHEN THE PERIOD ENDS IS WHEN THE SEAMAN RESUMED HIS EMPLOYMENT, IF HE DID SO. IF, HOWEVER, THE EVIDENCE SUPPORTS A FINDING THAT ECONOMIC NECESSITY FORCED THE SEAMAN TO RETURN TO WORK BEFORE REACHING MAXIMUM CURE, YOU MAY TAKE THAT FINDING INTO CONSIDERATION IN DETERMINING WHEN THE PERIOD FOR MAINTENANCE AND CURE ENDS.

IF YOU FIND THAT PLAINTIFF IS ENTITLED

02:46p

TO AN AWARD OF DAMAGES UNDER EITHER THE JONES ACT OR UNSEAWORTHINESS CLAIMS AND IF YOU AWARD HIM EITHER LOST WAGES OR MEDICAL EXPENSES, THEN YOU MAY NOT AWARD HIM MAINTENANCE AND CURE FOR THAT SAME PERIOD. THAT IS BECAUSE PLAINTIFF MAY NOT RECOVER TWICE FOR THE SAME LOSS OF WAGES OR MEDICAL EXPENSES. HOWEVER, PLAINTIFF MAY BE ENTITLED TO AN AWARD OF DAMAGES IF DEFENDANTS FAILED TO PAY MAINTENANCE AND CURE WHEN IT WAS DUE.

AN EMPLOYER WHO HAS RECEIVED A CLAIM FOR MAINTENANCE AND CURE IS ENTITLED TO INVESTIGATE THE CLAIM. IF AFTER INVESTIGATING THE CLAIM THE EMPLOYER UNREASONABLY REJECTS IT, IT IS LIABLE FOR BOTH THE MAINTENANCE AND CURE PAYMENTS IT SHOULD HAVE MADE AND FOR ANY COMPENSATORY DAMAGES CAUSED BY HIS UNREASONABLE FAILURE TO PAY. COMPENSATORY DAMAGES MAY INCLUDE ANY AGGRAVATION OF PLAINTIFF'S CONDITION BECAUSE OF THE FAILURE TO PROVIDE MAINTENANCE AND CURE.

YOU MAY AWARD COMPENSATORY DAMAGES BECAUSE THE EMPLOYER FAILED TO PROVIDE MAINTENANCE AND CURE IF YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT, ONE, PLAINTIFF GRIFFIN WAS ENTITLED TO MAINTENANCE AND CURE; TWO, IT WAS NOT PROVIDED; THREE, DEFENDANTS ACTED UNREASONABLY IN FAILING TO

02:47p

PROVIDE MAINTENANCE AND CURE; AND FOUR, THE FAILURE TO PROVIDE THE MAINTENANCE AND CURE RESULTED IN SOME INJURY TO PLAINTIFF.

IF YOU ALSO FIND THAT THE EMPLOYER'S FAILURE TO PAY MAINTENANCE AND CURE WAS NOT ONLY UNREASONABLE BUT WAS ALSO WILLFUL, WANTON, AND ARBITRARY, YOU MAY ALSO AWARD PLAINTIFF PUNITIVE DAMAGES AND ATTORNEY'S FEES. THE DEFENDANT'S ACTION IS WILLFUL, WANTON, AND ARBITRARY IF IT IS IN RECKLESS OR CALLOUS DISREGARD OF OR WITH INDIFFERENCE TO THE RIGHTS OF PLAINTIFF. YOU MAY NOT AWARD THESE DAMAGES UNLESS THE EMPLOYER HAS ACTED CALLOUSLY OR WILLFULLY IN DISREGARD OF THE SEAMAN'S CLAIM FOR MAINTENANCE AND CURE. THE PURPOSE OF AN AWARD OF PUNITIVE DAMAGES IS TO PUNISH THE DEFENDANT AND TO DETER THE DEFENDANT AND OTHERS FROM SUCH CONDUCT IN THE FUTURE.

A PLAINTIFF MAY NOT RECOVER ATTORNEY'S FEES FOR PROSECUTING JONES ACT OR UNSEAWORTHINESS CLAIMS. INSTEAD, FEES MAY ONLY BE RECOVERED FOR PROSECUTING CLAIMS THAT THE EMPLOYER NOT ONLY FAILED TO PAY MAINTENANCE AND CURE BUT DID SO IN A WILLFUL AND WANTON DISREGARD OF THE OBLIGATION TO DO SO. YOU MAY AWARD SUCH ATTORNEY'S FEES ONLY IF YOU FIND THAT THE EMPLOYER ACTED WILLFULLY AND WANTONLY IN

02:48p

DISREGARDING THE EMPLOYER'S OBLIGATION TO PAY MAINTENANCE AND CURE.

IF PLAINTIFF GRIFFIN HAS PROVED HIS CLAIM AGAINST DEFENDANTS BY A PREPONDERANCE OF THE EVIDENCE, YOU MUST DETERMINE THE DAMAGES TO WHICH PLAINTIFF GRIFFIN IS ENTITLED. YOU SHOULD NOT INTERPRET THE FACT THAT I AM GIVING YOU INSTRUCTIONS ABOUT PLAINTIFF GRIFFIN'S DAMAGES AS AN INDICATION IN ANY WAY THAT I BELIEVE THAT PLAINTIFF GRIFFIN SHOULD OR SHOULD NOT WIN THIS CASE. IT IS YOUR TASK FIRST TO DECIDE WHETHER DEFENDANTS ARE LIABLE. I AM INSTRUCTING YOU ON DAMAGES ONLY SO THAT YOU WILL HAVE GUIDANCE IN THE EVENT YOU DECIDE THAT DEFENDANTS ARE LIABLE AND THAT PLAINTIFF GRIFFIN IS ENTITLED TO RECOVER MONEY FROM DEFENDANTS.

IF YOU FIND THAT THE DEFENDANTS ARE LIABLE TO PLAINTIFF, YOU MUST DETERMINE AN AMOUNT THAT IS FAIR COMPENSATION FOR ALL OF PLAINTIFF'S DAMAGES. THESE DAMAGES ARE CALLED COMPENSATORY DAMAGES, AS I MENTIONED. THE PURPOSE OF COMPENSATORY DAMAGES IS TO MAKE THE PLAINTIFF WHOLE; THAT IS, TO COMPENSATE HIM FOR THE DAMAGES HE HAS SUFFERED. COMPENSATORY DAMAGES ARE NOT LIMITED TO EXPENSES THAT PLAINTIFF MAY HAVE INCURRED BECAUSE OF HIS INJURY. IF PLAINTIFF WINS, HE IS ENTITLED TO COMPENSATORY

02:49p

DAMAGES FOR THE PHYSICAL INJURY, PAIN AND SUFFERING, AND MENTAL ANGUISH THAT HE SUFFERED BECAUSE OF THE DEFENDANT'S WRONGFUL CONDUCT.

YOU MAY AWARD COMPENSATORY DAMAGES ONLY FOR INJURIES THAT PLAINTIFF PROVES WERE PROXIMATELY CAUSED BY DEFENDANTS' ALLEGED WRONGFUL CONDUCT. THE DAMAGES THAT YOU AWARD MUST BE FAIR COMPENSATION FOR ALL THE PLAINTIFF'S DAMAGES, NO MORE AND NO LESS. DAMAGES ARE NOT ALLOWED AS A PUNISHMENT AND CANNOT BE IMPOSED OR INCREASED TO PENALIZE DEFENDANTS. YOU SHOULD NOT AWARD COMPENSATORY DAMAGES FOR SPECULATIVE INJURIES BUT ONLY FOR THOSE INJURIES THAT PLAINTIFF HAS ACTUALLY SUFFERED OR THAT PLAINTIFF IS REASONABLY LIKELY TO SUFFER IN THE FUTURE.

IF YOU DECIDE TO AWARD COMPENSATORY DAMAGES, YOU SHOULD BE GUIDED BY DISPASSIONATE COMMON SENSE. COMPUTING DAMAGES MAY BE DIFFICULT, BUT YOU MUST NOT LET THAT DIFFICULTY LEAD YOU TO ENGAGE IN ARBITRARY GUESSWORK. ON THE OTHER HAND, THE LAW DOES NOT REQUIRE THAT PLAINTIFF PROVE THE AMOUNT OF HIS LOSSES WITH MATHEMATICAL PRECISION BUT ONLY WITH SUCH DEFINITENESS AND ACCURACY AS THE CIRCUMSTANCES PERMIT.

YOU MUST USE SOUND DISCRETION IN FIXING AN AWARD OF DAMAGES, DRAWING REASONABLE INFERENCES

02:50p

WHERE YOU FIND THEM APPROPRIATE FROM THE FACTS AND CIRCUMSTANCES IN EVIDENCE.

COMPENSATORY DAMAGES MAY INCLUDE NOT ONLY OUT-OF-POCKET LOSS BUT OTHER MONETARY HARMS -- AND OTHER MONETARY HARMS BUT ALSO SUCH INJURIES AS IMPAIRMENT OF REPUTATION, PERSONAL HUMILIATION, AND MENTAL ANGUISH AND SUFFERING.

COMPENSATORY DAMAGES FOR EMOTIONAL DISTRESS AND OTHER FORMS OF INTANGIBLE INJURY WILL NOT BE PRESUMED FROM MERE VIOLATION OF STATUTORY RIGHTS. SPECIFIC INDIVIDUALIZED PROOF IS NECESSARY, AND TESTIMONY FROM THE PLAINTIFF ALONE IS NOT ORDINARILY SUFFICIENT. COMPENSATION DAMAGES MAY BE AWARDED ONLY IF THE PLAINTIFF SUBMITS PROOF OF ACTUAL INJURY, OFTEN IN THE FORM OF PSYCHOLOGICAL OR MEDICAL EVIDENCE OR OTHER CORROBORATING TESTIMONY FROM A THIRD PARTY.

YOU SHOULD CONSIDER THE FOLLOWING ELEMENTS TO DAMAGE, TO THE EXTENT YOU FIND THEM PROVEN BY A PREPONDERANCE OF THE EVIDENCE: PAST AND FUTURE PHYSICAL PAIN AND SUFFERING, INCLUDING PHYSICAL DISABILITY, IMPAIRMENT AND INCONVENIENCE, AND THE EFFECT OF PLAINTIFF'S INJURIES AND INCONVENIENCE ON THE NORMAL PURSUITS AND PLEASURES OF LIFE, PAST AND FUTURE MENTAL ANGUISH AND FEELINGS OF

02:52p

ECONOMIC INSECURITY CAUSED BY DISABILITY; INCOME LOSS IN THE PAST; IMPAIRMENT OF EARNING CAPACITY OR ABILITY IN THE FUTURE, INCLUDING IMPAIRMENT OF PLAINTIFF'S EARNING CAPACITY DUE TO HIS PHYSICAL CONDITION; PAST MEDICAL EXPENSES; AND THE REASONABLE VALUE, NOT EXCEEDING ACTUAL COST TO PLAINTIFF, OF MEDICAL CARE THAT YOU FIND FROM THE EVIDENCE WILL BE REASONABLY CERTAIN TO BE REQUIRED IN THE FUTURE AS A PROXIMATE CAUSE OF THE INJURY IN QUESTION.

YOU MAY AWARD DAMAGES FOR THE BODILY INJURY THAT PLAINTIFF SUSTAINED AND ANY PAIN AND SUFFERING, MENTAL ANGUISH, AND THE LOSS OF CAPACITY FOR ENJOYMENT OF LIFE THAT PLAINTIFF EXPERIENCED IN THE PAST OR WILL EXPERIENCE IN THE FUTURE AS A RESULT OF THE BODILY INJURY. NO EVIDENCE OF THE VALUE OF INTANGIBLE THINGS, SUCH AS MENTAL OR PHYSICAL PAIN AND SUFFERING, HAS BEEN OR NEED BE INTRODUCED. YOU ARE NOT TRYING TO DETERMINE VALUE BUT AN AMOUNT THAT WILL FAIRLY COMPENSATE PLAINTIFF FOR THE DAMAGES HE HAS SUFFERED. THERE IS NO EXACT STANDARD FOR FIXING THE COMPENSATION TO BE AWARDED FOR THESE ELEMENTS OF DAMAGE. ANY AWARD THAT YOU MAKE MUST BE FAIR IN THE LIGHT OF THE EVIDENCE.

THE AMOUNT OF DAMAGES FOR AN ITEM SUCH AS LOSS OF FUTURE WAGES IS NECESSARILY SPECULATIVE

02:53p

AND CANNOT BE CALCULATED WITH MATHEMATICAL CERTAINTY. HOWEVER, IF YOU FEEL THAT SUCH DAMAGES SHOULD BE AWARDED, YOU SHOULD EXERCISE YOUR DISCRETION IN CONSIDERING ALL THE CIRCUMSTANCES AND AWARD AN AMOUNT THAT IS JUST TO BOTH PLAINTIFF AND DEFENDANTS AND NOT UNDULY OPPRESSIVE TO EITHER.

IN DETERMINING SUCH AN AWARD, YOU MAY CONSIDER PLAINTIFF'S PHYSICAL CONDITION BEFORE AND AFTER THE INCIDENT, HIS WORK RECORD, HIS EARNINGS IN PRIOR YEARS, THE PROBABILITY OR IMPROBABILITY THAT HE WOULD HAVE EARNED SIMILAR AMOUNTS IN THE REMAINDER OF HIS WORK LIFE, AND SIMILAR FACTORS.

SINCE, IF YOU MAKE SUCH AN AWARD, PLAINTIFF WOULD BE RECEIVING TODAY SUMS OF MONEY THAT OTHERWISE HE WOULD ONLY RECEIVE OVER A NUMBER OF YEARS IN THE FUTURE, THE LAW REQUIRES THAT YOU DISCOUNT OR REDUCE TO ITS PRESENT VALUE THE AMOUNT OF THE FUTURE LOSS YOU MIGHT OTHERWISE AWARD. IN SIMPLE TERMS, THIS IS A REDUCTION BY THE AMOUNT OF MONEY OR INTEREST WHICH IS A -- WHICH THIS SMALLER SUM OF MONEY WILL EARN FOR PLAINTIFF OVER THE PERIOD OF TIME IN WHICH HE WOULD HAVE BEEN EARNING FOR FUTURE WAGES. YOU SHOULD LIST THIS DISCOUNTED FIGURE AS YOUR AWARD FOR FUTURE WAGE LOSSES, IF YOU MAKE SUCH AN AWARD.

IN DETERMINING THIS DISCOUNT FACTOR,

02:54p

YOU MAY CONSIDER THE EVIDENCE OF THE EXPERTS WHO HAVE TESTIFIED ON THIS ISSUE.

A PERSON WHO CLAIMS DAMAGES RESULTING FROM THE WRONGFUL ACT OF ANOTHER HAS A DUTY TO -- UNDER THE LAW TO USE REASONABLE DILIGENCE TO MITIGATE HIS OR HER DAMAGE; THAT IS, TO AVOID OR MINIMIZE THOSE DAMAGES.

IF YOU FIND THE DEFENDANT LIABLE AND THE PLAINTIFF HAS SUFFERED DAMAGES, THE PLAINTIFF MAY NOT RECOVER FOR ANY ITEM OF DAMAGE WHICH HE COULD HAVE AVOIDED THROUGH REASONABLE EFFORT. IF YOU FIND THAT THE DEFENDANT PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT PLAINTIFF UNREASONABLY FAILED TO TAKE ADVANTAGE OF AN OPPORTUNITY TO LESSEN HIS DAMAGES, YOU SHOULD DENY HIM RECOVERY FOR THOSE DAMAGES THAT HE WOULD HAVE AVOIDED HAD HE TAKEN ADVANTAGE OF THE OPPORTUNITY.

YOU ARE THE SOLE JUDGES OF WHETHER THE PLAINTIFF ACTED REASONABLY IN AVOIDING OR MINIMIZING HIS DAMAGES. AN INJURED PLAINTIFF MAY NOT SIT IDLY BY WHEN PRESENTED WITH AN OPPORTUNITY TO REDUCE HIS DAMAGES. HOWEVER, HE IS NOT REQUIRED TO EXERCISE UNREASONABLE EFFORTS TO INCUR UNREASONABLE EXPENSES IN MITIGATING THE DAMAGES. THE DEFENDANT HAS THE BURDEN OF PROVING THE DAMAGES THAT THE PLAINTIFF

02:55p

COULD HAVE MITIGATED. IN DECIDING WHETHER TO REDUCE THE PLAINTIFF'S DAMAGES BECAUSE OF HIS FAILURE TO MITIGATE, YOU MUST WEIGH ALL THE EVIDENCE IN LIGHT OF THE PARTICULAR CIRCUMSTANCES OF THE CASE, USING SOUND DISCRETION IN DECIDING WHETHER THE DEFENDANT HAS SATISFIED HIS BURDEN OF PROVING THAT THE PLAINTIFF'S CONDUCT WAS NOT REASONABLE.

ALTHOUGH THERE ARE TWO DEFENDANTS IN THIS CASE, IT DOES NOT NECESSARILY FOLLOW THAT IF ONE IS LIABLE, THE OTHER IS ALSO LIABLE. EACH DEFENDANT IS ENTITLED TO FAIR, SEPARATE AND INDIVIDUAL CONSIDERATION OF HIS OR HER CASE WITHOUT REGARD TO YOUR DECISION AS TO THE OTHER DEFENDANT.

AND I SHOULD HAVE NOTED AT THE BEGINNING OF OUR PROCEEDINGS TODAY THAT THE THIRD DEFENDANT, QBE, IS NO LONGER A PARTY TO THIS CASE.

THE FACT THAT A PERSON BROUGHT A LAWSUIT AND IS IN COURT SEEKING DAMAGES CREATES NO INFERENCE THAT THE PERSON IS ENTITLED TO A JUDGMENT. ANYONE MAY MAKE A CLAIM AND FILE A LAWSUIT. THE ACT OF MAKING A CLAIM IN A LAWSUIT, BY ITSELF, DOES NOT IN ANY WAY TEND TO ESTABLISH THAT CLAIM AND IS NOT EVIDENCE.

NOW, IT IS YOUR DUTY TO DELIBERATE AND TO CONSULT WITH ONE ANOTHER IN AN EFFORT TO REACH A

02:56p

VERDICT. EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF BUT ONLY AFTER AN IMPARTIAL CONSIDERATION OF THE EVIDENCE WITH YOUR FELLOW JURORS. DURING DELIBERATIONS, DO NOT HESITATE TO REEXAMINE YOUR OWN OPINIONS AND CHANGE YOUR MIND IF YOU ARE CONVINCED THAT YOU WERE WRONG. BUT DO NOT GIVE UP ON YOUR HONEST BELIEFS BECAUSE THE OTHER JURORS THINK DIFFERENTLY OR JUST TO FINISH THE CASE.

REMEMBER, AT ALL TIMES YOU ARE THE JUDGES OF THE FACTS.

YOU HAVE BEEN ALLOWED TO TAKE NOTES DURING THE TRIAL. ANY NOTES THAT YOU TOOK DURING THE TRIAL ARE ONLY AIDS TO YOUR MEMORY. IF YOUR MEMORY DIFFERS FROM YOUR NOTES, YOU SHOULD RELY ON YOUR MEMORY AND NOT ON YOUR NOTES. THE NOTES ARE NOT EVIDENCE. IF YOU DID NOT TAKE NOTES, RELY ON YOUR INDEPENDENT RECOLLECTION OF THE EVIDENCE AND NOT BE -- AND DO NOT BE UNDULY INFLUENCED BY THE NOTES OF OTHER JURORS. NOTES ARE ENTITLED TO -- ARE NOT ENTITLED TO GREATER WEIGHT THAN THE RECOLLECTION OR IMPRESSION OF EACH JUROR ABOUT THE TESTIMONY.

NOW, WHEN YOU RETURN TO THE JURY ROOM TO DELIBERATE, YOU MAY TAKE -- I WILL PROVIDE YOU WITH A COPY OF THESE INSTRUCTIONS AS WELL AS THE JURY FORM -- THE VERDICT FORM. EXCUSE ME. WE WILL ALSO

02:57p

PROVIDE YOU WITH THE EVIDENCE IN THE CASE. AND, OF COURSE, YOU'LL BE ENTITLED TO RETAIN AND REVIEW YOUR NOTES.

YOU MUST ALSO SELECT ONE FROM AMONG YOU TO SERVE AS THE FOREPERSON WHO WILL HELP GUIDE YOUR DELIBERATIONS AND WILL SPEAK FOR YOU HERE IN COURT. THAT IS THE FIRST THING THAT YOU SHOULD DO, AGAIN, IS SELECT YOUR FOREPERSON.

LET'S TAKE A LOOK AT THIS TIME AT THE VERDICT FORM. WE'VE TRIED TO SIMPLIFY IT FOR YOU AS MUCH AS WE COULD, BUT LET'S REVIEW IT NONETHELESS. SO YOU WILL HAVE SEVERAL DECISIONS TO MAKE DURING THE COURSE OF YOUR DELIBERATIONS. IN FACT, A TOTAL OF 14.

SO THE FIRST WILL BE ASKED: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT THE PLAINTIFF INJURED HIS SHOULDER AS A RESULT OF A PERSONNEL BASKET TRANSFER ON THE VESSEL? THE ANSWER IS SIMPLY YES OR NO. AND, IN FACT, INTERROGATORIES NO. 1, 2 AND 3 ARE VIRTUALLY THE SAME, EXCEPT NO. 1 ADDRESSES THE DEFENDANT'S ALLEGED SHOULDER INJURY; NO. 2 ALLEGES OR PERTAINS TO THE ALLEGED NECK INJURY; AND NO. 3 ALLEGES -- PERTAINS TO THE BACK INJURY -- THE ALLEGED BACK INJURY.

SO IF YOU ANSWERED "YES" TO EITHER 1, 2

02:58p

OR 3 OR ALL OF THEM, THEN YOU HAVE TO GO ON TO THE NEXT QUESTION. IF, HOWEVER, YOUR ANSWER TO QUESTIONS 1, 2 AND 3 -- THAT IS, ALL THREE -- ARE "NO," THEN AS INSTRUCTED YOU SIMPLY -- THE FOREPERSON WILL SIMPLY SIGN AND DATE THE VERDICT FORM AND NOTIFY THE COURT SECURITY OFFICER THAT YOU'VE REACHED A VERDICT.

BUT AGAIN, IF YOUR ANSWER TO EITHER QUESTION 1, 2 OR 3 IS "YES," YOU MUST PROCEED TO QUESTION 4. QUESTION 4, AS YOU SEE, REQUIRES THAT YOU DETERMINE BY A PREPONDERANCE OF THE EVIDENCE WHETHER THE DEFENDANT WAS NEGLIGENT AND THAT SUCH NEGLIGENCE WAS A CAUSE, IN WHOLE OR IN PART, TO THE DAMAGE OR INJURY SUFFERED BY THE PLAINTIFF.

NOW, IF YOUR ANSWER TO NO. 4 IS "YES," YOU PROCEED -- YOU MUST PROCEED TO ANSWER THAT QUESTION. IN ANY CASE, YOU HAVE TO GO ON TO NO. 5. NO. 5 ASKS, ESSENTIALLY, DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT THE VESSEL WAS UNSEAWORTHY AND THAT THE UNSEAWORTHINESS WAS THE PROXIMATE CAUSE OF THE DEFENDANT'S INJURY? IF YOUR ANSWER TO 4 OR 5 WAS "YES," THEN YOU HAVE TO GO ON TO THE NEXT INTERROGATORY, NO. 6. IF YOUR ANSWER IS "NO" TO BOTH 4 AND 5, YOU ALREADY DELIBERATED, THE FOREPERSON SHOULD GO ON AND SIGN AND DATE THE VERDICT FORM AND NOTIFY THE COURT SECURITY OFFICER THAT

03:00p

YOU'VE REACHED A VERDICT.

IF YOU GO ON -- AGAIN, IF YOU ANSWER -- YOUR ANSWER TO QUESTION 4 OR 5, EITHER OR, IS "YES," YOU GO ON TO QUESTION -- OR INTERROGATORY NO. 6, WHICH REQUIRES YOU TO CONSIDER WHETHER THE PLAINTIFF HIMSELF WAS NEGLIGENT IN CAUSING HIS INJURIES. YOU THEN GO ON TO NO. 7, WHICH REQUIRES YOU TO APPORTION THE PERCENTAGE OF FAULT, IF YOU WILL, TO EACH OF THE THREE LISTED ON THE FORM.

NEXT, ON INTERROGATORY NO. 8 YOU'RE REQUIRED TO DETERMINE A FAIR AND REASONABLE SUM TO COMPENSATE THE PLAINTIFF FOR HIS INJURIES. AND YOU'LL SEE THE VARIOUS CATEGORIES THAT WE'VE ALREADY -- IN FACT, THE LAWYERS HAVE DISCUSSED THEM THAT THE COURT HAS INSTRUCTED YOU ON. AND AGAIN, IF YOU HAVE ANY QUESTIONS ABOUT THAT, I WOULD INVITE YOU TO JUST REVIEW THE INSTRUCTIONS -- THE COPY OF THE INSTRUCTIONS.

ALL RIGHT. SO ON TO NO. 9. IF YOU ANSWERED "YES" TO INTERROGATORIES 1, 2 OR 3, YOU'RE REQUIRED TO GO ON AND ANSWER NO. 9 AS TO THE INJURIES. WITH RESPECT TO PLAINTIFF'S SHOULDER, NECK AND/OR BACK INJURIES, DO YOU FIND THAT PLAINTIFF HAS REACHED THE MAXIMUM MEDICAL CURE?

IF YOUR ANSWER IS "NO" TO ANY OF THESE,

03:01p

THEN YOU'RE REQUIRED TO PROCEED TO THE NEXT QUESTION, INTERROGATORY NO. 10, AND ANSWER THAT QUESTION. IF YOUR ANSWER IS "YES" AS TO ALL THREE -- ALL THREE -- ONCE AGAIN, YOU CAN STOP YOUR DELIBERATIONS AT THAT POINT. THE FOREPERSON SIGNS AND DATES THE VERDICT FORM.

IF YOU ARE REQUIRED TO PROCEED TO INTERROGATORY 10, IT REQUIRES YOU TO DETERMINE IF THE DEFENDANT OWES ANY PAST OR FUTURE MAINTENANCE AND BENEFITS -- MAINTENANCE AND CURE BENEFITS TO THE PLAINTIFF. IF YOUR ANSWER IS "YES," YOU GO ON TO NO. 11. IF YOUR ANSWER IS "NO," AGAIN, THE FOREPERSON SIGNS AND DATES THE FORM AND NOTIFIES THE COURT SECURITY OFFICER.

BUT AGAIN, IF YOUR ANSWER TO NO. 10 IS "YES," THEN YOU THEN IN INTERROGATORY NO. 11 MUST WRITE AN AMOUNT OF APPROPRIATE MAINTENANCE AND CURE THAT YOU FIND IS SUPPORTED BY THE EVIDENCE. AND THAT'S SEPARATE CATEGORIES THAT HAVE TO BE CONSIDERED SEPARATELY.

THEN ON TO INTERROGATORY NO. 12: DO YOU FIND THAT REC MARINE ACTED UNREASONABLY IN FAILING TO PROVIDE MAINTENANCE AND CURE? A SIMPLE "YES" OR "NO." IF YOUR ANSWER IS "NO," THEN AGAIN, YOU CEASE YOUR DISCUSSIONS OR DELIBERATIONS, THE

03:03p

FOREPERSON AGAIN DATES AND SIGNS THE FORM AND NOTIFIES THE COURT SECURITY OFFICER.

IF YOUR ANSWER TO THE QUESTION IS "YES," THEN YOU GO ON TO QUESTION -- OR INTERROGATORY NO. 13, WHICH REQUIRES YOU TO DETERMINE IF THE EVIDENCE -- IF THERE IS EVIDENCE THAT IN FAILING TO PROVIDE MAINTENANCE AND CURE TO THE PLAINTIFF THE DEFENDANT ACTED UNREASONABLY -- NOT ONLY UNREASONABLY, THAT IS, BUT WITH WILLFUL -- WILLFULLY AND WANTONLY, SUCH THAT A PUNITIVE DAMAGE AWARD IS REQUIRED.

AND THEN, FINALLY, IF YOUR ANSWER IS "NO," THEN YOU -- AGAIN, YOU -- THE JURY FOREPERSON TURNS TO PAGE 6, SIGNS AND DATE IT -- DATES IT. IF THE ANSWER IS "YES," THEN YOU HAVE TO ANSWER INTERROGATORY NO. 14.

I KNOW IT SOUNDS LIKE A LOT, BUT YOU'RE A VERY ASTUTE, ATTENTIVE AND SMART JURY, AND I KNOW THAT -- I KNOW YOU FOLLOWED ALONG WITH ME AND YOU SHOULD HAVE EVERYTHING THAT YOU NEED.

SO AGAIN, WE'RE GOING TO GO ON AND EXCUSE YOU AT THIS TIME. IT'S GOING TO TAKE US ABOUT --

**THE LAW CLERK:** THE REST -- THERE IS MORE.

**THE COURT:** WELL, I'VE ALREADY COVERED THAT.

03:04p

I MEAN -- WELL, I'LL COVER -- YES.

**THE LAW CLERK:** IF THEY HAVE QUESTIONS.

**THE COURT:** ALL RIGHT. IF DURING YOUR DELIBERATIONS YOU WANT TO COMMUNICATE WITH ME -- AS YOU KNOW, THERE IS A NOTEPAD AND PENCILS AND PENS IN THE DELIBERATION -- IN THE JURY ROOM -- ALL YOU HAVE TO DO IS WRITE THE QUESTION. I WOULD ASK THE FOREPERSON TO ALSO WRITE THE DATE AND TIME OF THE QUESTION. I WILL THEN MEET WITH THE LAWYERS AND WE WILL ANSWER YOUR QUESTION TO THE BEST OF OUR ABILITY AND WE'LL RETURN THAT ANSWER TO YOU IN WRITING. HOWEVER, I MAY FIND IT APPROPRIATE TO RETURN YOU TO THE COURTROOM TO ANSWER THE QUESTION. IF I BELIEVE THAT WOULD BE A MORE EFFECTIVE WAY OF RESPONDING OR ANSWERING TO YOUR QUESTIONS, I'LL DO SO.

I WILL REMIND YOU THAT YOU MUST NEVER DISCLOSE TO ANYONE YOUR NUMERICAL DIVISIONS. IF YOU HAVE A NOTE OR IF I RETURN YOU TO THE COURTROOM, DO NOT TELL ME OR ANYBODY ELSE, AGAIN, YOUR DIVISION, YOUR NUMERICAL DIVISION, UNTIL YOU REACH A UNANIMOUS VERDICT.

AFTER YOU'VE REACHED THE VERDICT, YOU ARE NOT REQUIRED TO SPEAK TO ANYONE ABOUT THIS. THERE MAY BE -- THERE ARE RARE OCCASIONS WHERE I HAVE TO ORDER JURORS TO PERHAPS DISCLOSE INFORMATION TO

03:05p

ME, BUT THAT'S ONLY AFTER -- IT'S EXCEEDINGLY RARE CIRCUMSTANCES, AND IT'S ONLY IF I ORDER YOU TO DO SO. BUT AGAIN, AFTER YOU -- CERTAINLY UNTIL YOU REACH DELIBERATION, YOU CANNOT REVEAL YOUR NUMERICAL DIVISION TO ANYONE, NOR CAN YOU TALK ABOUT THIS CASE WITH ANYONE UNTIL YOU REACH A VERDICT.

AT THIS TIME I WILL EXCUSE YOU ALL. WE WILL, AGAIN, PROVIDE YOU WITH COPIES OF THE VERDICT FORM AND THE INSTRUCTIONS. WE'RE GOING TO NEED ABOUT FIVE OR TEN MINUTES TO GATHER UP ALL THE EVIDENCE TO MAKE SURE YOU HAVE EVERYTHING YOU NEED, AFTER WHICH MS. BREDA WILL COME ON INTO THE JURY ROOM. DO NOT BEGIN TO DELIBERATE UNTIL SHE TELLS YOU THAT YOU NOW HAVE MY PERMISSION TO BEGIN YOUR DELIBERATIONS.

SO SHE'S GOING TO RETURN TO THE JURY ROOM WITH YOU SO THAT SHE CAN GIVE YOU A BRIEF TUTORIAL ON HOW TO USE THE JERS SYSTEM. IT'S A VERY USER-FRIENDLY SYSTEM. YOU WILL HAVE NO PROBLEM USING IT. BUT AGAIN, UNTIL SHE GIVES YOU THAT TUTORIAL AND SHE PROVIDES YOU WITH ALL THE EVIDENCE, THEN AND ONLY THEN, AFTER SHE LEAVES THE ROOM, THE JURY ROOM, ARE YOU ENTITLED TO BEGIN -- FIRST SELECT A FOREPERSON AND THEN BEGIN YOUR DELIBERATIONS.

LET'S ALL RISE FOR THE JURY.

**(WHEREUPON, THE JURY IS OUT OF THE**

03:07p

COURTROOM.)

**THE COURT:** BE SEATED.

ANY ADDITIONAL OBJECTIONS TO THE JURY INSTRUCTIONS BY THE PLAINTIFF?

**MR. SHEPPARD:** NO, YOUR HONOR.

**THE COURT:** THANK YOU.

BY THE DEFENSE?

**MR. PUSATERI:** NO, YOUR HONOR.

**THE COURT:** THANK YOU, MR. PUSATERI. ALL RIGHT.

**MR. PUSATERI:** YOUR HONOR, I DID HAVE A QUESTION ABOUT THE VERDICT FORM. ON THE PUNITIVE DAMAGES ONES, IT'S ONLY "WILLFUL AND WANTON." I THINK YOUR HONOR HAD CHANGED THE INSTRUCTIONS TO "WILLFUL, WANTON AND ARBITRARY."

**THE COURT:** YES, LET'S GO ON AND INSERT THAT WORD "ARBITRARY."

I WILL ALSO TELL YOU THAT I WILL ALLOW THE JURY TO GO AS LATE AS THEY WANT TODAY. I NEGLECTED TO MENTION THAT TO THEM.

BUT, MS. BREDA, I WILL ASK YOU TO MENTION THAT THEY CAN GO AS LATE AS THEY WANT TODAY OR THEY CAN LEAVE AS EARLY -- IF THEY CAN'T REACH A VERDICT TODAY AND THEY WANT TO RETURN TOMORROW, THEY'RE FREE TO DO THAT.

03:08p

I DON'T WANT THEM TO -- OF COURSE, NONE OF US WANT THEM TO RUSH THROUGH THIS. THIS WAS A LOT OF EVIDENCE IN THIS CASE, AND I THINK IT'S IN THE INTEREST OF BOTH -- OF ALL PARTIES FOR THEM TO SIMPLY JUST TAKE THEIR TIME.

SO, MS. BREDA, IF YOU WOULD BE KIND ENOUGH TO GIVE THEM THAT -- JUST TELL THEM -- JUST GIVE THAT INSTRUCTION. OKAY?

**MR. PUSATERI:** YOUR HONOR, FOR THE RECORD, MY REQUEST WAS THAT "ARBITRARY" BE ADDED TO INTERROGATORY NO. 13 AND INTERROGATORY NO. 14.

**THE COURT:** LET'S TAKE A LOOK HERE.

**MR. PUSATERI:** I GUESS IT'S "ARBITRARILY" FOR 13 AND THEN "ARBITRARY" FOR 14. SORRY ABOUT THAT.

**THE COURT:** THAT'S ALL RIGHT.

OKAY. GOT THAT, AMBER?

**THE LAW CLERK:** YES, SIR.

**MR. PUSATERI:** THANK YOU, YOUR HONOR.

**THE COURT:** OKAY. ALL RIGHT. LET'S TALK ABOUT THE EVIDENCE THAT'S GOING BACK. I'VE ALREADY TOLD THEM THAT ALL OF THE JOINT EXHIBITS ARE GOING BACK. EVEN THOUGH --

**THE COURTROOM DEPUTY:** ALL THE ONES THAT WERE ADMITTED.

03:09p

**THE COURT:** YES. SO NOT ALL WERE OFFERED. AND I WOULD SUGGEST -- I MEAN, IF YOU ALL WANT EVERYTHING BACK THERE, THAT'S FINE. IT'S UP TO YOU. IT MAY RESULT IN JURY CONFUSION. I DON'T KNOW. I MEAN, IT WAS THE SUBJECT OF THE STIPULATION, TECHNICALLY SPEAKING. IS THAT RIGHT?

**MR. KHOURY:** YES, YOUR HONOR. I THINK WE JUST AGREED THAT WE WERE GOING TO SUBMIT ALL OF THE JOINT EXHIBITS.

**THE COURT:** SO ALL THE JOINT EXHIBITS GO.

LET ME TELL YOU WHAT ELSE I HAVE HERE. SO I'VE GOT PLAINTIFF'S 1, PLAINTIFF'S --

**MR. SHEPPARD:** IT JUMPS FROM 1 TO 12, YOUR HONOR, FOR THE ONES THAT WERE ADMITTED.

**THE COURT:** OKAY. SO PLAINTIFF'S 1 AND PLAINTIFF 12. IS THAT CORRECT?

**MR. SHEPPARD:** 12 WAS THE DEMONSTRATIVE THING THAT WE BOTH KIND OF PUT IN.

**MR. PUSATERI:** AND THEN 1 --

**MR. SHEPPARD:** -- WAS THE MANUAL.

**MR. PUSATERI:** SO THAT'S IT THAT'S COMING IN?

**MR. SHEPPARD:** I BELIEVE THAT'S IT.

**MR. KHOURY:** YOUR HONOR, I JUST WANTED TO NOTE THAT I THINK DEFENSE EXHIBIT 8 IS MISSING.

03:11p

**MR. PUSATERI:** THAT'S THE TRANSCRIPT. IT DIDN'T GO IN.

**MR. KHOURY:** I THOUGHT THAT WAS THE ACTUAL RECORDING.

**MR. PUSATERI:** NO. IT'S JUST THE TRANSCRIPT. IT WAS SUPPOSED TO BE THE TRANSCRIPT. I DON'T THINK YOU WANT TO GIVE THEM THE RECORDING.

**THE COURT:** THAT'S RIGHT. SO LET'S TALK ABOUT THE DEFENSE EXHIBITS. SO I'VE GOT DEFENSE 5, 6, 10, 11 AND 12. IS THAT CORRECT?

**MR. KHOURY:** YES, YOUR HONOR.

**THE COURTROOM DEPUTY:** I HAVE 4.

**THE COURT:** OH, YES, 4. I'M SORRY. I THOUGHT I MENTIONED 4. YES, 4. I GUESS I DID NOT MENTION 4. BUT YES, DEFENSE EXHIBIT 4.

**MR. KHOURY:** WE'RE MISSING DEFENSE EXHIBIT 9.

**THE COURTROOM DEPUTY:** I DON'T HAVE THAT ONE.

**MR. KHOURY:** THAT WAS THE LAWSUIT, THE 2014 LAWSUIT.

**MR. SHEPPARD:** THAT'S EXHIBIT 1, THOUGH. RIGHT? THEN YOU CHANGED THAT --

**MR. KHOURY:** NO. WELL, THE EXHIBIT 9 WAS THE CERTIFIED COPY. I ASSUME WE SHOULD -- ONE WAS AN

03:12p

UNCERTIFIED COPY, ONE WAS A CERTIFIED COPY.

**THE COURT:** DEFENSE EXHIBIT 9, YOU SAID?

**MR. KHOURY:** CORRECT.

**MR. SHEPPARD:** DEFENSE EXHIBITS 1 AND 9 ARE THE SAME THING. ONE HAS A CERTIFICATION, ONE DOES NOT.

**THE COURT:** IT DOESN'T MATTER.

**MR. SHEPPARD:** PICK YOURS.

**THE COURT:** YES, I -- IF WE HAVE A CERTIFIED, CERTIFIED. WHAT'S CERTIFIED? IS THAT 1?

**MR. KHOURY:** 9.

**THE COURT:** YES, THAT SHOULD GO IN.

**THE COURTROOM DEPUTY:** ALL RIGHT. I SEE IT.

**THE COURT:** ANY OTHER DEFENSE EXHIBITS?

**MR. KHOURY:** 1.

**MR. PUSATERI:** WE'RE TAKING A LOOK AT WHAT 2 AND 3 ARE, YOUR HONOR, JUST TO SEE IF WE COVERED THOSE.

**THE COURT:** YES, THOSE ARE THE ONLY ONES THAT I SEE.

**MR. PUSATERI:** I THINK 7 CAME IN WITH BRIAN THIS MORNING. IT SAYS "MAINTENANCE AND CURE DOCUMENTS REDACTED."

**THE COURT:** DEFENSE 7?

**THE COURTROOM DEPUTY:** THAT WAS J7.

03:13p

**MR. PUSATERI:** I'M SORRY. I APOLOGIZE.

**THE COURT:** NO, THAT DID NOT COME IN. I DON'T HAVE ANY NOTATION ABOUT 7.

**MR. PUSATERI:** SO I THINK MY CONCERN IS THAT I BROUGHT THOSE UP WITH DR. COWEN IN MY CROSS AT THE END. I DO HAVE THAT -- I SHOW DR. COWEN REC EXHIBIT 7, PAGE 12 OF 1 AND 11, REC 2236.

**THE COURTROOM DEPUTY:** WHAT DATE?

**THE COURT:** I DON'T SEE -- I DON'T SEE IT.

**MR. PUSATERI:** IT MAY HAVE BEEN IN ANOTHER EXHIBIT, BUT THAT WAS MY REFERENCE. IT'S THE THIRD FALL. MY NOTES INDICATE THAT I DID USE PART OF REC EXHIBIT 7 IN CROSS-EXAMINING DR. COWEN.

**THE COURT:** YOU MEAN DEFENSE EXHIBIT?

**MR. PUSATERI:** DEFENSE EXHIBIT 7. I'M SORRY. I KEEP CALLING IT REC. IT'S DEFENSE EXHIBIT 7.

**THE COURT:** I DON'T SHOW THAT COMING IN. DO YOU SEE IT, MS. BREDA?

**THE COURTROOM DEPUTY:** NO, I DON'T. WHAT DAY IS THIS? WHAT DAY?

**MR. PUSATERI:** THE DAY I DID -- WHEN I CROSS-EXAMINED DR. COWEN.

**THE COURT:** SO THAT WOULD HAVE BEEN DAY TWO. THAT WOULD HAVE BEEN ON WEDNESDAY MORNING.

03:17p

LISTEN, MR. PUSATERI, I'M NOT TRYING TO DENY IT. I JUST DON'T SEE IT. I ALWAYS TRY TO TAKE GOOD NOTES, AND I KNOW MS. BREDA DOES AS WELL.

DO YOU SEE IT, MISTER -- DID YOU KEEP TRACK OF ALL OF THAT?

**MR. SHEPPARD:** WE KEPT TRACK OF WHAT WAS GOING ON. I DON'T RECALL -- I REMEMBER HIM -- THERE WAS A QUESTION ABOUT SOME OF THE STUFF THAT WAS IN THERE. I JUST DON'T REMEMBER IT COMING OUT --

**MR. PUSATERI:** YOUR HONOR, WE'RE LOOKING AT -- MS. DOBARD -- SO WE'RE READING FROM THE TRANSCRIPT. I INITIALLY CALLED IT JOINT 7, THEN I CORRECTED MYSELF AND CALLED IT DEFENDANTS' EXHIBIT 7. I APOLOGIZED. AND THEN YOUR HONOR ALLOWED ME TO ADMIT IT.

**THE COURT:** OKAY. SO IT'S NOT JOINT 7. IT'S DEFENSE 7?

**MR. PUSATERI:** IT'S DEFENSE 7.

**THE COURT:** NO. THERE WAS A SEPARATE DEFENSE 7 THAT'S ALREADY IN AS WELL. BUT IF THAT'S WHAT THE TRANSCRIPT REFLECTS -- DESCRIBE THE DOCUMENT ONCE AGAIN.

**MR. PUSATERI:** YEAH. IT'S --

**THE COURT:** WE'LL GO ON AND LET MR. SHEPPARD TAKE A LOOK AT IT.

03:19p

**MR. SHEPPARD:** I SEE IT'S SAYING -- IT GOES "DEFENSE EXHIBIT NO. 7. THIS IS JOINT EXHIBIT 7. I APOLOGIZE. IT'S THE REVERSE." SO THEY WERE -- HE THOUGHT IT WAS DEFENSE EXHIBIT 7, BUT THEN HE SAYS IT'S JOINT EXHIBIT 7.

**THE COURT:** SO IT WAS DEFENSE EXHIBIT 7. AND I DIDN'T GIVE YOU AN OPPORTUNITY, OBVIOUSLY, TO OBJECT TO THAT BECAUSE I ASSUMED IT WAS A JOINT EXHIBIT, AND IT SOUNDS TO ME LIKE HE WAS ALREADY -- MR. PUSATERI HAD ALREADY REFERENCED IT.

**MR. SHEPPARD:** NO. WHAT I'M SAYING IS YOU ASKED "WHAT'S THE EXHIBIT?" HE GOES "DEFENSE EXHIBIT NO. 7. THIS IS JOINT. IT'S JOINT EXHIBIT 7. I APOLOGIZE." SO HE CORRECTED IT. IT WASN'T DEFENSE EXHIBIT 7. IT WAS THE JOINT EXHIBIT NO. 7 THAT HE WAS REFERENCING.

**THE COURT:** OKAY. IS THAT CORRECT? SO IT IS JOINT EXHIBIT 7?

**MR. SHEPPARD:** I'M JUST READING OFF THE TRANSCRIPT, YOUR HONOR.

**THE COURT:** I'M JUST THOROUGHLY CONFUSED. I SEE JOINT 7 IS IN.

**MR. PUSATERI:** SO WHAT IS JOINT 7, KYLE? WHAT'S JOINT 7?

**THE COURTROOM DEPUTY:** WHAT WAS YOUR REC

03:20p

THAT YOU REFERENCED JUST NOW?

**MR. STADICK:** IT'S 2537. THIS IS WHAT I HAVE.

**THE COURTROOM DEPUTY:** RIGHT. SO IT'S JOINT 7 -- I HAVE MY NOTES -- JOINT 7, REC 2537.

**MR. PUSATERI:** BUT IS THAT JOINT 7 OR IS THAT DEFENDANTS' 7? THAT'S WHAT I'M --

**THE COURT:** SO, COUNSEL, THIS IS WHY I RECOMMEND STRONGLY THAT THE EXHIBIT NUMBER BE ON EVERY PAGE SO THAT WE CAN AVOID THIS KIND OF AMBIGUITY.

**MR. PUSATERI:** SO JOINT 7 IS THE MAINTENANCE AND CURE DOCUMENTS.

**MR. SHEPPARD:** I'M JUST GOING OFF OF WHAT YOU SAID HERE. "EXHIBIT NO. 7. IT'S JOINT 7. I APOLOGIZE. JOINT EXHIBIT 7. APOLOGIES, YOUR HONOR."

**MR. PUSATERI:** RIGHT. BUT THAT'S NOT JOINT 7, BECAUSE JOINT 7 IS MAINTENANCE AND CURE DOCUMENTS.

**THE COURT:** BUT LET ME JUST BE CLEAR. YOU DID REFERENCE THE BATES NUMBER?

**MR. PUSATERI:** I DID.

**THE COURT:** OKAY.

**MR. PUSATERI:** AND THAT'S --

**THE COURT:** AND THAT'S -- SO WHETHER IT WAS JOINT OR DEFENSE, THIS DOCUMENT IS IN.

03:21p

**MR. PUSATERI:** CORRECT.

**THE COURT:** DO YOU UNDERSTAND THAT, MR. SHEPPARD?

**MR. SHEPPARD:** YES, YOUR HONOR.

**THE COURT:** OKAY. SO THE QUESTION IS, JUST SO THAT THE COURT OF APPEALS, IF -- SHOULD THERE BE AN APPEAL, IS NOT GRAPPLING WITH THIS, FOR THE SAKE OF ACCURACY, IS IT D7, DEFENSE 7, OR IS IT JOINT 7?

**MR. PUSATERI:** IT IS, IN FACT, DEFENSE 7.

**THE COURT:** OKAY. LET'S BE SURE IT'S LABELED. IT'S ALREADY IN. I AGREE WITH YOU, IT'S IN. BUT LET'S JUST GO ON AND MAKE SURE IT'S ACCURATELY NOTED AS DEFENSE EXHIBIT 7. OKAY?

**MR. PUSATERI:** CORRECT. AND THAT IS REC BATES NO. 2537.

**THE COURT:** AND THAT'S FROM VILLE PLATTE. CORRECT?

**MR. PUSATERI:** I BELIEVE THAT'S TRUE.

**THE COURT:** VILLE PLATTE FAMILY CARE. OKAY. SO THIS IS A REPLACEMENT 7. I TELL YOU WHAT. LET'S DO THIS. TO GET THIS THING ROLLING, LET'S JUST REMARK THAT.

ELIZABETH, CAN WE MARK IT AS DEFENSE EXHIBIT 13? CAN YOU DO THAT? BECAUSE WE NEED TO GET THINGS MOVING ALONG. HOW WOULD WE HAVE TO DO THAT, I

03:23p

MEAN, SHORT OF GIVING THEM A PIECE OF PAPER WITH A NEW EXHIBIT TAG? WHAT'S THE EASIEST THING, ELIZABETH?

**THE COURTROOM DEPUTY:** 7A REDACTED.

**THE COURT:** SO IT'S ALREADY IN AS -- DEFENSE EXHIBIT 7A IS IN EVIDENCE AND WILL GO TO THE JURY.

**THE COURTROOM DEPUTY:** 7A.

**THE COURT:** 7A. ANYTHING ELSE FROM THE DEFENSE SIDE?

**MR. PUSATERI:** THERE WAS ONE EXHIBIT -- I THINK IT WAS OUR DEFENSE EXHIBIT NO. 3 THAT WE SKIPPED OVER, BECAUSE WE WERE TACKLING NO. 7.

SO, MS. BREDA, CAN YOU TELL ME WHETHER WE CALLED EXHIBIT 3?

**THE COURT:** THAT WAS ALSO FROM MERCY -- NO, THIS IS MERCY REGIONAL MEDICAL CENTER.

**MR. PUSATERI:** I THINK THE MERCY RECORDS WENT IN ALREADY.

**THE COURT:** BUT YOU'RE SAYING THEY WENT IN THROUGH OTHER EXHIBITS?

**MR. PUSATERI:** I BELIEVE THEY WENT IN THROUGH OTHER EXHIBITS, SO I THINK WE'RE OKAY.

**THE COURT:** ANYTHING ELSE FROM THE DEFENSE SIDE?

OKAY. WELL, LISTEN, LET ME ASK YOU ALL

TO TRY TO REMAIN WITHIN 15 MINUTES OR SO OF THE COURTHOUSE IN CASE WE HAVE A QUESTION. AND PROVIDE YOUR CELL PHONE NUMBERS, IF YOU WILL, TO MS. BREDA.

ANYTHING ELSE WE SHOULD TAKE UP BEFORE THE JURY CHARGES, VERDICT FORM -- AND VERDICT FORM GO TO THE JURY?

**MR. PUSATERI:** NO, SIR, YOUR HONOR.

**MR. SHEPPARD:** NO, YOUR HONOR.

**THE COURT:** ALL RIGHT.

COURT IS IN RECESS.

**(WHEREUPON, A RECESS WAS TAKEN.)**

**THE COURT:** BE SEATED.

ALL RIGHT. WE'RE BACK ON THE RECORD IN THE CASE OF GRIFFIN VERSUS REC MARINE. LET THE RECORD REFLECT THAT COUNSEL FOR ALL PARTIES ARE PRESENT.

SO THREE DEVELOPMENTS. ONE, THE JURORS HAVE DECIDED TO WORK TONIGHT AND REQUESTED THAT FOOD BE ORDERED, WHICH WE'VE DONE. SO YOU SHOULD BE AWARE OF THAT. I DON'T KNOW IF THAT MEANS YOU TOO SHOULD ORDER SOMEPLACE. IT'S UP TO YOU.

ALSO, IN CONNECTION WITH THAT, TWO OF THE JURORS REQUESTED THE OPPORTUNITY TO CALL, IN ONE CASE TO HER HOME -- THAT WAS MS. HERRERA -- TO NOTIFY HER BOYFRIEND THAT SHE WOULD BE HOME A LITTLE LATE;

AND SHE HAD CHILDCARE ISSUES, SO JUST SO YOU ALL KNOW. AND THEN MS. FORTUNE, WHO APPARENTLY WAS SCHEDULED TO WORK TONIGHT, ALSO WANTED TO CALL HER EMPLOYER TO NOTIFY HIM.

THOSE CALLS WERE MADE HERE IN THE COURTROOM, WHICH IS WHY YOU SEE THE TELEPHONE POSITIONED TOWARD YOU. AND OUR COURT SECURITY OFFICER WAS HERE TO MONITOR. AND, OF COURSE, NO DISCUSSION WHATSOEVER OF ANY DELIBERATIONS OCCURRED, SO JUST SO THAT YOU ALL KNOW.

I HAVE INVITED, THROUGH THE CAPTAIN, ANY OTHER PERSON WHO NEEDS TO CALL HOME TO DO SO TO JUST LET US KNOW. AND, OF COURSE, WE'LL MONITOR THAT JUST TO MAKE SURE THAT THERE IS ONLY DISCUSSION, OF COURSE, ABOUT THEIR WHEREABOUTS TONIGHT.

ANY QUESTIONS ABOUT THAT FROM THE PLAINTIFF?

**MR. SHEPPARD:** NO, YOUR HONOR.

**THE COURT:** BY THE DEFENSE?

**MR. PUSATERI:** NO, YOUR HONOR.

**THE COURT:** THANK YOU.

NEXT, WE HAVE A QUESTION FROM THE JURY THAT HOPEFULLY YOU ALL CAN HELP THE COURT ANSWER. AND THE QUESTION READS AS FOLLOWS: "COULD WE HAVE MS. HAUPT'S LIFE CARE PLAN? THANK YOU." AND THIS

WAS SUBMITTED BY THE JURY FOREPERSON AT 4:46 P.M.

SO WE'VE GONE THROUGH THE WITNESS -- THE EXHIBIT LIST. AND, FRANKLY, JUST BASED UPON THE VERY BRIEF DESCRIPTIONS, IT WASN'T ALTOGETHER CLEAR TO ME WHERE THAT LIFE CARE PLAN IS.

**MR. PUSATERI:** RIGHT, YOUR HONOR. IT WAS IN A DEMONSTRATIVE EXHIBIT.

**THE COURT:** IT WAS NOT IN THE -- BUT IT WASN'T ENTERED. OKAY.

**MR. PUSATERI:** IT WAS NOT SUBMITTED IN EXHIBIT. THE CLOSEST THING THE JURY COULD REFER TO IS -- IT'S THE NUMBER WE PROVIDED THE JURY FOR FUTURE MEDICAL EXPENSES. IT'S CONSISTENT WITH THAT $37,000 FIGURE.

**THE COURT:** OKAY. WELL, ALL I'M GOING TO REPLY, THEN, IS THAT THE LIFE CARE PLAN -- ALTHOUGH MS. HAUPT TESTIFIED ABOUT THE LIFE CARE PLAN, THE LIFE CARE PLAN WAS NOT ADMITTED INTO EVIDENCE. OKAY?

**MR. PUSATERI:** CORRECT.

**THE COURT:** IS THAT SATISFACTORY FROM PLAINTIFF?

**MR. SHEPPARD:** YES, YOUR HONOR.

**THE COURT:** DEFENSE?

**MR. PUSATERI:** YES, YOUR HONOR.

**THE COURT:** WAS THAT BASED UPON A REPORT?

SHOULD IT BE CHARACTERIZED AS A LIFE PLAN ANALYSIS OR REPORT?

**MR. PUSATERI:** IT'S AN ANALYSIS, YOUR HONOR.

**THE COURT:** OKAY.

**MR. SHEPPARD:** IT THINK IT WAS -- IT'S PART OF THE EXPERT REPORT, YOUR HONOR.

**MR. PUSATERI:** IT IS PART OF HER REPORT, BUT I THINK --

**THE COURT:** BUT THE REPORT WAS NOT ADMITTED.

**MR. PUSATERI:** IT WAS NOT, YOUR HONOR. NOR DO I THINK IT COULD HAVE BEEN.

**THE COURT:** OKAY.

**MR. PUSATERI:** I DON'T KNOW IF IT WOULD BE HELPFUL TO ADD THAT THEY SHOULD JUST, YOU KNOW, TRY TO RECALL HER TESTIMONY. SHE ORALLY ADVISED OF THAT AMOUNT. SO MAYBE POINT THEM TO HER TRIAL TESTIMONY.

**MR. SHEPPARD:** YOUR HONOR, I THINK THAT THEY JUST ASKED COULD THEY HAVE THE LIFE CARE PLAN. I THINK THE ANSWER IS THAT THE LIFE CARE PLAN WASN'T ADMITTED INTO EVIDENCE, IS AN ANSWER TO THAT QUESTION.

**THE COURT:** OKAY. ALL RIGHT. THE ANSWER READS AS FOLLOWS: "ALTHOUGH MS. HAUPT TESTIFIED ABOUT HER ANALYSIS, HER REPORT WAS NOT ADMITTED INTO EVIDENCE." OKAY. AND WE'LL GO ON AND SEND THIS --

CAPTAIN, WOULD YOU BE KIND ENOUGH TO GIVE THAT TO THE JURY FOREPERSON, PLEASE?

ALL RIGHT. THANK Y'ALL FOR BEING AVAILABLE IN SUCH SHORT NOTICE. STICK AROUND. THERE MAY BE MORE QUESTIONS, OF COURSE.

COURT IS IN RECESS.

**(WHEREUPON, A RECESS WAS TAKEN.)**

**THE COURT:** BE SEATED.

ALL RIGHT. WE'RE BACK ON THE RECORD IN THE CASE OF GRIFFIN VERSUS REC MARINE. LET THE RECORD REFLECT THAT COUNSEL FOR THE DEFENDANTS AND THE PLAINTIFF ARE ALL PRESENT.

SO WE HAVE YET ANOTHER QUESTION FROM THE JURY. AND IT READS AS FOLLOWS: "WHAT IS AN ACDF SURGERY?" AND IT'S DATED THIS DATE AND SIGNED AT 6:10.

THAT'S THE ANTERIOR CERVICAL DISKECTOMY AND FUSION, I BELIEVE. IS THAT RIGHT?

**MR. SHEPPARD:** YES, YOUR HONOR.

**THE COURT:** AT LEAST ACCORDING TO THE MAYO CLINIC'S WEBSITE.

AND SO THE QUESTION IS -- IN ADDITION TO DEFINING IT, I'M INCLINED TO TELL THEM OR REMIND THEM THAT IT IS A TYPE OF PROCEDURE USED TO TREAT. BUT I WANT TO MAKE SURE THIS IS NOT GOING TO FOLLOW

THE EVIDENCE. I THINK THEY'LL UNDERSTAND THE CONTEXT OF IT.

IS THERE AN OBJECTION? OR WHAT ARE YOUR THOUGHTS, I SHOULD ASK, ABOUT SIMPLY MENTIONING THAT IT IS ONE OF THE PROCEDURES USED TO TREAT A HERNIATED DISK IN THE NECK AREA OF THE SPINE?

**MR. SHEPPARD:** YOUR HONOR, I THINK THAT'S PRECISELY WHAT IT'S FOR.

**MR. PUSATERI:** I THINK WE'RE PROBABLY GOING TO TAKE THE SAME POSITION MR. SHEPPARD TOOK; THAT IF THE QUESTION IS WHAT IS AN ACDF SURGERY, WE SHOULD JUST ANSWER "ANTERIOR CERVICAL DISK AND FUSION."

**THE COURT:** AND JUST -- OKAY.

**MR. PUSATERI:** I'M TRYING TO MAKE SURE -- YEAH, IT'S ANTERIOR CERVICAL DISKECTOMY AND FUSION, IS WHAT IT IS.

**THE COURT:** CORRECT. ARE YOU COMFORTABLE, MISTER -- WELL, LET'S SEE.

ARE YOU COMFORTABLE JUST INDICATING THAT IT IS A PROCEDURE USED TO TREAT INJURIES IN THE NECK AREA?

**MR. PUSATERI:** YEAH, WE --

**THE COURT:** I MEAN, THERE'S A LOT OF MEDICAL TERMS THAT HAVE BEEN TOSSED OUT HERE. THEY DON'T HAVE A TRANSCRIPT. NOW, THEY HAVE MEDICAL RECORDS.

I'M NOT SURE IF THE MEDICAL RECORDS REALLY DEFINE WHAT IT IS.

**MR. PUSATERI:** COULD WE PROPOSE THAT THE ANSWER BE AN ANTERIOR CERVICAL DISKECTOMY AND FUSION SURGERY?

**THE COURT:** THAT IT IS -- WELL, THEY ALREADY KNOW IT'S SURGERY. THE QUESTION IS "WHAT IS AN ACDF SURGERY?" WHICH SUGGEST TO ME TO THAT THEY KNOW IT'S SURGERY. AND I DON'T KNOW IF THEY'RE TRYING TO DECIDE, YOU KNOW, WHAT IS THE ACRONYM OR THE ABBREVIATION, WHAT DOES THAT MEAN OR HOW IS IT USED. I MEAN, WHY THIS SURGERY.

**MR. PUSATERI:** I THINK MY FIRST ASSUMPTION WOULD JUST BE TO DEFINE THE ACRONYM AND PROVIDE NO FURTHER INFORMATION, BECAUSE I DON'T THINK -- I'M NOT SURE ANY FURTHER INFORMATION WAS ELICITED FROM ANY WITNESS.

**THE COURT:** WELL, I DON'T -- YOU ALL WOULD KNOW. WAS THERE ANY TESTIMONY ABOUT WHAT IT WAS?

**MR. SHEPPARD:** YES, YOUR HONOR. THAT'S FROM DR. COWEN. HE WENT THROUGH THE TREATMENT THAT MR. GRIFFIN WOULD NEED IN THE FUTURE AND HE TALKED ABOUT THE ACDF SURGERY. AND DR. FERACHI ALSO TALKS ABOUT HIS SURGERY THAT HE'S RECOMMENDED TO MR. GRIFFIN.

**THE COURT:** DID HE -- IS IT YOUR

RECOLLECTION THAT HE ACTUALLY DEFINED THE SURGERY OR JUST THREW IT OUT THERE THAT -- THAT'S THE ISSUE. LET ME ASK -- LET'S GO OFF THE RECORD FOR A MINUTE.

**(OFF THE RECORD)**

**THE COURT:** THEY JUST NEED TO KNOW GENERALLY WHAT IT IS. I'VE BEEN HEARING ALL KIND OF THINGS, MR. PUSATERI. I'M JUST GOING TO TELL THEM -- AND YOUR OBJECTION IS NOTED -- THAT IT IS A PROCEDURE USED TO TREAT A DISK IN THE NECK AREA. OKAY?

**MR. SHEPPARD:** AND DEFINING WHAT "ACDF" STANDS FOR?

**THE COURT:** YES.

**MR. PUSATERI:** AND THAT WOULD BE ANTERIOR CERVICAL DISKECTOMY AND FUSION?

**THE COURT:** YES. SO WHAT WAS THE -- GIVE ME THE TESTIMONY AGAIN.

**MR. LEATHERWOOD:** SURE. FERACHI SAYS "AND SURGERY FOR HIM WOULD BE SOMETHING CALLED AN ACDF WHERE I REMOVE THE DISK, REMOVE THE DISK HERNIATION, AND DO A FUSION SURGERY." AND THAT IS --

**THE COURT:** ALL RIGHT.

**(OFF THE RECORD)**

**THE COURT:** THE RESPONSE READS AS FOLLOWS: "ACDF, ANTERIOR CERVICAL DISKECTOMY AND FUSION, SURGERY IS A PROCEDURE USED TO TREAT A DISK IN THE

NECK AREA."

CAPTAIN, WOULD YOU BE KIND ENOUGH TO RETURN THAT TO THE JURY? THANK YOU.

AND FOLKS, I THINK THEY MAY HAVE A VERDICT, BUT WE'LL GO ON AND PROVIDE THE ANSWER. AND THEY'RE FREE TO CONSIDER IT, FREE TO DISREGARD IT. BUT THEY ASKED THE QUESTION AND WE ARE OBLIGATED TO GIVE THEM AN ANSWER. SO LET'S JUST SEE WHAT HAPPENS.

**MR. PUSATERI:** YOUR HONOR, WE HAVE A COUPLE OTHER COUNSEL WHO WOULD LIKE TO COME BACK.

**THE COURT:** SO WHAT WE'LL DO IS WE'LL TAKE A VERY BRIEF BREAK. OKAY? HOW MUCH TIME DO YOU THINK YOU NEED AND TO GET YOUR CLIENT HERE? ABOUT TEN MINUTES?

**MR. PUSATERI:** TEN MINUTES.

**THE COURT:** IF THEY'RE ABLE TO BE HERE BEFORE TEN MINUTES, JUST LET US KNOW, BUT WE'LL BE IN RECESS FOR TEN MINUTES. OKAY?

**MR. PUSATERI:** THANK YOU, YOUR HONOR.

**MR. SHEPPARD:** THANK YOU, YOUR HONOR.

**(WHEREUPON, A RECESS WAS TAKEN.)**

**THE COURT:** BE SEATED.

ALL RIGHT. AS NOTED, I BELIEVE WE HAVE A VERDICT. IF YOU WOULD BE KIND ENOUGH TO ESCORT THE JURY BACK TO THE COURTHOUSE -- COURTROOM, I'D

APPRECIATE THAT.

AND WHILE THE CAPTAIN IS DOING SO, LET THE RECORD REFLECT, OF COURSE, THAT WE'RE BACK ON THE RECORD IN THE CASE OF GRIFFIN VERSUS REC MARINE. THE PARTIES ARE PRESENT, COUNSEL FOR THE PARTIES ARE PRESENT. AND I APPRECIATE EVERYBODY GETTING TO THE COURTHOUSE IN A TIMELY FASHION.

**(WHEREUPON, THE JURY IS IN THE COURTROOM.)**

**THE COURT:** BE SEATED.

WELCOME BACK, LADIES AND GENTLEMEN. I'VE BEEN INFORMED THAT THE JURY HAS REACHED A VERDICT IN THE CASE. CORRECT? IS THAT RIGHT?

**JUROR VENABLE:** YES, SIR.

**THE COURT:** THANK YOU. WOULD YOU BE KIND ENOUGH, MR. VENABLE, TO HAND THE VERDICT FORM TO THE CAPTAIN?

ALL RIGHT. I FIND THAT THE VERDICT FORM IS PROPERLY COMPLETED. THANK YOU FOR THAT, LADIES AND GENTLEMEN.

AT THIS TIME WE WILL WHAT WE CALL PUBLISH THE OPINION; IN OTHER WORDS, YOUR VERDICT WILL NOW BE READ ALOUD.

ALL RIGHT, MS. BREDA.

**THE COURTROOM DEPUTY:** IN THE CASE OF MCARTHUR GRIFFIN VERSUS REC MARINE LOGISTICS, LLC, ET

AL.

"INTERROGATORY NO. 1: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT PLAINTIFF MCARTHUR GRIFFIN INJURED HIS SHOULDER AS A RESULT OF A PERSONNEL BASKET TRANSFER INCIDENT ON BOARD THE M/V *DUSTIN DANOS*?

"YES.

"INTERROGATORY NO. 2: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT PLAINTIFF MCARTHUR GRIFFIN INJURED HIS NECK AS A RESULT OF A PERSONNEL BASKET TRANSFER INCIDENT ON BOARD THE M/V *DUSTIN DANOS*?

"YES.

"INTERROGATORY NO. 3: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT PLAINTIFF MCARTHUR GRIFFIN INJURED HIS NECK" -- EXCUSE ME -- "INJURED HIS BACK AS A RESULT OF A PERSONNEL BASKET TRANSFER INCIDENT ON BOARD THE M/V *DUSTIN DANOS*?

"NO.

"INTERROGATORY NO. 4: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT DEFENDANT REC MARINE LOGISTICS, LLC, WAS NEGLIGENT AND THAT SUCH NEGLIGENCE WAS A CAUSE, IN WHOLE OR IN PART, OF THE DAMAGE OR INJURY TO PLAINTIFF MCARTHUR GRIFFIN?

"YES.

"INTERROGATORY NO. 5: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT THE VESSEL, M/V *DUSTIN DANOS*, WAS UNSEAWORTHY AND THAT SUCH UNSEAWORTHINESS WAS THE PROXIMATE CAUSE OF THE DAMAGE OR INJURY TO PLAINTIFF MCARTHUR GRIFFIN?

"YES.

"INTERROGATORY NO. 6: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT PLAINTIFF MCARTHUR GRIFFIN WAS NEGLIGENT AND THAT SUCH NEGLIGENCE CONTRIBUTED, IN WHOLE OR IN PART, TO HIS ALLEGED INJURY OR INJURIES?

"YES.

"INTERROGATORY NO. 7: PLEASE ALLOCATE THE PERCENTAGE.

"REC MARINE LOGISTICS, LLC: 70%.

"OFFSHORE TRANSPORT SERVICES, LLC: 20%.

"MCARTHUR GRIFFIN: 10%.

"TOTAL: 100% HUNDRED PERCENT.

"INTERROGATORY NO. 8: WHAT AMOUNT OF MONEY WOULD FAIRLY AND REASONABLY COMPENSATE PLAINTIFF MCARTHUR GRIFFIN FOR HIS INJURIES, IF ANY, THAT RESULTED FROM A PERSONNEL BASKET TRANSFER INCIDENT ON BOARD THE M/V *DUSTIN DANOS*?

"$100,000.

"$250,000 FOR FUTURE GENERAL DAMAGES, INCLUDING: PHYSICAL IMPAIRMENT, DISFIGUREMENT, PAIN AND SUFFERING, MENTAL ANGUISH AND LOSS OF ENJOYMENT OF LIFE.

"PAST WAGE LOSS: $150,000.

"FUTURE LOSS OF EARNING CAPACITY: $500,000.

"PAST MEDICAL EXPENSES: $10,000.

"FUTURE MEDICAL EXPENSES: $686,700.

WITH RESPECT TO PLAINTIFF -- "INTERROGATORY NO. 9: WITH RESPECT TO PLAINTIFF MCARTHUR GRIFFIN'S SHOULDER, NECK, AND/OR BACK INJURIES, DO YOU FIND THAT PLAINTIFF HAS REACHED MAXIMUM MEDICAL CURE?

"BACK: YES.

"NECK: NO.

"SHOULDER: NO.

"INTERROGATORY NO. 10: DO YOU FIND THAT DEFENDANT, REC MARINE LOGISTICS, LLC, OWES ANY PAST OR FUTURE MAINTENANCE AND CURE BENEFITS TO THE PLAINTIFF MCARTHUR GRIFFIN?

"YES.

"INTERROGATORY NO. 11: PLEASE WRITE BELOW THE AMOUNT OF MAINTENANCE AND CURE BENEFITS YOU BELIEVE ARE OWED TO PLAINTIFF MCARTHUR GRIFFIN:

"MAINTENANCE: $10,000.

"CURE: ZERO.

"INTERROGATORY NO. 12: DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT REC MARINE LOGISTICS, LLC, ACTED UNREASONABLY IN FAILING TO PROVIDE MAINTENANCE AND CURE TO PLAINTIFF MCARTHUR GRIFFIN, RESULTING IN SOME HARM OR INJURY TO HIM?

"YES.

"INTERROGATORY NO. 13: DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT REC MARINE LOGISTICS, LLC, IN FAILING TO PROVIDE MAINTENANCE AND CURE TO PLAINTIFF MCARTHUR GRIFFIN, ACTED NOT ONLY UNREASONABLY, BUT ALSO WILLFULLY, WANTONLY, AND ARBITRARILY, SUCH THAT PUNITIVE DAMAGES ARE WARRANTED?

"YES.

"INTERROGATORY NO. 14: WHAT AMOUNT IN PUNITIVE DAMAGES SHOULD DEFENDANT REC MARINE LOGISTICS, LLC, PAY TO PLAINTIFF MCARTHUR GRIFFIN FOR HIS WILLFUL, WANTON, AND ARBITRARY FAILURE TO PROVIDE MAINTENANCE AND CURE?"

$1,500. I'M SORRY. EXCUSE ME. $1,000,500.

**THE COURT:** NO.

**THE COURTROOM DEPUTY:** EXCUSE ME.

"$1,500,000.

"DATED 5/1

"FOREPERSON DANNY VENABLE."

**THE COURT:** ALL RIGHT. THANK YOU.

WOULD EITHER SIDE LIKE THE JURY POLLED AT THIS TIME?

**MR. PUSATERI:** YES, WE WOULD, YOUR HONOR.

**THE COURT:** LADIES AND GENTLEMEN, AT THIS TIME YOU WILL BE POLLED. THAT SIMPLY MEANS THAT EACH OF YOU WILL BE ASKED TO CONFIRM THAT THIS IS, IN FACT, YOUR VERDICT. A MICROPHONE WILL BE PROVIDED TO YOU BY THE CAPTAIN, AND I WOULD ASK YOU -- WE'LL BEGIN WITH YOU, MR. VENABLE.

**THE COURTROOM DEPUTY:** MR. VENABLE, IS THIS YOUR VERDICT?

**JUROR VENABLE:** YES.

**THE COURTROOM DEPUTY:** MS. LEBLANC, IS THIS YOUR VERDICT?

**JUROR LEBLANC:** YES.

**THE COURTROOM DEPUTY:** MS. FORTUNE, IS THIS YOUR VERDICT?

**JUROR FORTUNE:** YES.

**THE COURTROOM DEPUTY:** MR. PAVLOVICH, IS THIS YOUR VERDICT?

**JUROR PAVLOVICH:** YES.

**THE COURTROOM DEPUTY:** MS. HERRERA, IS THIS YOUR VERDICT?

**JUROR HERRERA:** YES.

**THE COURTROOM DEPUTY:** MR. LEWIS, IS THIS YOUR VERDICT?

**JUROR LEWIS:** YES.

**THE COURTROOM DEPUTY:** MR. SOUTHALL, JR., IS THIS YOUR VERDICT?

**JUROR SOUTHALL:** YES.

**THE COURTROOM DEPUTY:** MR. HARRIS, IS THIS YOUR VERDICT?

**JUROR HARRIS:** YES.

**THE COURTROOM DEPUTY:** AND, MR. ZHOU, IS THIS YOUR VERDICT?

**JUROR ZHOU:** YES.

**THE COURT:** THANK YOU, LADIES AND GENTLEMEN.

LET THE RECORD REFLECT THAT THE POLLING CONFIRMS THE UNANIMOUS VERDICT OF THE JURY. I WILL ORDER THAT THE VERDICT BE PLACED -- ENTERED INTO THE RECORD AT THIS TIME.

LADIES AND GENTLEMEN, THANK YOU SO MUCH FOR JOINING US OVER THE PAST SEVERAL DAYS. THIS WENT A LOT LONGER THAN ANY OF US ANTICIPATED, BUT YOU ALL WERE VERY, VERY ATTENTIVE THROUGHOUT THIS TRIAL. AND ON BEHALF OF ALL PERSONS, CERTAINLY THE LAWYERS AND

THE PARTIES ASSOCIATED WITH THIS CASE, WE ALL THANK YOU VERY MUCH FOR EXERCISING REALLY YOUR DUTY OF CITIZENSHIP BY COMING DOWN HERE TO PRESIDE OVER THIS CASE.

SO YOU ARE NOW EXCUSED, WITH THE THANKS OF THE COURT AND EVERYONE INVOLVED. HOWEVER, I WILL ASK THAT YOU REMAIN JUST ABOUT -- GIVE ME ABOUT FIVE MINUTES. I'D LIKE TO PERSONALLY MEET WITH YOU AND ADDRESS YOU AND THANK YOU IN PERSON, SO I'LL SEE YOU IN ABOUT FIVE MINUTES.

LET'S ALL RISE.

**(WHEREUPON, THE JURY IS OUT OF THE COURTROOM.)**

**THE COURT:** ALL RIGHT. FIRST OF ALL, LET ME THANK ALL OF YOU FOR PUTTING ON A TERRIFIC CASE -- CASES. THIS WAS A VERY TOUGH CASE. WE KNEW THAT THIS WOULD BE A VERY CHALLENGING CASE FOR THE JURY TO SIT THROUGH ALL OF THE EVIDENCE AND TO CONSIDER ALL OF THE TESTIMONY. ESPECIALLY THE VOLUME OF EXPERT TESTIMONY WAS -- AGAIN, I THINK MAYBE I'M SPECULATING HERE, OF COURSE -- BUT A CHALLENGE TO THE JURY.

NONETHELESS, LET ME COMMEND ALL OF THE LAWYERS FOR DOING A TERRIFIC JOB ON REPRESENTING YOUR CLIENTS. MY HAT GOES OFF TO ALL OF YOU.

**(OFF THE RECORD)**

**THE COURT:** NOW, I JUST CONFERRED, AS YOU SAW, WITH MY COURT REPORTER TO DETERMINE WHEN WE CAN HAVE A TRANSCRIPT. I DON'T LIKE TO ORDER -- OR SET DEADLINES FOR THE FILING OF POST-TRIAL BRIEFS UNTIL I HAVE A SENSE OF WHEN WE CAN GET THE TRANSCRIPTS TO YOU ALL, ASSUMING YOU ORDER THE TRANSCRIPTS.

AND UNFORTUNATELY WE'RE BACKED UP RIGHT NOW WITH -- WE'VE GOT A LOT OF CRIMINAL MATTERS THAT ARE PROCEEDING THAT SHE'S WORKING ON, SO IT LIKELY WILL NOT BE FOR ANOTHER 30 TO 40 DAYS THAT WE COULD EVEN GET A TRANSCRIPT TO YOU ALL. BUT YOU ALL WILL BE NOTIFIED WHEN THE TRANSCRIPT IS PREPARED.

I WOULD URGE YOU TO GO ON AND GET YOUR ORDER IN NOW SO SHE CAN GET ON IT AS SOON AS PRACTICAL. AND GIVEN THE LENGTH OF THIS TRIAL AND THE ISSUES IN THE CASE, I'M LIKELY TO GIVE YOU AT LEAST 30 DAYS TO SUBMIT YOUR POST-TRIAL BRIEFS AFTER THE TRANSCRIPT IS AVAILABLE.

ANY QUESTIONS ABOUT THAT?

**MR. SHEPPARD:** NO, YOUR HONOR. I GUESS -- TO THE EXTENT WE'VE ORDERED ROUGHS ALREADY, I GUESS THOSE COULD JUST BE CONVERTED INTO CERTIFIED COPIES?

**THE COURT:** WELL, THEY COULD. SHE'S STARTED THE PROCESS, OBVIOUSLY, BUT IT'S STILL GOING TO TAKE SOME TIME. WE'VE GOT SOME THINGS THAT WE'RE WAITING

ON. BUT YES, HOPEFULLY THAT WILL EXPEDITE MATTERS.

**MR. SHEPPARD:** I JUST DIDN'T KNOW IF WE NEED TO SEND A SECOND REQUEST FOR CERTIFIED COPIES OR JUST INFORMAL SORT OF --

**THE COURT:** YES, YOU'RE GOING TO HAVE TO MAKE YOUR REQUEST -- YOUR FORMAL REQUEST FOR THE TRANSCRIPT FOR THE ENTIRE TRIAL.

**MR. SHEPPARD:** YES, YOUR HONOR.

**THE COURT:** AND I THINK THAT'S ALL WE HAVE TO -- OH. THE OTHER THING IS WE STILL HAVE SOME REMAINING ISSUES IN THIS CASE, LIMITATION ISSUES. AND SO WHAT I'M GOING TO ORDER IS THAT YOU MEET AND CONFER AND FILE TO THE COURT A JOINT STATUS REPORT IDENTIFYING THE REMAINING ISSUES TO BE ADDRESSED BY THE COURT. AND I'D LIKE THAT FILED WITHIN THE NEXT 14 DAYS. AND THAT WILL BE INCLUDED IN THE MINUTE ENTRY. I WILL NOT ISSUE A SPECIFIC OR STAND-ALONE ORDER ON THAT, BUT IT WILL BE INCLUDED IN THE MINUTE ENTRIES. ANY QUESTIONS ABOUT THAT?

WELL, LISTEN, THANK YOU ALL VERY MUCH FOR, AGAIN, BEING WELL PREPARED FOR THIS CASE -- THERE IS NO QUESTION ABOUT THAT -- AND FOR YOUR EFFORTS. AND AGAIN, YOU WILL LEARN MORE ABOUT THE COURT'S SCHEDULING ORDERS WHEN I ISSUE THE SCHEDULING ORDER FOR THE POST-TRIAL BRIEFS. OKAY? I HOPE Y'ALL

HAVE A GOOD EVENING AND Y'ALL HAVE A GOOD NIGHT.

COURT IS ADJOURNED.

(WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

C E R T I F I C A T E

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED NUMBERED MATTER.

S:/NATALIE W. BREAUX

NATALIE W. BREAUX, RPR, CRR

OFFICIAL COURT REPORTER