UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| MCARTHUR GRIFFIN<br>**Plaintiff**<br><br>VERSUS<br><br>REC MARINE LOGISTICS, LLC, ET AL<br>**Defendants** | CIVIL ACTION NO: 3:20-cv-00092-BAJ-EWD<br><br>DISTRICT JUDGE:<br>HON. BRIAN A. JACKSON<br><br>MAGISTRATE JUDGE:<br>HON. ERIN WILDER-DOOMES |
|---|---|

## AMENDED AND SUPPLEMENTAL MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

**MAY IT PLEASE THE COURT:**

Defendant, REC Marine Logistics, LLC ("REC Marine"), hereby submits this Amended and Supplemental Memorandum in Support of Renewed Motion for Judgment as a Matter of Law regarding plaintiff's maintenance and cure claim, as well as the issue of punitive damages.

### I.    LITIGATION BACKGROUND

#### A. Pertinent Procedural History

The Plaintiff, McArthur Griffin, was employed by REC Marine Logistics, LLC ("REC Marine") as a deckhand onboard a vessel named the M/V DUSTIN DANOS. Plaintiff alleges he sustained injury to his left shoulder, neck, and back on May 2, 2018, when he was struck by a personnel basket being lifted from the deck of the M/V DUSTIN DANOS to a nearby platform by a crane on the platform.[1] Griffin filed suit against REC Marine, Offshore Transport Services, LLC ("Offshore Transport"), and QBE Insurance (Europe) Ltd. ("QBE"), alleging claims for Jones Act

---

[1] Griffin had previously provided various dates on which the accident allegedly occurred. However, at trial he maintained that the accident occurred on May 2, 2018. (See e.g., Closing argument of Plaintiff's counsel, trial transcript for May 1, 2023, pg. 89)

negligence, unseaworthiness, and maintenance and cure. The maintenance and cure claim was exclusively against REC Marine, which was Griffin's employer.

A jury trial proceeded against REC Marine, Offshore Transport, and QBE from April 25, 2023 through May 1, 2023. At the close of the Plaintiff's case, and again at the close of all the evidence, REC Marine moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). More particularly, REC Marine sought dismissal of Plaintiff's maintenance and cure claim, as well as the punitive damages alleged in connection therewith.[2] Regarding the maintenance and cure claim, which pertained to alleged left shoulder, neck and back injuries, defense counsel argued that such should be dismissed for the following reasons (among others): (1) Plaintiff had already been paid full maintenance and cure benefits for his alleged shoulder injury until he was declared to be at maximum medical improvement (MMI), which is all the law requires; (2) Plaintiff remained at MMI with respect to his shoulder at the time of trial; (3) The evidence showed that Plaintiff did not sustain injury to his neck or back in the subject accident; and (4) Even if Plaintiff did sustain injury to his neck or back, REC Marine established a valid *McCorpen* defense with respect to these injuries. As to punitive damages, REC Marine argued that such damages were not warranted because Plaintiff had already been paid all maintenance and cure benefits to which he was entitled (*i.e.*, for his left shoulder). Moreover, Griffin was paid what amounted to his full wages until he was declared at MMI with respect to his left shoulder injury. Defendant further argued that, even if the jury were to find additional maintenance and cure benefits were owed and not paid, there was no evidence that the failure to pay such benefits was willful, wanton and arbitrary such that punitive damages would be appropriate. In fact, the evidence was to the contrary.

---

[2] The maintenance and cure and punitive damage claims could only be asserted against REC Marine as REC Marine was the Plaintiff's employer.

The Court denied REC Marine's Rule 50(a) motion seeking dismissal of the maintenance and cure claim. The motion was also denied insofar as it sought dismissal of punitive damages, although the Court noted this was a "much closer call," reserving the right to reconsider the issue.[3] On May 1, 2023, a verdict was returned for the Plaintiff.[4] As relevant to this Motion, the jury found Griffin sustained injury to his shoulder and neck, but not his back, as a result of the personnel basket incident.[5] The jury further found Plaintiff had not reached maximum medical cure with respect to his shoulder and neck, rendering an award of $10,000 for maintenance benefits.[6] The verdict form listed no amount for cure, likely because the jury instructions stated if the jury chose to award medical expenses on the Jones Act or unseaworthiness claims, they should not award cure for the same period. The jury awarded past medical expenses of $10,000 and future medical expenses of $686,700.[7] Judgment on the jury's verdict was entered into the record on May 5, 2023.[8]

## B. Alleged Injuries and Maintenance and Cure Issues

### 1. Left Shoulder

As noted above, the jury found that Griffin injured his left shoulder in the personnel basket incident on May 2, 2018. Plaintiff began treating with Dr. Brett Casey on July 2, 2018, who diagnosed him with a rotator cuff tear. On September 6, 2018, Dr. Casey recommended left shoulder arthroscopic surgery.[9] The surgery was performed on September 25, 2018.[10] Griffin subsequently underwent several months of physical therapy and had monthly follow-up visits with

---

[3] See trial transcript from May 1, 2023, pg. 64
[4] R. Doc. 212
[5] R. Doc. 212, pgs. 1-2
[6] R. Doc. 212, pgs. 6-7
[7] R. Doc. 212, pg. 5
[8] R. Doc. 215
[9] See Joint Trial Exhibit 26, attached hereto as Exhibit 1, GRIFFIN 000659 - 000661
[10] Exhibit 1, GRIFFIN 000677 - 000678

Dr. Casey. On June 5, 2019, Dr. Casey reported that Plaintiff was "doing great with regard to his shoulder he has full range of motion and improving strength."[11] He further stated "I feel he is at maximum medical improvement with regard to the shoulder."[12] It is undisputed that REC Marine paid maintenance benefits and for all of plaintiff's medical treatment (*i.e.,* cure) through June 5, 2019, when Dr. Casey declared him to be at MMI.[13] As a measure of good faith, Griffin was also paid what amounted to his full wages during this time.[14]

There was no testimony or evidence introduced at trial to rebut the fact that Plaintiff's shoulder was at MMI. REC Marine's IME physician, Dr. Charles Haddad, stated he agreed with Dr. Casey that Griffin reached MMI with respect to his left shoulder as of June 2019 and needed no further treatment.[15] Even Griffin's current treating physician, Dr. Craig Greene, testified that he had not seen Plaintiff in nearly a year, and had not recommended any further surgery.[16] Perhaps most significantly, Plaintiff's counsel acknowledged in closing argument that his client had reached MMI for his shoulder.[17] In going through the verdict form, counsel asked the jury to check "yes" to the question of whether Griffin was at MMI for the shoulder.[18]

   2. **Neck and Back**

REC Marine provided overwhelming evidence that Plaintiff did not injure his neck or back in the alleged personnel basket incident and was therefore not entitled to maintenance and cure on account of those claimed injuries. The jury agreed as to the claimed back injury. Concerning Griffin's neck, Defendant notes that Plaintiff personally completed two separate incident reports,

---

[11] Exhibit 1, GRIFFIN 000732 - 000733
[12] *Id.*
[13] See Joint Trial Exhibit 7, attached hereto as Exhibit 2; Joint Pre-Trial Order (R. Doc. 155, pg. 7); See also testimony of Brian Harris, trial transcript for May 1, 2023, pg. 20-22
[14] Exhibit 2; See also testimony of Brian Harris, trial transcript for May 1, 2023, pgs. 20-22
[15] See testimony of Dr. Charles Haddad, trial transcript for April 27, 2023, pg. 266; pgs. 280-281
[16] See testimony of Dr. Craig Greene's, trial transcript for April 26, 2023, pg. 285-286
[17] See closing argument of Plaintiff's counsel, trial transcript for May 1, 2023, pg. 105-106
[18] *Id.*

4

one on May 5, 2018 (3 days after the personnel basket incident) and another on June 20, 2018 (49 days after the personnel basket incident).[19] Neither report states that he hurt his neck.[20] On May 14, 2018, Plaintiff was evaluated at Occupational Medicine Services in Houma, Louisiana, with a complaint of left shoulder pain.[21] There is no reference to any accident impacting his neck whatsoever, and certainly no reference to a neck injury or pain.[22] In fact, Griffin filled out multiple forms, including a questionnaire which asked whether he had ever had neck or back problems. Plaintiff checked "no."[23] A separate form asked, "What is your injury/complaint", and Plaintiff wrote "my left shoulder."[24] This was not someone's interpretation of Mr. Griffin's complaint, these were his own words written in his own handwriting. He was diagnosed with a left shoulder contusion and released to full duty work.[25] On the same day, Griffin completed a written statement indicating he felt good enough to go back to work.[26] Again, there was no mention of a neck injury. He continued working until June 29, 2018.

As previously discussed, Griffin was first seen by Dr. Brett Casey on July 2, 2018, reporting only left shoulder pain.[27] He was given various diagnoses with respect to his left shoulder.[28] Plaintiff did not report a neck injury or any pain or symptoms related to his neck.[29] Three days later, on July 5, 2018 (more than two months after the alleged personnel basket incident), Plaintiff

---

[19] See Joint Trial Exhibit 4, attached hereto as Exhibit 3, REC 000001 - 000002
[20] Exhibit 3, REC 000001 - 000002
[21] See Joint Trial Exhibit 20, attached hereto as Exhibit 4, GRIFFIN 001439 - 001451
[22] Exhibit 4, GRIFFIN 001439 - 001451
[23] Exhibit 4, GRIFFIN 001439
[24] Exhibit 4, GRIFFIN 001444
[25] Exhibit 4, GRIFFIN 001441 and GRIFFIN 001451
[26] See Joint Trial Exhibit 6, attached hereto as Exhibit 5, REC 000004
[27] Exhibit 1, GRIFFIN 000641 - 000644
[28] *Id.*
[29] *Id.*; See also trial testimony of Dr. Brett Casey, attached hereto as Exhibit 6, pg. 20 (Dr. Casey's testimony was presented by way of deposition, and therefore was not re-transcribed as part of the official trial transcript)

gave a recorded statement to an insurance adjuster for REC Marine during which the following exchange occurred:

> Q: So your pain, the injury from these incidents, that's pretty much confined to your left shoulder area, correct?
>
> A: Yea.
>
> Q: Alright. Any other parts of your body were injured?
>
> A: No.[30]

Griffin treated with Dr. Casey and a physical therapist countless times in the months that followed and did not report any neck pain, injury, or symptoms. On April 10, 2019, almost a year after the personnel basket accident, Plaintiff's physical therapist wrote to Dr. Casey that when he saw Griffin two days prior (April 8, 2019), he reported cervical pain.[31] This is the first time any medical provider stated that Plaintiff told them of cervical symptoms.[32] Dr. Casey saw Plaintiff on April 10, 2019, noting that his shoulder was "doing great," but that Griffin was "mainly complaining of neck pain today."[33] Plaintiff was prescribed medication for his pain.[34] He returned to Dr. Casey on May 1, 2019, and stated that his neck was not hurting.[35]

---

[30] See excerpt from Defense Exhibit 8, attached hereto as Exhibit 7. (The excerpt was originally played at trial as an audio recording, but for purposes of this motion, REC Marine is submitting a transcription of the relevant portion which was previously provided to the Court); See also testimony of Brian Harris, trial transcript for May 1, 2023, pgs. 25-26
[31] See Joint Trial Exhibit 41, attached hereto as Exhibit 8, GRIFFIN 000951; See also Exhibit 1, GRIFFIN 000715
[32] See testimony of Dr. Charles Haddad, trial transcript for April 27, 2023, pgs. 273-274; See also testimony of the Plaintiff, trial transcript for April 27, 2023, pgs. 234-236
[33] Exhibit 1, GRIFFIN 000718 - 000720
[34] *Id.*
[35] Exhibit 1, GRIFFIN 000725 - 000727

Dr. Casey last saw Griffin on June 5, 2019. As mentioned previously, his shoulder was doing well and Dr. Casey stated he was at MMI.[36] However, Griffin again reported neck pain.[37] Dr. Casey noted incidental cervical findings which he did not believe were related to the subject accident, but recommended a cervical MRI because of Plaintiff's complaints.[38] In order to evaluate if the cervical MRI should be authorized as part of maintenance and cure, and out of an abundance of caution, an insurance adjuster for REC Marine requested Dr. Casey's formal written opinion on whether Griffin's neck issues were causally related to his alleged accident on the M/V DUSTIN DANOS. On June 12, 2019, Dr. Casey wrote a letter to the adjuster stating, in pertinent part, as follows:

> I am in receipt of your request regarding my opinion as to whether Mr. Griffin's neck condition is related to his shoulder condition. Currently his shoulder is at maximum medical improvement and he is doing quite well. He has continued to complain of off and on neck pain, but that did not start until well after his initial injury; therefore, based on that information it is my opinion that Mr. Griffin's neck condition although present is not related to his injury on the boat.[39]

In response to the extensive evidence discussed above, Griffin notes that on June 29, 2018 (3 days before he first saw Dr. Casey) he underwent an MRI of his shoulder at a facility affiliated with Gulf Coast Orthopedics (the clinic where Dr. Casey practices). In connection with the MRI, Plaintiff filled out a "pain diagram" wherein he placed an "x" on the left trapezius (not the neck) of a drawing of the human body, as well as a faint mark on the left hand.[40] The MRI report listed

---

[36] Exhibit 1, GRIFFIN 000731 - 000733
[37] Id.
[38] Id.
[39] Exhibit 1, GRIFFIN 000730
[40] Exhibit 1, GRIFFIN 000637

a history of "Trapezius and anterior left shoulder pain. Triceps burning."[41] There was no mention of neck pain or symptoms. At trial, Plaintiff argued that the markings on the pain diagram (one of which is barely discernible) were actually an indication he was experiencing cervical radiculopathy stemming from the personnel basket incident. To be clear, this is the **only** document in all the medical records introduced at trial which Plaintiff relies on to support his contention that he reported what could arguably be construed as a neck condition sometime prior to April 8, 2019, nearly a year after the accident. It is worth mentioning that this pain diagram which Plaintiff relies so heavily on was completed 59 days after he was allegedly struck by the personnel basket. Even Plaintiff's own expert orthopedic surgeon, Dr. David Ferachi, testified that two months is the absolute outer bounds of when an initial report of cervical symptoms could be causally related back to a traumatic injury.[42] Conveniently, Mr. Griffin comes approximately 24 hours within Dr. Ferachi's outer limit. Dr. Charles Haddad testified that the outer limit would be four to six weeks.[43]

After he was released to return to work by Dr. Casey in June of 2019, Plaintiff decided to switch physicians to Dr. Craig Greene. He saw Dr. Greene on August 20, 2019, with complaints of shoulder and neck pain.[44] A cervical x-ray revealed mild degenerative changes and no acute findings.[45] Dr. Greene ordered a cervical MRI. On January 7, 2020, Dr. Greene also ordered an EMG/nerve conduction study to evaluate whether Plaintiff's symptoms were being caused by a condition known as cervical radiculopathy.[46] The EMG/nerve conduction study was performed by a neurologist named Dr. Brian Murphy on March 11, 2020, and revealed no cervical radiculopathy, the exact cervical condition plaintiff claims he is suffering from.[47] The conclusion from Dr.

---

[41] Exhibit 1, GRIFFIN 000633
[42] See testimony of Dr. David Ferachi, trial transcript for April 25, 2023, pgs. 128-129
[43] See testimony of Dr. Charles Haddad, trial transcript for April 27, 2023, pg. 274 and pg. 284
[44] See Joint Exhibit 22, attached hereto as Exhibit 9, GRIFFIN 000079 - 000081
[45] Exhibit 9, GRIFFIN 000079 - 000081
[46] Exhibit 9, GRIFFIN 000076 - 000077
[47] Exhibit 9, GRIFFIN 000082 - 000083

Murphy's report states "Normal study with no evidence of a left-sided cervical radiculopathy, brachial plexopathy, or any peripheral nerve pathology involving the left upper extremity."[48] Although Dr. Ferachi explained that an EMG/nerve conduction study is not always 100% accurate, both Dr. Greene and Dr. Casey testified that the test is useful for evaluating possible cervical radiculopathy.[49] Dr. Greene further confirmed that an EMG/nerve conduction study is "generally accepted in the field of orthopedic surgery as an appropriate test to determine whether someone is having cervical radiculopathy."[50]

Griffin's first and only appointment with Dr. David Ferachi was on December 29, 2020.[51] He presented with neck pain rated 2 out of 10 and left shoulder and arm pain rated 3 out of 10.[52] Dr. Ferachi noted the MRI finding of a cervical disc herniation. He also reviewed the EMG/NCS results. Despite the test finding no evidence of cervical radiculopathy, Dr. Ferachi diagnosed Griffin with cervical radiculopathy.[53] He indicated Plaintiff was "a candidate for more physical therapy, cervical epidural steroid injections, or…a C6-7 anterior cervical discectomy and fusion."[54] Plaintiff was reportedly going to consider his options and let Dr. Ferachi know what he decided. However, Dr. Ferachi never heard from Griffin again.[55]

After Plaintiff was seen by Dr. Ferachi, REC Marine did not simply rely on the opinion of Plaintiff's initial treating physician (Dr. Casey) to deny payment for plaintiff's alleged neck injury. Rather, it took the cautious approach and arranged for an examination with Dr. Charles Haddad. An IME was conducted on April 6, 2021, and Dr. Haddad subsequently issued a report. As he

---

[48] *Id.*
[49] See testimony of Dr. Craig Greene, trial transcript for April 26, 2023, pgs. 273-275; See also Exhibit 6, pgs. 55-56
[50] See testimony of Dr. Craig Greene, trial transcript for April 26, 2023, pg. 275
[51] Exhibit 9, GRIFFIN 000067 - 000069
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] See testimony of Dr. David Ferachi, trial transcript for April 25, 2023, pgs. 140-141

testified at trial, Dr. Haddad found that Griffin's neck issues were not related to the alleged incident on the M/V DUSTIN DANOS.[56]

### 3. Prior Injuries and Plaintiff's Failure to Disclose

As part of its maintenance and cure investigation, REC Marine learned that Griffin was involved in two prior serious car accidents. The first occurred in 1994 when Plaintiff was traveling in a car with several people and was involved in a wreck. Griffin and the other individuals filed suit in 1995.[57] It was alleged that each of them "received various injuries, all of which necessitated extensive medical treatment…"[58] Although the injuries were not specified and Plaintiff has always denied he was injured, at trial he conceded that he "hurt the top part of my back or something…"[59]

More recently, Griffin was involved in a car accident in 2013 wherein he was rear-ended. He filed suit in the 15th Judicial District Court for Lafayette Parish in 2014. Plaintiff alleged that, as a result of the accident, he "suffered severe and permanent injuries to the structure, tissue, and musculature of his body, which injuries include, but are not limited to, injuries to his lower back, back, and neck, along with other parts of his body."[60] Damages alleged included past and future medical expenses and past and future wage loss.[61]

Plaintiff was hired by REC Marine in April of 2016 and did not disclose the injuries sustained in the above-referenced car accidents. He completed an employment application on April 19, 2016.[62] A section of the application asked, "Have you ever been a party (either plaintiff or

---

[56] See testimony of Dr. Charles Haddad, trial transcript for April 27, 2023, pg. 267
[57] See Defendants' Exhibit 2, attached hereto as Exhibit 10, REC 1863 – 1866
[58] Id.
[59] See testimony of the Plaintiff, trial transcript for April 27, 2023, pgs. 208-209
[60] See Defendants' Exhibit 1, attached hereto as Exhibit 11, REC 1894 - 1897
[61] Id.
[62] See portion of Joint Trial Exhibit 8, attached hereto as Exhibit 12, REC 000864 - 000866

defendant) to a lawsuit or civil action …If so, for each lawsuit please provide the following… [Parties to Lawsuit, Court or Parish/County, Brief Explanation of Claims]." Griffin left this section blank.[63] When questioned at trial regarding whether he thought REC Marine would have wanted to know he filed a lawsuit alleging neck and back injuries only two years before applying for a job at REC Marine, he responded "Yes, sir. I'm pretty sure they probably would want to know."[64] He acknowledged REC Marine would want to know this information to determine whether he was physically capable of performing the job of a deckhand.[65]

## II. LAW AND ARGUMENT

### A. Fed. R. Civ. P. 50

Pursuant to Rule 50 of the Federal Rules of Civil Procedure, a party is required to "specify the judgment sought and the law and facts that entitle the movant to the judgment" upon motion at trial before the jury renders its verdict. Fed. R. Civ. P. 50(a). "If the pre-verdict motion is denied, then the party can renew its motion under Rule 50(b). But the renewed Rule 50(b) is 'technically only a renewal of the [Rule 50(a) motion for judgment as a matter of law].'" *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 290 (5th Cir. 2019). According to Rule 50(b), "If the court does not grant a motion for judgment as a matter of law under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."

Judgment as a matter of law under Rule 50 is appropriate when "after considering all the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion, the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes reasonable jurors could not arrive at a contrary verdict." *Bellows v. Amoco Oil*

---

[63] *Id.*
[64] See testimony of the Plaintiff, trial transcript for April 27, 2023, pgs. 217-218
[65] *Id.*

11

*Co.*, 118 F.3d 268, 273 (5th Cir. 1997). To defeat a Rule 50 motion, "the party opposing the motion must at least establish a conflict in substantial evidence on each essential element of [its] claim." *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins, Co.*, 898 F.3d 461, 473 (5th Cir. 2018) (quoting *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1039 (5th Cir. 2011)). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quoting *Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 485 (5th Cir. 2017)).

### B. Plaintiff is Not Entitled to Maintenance and Cure

A Jones Act seaman's right to maintenance and cure terminates when a doctor provides a qualified medical opinion stating that the seaman has reached maximum medical cure. *Great Lakes Dredge & Dock Co. v. Martin*, 2012 WL 3158870, *2 (E.D. La. 2012) (citing *Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1012 (5th Cir. 1994); *Breese v. AWI, Inc.*, 823 F.2d 100, 104-05 (5th Cir. 1987)). On June 5, 2019, Plaintiff's own treating physician, Dr. Brett Casey, determined he had reached that point for his left shoulder injury.[66] Plaintiff's counsel admitted at closing argument that his client's shoulder was at MMI.[67] An attorney's remarks, made in closing, constitute binding admissions against the party he represents. *Montano v. Orange County, Texas*, 842 F.3d 865, 882 (5th Cir. 2016). REC Marine fully paid all maintenance and cure benefits owed through June 5, 2019.[68] Nothing further was due.

The jury found Plaintiff did not injure his back in the personnel basket incident. As such, no maintenance and cure was owed on account of that alleged injury. The overwhelming evidence

---

[66] Exhibit 1, GRIFFIN 000732 - 000733
[67] See closing argument of Plaintiff's counsel, trial transcript for May 1, 2023, pg. 106
[68] Exhibit 2; Joint Pre-Trial Order (R. Doc. 155, pg. 7); See also testimony of Brian Harris, trial transcript for May 1, 2023, pg. 20

also established Griffin did not injure his neck in that incident, although the jury found otherwise. Even if the Court is not inclined to vacate the jury's finding in this regard, Plaintiff is not entitled to maintenance and cure for his alleged neck injury for an additional reason. An employer such as REC Marine is entitled to rely on certain legal defenses to a claim for maintenance and cure. In a case called *McCorpen v. Central Gulf Steamship Corp.,* the U.S. Fifth Circuit Court of Appeals held that a seaman who "knowingly fails to disclose a pre-existing physical disability during his [or her] pre-employment physical examination" may not recover maintenance and cure. *Meche v. Doucet*, 777 F.3d 237, 244 (5th Cir. 2015). In order to establish a *McCorpen* defense, an employer must show that (1) the Plaintiff intentionally misrepresented or concealed medical facts; (2) the non-disclosed facts were material to the employer's decision to hire the Plaintiff; and (3) a connection exists between the withheld information and the injury complained of in the lawsuit. *Meche*, 777 F.3d at 244-45. Where the employer does not require a pre-employment medical examination or interview, the rule is that a seaman must disclose a past illness or injury only when in his own opinion the employer would consider it a matter of importance. *Id.*

All elements of the *McCorpen* defense are satisfied here. When Plaintiff was hired by REC Marine in 2016, he admittedly did not disclose that he "suffered severe and permanent injuries" to his neck in a car accident for which he filed suit in 2014.[69] Griffin candidly acknowledged on the witness stand that in his own opinion, REC Marine would have considered this a matter of importance because REC Marine needed to determine whether he was physically capable of performing the job of a deckhand.[70] By admitting this, Griffin acknowledged that the information was material to REC Marine's decision to hire him. With respect to the third element of the *McCorpen* defense (causal connection), it is sufficient that the prior injury and the injury for which

---

[69] Exhibit 12, REC 000864 - 000866
[70] See testimony of the Plaintiff, trial transcript for April 27, 2023, pgs. 217-218

entitlement to maintenance and cure is sought are to the same body part. *Johnson v. Cenac Towing*, 599 F.Supp.2d 721, 728-29 (E.D. La. 2009) ("the *McCorpen* defense will succeed if the defendant can prove that the old injury and the new injury affected the same body part."); *Chapman v. Spartan Offshore Drilling, LLC*, 2016 WL 1393490, at *5 (E.D. La. 2016)("The link between prior and present injuries does not necessarily need to occur to the exact same vertebrae or tissue but rather in the same location on the body."). Plaintiff's alleged injury in this case and the one sustained in the above-referenced car accident were both to his neck.

### C. Punitive Damages Were Not Warranted

The burden a seaman must meet to be awarded punitive damages on a maintenance and cure claim is extremely high. Under the general maritime law, a seaman may recover punitive damages "for the willful and wanton disregard of the maintenance and cure obligation." *Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 424 (2009). A shipowner who arbitrarily and capriciously denies maintenance and cure can be liable for punitive damages. *Yelverton v. Mobile Laboratories, Inc.*, 782 F.2d 555, 558 (5th Cir. 1986). The willful and wanton conduct necessary to justify an award of punitive damages requires an element of bad faith. *Nelton v. Cenac Towing Co., LLC*, 2011 WL 289040, *22 (E.D. La. 2011) (quoting *Harper v. Zapata Offshore Co.*, 741 F.2d 87, 90 (5th Cir. 1984)). Bad faith may be inferred from an employer's "complete failure to consult a medical source in deciding to terminate maintenance and cure payments." *Nelton*, 2011 WL 289040, at *22. However, an employer "does not act arbitrarily and capriciously by relying on one medical opinion over another." *Smith v. Florida Marine Transporters, Inc.*, 2011 WL 2580625, *3 (E.D. La. 2011) (dismissing punitive damages claim on summary judgment and stating "Dr. Cenac opined Smith's need for the [surgery] was the result of a long-standing and degenerative condition, not acute trauma. Although, Smith's physician, Dr. Brown, disagrees…an

14

employer is entitled to perform an investigation, and does not act arbitrarily and capriciously by relying on one medical opinion over another."); See also *Harrell v. Dixon Bay Transp. Co.*, 718 F.2d 123, 129-30 (5th Cir. 1983) (affirming judgment n.o.v. on the issue of punitive damages and attorney's fees in favor of employer who ceased maintenance and cure payments on the advice of seaman's treating physicians).

Simply put, Plaintiff does not come close to meeting the high bar necessary to support an award of punitive damages. When REC Marine moved for judgment as a matter of law during trial, the Court noted it was a "close call" as to whether the jury should even be allowed to consider punitive damages.[71] One would assume the Court did not envision that the jury would return a punitive damage award of $1,500,000, which is vastly higher than any punitive damage award on a maintenance and cure claim ever awarded by any Louisiana court (state or federal).[72] Perhaps most telling as to the shocking nature of this award was that in reading the jury verdict form, the Court's clerk initially stated that punitive damages were $1,500. Only after seeking confirmation from the Court did the clerk declare the award was actually $1,500,000. While we may never know why the jury made such an award, it is clear something went quite wrong.

There is absolutely no evidence that REC Marine acted in a willful, wanton or arbitrary manner with respect to the decisions it made regarding maintenance and cure. Arbitrary can be defined as being "based on whim or personal preference, without reason or pattern."[73] REC Marine's actions certainly were not "without reason" or "based on a whim." Rather, there was an immense amount of evidence to justify denial of maintenance and cure after June 5, 2019. As already discussed at length, no maintenance and cure was owed after that date on account of

---

[71] See trial transcript from May 1, 2023, pg. 64
[72] Comparative punitive damage awards will be discussed in REC Marine's Amended and Supplemental Motion for New Trial and/or Remittitur.
[73] See definition of "arbitrary" from Dictionary.com, based on the Random House Unabridged Dictionary

Plaintiff's shoulder injury because he was at MMI. Reasons justifying denial of maintenance and cure related to Griffin's claimed neck injury include:

1. Failure to report a neck injury or pain on two separate accident reports[74]

2. No report of (and in fact denial of) neck pain at Occupational Medicine Services on May 14, 2018[75]

3. Continuing to work for nearly 2 months after the subject accident

4. No report of neck pain to Plaintiff's physical therapist until almost a year after the subject accident despite months of treating with the physical therapist[76]

5. A recorded statement given by Griffin to an insurance adjuster on July 5, 2018, wherein he denied injury to any part of his body other than his shoulder[77]

6. The opinion of Dr. Brett Casey (a treating physician) that any neck/cervical issues were not related to the accident on the M/V DUSTIN DANOS[78]

7. An EMG/NCS which was negative for cervical radiculopathy as reported by Plaintiff's own neurologist, Dr. Brian Murphy[79]

8. Dr. Charles Haddad's opinion that Plaintiff's neck issues were not related to the accident on the M/V DUSTIN DANOS[80]

9. REC Marine arguably had a viable *McCorpen* defense, even if the jury did not ultimately agree

Against this vast amount of evidence, Plaintiff points to one "x" mark over the trapezius (not the neck) and an almost indiscernable mark on the left hand of a pain diagram completed on June 29, 2018, 59 days after he claims his neck was injured. Even Dr. Ferachi acknowledged that two months is the outer limit of when he could conceivably have related cervical symptoms back

---

[74] Exhibit 3, REC 000001 - 000002
[75] Exhibit 4, GRIFFIN 001439 - 001451
[76] Exhibit 8, GRIFFIN 000951; Exhibit 1, GRIFFIN 000715; See also testimony of Dr. Charles Haddad, trial transcript for April 27, 2023, pgs. 273-274
[77] Exhibit 7
[78] Exhibit 1, GRIFFIN 000731 – 000733; Exhibit 1, GRIFFIN 000730
[79] Exhibit 9, GRIFFIN 000082 - 000083
[80] See testimony of Dr. Charles Haddad, trial transcript for April 27, 2023, pg. 267

to the personnel basket incident on May 2, 2018.[81] Mr. Griffin conveniently comes approximately 24 hours within Dr. Ferachi's outer limit. As discussed above, Dr. Haddad stated that four to six weeks is the outer bounds of when an initial report of cervical symptoms could be causally related back to a traumatic injury.[82] Plaintiff's markings on this one diagram, to the extent they even represent symptoms of a cervical origin (which there is significant dispute over), fall well outside of this range.

It is important to highlight that even these two "markings" on the pain diagram do not constitute any type of diagnosis of a neck injury. And they certainly were no indication that REC Marine should pay for any medical treatment for a neck injury because <u>no treatment had been recommended at that time.</u> It was not until December 29, 2020, over two and a half years after the alleged accident, that Dr. David Ferachi saw Plaintiff and recommended either physical therapy for his neck, cervical epidural steroid injections, or a cervical fusion.[83] As previously discussed, Dr. Ferachi felt that Mr. Griffin's cervical symptoms and need for treatment were related to the personnel basket incident, an opinion with which Dr. Brett Casey disagrees. REC Marine reiterates that Dr. Ferachi saw the Plaintiff a grand total of one time, in contrast to Dr. Casey who treated him for nearly a year.

While this Honorable Court may ultimately choose not to vacate the jury's verdict on maintenance and cure entirely, REC Marine respectfully submits that allowing a punitive damage award of $1,500,000 to stand would be manifestly unjust. It is hardly difficult to imagine a scenario in which the jury found Plaintiff did not injure his neck in the personnel basket incident and was not entitled to maintenance and cure benefits beyond what he was already paid for his left shoulder.

---

[81] See testimony of Dr. David Ferachi, trial transcript for April 25, 2023, pgs. 128-129
[82] See testimony of Dr. Charles Haddad, trial transcript for April 27, 2023, pg. 274 and pg. 284
[83] Exhibit 9, GRIFFIN 000067 - 000069

To allow such an excessive punitive damage award under these circumstances would have a profound impact on the maritime and offshore industry, transforming maintenance and cure into a form of absolute liability at the risk of financially ruinous punitive damages. In a case such as this, which could have gone either way, a maritime employer will be forced to pay for what could be very expensive medical treatment for a questionable injury without being able to submit the issue to the jury first. Unless, of course, they want to risk being punished to the tune of $1,500,000. A cervical fusion alone could cost well over $100,000. If an employer guesses wrong out of fear and unnecessarily pays for treatment which a jury finds was unrelated or to which the employer had a viable defense, they are out of luck as the U.S. Fifth Circuit has held that a Jones Act employer cannot seek restitution of maintenance and cure benefits which were mistakenly paid. *Boudreaux v. Transocean Deepwater, Inc.*, 721 F.3d 723 (5th Cir. 2013). This is not a choice a Jones Act employer should be forced to make.

### III. CONCLUSION

For all of the foregoing reasons, REC Marine respectfully requests that this Honorable Court vacate the jury's award of maintenance and cure and punitive damages and render judgment in favor of REC Marine with respect to these issues.

Respectfully submitted,

***/s/ Kyle A. Khoury***
Salvador J. Pusateri, T.A. (#21036)
Kyle A. Khoury (#33216)
Kristian B. Dobard (#36997)
**PUSATERI, JOHNSTON, GUILLOT & GREENBAUM, LLC**
1100 Poydras Street, Suite 2250
New Orleans, Louisiana 70163
Telephone: (504) 620-2500
Facsimile: (504) 620-2510
Salvador.Pusateri@pjgglaw.com

Kyle.Khoury@pjgglaw.com
Kristian.Dobard@pjgglaw.com
**ATTORNEYS FOR REC MARINE LOGISTICS, LLC**