# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MCARTHUR GRIFFIN | § | |
| | § | |
| Plaintiff | § | |
| | § | CIVIL ACTION NO.: 3:20-92-BAJ-EWD |
| | § | |
| *Versus* | § | |
| | § | |
| REC MARINE LOGISTICS LLC, ET AL. | § | **TRIAL BY JURY DEMANDED** |
| | § | |
| Defendants | § | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT REC MARINE LOGISTICS, LLC'S MOTION FOR NEW TRIAL OR REMITTITUR[1]

Plaintiff, McArthur Griffin, files this Response in Opposition to REC Marine Logistics, LLC ("REC Marine") and Offshore Transport Services, LLC ("Offshore Transport") (collectively, "Defendants") Motion for New Trial or Remittitur ("Defendants' Motion").

With respect, there is no basis in fact for Defendants various positions. The five-day jury trial was free of genuine appealable issues. Indeed, evidence, jury charges and jury interrogatories were generally submitted without objection; opening statements and closing arguments were free of objections (although counsel for Defendants was cautioned by the Court about making argument during opening); and, there were very few objections during witness testimony. Nothing said or done engendered passion, prejudice or improper juror behavior. As to the jury verdict, the decision was unanimous and wholly consistent with the evidence. The overwhelming evidence supported each of the findings made by the jury.

---

[1] As part of Defendants' arguments overlap with those made in their Amended and Supplemental Motion for Judgment as a Matter of Law Plaintiff incorporates his Amended and Supplemental Response to Defendants Judgment as a Matter of Law herein.

## I.    GENERAL FACTUAL BACKGROUND

A.  THE INCIDENT

In May 2018,  Plaintiff suffered severe and significant injuries during a basket transfer operation that took place on the *M/V Dustin Danos* where, *inter alia*: (a) there is no documented Job Safety Analysis ("JSA") (presumably because Captain Michael Haglund failed to do it and REC Marine knowingly failed to enforce its policy that all JSA's must be documented in writing);[2] (b) Captain Haglund propelled the *M/V Dustin Danos* forward, stepped away from the controls, stopped supervising the personnel basket transfer operation, and began using his cell phone;[3] (c) Captain Haglund left Plaintiff on his own during a high risk operation;[4] (d) REC Marine and/or Offshore Transport failed to enforce its no-cell phone policy or failed to have a policy altogether;[5] (e) Defendants failed to ensure the crew was properly trained on policies and procedures designed to keep people safe, including their own safety policies,[6] conducting JSA's,[7] documenting JSA's,[8] and policies related to reporting incidents requiring medical attention.[9]  Plaintiff did his level best to prevent others from getting hurt.  *See* Trial Transcript Day 3 at 23:10-16.

---

[2] *See* Trial Transcript Day 3 at pgs. 119-22.

[3] *See* Trial Transcript Day 3 at pgs. 11-20, 23-24.

[4] *Id* at 23-24.

[5] *See* Trial Transcript Day 3 at pgs. 132-33 (Mr. Brian Harris ("Mr. Harris") recanting his sworn testimony that REC Marine had a no cell phone use policy for personnel operating vessels).

[6] *See* Trial Transcript Day 3 at pgs. 120-21 (Brian Harris, REC Marine's Health, Safety, and Environmental Manager testifying its written policy requiring JSA's to be documented in writing and sent to him is just a guideline that does not need to be followed).

[7] *See* Trial Transcript Day 2 at 307 (Commander Michael Lebsack ("Commander Lebsack") discussing REC Marine's dangerous practice in relying on crewmembers to review non-existent, pre-printed JSA's that do not take any conditions into account).

[8] *See* Trial Transcript Day 3 at pgs. 119-22.

[9] *See* Trial Transcript Day 2 at 329 (Commander Lebsack discussing standard requiring companies to report injuries to the U.S. Coast Guard within five days—which was not done here); *see also* Trial Transcript Day 3 125-26 (Mr. Harris confirming REC Marine's written policy required Captain Haglund to complete a written report documenting the Incident).

Immediately following the Incident, Plaintiff went to the wheelhouse to meet with Captain Haglund to discuss what happened.  *See* Trial Transcript Day 3 at 24:15-20. Mr. Badeaux accompanied Plaintiff to the meeting.  *Id*.  At the meeting, Captain Haglund: (a) denied seeing the Incident (presumably because he was on his phone at the time and did not want to get fired for his mid-operation cellphone use); (b) refused to allow Plaintiff to complete a report and document the Incident; (c) would not document the Incident himself; (c) minimized and disregarded the injuries Plaintiff reported to him; and (d) told Plaintiff he could lose his job if they had to take him off the vessel for treatment.  *Id*. at 24:21-25:2; 125-26; 226:24.

After the meeting, Plaintiff went to the galley to tend to his injuries, immediately identifying and reporting shoulder and neck pain to another crewmember. *See* Trial Transcript Day 3 at 154:25-155:11 (Plaintiff testifying that Mr. Badeaux checked to see if Plaintiff was okay); *see also* 25:16-26:11; 28:17-20  (Mr. Badeaux confirming this).

B. FOLLOWING THE INCIDENT, REC MARINE'S KNEE JERK REACTION WAS TO DENY PLAINTIFF MEDICAL CARE AND THREATEN TO FIRE HIM

Following the Incident, Plaintiff was threatened with termination and was denied medical care for nearly two weeks.  *See* Trial Transcript Day 3 at 156:13-157:4.  On May 14, 2018, Plaintiff was finally brought to Occupational Medicine Services by Mr. Harris—REC Marine's Health, Safety, and Environmental Manager.  *Id.* at 101:4-12.

C. PLAINTIFF URGES REC MARINE TO LET HIM SEE A DOCTOR (AGAIN)

No later than June 20, 2018, Plaintiff made renewed complaints of pain and asked to see a doctor.  *See* Exhibit 2 at p. 2 (Incident Reports).  REC Marine waited more than a week to have Plaintiff evaluated by an orthopedic physician.  *See* Exhibit 3 (Gulf Coast Orthopedics Records). Before being evaluated, Plaintiff completed paperwork for Dr. Brett Casey ("Dr. Casey"), which

documented his renewed complaints of shoulder and neck pain (and associated radicular symptoms). *See* Exhibit 3 at p. 13 (Gulf Coast Orthopedics Records).[10]

Dr. Casey only provided treatment for Plaintiff's shoulder. When Plaintiff's neck pain had not resolved following his rotator cuff surgery and associated physical therapy, Plaintiff renewed his neck complaints (yet again) in April 2019. *See* Exhibit 3 (Gulf Coast Orthopedics Records). A cervical MRI was recommended by Dr. Casey. *See* Exhibit 3 (Gulf Coast Orthopedics Records). REC Marine would not approve the MRI (this is not disputed).

### D. REC Marine Cuts Off Plaintiff's Maintenance and Cure

In June 2019, after denying Plaintiff the cervical MRI recommended by Dr. Casey, REC Marine terminated Plaintiff's maintenance and cure allegedly based on a letter written to an insurance adjuster that was rooted in the false premise that Plaintiff had not reported neck pain until a year after the Incident. Plaintiff reported neck pain immediately and again to Dr. Casey. Plaintiff's injuries were not healed when REC Marine terminated his maintenance and cure. *See generally* Medical Records and Testimony. In fact, he requires substantial treatment that REC Marine has been denying for years.

### E. Plaintiff Resumes Treatment (At His Own Expense)

In August 2019, after REC Marine cut off Plaintiff's maintenance and cure, Dr. Craig Greene ("Dr. Greene") examined the Plaintiff. *See* Exhibit 5 (Baton Rouge Orthopedics Clinic Records). The examination revealed, *inter alia,* shoulder pain (and associated range of motion

---

[10] Dr. Casey has agreed that the pain identified on the late-June 2018 pain diagram (a) is in the neck region; (b) could be caused by a problem in Plaintiff's neck, and (c) confirms that the symptoms identified, especially the pain in the hand/thumb, are consistent with radicular pain. *See* Exhibit 4 at 59:2-60:4 (Casey Deposition). REC Marine ignored this evidence in substance and when denying Plaintiff maintenance and cure.

issues), neck pain, and cervical radiculopathy.[11]   *See* Trial Transcript Day 2 at 230:7-23. Dr. Greene performed a Spurling test—which is done to test whether a nerve in the neck is being pinched—which revealed positive findings (*e.g.* radiculopathy).   *Id.* at 228:20-25. An MRI of Plaintiff neck was ordered and performed to confirm the diagnoses.   *See* Trial Transcript Day 1 at 96:2-4. The MRI *objectively* revealed a C6-C7 disc herniation in Plaintiff's neck.   *Id.* at 96:2-14; 98:24-99:9.[12]

F.   PLAINTIFF REPORTED A NECK INJURY TO DR. CASEY IMMEDIATELY

Dr. Casey agrees that the pain identified on the June 2018 pain diagram is in the neck area and could be caused by a problem in Plaintiff's neck.   *See* Exhibit 4 at 59:2-60:4 (Casey Deposition).   Moreover, Dr. Casey testified that the pain identified in Plaintiff's neck, shoulder, bicep, and thumb is indicative of radicular pain.   *See* Exhibit 4 at 102:11-23 (Casey Deposition) (Q. I think you would agree that he had some, uh, pain in his, uh, shoulder (indicating); in the, uh, biceps (indicating); and, also, in the hand (indicating). Would that be indicative of radicular pain? A. It would be, specifically, the thumb, and the index finger; yeah.").   These are the exact symptoms Plaintiff reported to Dr. Casey:

[11] Notably, despite REC Marine's exhaustive search for evidence of some intervening incident to blame Plaintiff's neck injury on, which included sending dozens of records requests to clinics, hospitals, and pharmacies Plaintiff never visited, the evidence (and the jury's findings) demonstrate the Incident caused Plaintiff's neck injuries.   *See* Exhibit 6 (Defendants' Records Requests).

[12] Defendants attempt to dispute the existence of a C6-C7 disc herniation is based on the results of an EMG study, despite the objective findings on the MRI where the disc herniation can be seen compressing the nerve root (which causes the radicular symptoms from Plaintiff's neck to his hand/thumb).   EMG studies are not designed to pick up cervical radiculopathy—they are designed to diagnose peripheral neuropathy or brachial plexopathy (*e.g.* carpal and/or cubital tunnel syndrome).   *See* Day 1 Trial Testimony at 136:24-137:7.   If an EMG study picks up cervical radiculopathy, that is just a "bonus."   *See* Day 1 Trial Testimony at 137:5-7.



*See* Exhibit 3 at p.13 (Gulf Coast Orthopedics Records).

The symptoms identified by Plaintiff are radicular in nature. This cannot be disputed. Even Dr. Charles Haddad ("Dr. Haddad") agrees with Dr. Casey's assessment. *See* Trial Transcript Day 3 at 292:22-293:7 (Dr. Haddad confirming pain in the left side of the neck can come with a neck injury and usually presents with other symptoms, including numbness and tingling).

G.  PLAINTIFF'S RECOMMENDED MEDICAL CARE[13]

In December 2020, Plaintiff was recommended for pain management and C6-C7 ACDF surgery. *Id.* at 100:13-101:6. This recommendation was not changed. Dr. David Ferachi ("Dr. Ferachi") testified that Plaintiff required additional physical therapy, cervical epidural steroid injections, and surgical intervention to include an Anterior Cervical Discectomy and Fusion ("ACDF"). *See* Trial Transcript Day 1 at 100:13-24; 107:23-108:4. Dr. Ferachi agreed to a reasonable degree of medical probability that the Incident caused Plaintiff's injuries and ACDF

---

[13] Plaintiff is still receiving medical care for his injuries. See Exhibit 7 (Haydel Spine and Wellness Records).

surgery recommended is necessary to alleviate Mr. Griffin's pain. *See* Trial Transcript Day 1 at 100:25-101:6.

Dr. Ferachi agreed to a reasonable degree of medical probability that the injuries sustained by Plaintiff are painful, have resulted in chronic pain, are difficult to treat, often result in permanent physical limitations, will require pain management, long-term prescription of pain medication, and future surgeries. *See* Trial Transcript Day 1 at 103:16-105:17; 106:24-107:4. Further, Plaintiff was examined and evaluated by Dr. Todd Cowen ("Dr. Cowen"), a Certified Physician Life Care Planner and practicing physical medicine and rehabilitation and pain medicine physician. *See* Day Two Trial Transcript at 33:9-34:1. As a Physician Life Care Planner, Dr. Cowen testified about the treatment Plaintiff needed for the remainder of his life. *See* Trial Transcript Day 2 at 63:25-64:3.

After examining Plaintiff and reviewing Plaintiff's relevant medical records, Dr. Cowen recommended additional treatment for the injuries Plaintiff sustained to his shoulder, neck, and back as a result of the Incident, which included, *inter alia*: (a) surgeon fees; (b) epidural steroid injections; (c) x-rays; (d) EMG studies; (e) pharmaceutical medications; (f) lab studies; (g) physical therapy; (h) a functional capacity evaluation; (i) nursing and attendant care costs; and (j) neck and shoulder surgeries. *Id*. at 34:23-47:20. Dr. Cowen's recommendations are based on information he gained from interviewing and examining Plaintiff, reviewing Plaintiff's medical records, and his twenty-eight years of treatment of patients like Plaintiff as a practicing physical medicine and rehabilitation and pain medicine physician. *See* Trial Transcript Day 3 at 42:2-8; 45:8-46:5. Plaintiff wants the treatment recommended by Dr. Ferachi and Dr. Cowen but simply cannot afford it. *See* Trial Transcript Day 3 at 167:4-25; 170:18-20.

H. PLAINTIFF HAS NOT WORKED SINCE THE INCIDENT AND CAN NO LONGER WORK

He has been unable to work since the Incident.  Mr. Randolph Rice ("Mr. Rice") offered testimony regarding Plaintiff's lost wages and lost earning capacity.  Dr. Rice testified Plaintiff's lost wages in the past amounted to $144,995.  *See* Trial Transcript Day 2 at 185:15-18.  Dr. Rice testified Plaintiff's lost earning capacity amounted to $321,589.  *See* Trial Transcript Day 2 at 185:15-18.  Dr. Rice's lost earning capacity calculation was based on Plaintiff having work life expectancy of approximately ten years.  *See* Trial Transcript Day 2 at 181:21-182:6.

Mr. Dan Cliffe ("Mr. Cliffe"), Defendants' retained expert, performed a similar analysis.  Mr. Cliffe testified that Plaintiff's work life expectancy was approximately eleven years.  *See* Trial Transcript Day 4 at 38:1-11.  Moreover, through Mr. Cliffe, the jury learned: (a) Plaintiff earned approximately $37,000 in 2014 (which was approximately $3,000 higher than his projected earnings in 2018) and (b) there is no appropriate methodology when making a determination for lost future earning capacity.  *See* Trial Transcript Day 4 at 30:20-24; 42:6-43:1.  Further, Mr. Cliffe conceded the work-life expectancy calculation he used when he served as an expert for himself (where he increased the years of his own work life expectancy to seventy-five years of age) which proved to be more accurate than data he used to perform the work life expectancy calculation for Plaintiff in this case.  *See* Trial Transcript Day 4 at 23:18-24:3.

I.  REC MARINE WITHHOLDS FACTS AND EVIDENCE FROM DR. HADDAD

Prior to reaching his opinions, Dr. Haddad did not review any of the depositions in this case, including Dr. Casey's deposition which was taken months before the trial.  *See* Exhibit 4 (Casey Deposition); *see generally* Testimony of Dr. Haddad; *see also* Exhibit 12 (Haddad Reports) (not mentioning the review of any depositions).[14]  REC Marine withheld from Dr. Haddad material

---

[14] Dr. Haddad's reports were not admitted into evidence.  Plaintiff references them as there is no reference in Dr. Haddad's reports that would indicate he reviewed any depositions, including Dr. Casey's.  Plaintiff was unable to find a reference to any depositions reviewed by Dr. Haddad in his trial testimony either.

evidence and proceeded to trial knowing they would be subject to punitive damages. REC Marine's intentional and knowing decision to withhold adverse evidence from Dr. Haddad does not eliminate their obligations to provide maintenance and cure nor insulate them from punitive damages.[15]

J.  REC MARINE'S EFFORTS TO KEEP THE TRUTH OUT OF SIGHT

REC Marine and Mr. Harris put a lot of energy into obscuring the truth. Mr. Harris claimed that he did not know about the Incident for nearly two months. Mr. Harris' evidence supporting this were notes he had written more than a month after Plaintiff's visit to Occupational Medicine Services "documenting" conversations and/or interactions with Plaintiff and Captain Haglund. *See* Exhibit 13 (Harris Notes). These notes further support the fact that Mr. Harris and REC Marine were actively trying to prevent the truth from being revealed.

Plaintiff discussed the Incident with Mr. Harris on the way to his visit to Occupational Medicine Services and in Mr. Harris' presence during the visit. *See* Trial Transcript Day 3 at 157:5-158:23. Objective evidence supports this, including the fact that the Incident is documented in Plaintiff's earliest medical records. *See* Exhibit 1 at p. 11 (Occupational Medicine Records). But Mr. Harris did  not know that the Incident was reflected in Plaintiff's medical records. *See* Trial Transcript Day 3 at 103:9-105:6 (Mr. Harris stating he had not seen the medical records from Occupational Medicine Services discussing the Incident). This evidence shattered Defendants' argument that Plaintiff did not report the Incident for months along with whatever credibility Mr. Harris may have had.[16]

---

[15] In fact, REC Marine's choice to withhold evidence from Dr. Haddad is evidence supporting the jury's award of punitive damages.

[16] Presented with this evidence, Mr. Harris suggested Plaintiff and Captain Haglund kept the Incident a secret Mr. Harris/REC Marine. *See* Trial Transcript Day 3 at 104:8-14; 107:15-25. Mr. Harris' suggestion is preposterous—there is certainly no reason for Plaintiff to discuss the Incident with medical personnel but keep the Incident a secret from Mr. Harris/REC Marine. This is especially true considering Plaintiff

The lengths Mr. Harris and REC Marine would go to avoid the truth were revealed to the jury (*e.g.*, instructing Plaintiff to complete multiple reports for another incident to create the illusion that the Incident did not occur, eliminating pages from vessel logs, refusing to perform a meaningful investigation, refusing to contact people who witnessed the Incident, writing notes falsely "documenting" conversations, etc.).  Mr. Harris and REC Marine's yearslong attempt to avoid the truth backfired.

REC Marine's intentional and knowing decisions to withhold evidence, deny the truth,  and rely on inherently flawed and unsupported opinions does not insulate them from punitive damages. The Incident and the actions taken by REC Marine in response have forever changed Plaintiff's life for the worse.

## II.    ARGUMENT & AUTHORITY

### A.  STANDARDS FOR RULE 59 MOTIONS FOR NEW TRIAL

Upon the conclusion of a jury trial, Federal Rule of Civil Procedure 59 empowers the trial court, on motion, to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court [.]" Deciding whether to grant a new trial is a matter "confided almost entirely to the exercise of discretion on the part of the trial court."  *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980).

A trial court "should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence."  *Carr v. Wal-Mart Stores, Inc.*, 312 F.3d 667, 670 (5th Cir. 2002) (*quoting Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir.1998)). Even if substantial evidence supports the jury's verdict, the court may find that the weight of the evidence is against the verdict; however, the court cannot grant a new trial "simply because [the

---

authorized Occupational Medicine Services to release his medical records to REC Marine.  *See* Exhibit 1 at p.15 (Occupational Medicine Services) (signed HIPAA release dated May 14, 2018).

court] would have come to a different conclusion then the jury did." *Peterson v. Wilson*, 141 F.3d 573, 577 (5th Cir. 1998). Likewise, "[t]he fact that there was conflicting testimony regarding causation and damages is not grounds for a new trial." *Dawson v. Wal-Mart Stores, Inc*., 978 F.2d 205, 208 (5th Cir. 1992). "Where the jury could have reached a number of different conclusions, all of which would have sufficient support based on the evidence, the jury's findings will be upheld." *Dawson*, 978 F.2d at 208. The court views the evidence "in a light most favorable to the jury's verdict…and [the verdict] must be affirmed unless…the court believes that reasonable persons could not arrive at a contrary decision." *Dawson*, 978 F.2d at 208, *citing Jones v. Walmart Stores, Inc*., 870 F.2d 982, 986 (5th Cir. 1989). Importantly, there is no abuse of discretion denying a motion for new trial unless there is a *complete absence of evidence to support the verdict*. *Vogler v. Blackmore*, 325 F.3d 150, 154 (5th Cir. 2003) (emphasis added). In conducting its analysis, the trial court must accord great difference to jury findings, and courts should disturb the jury's award only when it shocks the judicial conscience, is the result of bias, passion, prejudice, corruption, or other improper motive, is contrary to right reason, or is entirely disproportionate to the injuries sustained. *Wood v. Diamond M Drilling Co*., 691 F.2d 1165, 1168 (5th Cir. 1982).

A. THE PAST AND FUTURE MEDICAL DAMAGES AWARDED ARE REASONABLE AND SUPPORTED BY THE EVIDENCE

Defendants insinuate that the medical care recommended by Dr. Cowen is somehow speculative because there was no testimony regarding when Plaintiff will require the treatment recommended by Dr. Cowen and Plaintiff does not want the treatment recommended by Dr. Cowen. Plaintiff was examined and evaluated by Dr. Cowen, a Certified Physician Life Care Planner and practicing physical medicine and rehabilitation and pain medicine physician. *See* Trial Transcript Day 2 at 33:9-34:1. Dr. Cowen testified about the treatment Plaintiff needed for the remainder of his life. *See* Trial Transcript Day 2 at 63:25-64:3. In reaching his conclusions (which

were made to a reasonable degree of medical probability), Dr. Cowen applied the methodology approved for Physician Life Care Planners. *See* Trial Transcript Day 2 at 35:16-19; 38:20-39:1; 40:4-41:9; 42:9-14; 43:2-8. After examining Plaintiff and reviewing Plaintiff's relevant medical records, Dr. Cowen recommended additional treatment for the injuries Plaintiff sustained to his shoulder, neck, and back as a result of the Incident, which included, *inter alia*: (a) surgeon fees; (b) epidural steroid injections; (c) x-rays; (d) EMG studies; (e) pharmaceutical medications; (f) lab studies; (g) physical therapy; (h) a functional capacity evaluation; (i) nursing and attendant care costs; and (j) neck and shoulder surgeries. *Id*. at 34:23-47:20. Dr. Cowen's recommendations are based on information he gained from interviewing and examining Plaintiff, reviewing Plaintiff's medical records, and his twenty-eight years of treatment of patients like Plaintiff as a practicing physical medicine and rehabilitation and pain medicine physician. *See* Trial Transcript Day 3 at 42:2-8; 45:8-46:5.

Dr. Cowen is both a medical doctor and a life care planner. Moreover, Dr. Cowen's recommendations are consistent with his experience, the recommendations of Plaintiff's treating physicians, and an arguable standard of care. Defendants' argument that the damages awarded for certain medical treatment recommended by Dr. Cowen are somehow improper because Plaintiff's treating physicians did not put into their reports all the treatment Plaintiff will need over the course of his life. That certainly is not the standard—that is what life care planners do. Moreover, these same arguments have been raised by REC Marine and rejected by sister courts. *See Durr v. GOL, LLC and REC Marine Logistics, LLC*, 2019 WL 6464971, at *4 (E.D. La. Dec. 2, 2019).[17]

---

[17] Defendants reliance on *In the Matter of Masala* and *Associated Terminals of Saint Bernard v. Potential Shipping HK Co. Ltd.* is misplaced. *In the Matter of Masala,* there was no life care plan and no timeframe for when future treatment would be needed. 2022 WL 17485951 (E.D. La. Dec. 7, 2022). Here, there was a life care plan and Dr. Cowen identified not only the treatment Plaintiff will require, but also when he will need it. *See* Day 2 Trial Transcript at 36:5-46:2. Defendants reliance on *Associated Terminals of Saint Bernard v. Potential Shipping HK Co. Ltd*. is misplaced. In *Associated Terminals of Saint Bernard*, the

The jury's award of future medical expenses for Plaintiff's shoulder injury is appropriate because injured seamen can be awarded damages for cure and future medical expenses:

> When supported by a physician's testimony, it is appropriate for a district court to award future maintenance and cure until the plaintiff reaches maximum medical improvement. Moreover, a *plaintiff can be awarded both cure and tort damages for future medical expenses*, so long as no duplication will occur, because the cure obligation is independent of tort law.

*McBride v. Estis Well Serv., L.L.C.*, 853 F.3d 777, 783 (5th Cir. 2017) (internal citations omitted) (emphasis added). The jury did not award cure, so there is no possibility of duplicative damages. *See* Exhibit 8 (Verdict). Moreover, the future medical expenses associated with Plaintiff's shoulder injuries are supported by physician testimony. *See* Day One Trial Transcript at 100:13-24; 107:23-108:4; *see also* Trial Transcript Day 2 at 37:1-11; 41:12-23; 43:12-44:9; 63:12-21; and 63:22-64:3.

The overall award of future medical expenses should not be reduced. Jury awards must not fall within estimates given by experts. "Although we must give great deference to the jury, the jury need not defer to the experts. We do not require that a jury's award fall within the estimates given by expert testimony. The purpose of expert testimony is to guide the jury." *Gildersleeve v. Historic Renovations of Yazoo, Inc*., 2010 WL 4718398, at *1 (S.D. Miss. Nov. 15, 2010), *quoting Leefe v. Air Logistics, Inc.,* 876 F.2d 409, 411–12 (5th Cir.1989) (internal citations omitted).

---

intervenor, Jamaal Ford, was unable to establish that he was more likely than not that he would pursue a surgery. *Id.* The Defendants omit the following exchange that led to the court's finding that the future medical care was speculative:

> THE COURT: Your plan is based on the plaintiff changing his mind and authorizing surgery?
> THE WITNESS: Ultimately, yes, sir.

*Id.* at fn. 104.

The opposite is true here. Plaintiff wants the treatment recommended by Dr. Ferachi and Dr. Cowen, but cannot afford it. *See* Trial Transcript Day 3 at 167:4-25; 170:18-20 ("Q. Would you like to get the treatment recommended by Dr. Cowen. A. Yes, sir. Q. Would you like REC [Marine] to pay for that? A. I would love for them to pay for it. I can't pay for it.").

As discussed *supra*, there was substantial evidentiary support for the jury's damage award for Plaintiff's future medical care.[18] *Id.* Additionally, the jury learned Dr. Cowen's estimates were conservative and that Plaintiff's future medical costs may be greater than his estimate. *See* Trial Transcript Day 2 at 112:5-9. The jury may have just as easily found Dr. Cowen's estimate too conservative. The award of future medical expenses is neither against the great weight of evidence, nor is it indicative of any passion or prejudice.

B. THE AWARD OF LOST INCOME AND LOSS OF EARNING CAPACITY WAS APPROPRIATE

When he worked for JNB Operating (the company that merged with REC Marine in 2016) and REC Marine, he never missed a single day of work. *See* Trial Transcript Day3 at 215:16-23. However, Plaintiff has not been able to work since mid-2018. In 2018, Plaintiff earned $19,635.[19] *See* Exhibit 10 (2018 W-2 Form). Plaintiff has no reported earnings since 2018.

Mr. Randolph Rice ("Mr. Rice") performed an economic analysis on behalf of Plaintiff and determined the amount of Plaintiff's lost wages in the past and his projected loss of earning capacity in the future. *See* Trial Transcript Day 2 at 185:15-188:12. Defendants hired Mr. Dan Cliffe ("Mr. Cliffe") to perform a similar analysis.

As discussed *supra*, courts "do not require that a jury's award fall within the estimates given by expert testimony. The purpose of expert testimony is to guide the jury." *Gildersleeve v. Historic Renovations of Yazoo, Inc*., 2010 WL 4718398, at *1 (S.D. Miss. Nov. 15, 2010), *quoting Leefe v. Air Logistics, Inc*., 876 F.2d 409, 411–12 (5th Cir.1989) (internal citations omitted).

---

[18] The recommended treatment was condensed on the attached chart that was given to the jury. *See* Exhibit 9 (Chart of Recommended Future Medical Treatment).

[19] REC claims they provided wage advances to Plaintiff while he was treating with Dr. Casey and Mr. Fitzgerald. However, this claim is not supported by the evidence as none of the supposed "wage advances" are reflected on Plaintiff's W-2.

Moreover, the jury is permitted to make upward adjustments to the calculations if supported by the evidence:

> In a related argument, Defendant also objects to the number of years, in essence the retirement age projected, used in the jury's calculation. Defendant argues that 65 years is the absolute cap to any award of loss of future earning capacity. This is incorrect…Finding that the evidence would have supported logically and reasonably an award in excess of the one stated by the jury for loss of future earning capacity, the Court finds that the 'jury's award was not speculative, nor based upon conjecture, but rather grounded in evidence properly before it. Therefore, the Court declines to disturb the 'jury's award on this ground.

*McKissack v. Wal-Mart Stores, Inc*., 2004 WL 212930, at *3 (W.D. Tex. Jan. 26, 2004).

The jury awarded Plaintiff $150,000 in past wage loss and $500,000 in future loss of earning capacity. While this may be a departure from the analysis performed by Mr. Rice, it is supported by the testimony of Mr. Cliffe. During the examination of Mr. Cliffe, the jury learned: (a) Plaintiff earned approximately $37,000 in 2014 (which was approximately $3,000 higher than his projected earnings in 2018); (b) the work-life expectancy calculation he used when he served as an expert for himself (where he increased the years of his own work life expectancy) proved to be more accurate than the calculation he performed in this case; and (c) there is no appropriate methodology when making a determination for lost future earning capacity. *See* Trial Transcript Day 4 at 30:20-24; 42:6-43:1.

Mr. Cliffe, Defendants' own expert, provided a basis for the jury to depart from Mr. Rice's estimate and award a greater amount in lost wages and lost earning capacity in the future (by accounting for higher earnings in the past and a longer work life expectancy). Frankly, taking into account the increased work life expectancy Mr. Cliffe relied upon when serving as his own expert (adding a decade or more to his work life expectancy) would increase Plaintiff's loss of

earning capacity by hundreds of thousands of dollars—the jury's award is well within that range.[20] There can be no indication the jury was motivated by any passion or prejudice.

Further, as the jury could have made an upward adjustment to Plaintiff's lost wages based on the testimony of Mr. Cliffe, the damages awarded as maintenance are not proved to be duplicative. It is Defendants' burden to establish whether the amount of damages awarded to Plaintiff for his lost wages is duplicative of the damages awarded for maintenance. In light of the above, Defendants have not met their burden in showing the maintenance award is duplicative.

C. A NEW TRIAL ON GENERAL DAMAGES IS NOT WARRANTED

When a jury verdict results from passion or prejudice, a new trial is the proper remedy. When a damage award is merely excessive or so large as to appear contrary to right reason, remittitur is the appropriate remedy. *Laxton v. Gap, Inc*., 333 F.3d 572, 58[6] (5th Cir. 2003). The jury's assessment of damages, however, is heavily weighted against judicial reconsideration. A court will not reverse a jury verdict as excessive except on the strongest of showings that the award was completely disproportionate to the injury sustained by the plaintiffs. *Caldarera v. Eastern Airlines, Inc*., 705 F.2d 778, 78[4] (5th Cir. 1983). Like a new trial, remittitur is appropriate only when the inconsistency between injury and award is so vast as to "shock the judicial conscience,…be contrary to right reason,…or indicate bias, passion, corruption or other improper motive…" 705 F.2d at 784.

Plaintiff suffered significant injuries to his shoulder and neck. Plaintiff has undergone one rotator cuff surgery and will need another in the future. He has a disc herniation in his neck at C6-C7. Plaintiff will also need to undergo two separate surgeries to his neck—an ACDF and an

---

[20] There is no requirement that the jury "award fall within the estimates given by expert testimony. The purpose of expert testimony is to guide the jury." *Gildersleeve v. Historic Renovations of Yazoo, Inc*., 2010 WL 4718398, at *1 (S.D. Miss. Nov. 15, 2010), *quoting Leefe v. Air Logistics, Inc*., 876 F.2d 409, 411–12 (5th Cir.1989) (internal citations omitted).

adjacent level surgery.  He will need to be on pain medication throughout the rest of his life.  *See* Trial Transcript Day 2 at 34:24-47:20. The argument that Plaintiff has not or will not suffer physical pain, disfigurement, pain and suffering, mental anguish, and loss of enjoyment of life is divorced from the evidence.  The nature and extent of Plaintiff's injuries, pain and suffering, mental anguish, and loss of enjoyment of life is reflected in the hundreds of pages of medical records admitted during the trial along with the testimony of the witnesses.  Examples include the following:

1. Plaintiff had pain in his shoulder and neck immediately following the Incident.
2. Plaintiff was still in pain days after the Incident.  *See* Trial Transcript Day 3 at 156:13-18.
3. As of the date of trial, Plaintiff was still experiencing a burning pain in his shoulder.  *Id*. at 162:3-8.
4. Plaintiff is in pain every day—he stays in pain.  *Id*. at 168:1-169:16.
5. The objective MRI findings show that Plaintiff had a C6-C7 disc herniation pinching a nerve in Plaintiff's neck, which is very painful.  *See* Trial Transcript Day 1 at 105:3-8.
6. On June 29, 2018, Plaintiff identified areas that he was still experiencing pain, including his neck, shoulder, bicep, and hand/thumb. *See* Trial Transcript Day 3 at 161:18-162:2.
7. Plaintiff's pain has been getting worse.  *Id*. at 163:18-22.
8. Plaintiff needs a surgery and significant medical care.  *See* Trial Transcript Day 2 at 34:24-47:20; *see also* Trial Transcript Day 1 at 100:17-101:6.
9. Plaintiff has difficult to treat chronic pain as a result of the Incident.  *See* Trial Transcript Day 1 at 105:9-17.
10. Plaintiff has physical limitations.  *Id*. at 107:12-17.
11. Plaintiff only gets three (3) or four (4) hours of sleep a night and sometimes is awake for the entire day due to his pain.  *See* Trial Transcript Day 3 at 163:12-16.
12. To a reasonable degree of medical probability, if Plaintiff does not receive the treatment he needs he could suffer some degree of disability for the rest of his life. *See* Trial Transcript Day 1 at 107:18-22.
13. Plaintiff can no longer take care of himself or play with his kids.  *See* Trial Transcript Day 3 at 168:9-169:8.
14. Plaintiff is unable to provide his children to swim.  *Id*.
15. Plaintiff cannot engage in activities he enjoyed prior to the Incident, including riding horses and four-wheelers or playing volleyball or football with his kids.  *Id*.
16. Plaintiff physical cannot pick up his children.  *Id*.

The jury assessed all this information (and more) and awarded $100,000 in past general damages and $250,000 in future general damages for Plaintiff's physical impairment, disfigurement, pain and suffering, mental anguish, and loss of enjoyment of life. *See* Exhibit 8 (Verdict Form). There is absolutely no indication that this decision was based on passion, prejudice or any other improper motive. Both sides tried the case professionally and well within the rules. The jury simply deliberated and concluded that the totality of Plaintiff's pain and suffering required a $350,000 general damages award to place him back in the position he would have been in but for the Incident, despite counsel for Plaintiff requesting $510,720 in past general damages and $2,452,800 in future general damages. *See* Trial Transcript Day 5 at pgs. 103-04. The jury answers this question, not the lawyers trying the case.

Under the circumstances, there is simply no reason to grant a new trial on damages.

D.  REMITTITUR ON GENERAL DAMAGES IS UNNECESSARY

When analyzing whether a remittitur is appropriate, the U.S. Fifth Circuit has endorsed two methods for evaluating a jury award: (1) The maximum recovery rule, and (2) the clearly excessive rule. *Campbell v. England*, 2005 WL 1400465 (E.D. La.), *revd on other grounds*, 2007 WL 1454542 (5th Cir. 2007). These somewhat competing avenues for evaluating were discussed in *Raynes v. McMoRan Expl. Co.*:

> Under the 'maximum recovery rule, a court reviewing a jury verdict should remit damage awards that are found to be excessive to the maximum amount the jury could have awarded. The maximum amount is determined by comparing the award under scrutiny to awards in other similar cases. A multiplier of 50% is then applied to arrive at the maximum recovery amount, and the jury award is remitted to that amount if necessary. Under the 'clearly excessive' rule, a 'damage award may be overturned only upon a clear showing of excessiveness or upon a showing that the jury was influenced by passion or prejudice.' Applying this rule, courts have traditionally frowned upon comparing an award to awards in factually similar cases as a method for determining if an award is excessive. Rather, this inquiry emphasizes the uniqueness of each case, which must be determined upon its own facts, while recognizing that comparisons may serve as a point of reference.

297 F.3d at 374 (internal citations omitted).

Whichever method is used, the past and future general damages awarded by the jury were reasonable.  Plaintiff has found the following cases which offer some guidance:

| *May v. Global Santa Fe Drilling, et al.*, 2007 WL 2728482, at *1 (E.D. La. Sept. 14, 2007) |
|---|
| May was injured because a defective snub line on spinner hawks on the drill floor on the *J/U High Island II* was negligently replaced.  May was hurt when he was struck on the right shoulder and neck by the spinner hawks during rig operations. He first complained of headaches and shooting pain down his right shoulder. The condition caused pain and weakness prevented May from working offshore. The jury awarded the plaintiff $1,250,000 in past and future pain and suffering. Applying the 50% multiplier to the May verdict brings the general damage award to $1,875,000.  Judge Lemmon denied the defendant's post-trial motion for relief from this award. *See also* Motion for New Trial (found at 2007 WL 4535410) and Opposition (found at 2007 WL 4535411). |
| *Simeon v. T. Smith & Son, Inc,* 852 F.2d 1421 (5th Cir. 1988) |
| Simeon, a derrick barge deckhand, nearly lost his foot in a mooring line incident. He underwent a surgical operations and hospitalization.  Thereafter, he had to use a cane to walk and could only walk short distances.  He became "gloomy and depressed." <br><br> The $1,250,000 pain and suffering jury award against the Jones Act employer was remitted to $600,000, and the $450,000 pain and suffering award against a third-party tugboat owner was upheld. This total damage award of $1,050,000 is equivalent to $2,699,352 today. Utilizing the 50% multiplier, the maximum award for this type of injury expressed in 2023 dollars in the U. S. Fifth Circuit in a Jones Act is $4,049,028. |
| *Willett v. W. Oceanic, Inc.*, 117 F.R.D. 379, 383 (E.D. La. 1987) |
| Willett suffered two (2) broken wrists and a cervical fracture. The jury awarded him $1.5 million in general damages in his Jones Act case. District Judge Peter Beer applied the maximum recovery rule and ordered a remittitur in the amount of $600,000, thereby reducing the jury verdict to $900,000. The remitted amount is equal to $2,409,457 in 2023 dollars. Applying the 50% multiplier, the general damage award totals $3,614,185 in 2023 dollars. |
| *Gough v. Natural Gas Pipeline Co.*, F.2d 763 (5th Cir. 1993) |
| Captain Gough was at the helm of a vessel involved in an explosion offshore. He was not physically hurt, he suffered from post-traumatic stress disorder that his doctors opined would take two (2) to three (3) years to bring under control.  The disorder was not totally disabling, as he was working as a carpenter at the time of trial.  In this mental pain and anguish case, the general damage award of $1,444,599 was reduced to $600,000 as the maximum reasonable award for emotional distress.  This award is equivalent to $1,262,811 in 2023 dollars. The 50% multiplier brings the maximum emotional distress award to $1,836,134 in 2023 dollars. |

E.  PUNITIVE DAMAGES WERE WARRANTED AND THE $1.5 MILLION PUNITIVE DAMAGE AWARD IS PROPER[21]

---

[21] Plaintiff incorporates his Response to REC Marine's Amended and Supplemental Motion in Support of Renewed Judgment as a Matter of Law.

If an employer willfully and wantonly disregards its maintenance and cure obligations, the seaman is entitled to punitive damages. *Atlantic Sounding Co. Inc. v. Townsend*, 557 U.S. 404, 424 (2009).  Examples of conduct meriting an award of punitive damages include: (1) laxness in investigating a claim; (2) termination of benefits in response to the seaman's retention of counsel or refusal of a settlement offer;[22] and (3) failure to reinstate benefits after diagnosis of an ailment previously not determined medically.  *Breese*, 823 F.2d at 103; *See also Harper v. Zapata Off-Shore Co*., 741 F.2d 87, 90 (5th Cir. 1984) (collecting cases).  Plaintiff highlights a few of the many reasons why punitive damages are warranted.[23]

Remarkably, REC Marine claimed the Incident did not occur and maintained that position through trial, stating to the jury: "He claims that the personnel basket incident happened a few days after the incident where he hit his shoulder on the fire hose rack. We believe the evidence that you're going to hear in this case will establish that this personnel basket incident simply didn't happen."  *See* Trial Transcript Day 1 at 78:7-13. However, the jury was presented with considerable evidence demonstrating the Incident occurred and the attempts by REC Marine and Mr. Harris to conceal the truth.  The investigation alone was designed to learn as little as possible.

As a pretext to deny Plaintiff maintenance and cure, REC Marine claims they relied on Dr. Casey's opinion where he suggests Plaintiff did not identify neck pain until April 2019.  However, Dr. Casey's opinion is inherently flawed and ignores the evidence.  It was never reasonable for REC Marine or their retained experts to rely on Dr. Casey's opinion because the evidence proves the very foundation of the opinion to be inherently flawed.  After learning Plaintiff reported pain

---

[22] This lawsuit was filed in April 2019, Plaintiff's counsel sent letters to REC Marine regarding issues regarding Plaintiff's maintenance and cure, and Plaintiff's maintenance and cure was terminated in June 2019.
[23] Plaintiff incorporates the arguments made in his Response to REC Marine's Motion for Judgment as a Matter of Law.

to Captain Haglund, REC Marine did not reinstate Plaintiff's maintenance and cure. Nor did they reinstate Plaintiff's maintenance and cure when they learned he reported pain to Mr. Badeaux. They did not reinstate benefits when they learned the Incident was reported to Mr. Harris prior to and during his appointment at Occupational Medicine Services. They kept denying Plaintiff maintenance and cure even after they knew Dr. Casey's opinion was flawed. REC Marine chose to not provide maintenance and cure after learning Plaintiff was diagnosed with a disc herniation. REC Marine's position remained unchanged even after learning Plaintiff had been recommended for neck surgery. REC Marine did not reassess their decision to terminate Plaintiff's maintenance and cure even after learning Plaintiff needed significant medical care in the future, including two back surgeries, a shoulder surgery, physical therapy, check-ups and evaluations.

REC Marine continued refusing to reinstate Plaintiff's maintenance and cure despite knowing that "when there are ambiguities or doubts [regarding maintenance and cure], they are resolved in favor of the seaman." *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962); *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 735 (1943) ("If leeway is to be given in either direction, all considerations which brought the liability into being dictate it should be on the sailor's behalf."); *Johnson v. Marlin Drilling Co.*, 893 F.2d 77, 79-80 (5th Cir. 1990) (applying "ambiguities or doubts" rule). REC Marine repeatedly failed in their responsibility to reassess their decision to terminate Plaintiff's maintenance and cure.

Moreover, there is no bright line rule limiting punitive damages to the ratio in *Exxon Shipping Co. v. Baker* is contrary to the holding in that case. In the *Exxon* case, the United States Supreme Court's decision involved punitive damages awarded for the Exxon Valdez oil spill in Alaska. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008). The jury awarded $507 million in compensatory damages and $4.5 billion in punitive damages.

*Id.*  Upon remand by the Ninth Circuit, the punitive damage award was reduced to $2.5 billion.

*Id.*  The United States Supreme Court further limited the punitive damages award in that case to a

1:1 ratio to compensatory damages.  *Id.*  However, the case does not establish a broad, sweeping

rule limiting punitive damage awards.  On the contrary, the United States Supreme Court expressly

limits its holding to the facts presented in the *Exxon* case: "whether the award…***in this case*** is

greater than maritime law should allow in the circumstances."  *See Exxon*, 554 U.S. at 476

(emphasis added).  The 1:1 ratio has been found inapplicable in other cases.  *See Clausen v. Icicle*

*Seafoods, Inc.* 272 P.3d 827, 835 (Wash. 2012) (affirming award $1.3 million in punitive

damages).    The *Clausen* court also noted that punitive damages beyond the 1:1 ratio to

compensatory damages were necessary as a "deterrent." *Id.* at 836.  The court said:

> A variable punitive damages award creates a disincentive to employers who would
> otherwise prefer to hold out on paying maintenance and cure until a suit is filed, if at all.
> Because seamen do not qualify for state or federal worker compensation, their only
> recourse from being abandoned when sick or injured on the job is maintenance and cure.

*Id.*

However, even if the Court were to follow the 1:1 ratio, Plaintiff's economic and non-

economic damages versus the punitive damages is less than 1:1.  The economic and non-economic

damages awarded were in excess of $1.7 million and the punitive damages awarded were $1.5

million.

In the alternative, even if the Court were to apply the 1:1 ratio, the compensatory damages

awarded by the jury (*e.g*., Plaintiff's lost wages, lost earning capacity, past medical expenses, and

future medical expenses, etc.) and any attorneys' fees owed to Plaintiff calculated to establish the

denominator for the punitive to compensatory damages ratio.  Notably, despite arguing the Court

in the instant Motion that the Court should not treat the compensatory damages awarded by the

jury (*e.g*., Plaintiff's lost wages, lost earning capacity, past medical expenses, and future medical

expenses, etc.) as maintenance and cure as a basis for determining the ratio between compensatory damages and punitive damages, REC Marine took the opposite position in their Amended and Supplemental Memorandum in Support of Renewed Motion for Judgment as a Matter of Law. *See* REC Marine's Amended and Supplemental Memorandum in Support of Renewed Motion for Judgment as a Matter of Law at p.3 ("The verdict form listed no amount for cure, likely because the jury instructions stated if the jury chose to award medical expenses on the Jones Act or unseaworthiness claims, they should not award cure for the same period.").

The facts here support a punitive damages award beyond the 1:1 ratio as a deterrent to REC Marine in the future. However, to the extent the ratio is determined to be greater than 1:1, Plaintiff would urge the Court to follow the approach in *Claussen*.

F. THE TIME LIMIT IMPOSED BY THE COURT WAS APPROPRIATE AND DID NOT CAUSE PREJUDICE TO DEFENDANTS

A court may set time limits on a trial, and a limit of days is acceptable even in complex cases. *See MCI Communications Corp. v. American Tel. & Tel. Co*., 708 F.2d 1081, 1171-72 (7th Cir.), *cert. denied*, 464 U.S. 891 (1983) (rejecting defendants' suggestion that a 26-day time limit in an antitrust case was too short and that the limit should have been computed in months, not days); *see also United States v. Hardage*, 750 F.Supp. 1460 (W.D.Okla.1990), *aff'd in relevant part*, 982 F.2d 1436, 1463 (10th Cir. 1992) (a complex environmental case where a time limit of days was imposed).

Federal Rule of Evidence 611(a) states that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth [and] (2) avoid needless consumption of time…" It is fundamental that a court has the power and duty to manage its docket and the individual cases before it to "secure fairness in administration and elimination of

unjustifiable expense and delay." *United States v. Hardage*, 750 F.Supp. at 1528 (W.D.Okla.1990), *aff'd in relevant part*, 982 F.2d 1436 (10th Cir.1992) (*quoting* FED. R. EVID. 102). In addition, "courts have the discretion to place reasonable time limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence." *Id*. (citations omitted).

After time limits were imposed, the following witnesses were called: Mr. Badeaux, Mr. Harris (called in both Plaintiff and Defendants' case in chief), Plaintiff, Dr. Haddad, Mr. Carlisle, Ms. Haupt, Mr. Cliffe, Mr. Fazioli, Mr. Winhauer, Captain Haglund (by deposition), and Dr. Casey (by deposition). Defendants conceded at trial that they were given all the time they needed to examine witnesses:

1. Defendants elected to reserve their questions for Mr. Harris until their case in chief. *See* Trial Transcript Day 3 at 133:7-11.
2. Defendants decided not to question Mr. Badeaux, seeding their time to counsel for QBE Insurance (Europe), Ltd. *Id*. at 55:20-56:22.
3. When counsel requested more time to examine Plaintiff, the Court granted their request. *Id*. at 234:9-13.
4. After advising the Court they had just one final question for Plaintiff and certainly not the five areas of questioning they now claim (73 days after the trial) they wanted to explore with the Plaintiff, Defendants did not ask for any additional time to examine Plaintiff. *Id.* at 235:20-236:8.
5. Defendants never requested more time to examine Dr. Haddad. *Id*. at 312. In fact, counsel for Defendants admitted on the record that the time limit for Dr. Haddad was "perfect." *Id*. at 291:6-7.
6. After examining Mr. Carlisle on redirect counsel for Defendants confirmed they had "No further questions" for him. *Id*. at 349:20-21.
7. Counsel for Defendants did not ask for more time to examine Ms. Stephanie Haupt. *Id*. at 403-404.
8. After examining Mr. Cliffe, counsel for Defendants stated on the record they had no further questions for him. *See* Trial Transcript Day 4 at 41:5.
9. Before Mr. Fazioli was excused, counsel for Defendants stated on the record "Those are all the questions I have." *Id*. at 97:19-20.
10. Counsel for Defendants stated on the record that they had no further questions for Captain Winhauer. *Id*. at 128:24-25.
11. Captain Haglund and Dr. Casey were presented by deposition and Defendants were able to play all testimony they wanted that was not excluded by the Court on evidentiary grounds.

12. Counsel for Defendants stated on the record that they had no further questions for Mr. Harris.  *See* Trial Transcript Day 5 at 52:6-10.
13. Further, counsel for Defendants advised the Court that if they needed more time to question Mr. Harris that they would renew his request after co-counsel completed his direct examination.  *See* Trial Transcript Day at p. 162. No request was made or denied.

The record reflects that Defendants were able fully question the witnesses.  Nevertheless, Defendants argue they were prejudiced by the time limits imposed by the Court.  They claim the time limits required them to recraft their trial strategy but have not cited to any portion of the record where this is indicated with any specificity.  Defendants, however, for the first time (seventy-three days after the trial), claimed there were some areas of questioning they wanted to explore with the Plaintiff.

Defendants post-trial objection is much too late.  *See, e.g., Life Plus Int'l v. Brown*, 317 F.3d 799, 807 (8th Cir. 2003) ("To preserve this issue for [appellate] review, a party must lodge a timely objection to the time limits and must make a proffer of evidence that was excluded for lack of sufficient time." (*citing Johnson v. Ashby*, 808 F.2d 676, 678–79 (8th Cir. 1987))), *as amended on reh'g in part* (Feb. 19, 2003); *Colquitt v. Muhammad*, 86 S.W.3d 144, 152 (Mo. Ct. App. 2002) ("A party who complains about the exclusion of evidence should make an offer of proof to inform the trial court of the content of the evidence proffered . . . .").  "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and…if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context."  *See* Fed. R. Evid. 103(a).  Defendants repeatedly informed the Court they had no further questions for witnesses.  Defendants did not object to the time limits until after the close of evidence.  Defendants did not make an offer of proof as to the evidence they could not introduce.  Defendants' post-trial objection is much too late.  Defendants have waived any complaint as to the time limits imposed by the Court.

G.  THERE IS NO BASIS TO OVERRULE THE JURY'S ALLOCATION OF LIABILITY

A substantial amount of evidence was introduced demonstrating Defendants' liability. These facts are briefed *supra* and include the overall failure of Defendants to plan, supervise, and perform their duties in a reasonable manner. Moreover, the jury's partial allocation of fault to both parties suggests that they considered and accounted for the credible and relevant testimony in determining fault.  Moreover, while "[Defendants] complain[] that the allocation is lopsided in favor of [Plaintiff]…that is not enough to overrule the jury's allocation of liability." *Johnston v. Char-Broil, LLC*, 622 F. Supp. 3d 317, 329 (N.D. Tex. 2022).  The jury's verdict (later adopted by the Court) was in accordance with the weight of the credible evidence and represents a reasoned decision which should not be discarded and replaced simply because Defendants are not happy with the net amount of the verdict.  The jury considered the evidence and arguments Defendants presented and rejected them.

H.  THE ARGUMENTS MADE DURING PLAINTIFF'S CLOSING WERE FACTUAL

The Fifth Circuit has explained that "improper comments by counsel will not warrant reversal unless they so permeate the proceedings that, in the light of all evidence presented, *manifest injustice would result* if the court allowed the verdict to stand." *Verdin v. Sea-Land Serv.*, 8 F.3d 21, at *3 (5th Cir. 1993) (emphasis added).  In other words, "the conduct must be such as to gravely impair the calm and dispassionate consideration of the case by the jury." *Dixon v. Intl. Harvester Co.*, 754 F.2d 573, 585-86 (5th Cir. 1985); *see also United States v. Blevins*, 555 F.2d 1236, 1240 (5th Cir. 1977) (to warrant a new trial, "[t]he [improper attorney] conduct [must have] been of such an extreme nature that an instruction to the jury could not effectively remedy the damage").

Plaintiff's counsel stated facts:

| Content of Statement | Facts Supporting |
|---|---|
| Captain Haglund decision to not document JSA's because they would still be at the rig right now and references to his outbursts of anger. | Captain Haglund stating the JSA was verbally done and that if they documented everything "We'd still be sitting at that rig now." *See* Exhibit 11 at 38:9-40:8 (Captain Haglund Deposition). Commander Lebsack referenced this exchange in his testimony. *See* Trial Transcript Day 2 at 306:13-23. Moreover, Defendants cannot honestly claim Captain Haglund was not angry during his deposition. He was rude, combative, and made frequent outbursts that startled the jurors. Defendants chose to show that side of Captain Haglund to the jury. |
| Plaintiff's relationship with his children has been impacted, which is evidence of how the Incident has affected his life. | Plaintiff testified at length about how the Incident has affected his life and his relationship with his children. *See* Trial Transcript Day 3 at 168-170. |
| Responses to Defendants arguments blaming Plaintiff. | The jury heard a substantial amount of evidence about the protections in place for seamen like Plaintiff from Commander Lebsack. *See* Trial Transcript Day 2 at p. 290, 291, 293, and 316. His testimony included how you must protect mariner safety and do what you can to prevent illness and injury. *Id*. Moreover, the jury heard how Plaintiff was trying to protect the offshore workers that were being transported off the vessel during the Incident and how Plaintiff was endeavoring to prevent them from getting hurt. Id. at 22:22-23:15. |
| The number of people that need to get hurt until before Defendants ensure proper investigations designed at reveal the truth are conducted; Defendants will continue hurting people and nothing has made them change their ways; they will keep hurting people, the jury has the power to change this behavior. | Early on, REC Marine decided it was not going to meaningfully investigate the Incident. In fact, there is direct and/or circumstantial evidence that REC Marine conceal the truth by denying knowing about the Incident for nearly two months, having Plaintiff complete a second report for an unrelated incident, the disappearance of boat logs, the refusal to contact eyewitnesses. *See* Trial Transcript Day 3 at 26:16-25; *see also* Facts Section at p.4 regarding Mr. Harris' attempt to cover up the Incident. |

|  | Refusing to take reasonable steps to learn the facts is the same as putting your head in the sand.<br><br>Moreover, Defendants will not change their ways. Mr. Harris testified the company will not follow its own safety policies. Mr. Harris testified REC Marine had no plan to reinstate Plaintiff's maintenance and cure (which obviously results in more harm to Plaintiff). |
|---|---|
| The injuries sustained by Plaintiff as a result of the Incident should have been reported to the Coast Guard. | As testified by Commander Lebsack, REC Marine was required to report the Incident to the Coast Guard using Coast Guard Form 2692. *See* Trial Transcript Day 2 at 321:15-322:7, 327:8-22, and 329:2-17. The Court permitted questions about the standard. *Id*. at 326:9-13. In closing, the following remarks related to the Coast Guard policy violated by REC Marine was as follows: "There is industry customs and practice that require them to report it and Coast Guard requirements that require them to report it. None of that was enough for them to report this." *See* Trial Transcript Day 5 at 86:3-6. There was no argument that Defendants consistently violate Coast Guard reporting requirements. However, Defendants do consistently violate their own policies. |
| Plaintiff provided ample evidence he was not permanently injured as a result of the 2013 car crash. | Plaintiff (a) only went to the doctor two times and received a medical release and was fit for duty; (b) testified that he had never seen the lawsuit filed in connection with the 2013 car crash before it was filed; (c) provided uncontroverted testimony that he worked for five (5) years after the 2013 crash and had no issue performing his duties. *See* Trial Transcript Day 3 at p. 137, 138, and 215. A far greater amount of the evidence showed Plaintiff was not permanently injured as a result of the 2013 car crash. |

None of the arguments made by counsel gravely impaired the calm and dispassionate consideration of the case by the jury and none were of such an extreme nature that could not effectively remedied with an instruction. Defendants' complaints as to Plaintiff's arguments are at

best a disagreement with the conclusions reached from the facts.  Further, jury instructions, such as those in the Fifth Circuit's Pattern Jury Instructions, advising that attorney arguments are not evidence and that the jury should not be affected by bias or prejudice, weigh against a finding of prejudice.  *See Guar. Ser. Corp. v. Am. Employers' Ins. Co*., 893 F.2d 725, 728-29 (5th Cir. 1990) (arguments invoking "conscience of the community" were not prejudicial given instruction to jury that statements of counsel are not evidence); *Nissho-Iwai*, 848 F.2d at 620 (noting that the court instructed the jury that attorney argument is not evidence and that the jury should not be swayed by prejudice or emotion).

Moreover, Defendants chose not to object to any of the arguments made at trial.  Under such circumstances the court reviews only for "plain error."  *See McLendon v. Big Lots Stores, Inc*., 749 F.3d 373, 375 (5th Cir. 2014).  Plain error exists when a party demonstrates "(1) that an error occurred; (2) that the error was plain, which means clear or obvious; (3) the plain error must affect substantial rights; and (4) not correcting the error would 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'"  *Leonard v. Gautreaux*, 2000 WL 634647, at *2 (5th Cir. 2000) (*quoting Highlands Ins. Co. v. National Union Fire Ins. Co. of Pittsburgh*, 27 F.3d 1027, 1031-32 (5th Cir. 1994)).  When analyzing whether attorney comments affected a party's substantial rights under plain error review, "the central issue for th[e] court is 'whether the [attorney's] remarks cast serious doubt on the correctness of the jury's verdict.'"  *United States v. Rashad*, 687 F.3d 637, 643 (5th Cir. 2012); *accord McLendon*, 749 F.3d at 375.  Plain error review is not concerned with "the ordinary backfires—whether or not harmful to a litigant's cause—which may mar a trial record. The doctrine focuses…only on blockbusters: those errors so shocking that they seriously affect the fundamental fairness and basic integrity of the proceedings ..."  *United States v. Griffin*, 818 F.2d 97, 100 (1st Cir. 1987).

There is no "plain error."  Plaintiff presented the jury with hundreds of thousands in general/compensatory damages and evidence supporting the jury's punitive damage award (which was $1.5 million less than what was asked for by Plaintiff.

## III.    CONCLUSION & PRAYER

Plaintiff respectfully requests that the Court DENY Defendants' Motion and for all other relief Plaintiff is entitled.

Respectfully submitted,

**MORROW & SHEPPARD LLP**

/s/ *Daniel E. Sheppard*[24]
Daniel E. Sheppard
Bar Roll No. 38076
John D. Sheppard
*Admitted Pro Hac Vice*
P. Hogan Leatherwood
*Admitted Pro Hac Vice*
*msfiling@morrowsheppard.com*
*dsheppard@morrowsheppard.com*
*jsheppard@morrowsheppard.com*
*hleatherwood@morrowsheppard.com*
5151 San Felipe Street, Suite 100
Houston, Texas 77056
Telephone:  (713) 489-1206
Facsimile:  (713) 893-8370
*Attorneys for Plaintiff*

---

[24] I certify this document was served electronically via CM/ECF on August 3, 2023 on counsel of record.